# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WILLIAM M. SCHOOLEY, et al.,       *

       *

    Plaintiffs,       *

       *

    v.       *       Case No. 1:17-CV-01376 (BAH)

       *

ISLAMIC REPUBLIC       *

OF IRAN, et al.,       *

       *

    Defendants.       *

**************************************************************************

## PLAINTIFFS' PROPOSED FINDING OF FACTS AND CONCLUSIONS OF LAW

Plaintiffs by and through undersigned counsel submit the following Proposed Findings of Fact and Conclusions of Law:

## I.  INTRODUCTION

This case arises out of the June 25, 1996 terrorist bombing of the United States Air Force housing complex at Khobar Towers in Dhahran, Saudi Arabia. The bombing killed nineteen American service members and wounded hundreds of others by means of a truck bomb detonated next to Khobar Towers Building 131. The explosion destroyed Building 131 and severely damaged other residential buildings in the Khobar Towers complex, which was being used as dormitories for members of the United States Air Force and other Coalition forces who were assigned to Operation Southern Watch. Their mission at the time of the bombing was to impose a no-fly zone over southern Iraq from King Abdulaziz Air Base (Dhahran Air Base) in Dhahran, Saudi Arabia.

Plaintiffs are 101 of the injured American service members who were wounded in the bombing and 118 of their immediate family members. Plaintiffs allege that the Islamic Republic of Iran (hereinafter "Iran"), the Iranian Ministry of Information and Security (hereinafter "MOIS") and the Iranian Islamic Revolutionary Guard Corps (hereinafter "IRGC"), orchestrated the attack and are liable for Plaintiffs' claims under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.

## II.    PROCEDURAL HISTORY

Plaintiffs commenced this action on July 13, 2017. (ECF No. 1). This Court issued an Order granting Plaintiffs' Motion to Proceed with Service Through Diplomatic Channels on December 19, 2017. (ECF No. 12). Subsequently, all Defendants were properly served via diplomatic channels by the United States State Department pursuant to 28 U.S.C. §1608(a)(4). (ECF No. 13). Defendants failed to respond or file an answer to the complaint filed against them within the 60 days allowed for foreign defendants under 28 U.S.C. §1608(d).

Plaintiffs filed a Motion for Entry of Default against Defendants as to Defendants Iranian Islamic Revolutionary Guard Corps, Iranian Ministry of Information and Security, and the Islamic Republic of Iran on April 20, 2018. (ECF No. 14). The Court issued an Entry of Default as to those Defendants on April 23, 2018. (ECF No. 15). In a minute order, the Court directed Plaintiffs to submit, *inter alia*, whether an evidentiary hearing was required in light of this Court's ability to take judicial notice of evidence of the defendants liability under Section 1605A of the FSIA in previous cases, which cases were noted in the plaintiffs Statement of Points and Authorities in Support of Their Motion for Default Judgment Upon Evidentiary Hearing Against Iranian Defendants and the opportunity for the plaintiffs to submit documentary evidence directly to this Court regarding damages. (Line Entry of 06/18/18, Docket).

On June 20, 2018, the Court issued an Order vacating the status conference scheduled on June 29, 2018 and directing Plaintiffs to submit their proposed findings of fact and conclusions of law and any documentary evidence as to damages by July 27, 2018. (Line Entry of 06/20/18, Docket). Plaintiffs filed a Motion for Extension of Time on July 12, 2018 (ECF No. 19) which the Court granted and directed Plaintiffs to file their submissions by September 26, 2018. (Line Entry of 07/13/18, Docket). On August 27, 2018 plaintiffs filed an amended complaint. (ECF No. 21). The First Amended Complaint contains claims for assault, battery, intentional infliction of

emotional distress, and wrongful death. Plaintiffs requested that this Court grant judgment in their favor against Defendants jointly and severally, and grant Plaintiffs compensatory damages including pain and suffering, solatium, and economic losses, and punitive damages, in favor of Plaintiffs and against Defendants jointly and severally.

Plaintiffs filed a Motion for Extension of Time on September 21, 2018 (ECF No. 19) which the Court granted, and directed Plaintiffs to file their submissions by November 13, 2018. (Line Entry of 09/26/18, Docket). Plaintiffs filed a Motion for Extension of Time on November 7, 2018 (ECF No. 26) which the Court granted, and directed Plaintiffs to file their submissions by December 28, 2018. (Line Entry of 11/8/18, Docket).

On November 7, 2018 Plaintiffs filed a notice of voluntary withdrawal of their claims for punitive damages without prejudice in consideration of the decision of the United States Court of Appeals for the District of Columbia in *Owens v. Rep. of Sudan*, 864 F.3d 751, 812 (D.C. Cir. 2017). (ECF No. 28). In light of plaintiffs' voluntary withdrawal, this Court hereby dismisses plaintiffs' claims for punitive damages without prejudice. *See, e.g., Montgomery v. Ind. Sch. Dist. 709*, 109 F. Supp. 2d 1081, 1083 n.1 (D. Minn. 2000) (dismissing without prejudice claims for punitive damages that were voluntarily withdrawn by plaintiff); *Buffkin v. Maruchan, Inc.,* Case No. 14-cv-003, 2015 U.S. Dist. LEXIS 23677 *3 (M.D.N.C. Feb. 23, 2015) (same).

Plaintiffs filed a Motion for Extension of Time on December 28, 2018 (ECF No. 83) which the Court granted, and directed Plaintiffs to file their submissions by February 11, 2019. (Line Entry of 1/2/19, Docket).

## III.    LEGAL STANDARDS

### A.    Default Judgment

In the case of a defaulting sovereign defendant, the FSIA "requires only that a plaintiff 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Owens v. Rep. of*

*Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2016) (quoting 28 U.S.C. § 1608(e)). The FSIA's evidentiary requirements mirror the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d). *Harrison v. Rep. of Sudan*, 882 F. Supp. 2d 23, 28 (D.D.C. 2012). "[W]hen the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Dem. People's Rep. of Korea*, 774 F.3d 1044, 1047, (D.C. Cir. 2014) (internal quotation omitted).

In evaluating a plaintiff's claims in support of default judgment in FSIA cases, courts

> may look to numerous evidentiary sources to satisfy their statutory obligation. As an initial matter, a court can rely upon plaintiff's uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence. Moreover, in addition to traditional documentary and testimonial evidence in the record, upon which the court may rely, plaintiffs in FSIA cases may also submit evidence in the form of affidavits. Finally, a court may take judicial notice of related proceedings and records in cases before the same court.

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171, (D.C. Cir. 2010) (internal quotation and citation omitted). Courts in this district have accepted uncontroverted affidavits and other documentary evidence in FSIA claims. *See Harrison*, 882 F. Supp. 2d at 28 (in evaluating a plaintiff's claims, "a court may accept as true the plaintiffs' uncontroverted evidence, including proof by affidavit") (internal quotation and citation omitted); *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit.")

**B.      Subject-Matter Jurisdiction and Sovereign Immunity**

Pursuant to the Foreign Sovereign's Immunity Act's terrorism exception to the jurisdictional immunity of a foreign state, 28 USC §1605A, Plaintiffs must initially establish that this Court has jurisdiction to hear their claims and that the defendants are not immune from suit. "The FSIA is the sole basis for jurisdiction over foreign states in our courts." *In re Islamic Rep. of Iran Terrorism*

*Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009).   Judge Lamberth of this District Court has explained

the five elements that must be met for jurisdiction under §1605(A):

> (1) money damages are sought (2) against that state for (3) personal injury
> or death that (4) was "caused by" (5) an act of torture, extrajudicial killing
> ... or the provision of material support of resources for such an act if such
> act or provision of material support or resources is engaged in by an
> official, employee or agent of such foreign state while acting within the
> scope of his or her office, employment or agency." . . . With regard to §
> 1605A's causation requirement, in this Circuit there must be some
> reasonable connection between the act or omission of the defendant and the
> damages which the plaintiff has suffered.
>
> * * *
>
> Furthermore, the FSIA provides that courts "shall hear a claim" under §
> 1605A of the FSIA if (1) the foreign state was designated as a state sponsor
> of terrorism at the time the act occurred; (2) the claimant was a United
> States national, a member of the armed forces, or otherwise an employee or
> contractor of the Government of the United States, acting within the scope
> of her employment and (3) the claimant has afforded the foreign state a
> reasonable opportunity to arbitrate the claim, provided that the act occurred
> in the foreign state against which the claim is brought. 28 U.S.C. §
> 1605A(a)(2).

*Harrison*, 882 F. Supp. 2d at 29 (internal quotations and citations omitted).

The FSIA provides that the term "extrajudicial killing," 28 U.S.C. § 1605A(h)(7), has the

meaning given it in section 3 of the Torture Victims Protection Act of 1991, which defines an

"extrajudicial killing" as a "deliberated killing not authorized by a previous judgment pronounced

by a regularly constituted court affording all the judicial guarantees which are recognized as

indispensable by civilized peoples."   Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. §

1350 note.

With respect to the provision of material support, the FSIA provides that the term "material

support or resources," 28 U.S.C. § 1605A(h)(3),  has the meaning provided by 18 U.S.C. § 2339A,

which states that support means any "property, tangible or intangible, or service, including currency

or monetary instruments or financial securities, financial services, lodging, training, expert advice

or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."18 U.S.C. § 2339A(b)(1).

The element of "material support" has been met when "the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008). In *Gates*, Judge Collyer expounded on what types of evidence can establish material support:

> The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, allowing terrorist groups to use its banking institutions to launder money, and allowing terrorist groups to use its territory as a meeting place and safe haven, Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, or that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack, (expert testimony that the "attack might have been possible, but would not have been as easy" without defendant's support).

*Id*. at 67-68. Although the Court considers the evidence, it is well aware that nonetheless, "the defendant bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity." *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted).

The statute of limitations period in 28 U.S.C. § 1605A(b) is not jurisdictional. Defendants have forfeited any attempt to raise an affirmative statute of limitations defense "by failing to raise it in" this Court. *Owens*, 864 F.3d at 804.

## C.     Personal Jurisdiction

As explained in *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148, (D.D.C. 2011):

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, is the sole basis for obtaining jurisdiction over a foreign state in the United States. Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, see 28 U.S.C. § 1604, a federal district court can obtain personal and subject matter jurisdiction over a foreign entity in certain circumstances. A court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b). Moreover, subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. See 28 U.S.C. §§ 1330(a) & 1604.

(internal quotations omitted).

**D.     Choice of Law**

In *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004), the D.C. Circuit held that neither the terrorism exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(7), nor the Flatow Amendment, Pub.L. No. 104–208, § 589, 110 Stat. 3009 –1, 3007–172 (1996) (codified at 28 U.S.C. § 1605 note), created a private right of action against foreign states for terrorism related injuries. It further held that 28 U.S.C. § 1605(a)(7) only provided federal courts with jurisdiction to hear terrorism related claims and that each individual plaintiff must plead a cause of action under the particular tort law applicable to their claims. Id. at 1036. Following *Cicippio*, the courts, in most cases, looked to the law of the state in which the plaintiff was domiciled for the applicable tort law. *See, e.g., Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261 (D.D.C. 2005). As a result, it was not uncommon for the courts to apply more than one state's tort law in the same case, resulting in inconsistent damage awards to similarly situated plaintiffs. *See, e.g., Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007).

Recognizing the strong federal interest in creating uniformity in this area of foreign affairs, however, in 2008 Congress repealed 28 U.S.C. § 1605(a)(7) and enacted 28 U.S.C. § 1605A. See § 1083, Pub.L. 110-181; *see also In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 58-59 (D.D.C. 2009). In so doing, Congress created a comprehensive statutory scheme that

provided a federal private right of action for terrorism related injuries.  The new cause of action

provides:

> **(c)PRIVATE RIGHT OF ACTION.**—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
> **(1)** a national of the United States,
> **(2)** a member of the armed forces,
> **(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> **(4)** the legal representative of a person described in paragraph (1), (2), or (3),
> for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A.

Following its enactment, in cases in which plaintiffs state a cause of action under 28 U.S.C. § 1605A, the district courts are no longer required to engage in a choice of law analysis, looking instead to the generally established principles of tort law. *See, e.g., Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010); *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 157 (D.D.C. 2011); *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 224-25 (D.D.C. 2011). Accordingly, in assessing defendants' liability for plaintiffs' 28 U.S.C. § 1605A(c) claims, courts in this district look to, *inter alia*, the Restatements—including the Restatement (Second) of Torts (1965)—as well as the relevant decisions of this District. *See, e.g., Valore*, 700 F. Supp. 2d at 76.

**IV.    PROPOSED FINDINGS OF FACTS**

## A.    Judicial Notice of Prior Related Actions Arising out of the 1996 Bombing of the Khobar Towers Complex

This Court will take judicial notice of the records and proceedings from prior related cases before the District Court for the District of Columbia, including *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006)(*Heiser I*); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010); and *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181 (D.D.C. 2008), which also arose out of the bombing of Khobar Towers and dealt with identical issues regarding the liability of Iran, MOIS, and IRGC for the attack on Khobar Towers.  Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice, on its own or at the request of a party, of adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a)–(c). As set forth in further detail below, judicial notice of these proceedings is warranted here.

The District Court in *Harrison*, in a discussion of the issue of whether to take judicial notice of *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541(E.D.Va. 2007), a related proceeding arising out of the bombing of the U.S.S. Cole, concluded:

> **The statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack,"** *Rimkus v. Republic of Iran*, 750 F.Supp.2d 163, 172 (D.D.C.2010). Thus, when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may "rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.

*Harrison*, 882 F. Supp. 2d at 30-31 (emphasis added).

In similarly taking judicial notice of the proceedings set forth in prior Khobar Towers FSIA litigation in *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), the Court concluded that judicial notice of a prior case is permissible "because the validity of judicial records

is generally 'not subject to reasonable dispute,' and such records are capable of establishing the type and substance of evidence that was presented to earlier courts. The objective issue of what that evidence was — rather than the subjective determination of what that evidence means — is thus a proper exercise of judicial notice." *Id.*

The taking of judicial notice of the prior Khobar cases does not conclusively establish the facts found in those cases, or the liability of the defendants in the instant case. Iran did not appear in those cases and was not represented by counsel, and the plaintiffs here were not plaintiffs in those cases. However, "'[T]he FSIA does not require this Court to re-litigate issues that have already been settled' in previous decisions." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). Instead, this Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence. *Heiser*, 466 F. Supp. 2d at 264 (reconsidering evidence presented in *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006)). In rendering default judgment against Defendants, this Court is therefore required to, and does, find facts and make legal conclusions anew.

The courts in *Blais*, *Heiser* and *Rimkus* found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hezbollah to execute the plan, and the MOIS participated in the planning and funding of the attack." *Heiser*, 466 F. Supp. 2d at 265; see also *Blais*, 459 F. Supp. 2d at 48 and *Rimkus,* 575 F. Supp. 2d at 195.

In *Heiser*, evidentiary hearings were held on December 1 - 12, 16, 18 and 19, 2003 and on February 5, 6, 9 and 10, 2004, *Heiser,* 466 F. Supp. 2d at 250; in *Blais* on May 26, 2006, *Blais,* 459 F. Supp. 2d at 46 n.4.; and in *Rimkus* on January 4, 2008, *Rimkus,* 575 F. Supp. 2d at 185.

The Plaintiffs in *Blais* presented the investigations and opinions of Louis Freeh, the FBI Director at the time of the Khobar bombing, and Dale Watson, the Deputy Counterterrorism Chief

of the FBI, who after the bombing became Section Chief for all international terrorism. Dr. Bruce Tefft, one of the founding members of the CIA's counterterrorism bureau in 1985, was qualified as an expert and testified about Defendants' involvement in sponsoring terrorism. *Blais* Tr. 6, 8.[1]

The *Heiser* Plaintiffs, in addition to the evidence presented in *Blais*, presented live testimony from Mr. Freeh, additional statements from Mr. Watson and Dr. Tefft, and the testimony of Middle East expert Dr. Patrick Clawson who studies Iranian sponsorship of terrorism. Dr. Clawson's expert opinion regarding the perpetrators of the Khobar Towers bombing was based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject. *Heiser* Ex. 9 at 62–63.

Having considered the declarations and documentary evidence submitted by plaintiffs and the evidence in *Blais*, *Heiser* and *Rimkus*, the Court makes the following findings of fact:

Plaintiffs' documentary evidence demonstrates that in June 1996, each of the injured Plaintiffs were service members of the United States Air Force, were stationed in Dhahran, Saudi Arabia, and resided in the Khobar Towers complex. Plaintiffs have submitted documentary evidence proving that all Plaintiffs are, and were on June 25, 1996, citizens of the United States.

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism . . . since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (internal quotations omitted). Defendant MOIS is the secret police and intelligence organization of Iran, and has been previously characterized as both a "division of the state of Iran," *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010), and a "conduit for [Iran]'s provision of funds to Hezbollah." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). Defendant IRGC has been

---

[1] References to the transcripts of the hearings held in *Blais* and *Heiser* will be abbreviated throughout as "Tr." References to exhibits admitted into evidence in those hearings will be abbreviated "Ex."

described by expert testimony as "a non-traditional instrumentality of Iran" that acts as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." *Blais*, 459 F. Supp. 2d at 47.

The United States military presence in Saudi Arabia was with the consent of that host country. *Blais* Ex. 14 at 3. It was part of a coalition of forces, primarily from the United States, Great Britain, and France that was charged with monitoring Iraq's compliance with United Nations Security Council resolutions enforcing the cease-fire that had brought an end to the 1991 Gulf War "Operation Desert Storm" ejection of Iraqi occupying forces from Kuwait. *Id.* at 3-4; *Blais* Tr. at 40-41.

The deployment of U.S. troops to the region was considered a peacetime deployment within a friendly host country. *Blais* Tr. at 42-43.

The IRGC is a non-traditional instrumentality of Iran. It is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II. The IRGC actively supports terrorism as a means of protecting the Islamic revolution that brought the Ayatollah to power in Iran in 1979. It has its own separate funding sources, derived from confiscation of the assets of the former Shah of Iran in 1979, when the Shah was deposed. *Blais*, Tr. 15-17; Ex. 11.

Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces assigned to Operation Southern Watch, charged with monitoring compliance with U.N. Security Council resolutions after the end of the Gulf War. *Blais*, Tr. 41.

**B.      The Attack on Khobar Towers**

At approximately ten minutes before 10 pm on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex. The driver jumped out, ran

into a waiting car that had pulled up near the truck, and sped off. *Blais*, Tr. 9-10. Although security guards on top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes. The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The Defense Department said that it was the largest non-nuclear explosion ever up to that time. *Blais*, Tr. 10.

The explosion sheared off the face of Building 131, which housed members of the U.S Air Force 4404th Wing (Provisional), and damaged every other building in the complex. Nineteen United States Air Force personnel were killed in the explosion, and hundreds of others were injured. *Blais*, Tr. 11; Ex. 2.

**C.    Iranian Support and Sponsorship of the Attack**

The attack was carried out by individuals recruited principally by a senior official of the IRGC, Brigadier General Ahmed Sharifi. Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria. He provided the passports, the paperwork, and the funds for the individuals who carried out the attack. *Blais*, Tr. 12-13; Ex. 13.

The truck bomb was assembled at a terrorist base in the Bekaa Valley in Lebanon which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah. *Blais*, Tr. 13. The individuals recruited to carry out the bombing referred to themselves as "Saudi Hezbollah," and they drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia. *Id*.

The terrorist attack on the Khobar Towers was approved by Ayatollah Khamenei, the Supreme leader of Iran at the time. *Blais*, Tr. 13-14. It was also approved and supported by the Iranian Minister of Intelligence and Security ("MOIS") at the time, Ali Fallahian, who was involved

in providing intelligence security support for the operation. *Blais*, Tr. 14. Fallahian's representative in Damascus, a man named Nurani, also provided support for the operation. *Id*.

Under Director Louis Freeh, the FBI conducted a massive and thorough investigation of the attack, using over 250 agents. *Blais*, Ex. 4 at 37. Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment on June 21, 2001, against 13 identified members of the pro-Iran Saudi arm of the Hezbollah organization. The indictment's description of the plot to bomb the Khobar Towers complex frequently refers to direction and assistance from Iranian government officials. *Blais*, Tr. 25-26; Exs. 7, 7A.

In addition, as a result of this investigation, the FBI also obtained a great deal of information linking the defendants to the bombing from interviews with six admitted members of the Saudi Hezbollah organization, who were arrested by the Saudis shortly after the bombing. *Heiser*, Dec. 18, 2003 Tr. at 11-30.

These six individuals admitted to the FBI their complicity in the attack on the Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers. *Heiser*, Ex. 7 at 11, 13–14, 27; *see also Heiser*, Dec. 18, 2003 Tr. at 24–30. The six individuals also indicated that the selection of the target and the authorization to proceed was done collectively by Iran, MOIS, and IRGC, though the actual preparation and carrying out of the attack was done by the IRGC. *Heiser*, Dec. 18, 2003 Tr. at 25.

According to Director Freeh, the FBI obtained specific information from the six about how each was recruited and trained by the Iranian government in Iran and Lebanon, and how weapons were smuggled into Saudi Arabia from Iran through Syria and Jordan. One individual described in detail a meeting about the attack at which senior Iranian officials, including members of the MOIS and IRGC, were present. (*Heiser*, Dec. 18, 2003 Tr. at 23.) Several stated that IRGC directed,

assisted, and oversaw the surveillance of the Khobar Towers site, and that these surveillance reports were sent to IRGC officials for their review. Another told the FBI that IRGC gave the six individuals a large amount of money for the specific purpose of planning and executing the Khobar Towers bombing.

Director Freeh has publicly and unequivocally stated his firm conclusion, based on evidence gathered by the FBI during their five-year investigation, that Iran was responsible for planning and supporting the Khobar Towers attack. *Blais*, Ex. 3 at 16; Exs. 5, 3; Tr. at 19-20, 23.

Dale Watson was responsible for day to day oversight of the FBI investigation of the Khobar Towers attack. Mr. Watson gave sworn testimony that information uncovered in the investigation, "clearly pointed to the fact that there was Iran, MOIS and IRGC involvement in the bombing." *Blais*, Ex. 4, at 42; *see also id.* at 48-49.

Dr. Clawson testified that the government of Iran formed the Saudi Hezbollah organization. *Id.* at 56. He testified that the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack. *Id.* at 28. He also testified as to the defendants' state-sponsorship of terrorism, noting that at the time of the Khobar Towers bombing, Iran spent an estimated amount of between $50 million and $150 million on terrorist activities. *Heiser*, Ex. 10 at 46.

In light of all these facts, Dr. Clawson stated conclusively his opinion that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction. *Heiser*, Ex. 9 at 67–68.

Dr. Bruce Tefft, who testified as an expert in *Blais*, was one of the founding members of the CIA's counterterrorism bureau in 1985. *Blais*, Tr. 6, 8. He served in the CIA until 1995, and continued to work as a consultant on terrorism, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions. *Blais*, Tr. 6. He retained a

top-secret security clearance in connection with his work. *Id*. He had been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism. *Blais*, Ex. 1 at 3.

Dr. Tefft expressed the opinion that defendants Iran and the IRGC were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support. He stated that there was "no question about it. It wouldn't have happened without Iranian support." *Blais*, Tr. 43. Dr. Tefft based his conclusion on publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time. He relied on the public sources described above, as well as several others, which he described as authoritative and reliable, including congressional testimony by Matthew Levitt, senior fellow and director of the Washington Institute's Terrorism Studies Program, and articles published by the Federation of American Scientists as well as the Free Muslims Coalition. *Blais*, Exs. 8, 11, 12; Tr. 28-29, 31-33.

## V. PROPOSED CONCLUSIONS OF LAW

### A. Jurisdiction

"[F]oreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329, 354 U.S. App. D.C. 244 (D.C. Cir. 2003). This immunity is provided by the FSIA, which both withdraws original jurisdiction over suits against foreign states from all state and federal courts, and limits the circumstances in which a foreign state's sovereign immunity is waived so that a court may hear a claim against it. 28 U.S.C. §§ 1604 & 1605A(a)(2). These protections are not absolute, but are subject to certain enumerated exceptions—including the state-sponsored terrorism exception. *Id.* at § 1605A(a)(1)-(2). Here, the evidence is sufficient to warrant a finding that jurisdiction exists and that defendants are not immune from suit.

### 1. Original Jurisdiction

The Court finds that the plaintiffs have met the FSIA's five-part test for subject matter jurisdiction and waiver of immunity discussed *supra*.

First, plaintiffs seek solely "money damages." 28 U.S.C. § 1605A(a)(1).

Second, the defendants are all foreign states. Iran is clearly a foreign state. Similarly, the IRGC and MOIS are political organs of the state of Iran and are amenable to suit under the FSIA. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 65 (holding MOIS is subject to suit under 1605A); *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010) (holding under FSIA, "MOIS is a division of the state of Iran, while IRGC is an instrumentality of Iran that acts as a military arm of the government. In such circumstances, both entities constitute integral parts of Iran's political structure, and thus constitute a foreign state"); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC are liable under terrorism exception to jurisdiction of the FSIA).

Third, plaintiffs have all presented claims for damages resulting from personal injury or wrongful death.

Fourth, the evidence presented to prove causation shows that the defendants aided Hezbollah in executing the bombing. With respect to causation, there is no `but-for' causation requirement for claims made under the FSIA, and proximate causation is sufficient. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). In *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, a case which interpreted the substantially similar § 1605(a)(7) that is now § 1605A, this Circuit noted that in the FSIA, "the words `but for' simply do not appear; only `caused by' do." 376 F.3d 1123, 1128 (D.C.Cir.2004). Adopting the Supreme Court's approach to a different but similarly worded jurisdictional statute, the Circuit interpreted the causation element "to require only a showing of `proximate cause.'" *Id.* (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536-38, (1995)). Proximate cause exists so long as there is `some reasonable

connection between the act or omission of the defendant and the damages which the plaintiff has suffered.' *Valore at 66* (internal quotations omitted).

Here, there are several reasonable alleged connections between the acts of defendants and the physical and emotional injuries suffered by plaintiffs: plaintiffs allege that the bombing of Khobar Towers was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran. Plaintiffs therefore have sufficiently alleged causation. On the evidence presented, there is a reasonable connection between the acts of defendants and the damages which the plaintiffs have suffered, and proximate cause has been proven.

Fifth, the Khobar Towers bombing was an extrajudicial killing of nineteen United States Airmen for which Defendants provided material support and resources. There is no evidence that these killings were judicially sanctioned by any judicial body and clearly was not sanctioned by one that affords judicial guarantees. Defendants thus committed an extrajudicial killing through their agent Saudi Hezbollah. The evidence relied upon by the Court in reaching its finding of facts establishes that defendant IRGC provided materials and shelter for members of Saudi Hezbollah in planning and preparing the attack, that defendant Iran financed the operation, and that defendant MOIS provided members of Saudi Hezbollah with false documents and expert advice for the purpose of executing the bombing for the purpose of killing U.S. military service member. These constitute the provision of material support or resources.

The FSIA further provides that courts shall hear a claim under §1605(A) where (1) "the foreign state was designated as a state sponsor of terrorism at the time of the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section," (2) "the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States . . . acting within the scope of the employee's

employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)-(iii).

Evidence has established that these three provisions are fulfilled. Iran has been designated a state sponsor of terrorism by the U.S. Secretary of State continuously since January 19, 1984 pursuant to section 6(j) of the Export Administration Act of 1979, U.S. Department of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984. The victims were all American citizens. Moreover, they were all members of the United States Armed Forces. As for the arbitration requirement under § 1605A(a)(2)(A)(iii), Plaintiffs were not required to extend an offer to Iran to arbitrate because this requirement applies only when the terrorist act occurred in the foreign state against which the claim is brought. Since the attack occurred in Saudi Arabia, not in Iran, the arbitration provision does not apply.

Plaintiffs have brought forth sufficient evidence as to jurisdiction to meet the standard for default judgment under Federal Rule of Civil Procedure 55(d) for all defendants. As each of these defendants was properly served under 28 U.S.C. § 1608, did not appear in this action, and "bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity," the Court finds that jurisdiction has been established. *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted).

## 2. Personal Jurisdiction

All defendants have been validly served under 28 U.S.C. § 1608(a). (ECF No. 13). To determine whether an entity was properly served under the FSIA, a court examines whether "the core functions of the foreign entity are predominantly governmental or commercial[.]" *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 152 (D.C. Cir. 1994). If the entity's functions are

predominantly governmental, then a plaintiff must proceed with service of process under the methods outlined in 28 U.S.C. § 1608(a), in the order they are listed in under that section of the statute. *Id.* at 154. The defendants here are either the state itself or various military, security, and intelligence apparatuses of the state, which are considered the state itself under the FSIA. *See, e.g., Transaero*, 30 F.3d at 153 ("core functions" of military apparatus of foreign sovereign are governmental, accordingly service of process under 28 U.S.C. 1608(a) proper); *Owens*, 826 F. Supp. 2d at 148 (holding service of process proper under 28 U.S.C. § 1608(a) upon defendants Republic of Sudan and its Ministry of the Interior, the Islamic Republic of Iran and its intelligence service, the Ministry of Information and Security (MOIS), and the Iranian Islamic Revolutionary Guard Corps (IRGC) in 1605A action); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC must be treated as the state of Iran itself); *Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (same). If the entity's functions are predominantly commercial, then it is considered an "agency or an instrumentality" of the state, and service proceeds under 28 U.S.C. § 1608(b). *See Transaero.* at 151-52.

### 3. Venue

Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4). Actions for personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents fall within the meaning of 28 U.S.C. § 1605A generally.

### B. Defendants' Liability for Material Support of the 1996 Bombing of the Khobar Towers Complex

The Court is satisfied that there is sufficient evidence to conclude that as a result of its support the Defendants caused Hezbollah to be able to plan and execute its attack against Khobar Towers, which led to the injuries sustained by the Plaintiffs named herein. As a result, the Court finds that the Defendants Iran, MOIS and IRGC were responsible for the bombing of Khobar

Towers, an act of brutality responsible for the deaths of nineteen Air Force personnel who died at the scene, and the death of Airman Hector M. Gonzalez who died in 2017, and injuries to hundreds of U.S. Air Force personnel and civilians including the 100 other injured Plaintiffs and are liable, under 28 U.S.C. § 1605A, for the injuries sustained by Plaintiffs as a result of the terrorist attack on Khobar Towers.

The evidence relied upon by the Court in reaching its finding of fact establishes that defendant IRGC provided materials and shelter for members of Saudi Hezbollah in planning and preparing the attack, that defendant Iran financed the operation, and that defendant MOIS provided members of Saudi Hezbollah with false documents and expert advice—all for the purpose of executing the bombing.

Defendants are liable to Plaintiffs for personal injury and death under the private right of action under FSIA § 1605A(c) and are liable for compensatory damages including damages for pain and suffering, solatium, and economic losses.

**1.      Battery**

Plaintiffs have established through evidence that Defendants intentionally sought to harm them through the Khobar Towers bombing by means of providing Saudi Hezbollah with support. Plaintiffs' evidence shows that the harmful contact occurred.

Under general principles of law, recovery for battery may be had where a defendant (1) acted "intending to cause a harmful or offensive contact with. . ., or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13. A harmful contact is one that results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* at § 15.

Here, both elements have been established.   The evidence plainly establishes that defendants, in providing Saudi Hezbollah with the materials, training, and money necessary to

detonate a significant explosion near an Air Force residence, acted with an intent to harm plaintiffs. Moreover, as set forth below, the injured airmen submitted declarations and documentary evidence providing uncontroverted evidence that they suffered significant physical injuries as a result of the attack on Khobar Towers. On the basis of this evidence, defendants are responsible for the injured service member plaintiffs' injuries under a battery theory (Count I).

**2.       Assault**

The defendants are liable for assault on the injured plaintiffs if, "when they provided material support and resources for the Attack, they acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' with those attacked and those attacked were 'thereby put in such imminent apprehension.'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) (quoting Restatement (Second) Torts §21(1) (1979)).

The Court finds that the terrorist attack on the Khobar Towers complex "and other similar acts are intended to cause harm or, at least, fear of such harm among those targeted." *Id.*  As this Court has previously recognized, terrorism literally means "'the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal.'" *Id.* (quoting Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism).     Just as terrorist acts are designed to harm others physically, they are also designed to inflict psychological terror by instilling fear of future harm into the victims. *Valore,* 700 F.Supp.2d at 76.

The actions of defendants here certainly qualify under this standard. The evidence set forth in the plaintiffs' declarations indicates that the servicemember plaintiffs were all  struck with fear following the attack and were put in imminent apprehension of harm.  The plaintiffs have thus demonstrated that the defendants are liable for assault (Count II).

**3.       Intentional Infliction of Emotional Distress Against Injured Plaintiffs**

This District has long recognized that "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Valore*, 700 F. Supp. 2d at 77 (quoting Restatement (Second) of Torts § 46(1) (1979)). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) . Indeed, acts of terrorism are "by their very nature, intended to harm and terrify others." *Valore,* 700 F. Supp. 2d at 77.

Plaintiffs here may rely upon theories of intentional infliction of emotional distress to recover under § 1605A. There can be no dispute that defendants, in working with Saudi Hezbollah to plan and execute the attack, sought to cause severe emotional distress to U.S. Air Force personnel living in the Khobar Towers complex.  The plaintiffs who were stationed at Khobar Towers at the time of the explosion certainly were afflicted with emotional distress.

Accepting the injured servicemember plaintiffs' uncontroverted assertions that they did, in fact, suffer severe emotional injury, this Court concludes that defendants are liable for intentional infliction of emotional distress (Count III).

4.  **Intentional Infliction of Emotional Distress/Loss of Solatium Against Immediate Family Members**

   a.       **Solatium claims under 28 U.S.C. § 1605A(c)**

Plaintiffs who are the immediate family members of injured servicemember plaintiffs bring claims that defendants are liable to them for intentional infliction of emotional distress and loss of solatium (Count IV).  They assert that the actions by defendants when they provided material support and resources for the Khobar Towers bombing were undertaken deliberately and recklessly,

with knowledge that they would cause severe emotional distress to the immediate relatives of the U.S. Air Force personnel injured in the bombing.

A solatium claim under the FSIA is identical to a claim for intentional infliction of emotional distress. *Valore*, 700 F.Supp.2d at 85. Solatium refers to compensation for the "mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Id.*

Although FSIA cases arise under a federal cause of action, 28 U.S.C. § 1605A(c), the common law of intentional infliction of emotional distress governs questions of who is entitled to recover damages. As such, courts have looked at "state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law" *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009)(*Heiser II*). This is necessarily so because of the "interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts]" and the fact that "generally accepted legal standards of the states provide the only steady foundation for the rules of decision." Id. at 24–25 (citations and quotation marks omitted). A nearly universal source that most courts have considered to be a "proxy for state common law" is Restatement (Second) of Torts § 46. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).

This section of the Restatement states:

Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
    (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1965).  According to the Restatement, therefore, third parties towards whom extreme and outrageous conduct has not been directed, and who themselves did not suffer bodily harm, may recover under two conditions: (1) they were physically present at the time of the conduct; and (2) they are an immediate family member of the person at whom the conduct was directed. Id.

The above notwithstanding, the "physical presence" requirement has been almost universally waived for solatium claims arising in under the FSIA's terrorism provisions. This is so because "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); *Jenco v. Islamic Republic of Iran,* 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability'" (citing Dan B. Dobbs, *The Law of Torts* § 307, at 834 (2000))).

b. **Certain Plaintiffs are the Functional Equivalent of Immediate Family Members of Injured Servicemembers of the Khobar Towers Attack, and thus Entitled to Recover Solatium Damages**

The second prong of the Restatement's requirements for a plaintiff to be eligible to recover solatium damages is that they are "an immediate family member" of the person at whom the conduct was directed.  Restatement (Second) of Torts § 46 (1965).  Courts have traditionally defined "immediate family" to include parents, children, siblings, and spouses. *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001).

Here, three plaintiffs who were not legally related to injured plaintiffs at the time of the Khobar Towers bombing in June 1996 claim to be the functional equivalent of "immediate family members" of injured servicemembers. Two plaintiffs are non-adoptive stepchildren of surviving injured plaintiffs. Plaintiff Brandon C. Olsen is the stepson of an injured airman, plaintiff Joseph D. Wilson. Plaintiff Erik B. Lee is the stepson of an injured airman, plaintiff Elliott Williams. One plaintiff, Carol Adams, was engaged to an injured airman, plaintiff Jimmy Adams, at the time of the bombing. They married in 1997.

The Court of Appeals for the D.C. Circuit addressed the question of the eligibility of non-immediate family members to recover solatium damages in the FSIA context in *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003), where it rejected solatium claims brought by the nieces and nephews of a terrorism victim, none of whom were members of the victim's household. Referring to the Restatement (Second) of Torts, the court noted that "§ 46(2)(a) is perfectly plain in its reference to 'immediate family.' It does not refer to 'family members,' 'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties' – rather, it says, plainly, 'immediate family.' And there is no doubt whatsoever that, in this case, nieces and nephews are not 'immediate family' members." *Id.* at 335–336. The court expressed concerns over choosing to include nieces and nephews within the definition of "immediate family" instead of, for example, "close friends who may be even more egregiously affected by state-sponsored terrorism" and emphasized the clarity of the prevailing common law as reflected in § 46(2)(a). Id. at 337–38. Accordingly, it held that "[a]s the law now stands, the nieces and nephews of a victim have no viable basis for a third-party claim of intentional infliction of emotional distress under the statute." *Id*. at 338.

However, the *Bettis* court did hint that rare exceptions to the "immediate family" requirement existed. "In a few limited circumstances, some courts have allowed relatives who either

*resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional distress. In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." *Id.* at 337 (emphasis in original). To illustrate what it meant by "functional equivalent," the *Bettis* court cited *Sullivan v. Ford Motor Co.* No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000). In *Sullivan*, the court awarded solatium damages to an aunt who was the legal custodian of her nephew, "performed all of the duties and responsibilities of a natural or adoptive parent," and was "the only family with whom [the nephew] shared his life on a daily basis from the time he was an infant of 12 months until his death." *Id.* at *11 & n.3.

Other FSIA terrorism cases have applied the "functional equivalent" language from *Bettis*. In *Estate of Heiser v. Islamic Republic of Iran, (Heiser II),* the court emphasized the importance of cohabitation, noting that "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement" 659 F. Supp. 2d 20, 29 (D.D.C. 2009). On this logic, the *Heiser II* court awarded solatium damages to two non-adoptive stepfathers who were found to be the "functional equivalents of fathers" because they lived in the same household while their stepsons were minors and treated them as their own sons in every sense, financially, emotionally and socially. *Id.*

In the same case, the Court considered the intentional infliction of emotional distress claim of a non-adopted stepson who was treated by his stepfather like he was his biological father, where they maintained their close relationships until the day his stepfather died, and where after his stepfather had married his mother, his stepfather was financially responsible for him. The Court found that the stepson had been the functional equivalent of a son, satisfying the immediate-family

test, and awarded him solatium damages. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 29, (D.D.C. 2009). *See also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011) (awarding solatium damages to grandson for grief over grandfather who was like "a second father to him").

In *Valore v. Islamic Republic of Iran*, the Court followed the rationale it had adopted in *Heiser II*, awarding solatium damages to a non-adoptive stepfather and stepbrother, who were the functional equivalent of a father and brother, but denying them to an uncle and niece. 700 F. Supp. 2d 52, 79 (D.D.C. 2010). While the decision is sparse on details about the family relationships, the court remarked that the stepfather and stepbrother treated the victims as a son and a brother, respectively, and would engage in activities such as hunting and fishing together. *Id.* at 79–80.

In *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) (*Heiser I*), two non-adopted stepchildren of a deceased victim of the Khobar Towers bombing were able to recover in a FSIA action as beneficiaries to his estate and for their own personal claims arising out of their stepfather's death. *Id.* at 313, n. 47. The stepchildren were able to show clear and convincing evidence that the decedent would have adopted his stepchildren but for a legal barrier. *Id.* The decedent became their stepfather when they were both still minors and he would have adopted them but for the inability to locate their biological father. *Id.* The court was also persuaded by evidence that the decedent held his stepchildren as his own children and provided sole financial care for them. *Id.* In *Heiser I*, the applicable law was the California Probate Code 2008, as this case was prior to the repeal of 28 U.S.C. § 1605(a)(7) and the enactment of 28 U.S.C. § 1605A.

Therefore the lack of a formal legal relationship at the time of the injury is not necessarily a bar to recovery for solatium damages. Rather, in such instances, the Court's inquiry turns on whether these family members were "members of the victim's household" such that they were

"viewed as the functional equivalents of family members[.]" *Valore*, 700 F. Supp. 2d at 78-80. Nevertheless, the Valore court, as well as the Bettis decision that it relied on, made clear that "[t]he mere existence of a 'close relationship' between a claimant who is a non-immediate family member and the victim . . . falls 'far short of what § 46(2)(a) requires.'" *Id*. at 79 (citing *Bettis*, 315 F.3d at 337).

Although it has not been adopted by this Court, the Restatement (Third) of Torts section on negligent infliction of emotional distress provides guidance with its use of the broader term "close family member," instead of "immediate family member" and calls for a "functional approach" in determining who qualifies for recovery. Restat. 3d of the Law, Torts: Liability for Physical and Emotional Harm, § 48 (3rd 2010) (citing Principles of the Law of Family, Dissolution: Analysis and Recommendations § 2.03(1)(c) and Comment *c*).

This section of the Restatement (Third) provides that "An actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who: (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury." *Id.* at § 48.

In describing a "close family member", the Restatement (Third) states, "Sometimes people live functionally in a nuclear family without formal legal family ties. When defining what constitutes a close family relationship, courts should take into account changing practices and social norms and employ a functional approach to determine what constitutes a family." *Id*. at §48 Comment h.

There are also examples of FSIA terrorism cases where courts have awarded full solatium damages to a plaintiff who was not legally married to the victim at the time of the act of terrorism. In *Surette v. Islamic Republic of Iran*, 231 F. Supp.2d 260, 270 (D.D.C. 2002) the Court allowed recovery for intentional infliction of emotional distress to a woman who, although not legally

married to the victim, had lived with him for over 20 years in a "bond that was the functional equivalent of marriage."

Outside of this District, a magistrate judge in the District Court of the Southern District of New York recommended that the fiancées of two of the victims killed in the September 11, 2001 attack on the World Trade Centers were entitled to full solatium damages as spouses. Report & Recommendation, In re: Terrorist Attacks on September 11, 2001, 1:03md-01570 October 14, 2016, ECF 3363 (*Hoglan v. Islamic Republic of Iran*, No. 03-MDL-1570 (S.D.N.Y. Oct. 14, 2016) (Netburn, Mag J.), ECF No. 172). *Adopted by* 1:03-md-01570 ECF 3384. Oct. 31, 2016. Judge Daniels.

One of the plaintiffs was engaged to the deceased victim at the time he was killed and they were planning to marry in December 2002. The report does not say whether they were living together at the time of the victim's death, but states that they had prepared a home to begin their married lives together. They spent their weekends together and travelled extensively. *Id.* at 26. She was profoundly distraught after his death. The Court found that though she could not legally marry her fiancé because of his untimely death, she was "clearly the functional equivalent of his spouse" and recommended that she be awarded the full solatium damages for a spouse. *Id.* at 27. The other plaintiff had become engaged to the deceased victim in August 2001 and had gone on numerous vacations together. They had moved in together the day before the September 11 attacks. She suffered deeply from his death. *Id.* at 27. Similarly, the Court found that the relationship was deserving of legal protection and recommended she be awarded the full solatium damages for a spouse. *Id.*

Plaintiffs have submitted evidence, including declarations, sufficient to prove that plaintiff Brandon C. Olsen is the functional equivalent of a son to injured plaintiff Joseph Wilson. Joseph D. Wilson Declaration and Exhibits, Decl. of Joseph D. Wilson ¶¶ 4 - 6 at 2 – 3; Decl. of Brandon C.

Olsen ¶¶ 5 – 9 at 53 - 54. Brandon was born in 1989. *Id.* Exhibits at 57. Brandon first met Joseph in 1993 when Joseph and Brandon's mother, Toni Olsen, were dating. *Id.* Decl. of Joseph D. Wilson ¶ 4 at 2. Joseph and Toni married in 1994 when Brandon was five years old. *Id.* Exhibits at 47. Brandon called Joseph his "Pop" from the very beginning. Decl. of Brandon C. Olsen ¶ 5 at 53. Brandon was very close with his little half-brother, Joseph and Toni's son Brenton Wilson, who was born in 1994. *Id.* ¶ 2 at 52. Brandon looked up to Joseph and was proud that his Pop was in the Air Force. *Id.* ¶ 6 at 53. Brandon was happy when Joseph came home from work and the two would toss a football in the yard, with Joseph sometimes still in his uniform. *Id.*

Joseph would help Brandon with his homework before dinner. *Id.* Brandon, Brenton, and Joseph would sit at the end of the flight line on the Air Force base and watch the planes land and take off. *Id.* ¶ 7 at 53. The three of them were inseparable. *Id.* Brandon states that Joseph was a great role model for him and that Joseph always made time for him and Brenton. *Id.* ¶ 6 at 53

Brandon lived with Joseph and Toni full-time. *Id.* Decl. of Joseph D. Wilson ¶ 5 at 2. As part of a military family, Brandon moved with the family around the country for Joseph's Air Force career. *Id.* ¶ 4 at 2. The four of them moved from Nebraska to California for Joseph's new Air Force posting. *Id.* Joseph treated Brandon and Brenton equally. Joseph played with Brandon, got him his first bicycle and taught him to ride it, taught him to drive a car, paid for all his food and clothing, put Brandon on his life insurance, provided health care, and paid his college expenses (Brandon received a scholarship for college tuition). *Id.* ¶ 6 at 2. Joseph did not formally adopt Brandon because he did not want the family name of Olsen to disappear. *Id.*

In his declaration Brandon says that he knows that Joseph loved him as if he were his own son. *Id.* ¶ 5 at 53. Even today, Brandon is so close with Joseph that he lives with Joseph and Toni in their home. *Id.* ¶ 9 at 54. Brandon C. Olsen is the functional equivalent of a son to injured plaintiff Joseph Wilson and is eligible to recover solatium damages.

Plaintiffs have submitted evidence, including declarations, sufficient to prove that plaintiff Erik B. Lee is the functional equivalent of a son to injured plaintiff Elliott Williams. Elliot Williams Declaration and Exhibits, Decl. of Elliot Williams; Decl. of Erik B. Lee. Erik was born in 1982. *Id.* Exhibits at 29. Elliott Williams married Erik's mother, Dana E. Lee, in January 1983 when Erik was one year and one month old. *Id.* Exhibits at 26. Erik was raised in the Williams home and treated as if he were Elliot's biological child, just like Erik's half-sister Kelsie and half-brother Chad. *Id.* Decl. of Elliot Williams at ¶ 2 at 1. Erik lived with Elliott and Dana full-time. *Id.* Decl. of Erik B. Lee ¶ 2 at 27. Elliott was completely financially responsible for Erik and raised him as if he were his own child. *Id.* Erik has always thought of Elliott as his father. *Id.* Erik B. Lee is the functional equivalent of a son to injured plaintiff Elliott Williams and is eligible to recover solatium damages.

Plaintiff Carol Adams is the wife of surviving injured airman, Plaintiff Jimmy Adams. Carol and Jimmy were engaged before the Khobar Towers bombing and were planning to marry as soon as Jimmy returned from his deployment in Saudi Arabia, in November 1996. Jimmy N. Adams Declaration and Exhibits, Decl. of Jimmy N. Adams ¶ 3 at 1. While Jimmy was in Saudi Arabia in the summer of 1996, Jimmy gave Carol power of attorney to secure a mortgage and buy a house for the two of them. *Id.* Plaintiffs have submitted documentary evidence showing that the original mortgage was executed by Carol and Jimmy on August 1, 1996. *Id.* Exhibits at 9 - 18. After Jimmy was injured in the bombing, he returned to the U.S. and they moved into the house in Texas that Carol had purchased. *Id.* ¶ 6 at 2. They postponed their wedding for a year to focus on Jimmy's recovery and because Jimmy wanted to give Carol time to decide if she wanted to marry him after he had been injured. *Id.* ¶ 5 at 2. They married a year later on September 25, 1997. *Id.* Exhibits at 8. Carol and Jimmy have demonstrated the seriousness of their commitment to each other both prior to the bombing, as evidenced by the purchase of a house together. After Jimmy

was injured in the bombing, Carol devoted herself to helping him recover. They have been married for over twenty years. In light of the evidence of their commitment to each other before the Khobar Towers bombing, Carol's dedication to help Jimmy recover from his injuries, and their subsequent enduring marriage of over twenty years, this Court finds that Carol Adams was the functional equivalent of a spouse to injured plaintiff Jimmy Adams at the time of the bombing on June 25, 1996 and is eligible to recover solatium damages.

### c. Entitlement to Solatium Damages

Plaintiffs who are immediate family members of injured airmen are entitled to solatium damages. Solatium damages compensate for the mental anguish, bereavement and grief that those with a close personal relationship to an injured or killed family member experience as the result of that person's injury or death, as well as the harm caused by the loss of that person's society and comfort. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 88 (D.D.C. 2011). A close family member has been generally (but not always) recognized "as one's spouse, parents, siblings, and children." *Heiser*, 659 F. Supp. 2d at 28. Accepting the uncontroverted evidence that those Plaintiffs who are immediate family members of injured or deceased service members suffered severe emotional and physical injury, this Court concludes that the defendants are liable to them for solatium damages.

Here, all family member plaintiffs have established that they are entitled to recover damages for their claims for solatium and intentional infliction of emotional distress. They are either close family members of the injured claimant or the functional equivalent thereof, and have suffered emotional distress as a result of their injured family member's loss of society and companionship after the Khobar Towers bombing. The amount of those solatium damages for each family is set forth *infra*.

### 5. Wrongful Death (Estate of Hector Manuel Gonzalez Pastrana)

The Estate of Hector Manuel Gonzalez Pastrana (hereinafter "the Estate"), a deceased injured serviceman, has brought a wrongful death claim (Count V). Plaintiff Diana Gonzalez, aka Diana Gonzalez-Pastrana, is the surviving spouse of Airman Gonzalez and is the personal representative of the Estate. Mrs. Gonzalez has submitted Letters of Administration issued on September 20, 2018 by the Probate Division of the Circuit Court of the First Judicial Circuit of Okaloosa County, Florida, appointing her personal representative of the Estate under the laws of the State of Florida, with full power to administer the Estate. Estate of Hector M. Gonzalez-Pastrana Declaration and Exhibits, Exhibits at 17. Diana Gonzalez, as personal representative, has standing to bring this claim on behalf of the Estate.

Hector Gonzalez enlisted in the United States Air Force in 1985. Id. Decl. of Diana Gonzalez-Pastrana, Personal Representative of the Estate of Hector Manuel Gonzalez-Pastrana, ¶ 10 at 3. On June 25, 1996, he was a Master Sergeant in the United States Air Force deployed to Saudi Arabia and stationed at Khobar Towers. *Id*. When the attack occurred, Hector was in his dormitory room and had just gotten into bed to go to sleep when the bomb went off. *Id*. ¶ 11 at 3. He sustained lacerations to both feet from walking barefoot on broken glass, glass fragments embedded in his head, and trauma to his body. *Id*. In the chaos immediately following the bombing he administered self-aid to his feet and his fellow airmen provided buddy care. *Id*. He helped rescue injured airmen in the chaos of the aftermath of the bombing. *Id*. ¶¶ 12 – 14 at 3 - 4. He was awarded a Purple Heart for his wounds. *Id*. Exhibits at 19 – 20.

Airman Gonzalez was a strong, caring husband and father, happy and full of life, who became withdrawn and depressed in the wake of the Khobar bombing. *Id*. ¶ 16 at 4. He survived for twenty-one years after the bombing, leaving the Air Force in 2007 and struggling with PTSD, nightmares, flashbacks, paranoia, hallucinations, anxiety, panic attacks, alcohol abuse, and severe depression to the point of not being able to get out of bed. (See Medical Record at 4, 5). *Id*. ¶¶ 19 -

34

20 at 4; Exhibits at 55 – 56. He had severe back pain resulting from the bombing, for which he had lumbar decompression surgery in 2011. *Id.* ¶ 22 at 5; Exhibits at 68 - 69. The surgery provided relief from pain for a year but his back pain then became progressively worse. *Id.* ~~(Medical Record at 23)~~. **Airman** Gonzalez was on a number of medications for PTSD, panic attacks, gastroesophageal reflux disease, hypertension, insomnia, and migraines. *Id.* Exhibits at 89 -91. **Airman** Gonzalez had been rated as 100% disabled by the V.A. Exhibits at 21 – 34.

In his final years **Airman** Gonzalez had become increasingly paranoid and almost totally withdrawn from his family. *Id.* ¶ 27 at 6. He would spend the day behind a privacy fence in the yard and eating dinner alone at midnight. *Id.* He installed five security cameras in the house and spending hours reviewing the recordings to make sure nobody was breaking into their house. *Id*. ¶ 28 at 6. In 2009 he became so paranoid and erratic that he was involuntarily committed by his psychiatrist. *Id*. ¶ 30 at 6. On his final day he had not slept for three days and believed that a demon was hissing at him from under the shed. *Id.* ¶ 31 at 6.

**Airman** Gonzalez died at home of a heart attack on March 4, 2017 at age 48. *Id.*; Exhibits at 93. His death certificate shows that the cause of death was hypertension cardiovascular disease. *Id.* The V.A. has determined that his death was service connected. The May 2, 2017 V.A. decision stated:

> The death of a Veteran will be considered as having been due to a service-connected disability when the evidence establishes that such disability was either the primary or contributory cause of death. Prior to death, the Veteran was service connected for hypertension. The death certificate recorded the Veteran's cause of death as hypertension cardiovascular disease. Prior to death, the Veteran was service connected for hypertension. Service connection for the cause of the Veteran's death is granted on a primary basis as the evidence shows that it was directly related to military service.

*Id.* Exhibits at 38. Plaintiffs have submitted uncontroverted evidence that **Airman** Gonzalez's death was caused by the Khobar Towers bombing. This Court finds that Defendants are liable for **Airman** Gonzalez's death.

**C.     DAMAGES**

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c). The service members who survived the Khobar Towers bombing can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from the wrongful death of the decedent; family members can recover solatium for their emotional injury. As set forth *supra*, Plaintiffs have voluntarily withdrawn their demand for punitive damages without prejudice to future applications for punitive damages.

"To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were `reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar,* 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C.Cir.2003) (internal quotations omitted)). This Court "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018). Plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to, and indeed intended to, cause injury to plaintiffs. The Court now discusses reasonable estimates of the different damages sought under the FSIA-created cause of action.

**1.     Damages Framework**

The validity of each claim having been assessed, the Court can now turn to the respective amounts of damages associated with each valid claim before this Court. "In determining the appropriate compensatory damages for each plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium." *Haim v. Iran,* 425 F.Supp.2d 56, 71 (D.D.C. 2006).

### d. Pain and Suffering Amount for Surviving Service Members

Each of the injured surviving servicemen have sought pain and suffering awards associated with their claims for battery. The claimants have provided uncontroverted evidence of physical and emotional injuries in the form of declarations, medical records, Purple Heart citations, V.A. disability ratings and other supporting personal documents such as news clippings and photographs.

In awarding pain and suffering damages, the Court must take pains to ensure that **individuals with similar injuries receive similar awards**. This court adopts the approach described in *Valencia* for awarding pain and suffering damages for personal injury for surviving service members:

> Assessing appropriate damages for physical injury or mental disability can depend upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." In *Peterson,* however, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. In applying this general approach, this Court has explained that it will "depart upward from this baseline to $7-$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," and will "depart downward to $2-$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire."

*Id.* at 33-34 (internal citation omitted).

This District Court in *Valencia* awarded the baseline $5 million to two airmen who sustained injuries in the Khobar Towers bombing that are very comparable to those claimants here who seek

the $5 million baseline for pain and suffering damages. *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010).  In that case, an airman who was knocked unconscious by the blast and woke to find his abdomen and legs pummeled by pieces of glass, and underwent ten surgeries in the next month to remove the pieces of glass and to repair a major vein in his foot that had been severed, and who still limped and relied on painkillers, had  nightmares, began abusing alcohol, and had been diagnosed with PTSD, was awarded the baseline of $5 million in damages for pain and suffering. *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 16-17 (D.D.C. 2010).

The other airman in *Valencia* who was awarded the baseline of $5 million for pain and suffering  was thrown off her feet by the blast and had been forced to walk across broken glass barefoot, found out the next day that her foot was broken and it was placed in a cast, developed PTSD and was forced to leave the military less than a year later, and became unemployed because she couldn't work anymore around people. *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 at 17 (D.D.C. 2010).

Similar to the plaintiffs who received baseline awards in *Valencia*, many of the claimants here sustained serious lacerations from broken glass because the impact of the bomb caused the windows and sliding glass balcony doors to explode into the living areas of their dormitories, where the airmen were relaxing for the evening, forcing the airmen to evacuate the building in their bare feet over floors and sidewalks strewn with broken glass; many have lived with chronic pain from their injuries; and many developed PTSD that brought nightmares, damaged relationships and careers and sometimes led to divorce and alcohol abuse. These claimants, having proved that they were significantly injured in the Khobar Towers bombing, are entitled to the baseline award of $5 million in compensatory damages for pain and suffering.

Courts in this District have found that the lack of physical injury suffered by a victim of state-sponsored terrorism generally counsels in favor of departing downward from the baseline

award for pain and suffering. *See, e.g., Valore*, 700 F. Supp. 2d at 84 (departing downward where victim was knocked to ground but was not "seriously physically injured"); *Peterson*, 515 F. Supp. 2d at 54 (departing downward where victim "was minimally injured" but "suffered lasting and severe psychological problems").

However, where the psychological trauma is severe and debilitating, the downward departure should not be severe. *Valencia* at 17. The court in *Valencia* awarded $3 million to an airman who was offsite at the time of the Khobar Towers bombing. *Id.* The airman and his crew had left work at the Dhahran Air Base and were driving back to their residences at Khobar Towers when the explosion occurred. *Valencia*, Report of Special Master Concerning Counts I-III at 5. Their truck began to sway six to seven inches back and forth and they heard the blast. *Id*. The airman suffered no physical injury but experienced severe psychological trauma from his experiences during the rescue operations when he was "exposed to death all around him after arriving on the scene and being forced to dig through the rubble and collect people and – often – body parts." *Valencia*, 774 F. Supp. 2d at 8. He experienced flashbacks, alcohol abuse, at least two suicide attempts and repeated hospitalizations, and was diagnosed with PTSD. *Id.* at 16-17.

In contrast to the airman in *Valencia* who was offsite at the time of the explosion, all of the claimants here were present in the Khobar Towers complex at the time of the bombing and were in the blast zone. Most of the claimants here were inside their dormitory buildings, in their day rooms, bedrooms, or bathrooms, or were in the elevators or stairwells of their dormitories. Some were outside, on the way to the gym or getting ready for work. Some airmen were working in other buildings in the complex. One airman was on patrol at the front gate when she and her partner got a radio call to help evacuate Building 131. They were pulling into the parking lot when the bomb exploded. All of them felt the blast wave. Almost all of the claimants sustained lacerations from glass shrapnel and were battered by flying furniture and debris, and many were thrown into walls

and knocked unconscious. **Each claimant here was put in** imminent apprehension of death or harm and fear of follow-on attacks. Therefore, even those plaintiffs here who escaped relatively uninjured physically are distinguishable from the plaintiff for whom a downward departure was warranted in *Valencia*. Therefore, downward departures are not warranted here and the plaintiffs here are **entitled to at least the baseline of $5 million.**

Some claimants sustained more severe physical and psychological injuries in the Khobar Towers bombing and seek upward departures. As an example of an upward departure in a case arising out of a terrorist bombing, in *Peterson*, which arose out of the bombing of the 1983 U.S. Marine barracks in Beirut, an airman who had suffered loss of sight in one eye, a perforated right eardrum resulting in some hearing loss, and a shrapnel injury to the back of his right thigh, as well as lasting and severe psychological problems, was awarded $7.5 million. *Peterson*, 515 F. Supp. 2d at 54.

Also in *Peterson*, an airman who had suffered two broken eardrums, skin lacerations, burned skin, knee damage and lasting and severe psychological problems was given an upward departure of $7 million. *Peterson* at 56. An airman who suffered an eye injury, a perforated left ear drum, broken ribs, various shrapnel wounds, and the lining of his lungs were burned as a result of the attack and suffered lasting and severe psychological problems was given an upward departure of $8 million. *Peterson* at 55. An airman who sustained skull fractures, brain bruising, various broken bones in his leg, and an exposed Achilles tendon was also awarded an upward departure of $8 million. *Id.*

As a basis of comparison, the greatest upward departures have been reserved for those victims of terrorism who have sustained the most severe injuries. One plaintiff in *Peterson*, who had suffered a skull fracture, a shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on his arms and back, internal bleeding, and severe psychological problems, was awarded an upward departure of $9 million in

pain and suffering, and one plaintiff who had suffered severe injuries including a broken neck, resulting in permanent quadriplegia, and also suffered lasting and severe psychological problems, was awarded an upward departure of $12 million. *Peterson* at 55. In another case an upward departure of $20 million for pain and suffering was found warranted for an airman who was very severely injured in the Khobar Towers bombing who was in a coma and then a vegetative state for approximately five weeks, suffering severe brain trauma and had to be given a tracheotomy in order to enable him to breathe and was hospitalized for nearly four months. *Blais* at 59.

No claimant here demonstrates injuries that would argue for an upward departure of $20 million. However, the injuries sustained by the *Peterson* claimants that warranted upward departures between $7 and $8 million are similar to the injuries of the more severely injured claimants here. These claimants are entitled to an upward departure of compensatory damages for pain and suffering of between $7 and $8 million.

**b.      Solatium Amount for Family Members of Surviving Service Members**

This Court finds that the damages framework set forth in *Heiser* to be an appropriate measure of damages for those family members of victims who died in the Khobar Towers attack and that the framework detailed in *Blais* is appropriate to help determine damages for those surviving servicemen and their families seeking redress. See *Blais*, 459 F.Supp.2d at 59.

In determining the amount of compensatory damages awards to family members of a surviving victim, this District Court has held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim,* 425 F.Supp.2d at 75. Parents of victims typically receive smaller awards than spouses, but receive larger awards than siblings. *Id.* Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser* at 59-60.

Following the court in *Heiser*, this Court finds that the appropriate amount of pain and suffering damages for the spouse of a deceased serviceman to be $8 million and that the appropriate amount of pain and suffering damages for the parents and children of a deceased serviceman to be $5 million, per individual.

Next, the Court finds that the appropriate amount of damages for family members of surviving servicemen who received the baseline of $5 million in compensatory damages are as follows: spouse ($4 million); parents ($2.5 million); children ($2.5 million); siblings ($1.25 million). *Blais*, 459 F.Supp.2d at 59. *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 26 n. 10, (D.D.C. 2011) (quoting *Valore,* 700 F.Supp.2d at 85). In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy,* 740 F.Supp.2d at 74, and that deviations may be warranted when, *inter alia,* "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi,* 768 F.Supp.2d at 26–27; *see also Fraenkel*, 892 F.3d at 351(explaining that *Heiser* "may serve as a useful reference point" but that District Court judges have discretion to adjudicate solatium claims "based on the particular facts of each case").

### c. Solatium awards not to exceed pain and suffering awards.

Courts in this District have held that it is inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen. *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15 (D.D.C. 2012). In cases arising out of the attack on the Marine Barracks in Beirut, the solatium awards to family members were reduced when

the Court reduced from the baseline $5 million the pain and suffering award to the servicemen. *Bland* at 158, *O'Brien*, *Davis*.

Where the servicemen received $1.5 million awards for pain and suffering, the Court reduced the awards of the family members in rough proportion to the *Heiser* framework to: $1 million for spouses, $850,000 for parents, $750,000 for children, and $500,000 for siblings. *O'Brien* at 48, *Bland* at 158. In *Davis*, where the Court reduced the award for a serviceman to $2 million, the Court reduced his parents' awards to $1 million each, and his siblings to awards of $650,000 each. *Davis* at 16.

**2.        Awards for damages**

Upon examination of the nature of the injuries of each of the servicemen, the Court makes the following findings about the compensatory damages for the surviving servicemen arising out of their respective battery, assault, IIED and wrongful death claims, and the IIED and loss of solatium claims of their family members. Plaintiffs have not presented evidence for lost wages or other economic losses and therefore no economic damages may be awarded.

**Individual pain and suffering awards to injured airmen and solatium awards to immediate family members**

**William M. Schooley** was in his room in Building 104 of Khobar Towers at the time of the explosion. William M. Schooley Declaration and Exhibits, Decl. of William M. Schooley ¶ 4 at 2. Debris and wall lockers fell on top of him but he made his way outside, where he cleared barbed wire and broken glass to create a pathway for the evacuation of the injured from Building 133, which had been severely damaged in the blast. *Id.* ¶ ¶ 6 - 12 at 2 -4. He then helped render first aid to the wounded at the picnic tables outside of the buildings. *Id.* ¶¶ 13 at 4. One of the victims appeared to be unconscious, with his left arm almost completely detached from his body and his torso sliced open in several locations. *Id.* The extent of his injuries was beyond Airman Schooley's

ability to stabilize. *Id.* In hindsight, Airman Schooley realized the airman was already dead. *Id.* Airman Schooley was awarded the Air Force Commendation Medal with Valor and the Air Force Achievement Medal with Valor for his actions in assisting the injured after the attack; a Certificate of Appreciation for Outstanding Service in Support of Operation Southern Watch; and his unit was awarded the Air Force Outstanding Unit Award with Valor. *Id.* Exhibits at 9, 79 – 91.   Airman Schooley developed PTSD from his experience in the bombing and began to suffer from nightmares, insomnia, anxiety, hypervigilance, headaches, and constantly thinking about the bombing. Decl. *Id.* ¶ 20 at 5.  He was medically retired from the Air Force in 1999. *Id.* ¶ 21 at 5; Exhibits at 10 - 72.  The V.A. has rated him as 70% disabled due to his PTSD and compensates him at the 100 percent rate because he is unemployable.  He is considered to be totally and permanently disabled. *Id.* Exhibits at 73 - 74.  He still suffers with PTSD and depends on his service dog Mavis to help manage his anxiety when he leaves the house. *Id.* Decl. ¶ 25 at 6.  Due to the severity of his PTSD and in light of his disability rating from the V.A., this Court finds that he is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Jimmy N. Adams** was in a parking lot at Khobar Towers at the time of the attack.  Jimmy N. Adams Declaration and Exhibits, Decl. of Jimmy N. Adams ¶ 10 at 2.  He was thrown twenty-five yards and landed under a vehicle. *Id.*  Both of his eardrums burst from the pressure wave of the blast, causing permanent hearing loss that requires him to wear hearing aids in both ears. *Id.* ¶ 11 at 3.  His kidneys were bruised and he also sustained glass and rock shrapnel wounds to his left leg for which he received treatment at the Khobar Towers clinic and in the U.S. *Id*. Airman Adams received the Purple Heart for the wounds he sustained in the bombing. *Id.*  Exhibits at 21.  He retired from the Air Force in December 1996, ten years early, because of his injuries from the Khobar Towers bombing.  *Id.* Decl. ¶ 14 at 3. The injuries to his kidneys caused permanent damage that caused them to bleed, so that the kidneys encapsulated the blood to form kidney stones.

*Id.* ¶ 10  at 2 .   Although he has had eight operations to remove them, he still produces kidney stones and is prescribed fentanyl for the constant pain.  *Id.* ¶ 10  at 3.    His experience in the Khobar Towers bombing has caused Airman Adams to be apprehensive in large crowds.  *Id.* ¶ 12  at 3.  The V.A. has rated him as 90 percent disabled and pays him at the 100 percent rate because he is unemployable due to his service-connected disabilities, and he is considered to be totally and permanently disabled. *Id.* Exhibits at 19.  In light of Airman Adam's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Carol S. Adams**, the wife of Airman Jimmy N. Adams, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Timothy L. Albritton** was in the kitchen in his dormitory in Building 102 at the time of the attack, filling a cup with water.  Timothy L. Albritton Declaration and Exhibits, Decl. of Timothy L. Albritton, ¶ 5 at 2.  The blast knocked him unconscious and he was hit in the back by rocks, debris, and glass.  He suffered a laceration to his elbow and glass shrapnel wounds. *Id.* ¶ 10 at 3, ¶ 16 at 4. He and his suitemates evacuated a wounded Navy liaison officer down five floors using a door as a stretcher. *Id.* ¶ 8 at 2–3. He spent hours rendering first aid at the triage area. *Id.* ¶ 11 at 3–4.  He had worked late that day preparing promotion letters and later learned that some of the men for whom he had typed letters had been killed in the bombing.  *Id.* ¶ 6 at 2. His elbow was rinsed and butterfly taped shut by medics. *Id.* ¶ 11 6 at 3.  Two days later the wound was cleaned and packed with gauze at the Khobar Towers clinic but not stitched because the tissue around the wound was too degraded to hold stitches. *Id.* ¶ 14 at 4; Exhibits at 11.  He was awarded the Purple Heart.  *Id.* Exhibits at 12. He was diagnosed with PTSD and prescribed medications. *Id.* Decl. ¶ 18 at 5.  He did not seek a V.A. rating after retirement because he could not bring himself to talk about the bombing. *Id.* ¶ 20 at 5. He struggles with memory problems, anger, mood swings, and self-isolating.  *Id.*  His PTSD

prevented him from advancing in his military career and his silence, unwarranted anger, mood swings, need for isolation, and other personality changes have caused problems with his relationships with his family. *Id.* ¶ 18–19 at 5. The wounds he sustained still cause him pain. This Court finds that he is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Sandra Albritton**, the wife of Airman Timothy Albritton, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Erika A. Weinfurter,** the daughter of Airman Albritton, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Billy G. Allen, Jr.,** was watching T.V. with friends on the fifth floor of Building 128 when the blast threw him across the room into a cinder block wall. Billy G. Allen, Jr. Declaration and Exhibits, Decl. of Billy G. Allen, Jr. ¶ 4 at 2. He lost consciousness and woke up with furniture and other people on top of him *Id.* ¶ 5 at 2; Exhibits at 238, 251. He sustained a traumatic brain injury (TBI), a dislocated left hip, dislocated left shoulder, nerve and muscle damage to his back, a sprained cervical spine, head trauma, ruptures of both ear drums, and multiple lacerations from broken glass, including a severe laceration of the posterior left thigh and a laceration to his upper lip. *Id;* Exhibits at 7. He was unable to walk and was taken to the makeshift trauma center at the Desert Rose cafeteria where he received twenty-four stitches and three staples to close his lacerations. *Id.* Decl. ¶ 6 at 2. He was taken by ambulance to Mohammad Dossary Hospital in Dhahran where he was treated for three days. *Id.* Exhibits at 8, 10. His dislocated hip and dislocated shoulder were put back into place and he was put in a cervical collar and received treatment for his back and neck injuries, including being placed in a body cast and traction for three days. *Id.* Decl. ¶ 7 at 2; Exhibits at 251. He also had glass shrapnel removed from all over his body. *Id.* He did not receive treatment for his head injury at the time. *Id.* He was flown to Pope Air

Force Base in North Carolina for further treatment of his left hip.  *Id*. Decl. ¶ 8 at 2; Exhibits at 9 -

13, 245, 251.  A physician noted in his medical record that he may need an assessment of the

vascular integrity for his left hip.  *Id*. Exhibits at 11.  Such an assessment was never done. *Id*. Decl.¶

8 at 3.  He was awarded the Purple Heart for his injuries in the bombing.  *Id*. Exhibits at 263.

Since that time, he has suffered with chronic pain including hip, shoulder and neck pain and

popping of the hip when walking.  *Id*. Decl. ¶ 11 at 3; Exhibits at  17 – 45.  Since the time that his

left hip was injured in the Khobar Tower bombing, he had complained to his medical providers of a

"tightening up" feeling;  tingling in his left anterior thigh;  lack of feeling in his left toes; and

numbness and tingling in his left toes and feet.  *Id*. Decl. ¶ 9 at 3; Exhibits at 20, 21, 43.  These

complaints were not evaluated. *Id*. Decl. ¶ 9 at 3.   He believes that the lack of feeling in his left toes

was an indication of poor circulation in the area of the injured hip.  *Id*.

Eventually, Airman Allen had surgery for his left shoulder at Landstuhl Regional Medical

Center at Ramstein Air  Base in Germany. *Id*. ¶ 13 at 3; Exhibits at 36 -37. -He  had nerve ablation

on his cervical spine in 2014 at Western Missouri Medical Center in Missouri.  *Id*. Decl. ¶ 13 at 3 -

4; Exhibits at 72.   In order to relieve his pain he has received occupational therapy and physical

therapy, and has used traction for his neck and back pain.  *Id*. Decl. ¶ 13 at 4; Exhibits at 20 – 45,

238.  His left shoulder sometimes partially dislocates when he bends to put on shoes or when he is

sleeping and he has to push it back into place himself, which is extremely painful.  *Id*. Decl. ¶ 13 at

4; Exhibits at 35, 251.

In 1998 he developed migraine headaches, with blurred vision, as a result of the blast

injury. *Id*. Decl. ¶ 14 at 4; Exhibits at 251.   In 2007 he began to have difficulty organizing his

thoughts and was diagnosed in 2015 with a traumatic brain injury (TBI) resulting from the Khobar

Towers blast. *Id*. Decl. ¶ 14 at 4; Exhibits at 251 - 253.  He also suffers memory problems.  *Id*.

Decl. ¶ 14 at 4.  He has sleep disorders and sleep apnea for which he uses a CPAP.  *Id*. Since the

bombing, Airman Allen has suffered from nightmares and is easily started. *Id.* ¶17 at 5. He has sought help from support group meetings and counseling. *Id.*

He retained glass fragments from the blast and small slivers of glass still come out of his scalp, chest, arms, back and face. *Id.* Exhibits at 245. He lives with daily neck and back pain. *Id.* Decl. ¶ 13 at 4; Exhibits at 238. He has left knee pain which led him to fall down a staircase in 2013. *Id.* Decl. ¶ 13 at 4; Exhibits at 256. In the past he has had to rely on painkillers for his chronic pain. *Id.* Exhibits at 256.

In April 2018, after an attack of acute pancreatitis and high blood sugar, Airman Allen developed blood clots and his lower left leg became gangrenous. *Id.* Decl. ¶ 12 at 3; Exhibits at 53 - 54. He required an above the knee amputation (AKA) on his left leg. *Id.* Decl. ¶ 12 at 3; Exhibits at 53 – 54, 216, 223 - 227. He had a history of deep vein thrombosis in his right arm and a history of lupus anticoagulant disorder. In light of the note in his medical record regarding the need for an assessment of the vascular integrity in his left hip area, Airman Allen's declaration that the assessment was never actually performed, and the documentation that he has experienced lack of feeling in his left toes and feet since the Khobar Towers bombing, the condition that led to his left leg amputation was likely to have been caused by the lack of circulation to the leg resulting from the hip injury he sustained in the bombing of Khobar Towers.

Airman Allen's medical records document that he sustained severe, longstanding injuries caused by the Khobar Tower bombing. *Id.* Exhibits at 238, 245, 248, 251, 252, 256, 259. Prior to his amputation he had been rated as 90 percent disabled by the V.A. *Id.* Exhibits at 261 – 262.

Airman Allen in his declaration describes how the bombing changed his life forever. *Id.* Decl. ¶ 16 at 4. He has had to learn how to live with an amputation and he still has chronic pain in his back, neck, left shoulder and left hip, which interferes with daily tasks. *Id.* ¶ 16 at 4. He still gets migraine headaches and muscle spasms in his back that last for three to five days. *Id.* ¶ 16 at 4.

His health problems create emotional stress for his wife and children as well as for himself. *Id.* ¶ 16 at 4. In light of Airman Allen's relatively more numerous and severe injuries, this Court finds that he is entitled to an award of $8 million for his pain and suffering as a survivor of the bombing.

**Josephine E. Alston** was in her suite with her roommates, in her dormitory building about three buildings away from Building 131, at the time of the blast. Josephine E. Alston Declaration and Exhibits, Decl. of Josephine E. Alston ¶ 5 at 2. She had gone into her bedroom to watch television and prepare for bed when suddenly she heard the loudest explosion she had ever heard. *Id.* The building shook and she jumped from her bed. Scared, she thought the base was being bombed. In the suite she found a thick cloud of dust in the air, the windows and air conditioner blown out, and her suitemates gone. As she fled the building, her foot was punctured by broken glass. *Id.* ¶¶ 5–6 at 2. Outside, she found people bleeding, running around, crying, and trying to figure out what happened. *Id.* ¶ 5 at 2. She learned that a truck bomb had been blown up near the perimeter fence. After the glass in her foot was removed at the medical area she volunteered to search the damaged buildings for survivors. *Id.* ¶ 6 at 2. The sight of all the blood and destruction remains etched in her memory. *Id.* One of the saddest days of her life was saluting the nineteen caskets draped in American flags of the airmen who had been killed in the bombing. *Id.* ¶ 6 at 2–3. Airman Alston was awarded the Purple Heart for her injuries. *Id.* Exhibits at 9–10. The stress of the bombing led to problems with her relationships and she was divorced from her husband soon after returning home from Saudi Arabia. *Id.*, Decl. of Brittany R. Alston ¶ 6 at 13. She became withdrawn even from her young children, and this has affected her relationships with her children to this day. *Id.* ¶ 7 at 13. She still has trouble sleeping and depends on medication to sleep. *Id.* Decl. of Josephine E. Alston ¶ 7 at 3. This Court finds that Airman Alston is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Brittany R. Alston** and **Marcus A. Alston**, the children of Airman Alston, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Michael D. Atkins** was on the fifth floor of Building 131 at the time of the explosion. Michael D. Atkins Declaration and Exhibits, Decl. of Michael D. Atkins ¶ 5 at 2. He sustained multiple glass and wood fragment lacerations from the shattered window glass and building debris. *Id.* Glass shrapnel severed his right temporal artery. *Id.* The blast knocked him unconscious for almost half an hour with a concussion. *Id.* After he came to, Airman Atkins, a trained pararescueman, escaped the building but went back inside to rescue wounded airmen. *Id.* Eventually Airman Atkins was taken to a local hospital where his severed temporal artery was repaired and he had surgery to remove glass shrapnel from his arms, face, left knee, chest, back, stomach, and had wire shrapnel removed from his face. *Id.* ¶ 6 at 2; Exhibits at 8 – 10. He had an open wound from a one-inch diameter wood-shard removed from his left calf. *Id.* Exhibits at 8. Airman Atkins was awarded the Purple Heart for his injuries and the Airman's Medal for heroism in rescuing airmen after the bombing. *Id.* Exhibits at 63 – 66. He developed PTSD and as a result of his traumatic experiences in the bombing. *Id.* Decl. ¶ 8 at 2; Exhibits at 37, 43, 67, 68. He developed sleep problems requiring a sleep study and sleep aids. *Id.* Exhibits at 37 – 57. He also experiences chronic post-traumatic headaches as a result of the blast. *Id.* Exhibits at 14 – 20. He was also diagnosed with a traumatic brain injury caused by the loss of consciousness. *Id.* Exhibits at 25, 37. He was treated at the Concussion Care Clinic at Camp Pendleton for headaches, pain, insomnia, and anxiety. *Id.* Exhibits at 13. He still suffers with chronic neck and back pain, for which he takes prescription medication, respiratory problems, painful disfiguring scars, tinnitus and hearing loss, chronic skin disorders from contact with chemicals in the blast, loss of sensation from shrapnel wounds, TMJ and sinus pain, loss of vision in his left eye, and gastro-esophageal reflux disease. *Id.* Decl. ¶ 9 at 3.

Airman Atkins retired from the Air Force in November, 2018 and received a disability rating of 100 percent from the V.A., including 50 percent for PTSD with traumatic brain injury (TBI), 50 percent for headaches, and 50 percent for obstructive sleep apnea, as well as ratings for nerve damage, gastroesophageal reflux disease, osteoarthritis, tinnitus, temporomandibular joint disorder (TMJ), and scars, all of which are related to the injuries he sustained in the Khobar Towers bombing. *Id.* Exhibits at 6 – 7, 67 – 70. Airman Atkins's medical record contains ample documentation that the Khobar Towers bombing was the cause of multiple medical conditions, both acute and chronic, including loss of consciousness for thirty minutes from the blast, head injury, operations to remove foreign bodies from leg and face, headaches, left vision decline, wounds, and dermatological conditions. *Id.* Exhibits at 8, 9, 10, 14, 17, 19, 25, 27. These multiple and chronic medical problems have not only caused pain and suffering for Airman Atkins, but they also interfered with his career advancement and impacted his personal relationships. *Id.* Decl. ¶ 12 at 3 - 4. In light of Airman Atkins's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Patricia D. Atkins**, the mother of Airman Atkins, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Angel M. Ayala** was in the living room of his dormitory on the second story of Building 133, the building next to Building 131, at the time of the bombing. Angel M. Ayala Declaration and Exhibits, Decl. of Angel M. Ayala ¶ 5 at 2. He was sitting next to the sliding glass door and watching television. He was thrown across the room by the blast and knocked unconscious. *Id.* ¶ 6 at 2. He sustained glass shrapnel lacerations to his face, neck, arm and abdomen, and a perforated left eardrum. He was bleeding badly and was rescued by fellow airmen who applied pressure with towels to stop the blood loss. *Id.* ¶ 8 at 2. He was treated at the Armed Forces Hospital at the King

Abdulaziz Air Base in Saudi Arabia  where he was sedated and rushed to emergency surgery.  *Id*. ¶ 10 at 2; Exhibits at 7–18.   He was then aeromedically evacuated to Landstuhl Regional Medical Center in Germany and then to Eglin Air Force Base in Florida where they continued to perform tests and procedures.  *Id*. Decl. ¶ 11 at 3; Exhibits at 19 –39. He was then flown back to his home base of Holloman Air Force Base in New Mexico. *Id*. Exhibits at 40–51.   He underwent further multiple surgeries including plastic surgery on his face and neck at Brooks Army Medical Center in Texas. *Id*. Decl. ¶ 16 at 4; Exhibits at 52–53.  He was awarded the Purple Heart for his injuries.  *Id*. Exhibits at 57–58.   He suffers from permanent hearing loss and tinnitus, and has permanent disfiguring scars on his face and neck.  *Id*. Decl. ¶ 17 at 4.  Airman Ayala developed PTSD with extreme anxiety, panic attacks, and suicidal depression, leading him to substance abuse and homelessness.  *Id*.   He has begun attending mental health group meetings at the V.A.  He has been rated as 40 percent disabled by the V.A..  *Id*. Exhibits at 60 – 62.  In light of Airman Ayala's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Fernando Ayala**, the father of Airman Ayala, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Zandra M. Ayala**, the mother of Airman Ayala,  is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.  **John J. Ayala**, the brother of Airman Ayala, is entitled to an award of $1.25 million to compensate him for his emotional distress and pain and suffering.

**John M. Baldwin** was on the second floor of the northeast corner of Building 133, the building next to Building 131.  John M. Baldwin Declaration and Exhibits, Decl. of John M. Baldwin ¶ 5 at 2.  The blast blew the door off the hinges and hit him on the head, knocking him unconscious. *Id.* He sustained glass lacerations to his right leg, abdomen, and right arm. *Id.* He had to crawl through the dark rooms and sustained cuts to his hands, feet, and knees from broken glass.

*Id.* He found an airman with deep cuts to his neck and body and carried him to the clinic, saving his life. *Id.*; Exhibits at 12. Airman Baldwin was awarded the Purple Heart for his injuries. *Id.* Exhibits at 9–10. He was awarded the Airman's Medal for heroism for saving the life of the injured airman. *Id.* Exhibits at 11–12. Returning to Whiteman Air Force Base, he had a hard time coping with the bombing and sought and was diagnosed with PTSD. *Id.* Decl. ¶ 7 at 2. He began to isolate himself and started drinking to drown the horror and intrusive thoughts in his head. *Id.* He would wake up in a sweat at night and take a shower to wash away blood that wasn't there. *Id.* He was honorably discharged from the Air Force in 1998. *Id.* ¶ 8 at 3. He became reclusive even from his wife, children and close family, and considered suicide many times. *Id.* At night, intrusive thoughts plagued his mind, with the smells of the bomb. *Id.* He avoided crowds and loud noises. *Id.* Recently he reunited with his church and quit drinking and has begun to redevelop his relationships with his family. *Id.* The lacerations to his right leg still cause pain and he still suffers from hearing loss and constant ringing in his left ear. *Id.* ¶ 6 at 2. The V.A. has rated him as 100 percent totally and permanently disabled. *Id.* Exhibits at 6–8. This Court finds that Airman Baldwin is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Kathy L. Beach**, Airman Baldwin's mother, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Bobby F. Baldwin, Jr.**, Airman Baldwin's father, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

Airman Baldwin's brothers, **Steven L. Baldwin** and **Bobby F. Baldwin III**, are entitled to an award of $1.25 million, each, to compensate them for their emotional distress and pain and suffering.

**Stacey D. Benfield** was in his dormitory suite in Building 130, near Building 131. Stacey D. Benfield Declaration and Exhibits, Decl. of Stacey D. Benfield ¶ 5 at 2. He was looking through

the patio glass doors as the bomb exploded. The blast blew him across the room, through a door and into the kitchen area and knocked him unconscious. *Id.* He sustained multiple lacerations from the shattered glass windows. *Id.* ¶ 6 at 2. The broken glass ripped off half of his upper lip, broke his nose, and damaged his left eye socket. *Id.* The impact caused trauma to his right shoulder and right knee. *Id.* While he was still unconscious, he was carried to the triage area. *Id.* ¶ 5 at 2. He was treated at a local hospital in Dhahran and then aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id.* Exhibits at 8 – 17. He was awarded the Purple Heart for the injuries he sustained in the bombing. *Id.* Exhibits at 18. After returning home, he received treatment at Shaw Air Force Base in South Carolina. After leaving the Air Force he received treatment at the VA for behavioral issues which were later diagnosed at PTSD. *Id.* ¶ 8 at 2. His shoulder continued to cause pain and he had shoulder surgery in November 2016. *Id.* ¶ 11 at 3. The lacerations from broken glass have left holes in his face and he has permanent disfiguring facial scars. *Id.* ¶ 10 at 3; Exhibits at 6 – 7. He cannot run and play with his son because of his injuries. *Id.* Decl. ¶ 12 at 3. Due to his PTSD he cannot be around crowds, noises, or stressful situations. *Id.* His family knows not to wake him because he is easily startled. In one instance, he cleared everyone out of the house during a thunderstorm, dragging everyone to a ditch in front of the house. *Id.* He has lost trust in people and finds it difficult to make friends. *Id.* ¶ 14 at 3. He has tried to improve his work prospects but has trouble retaining information because of short term memory loss. *Id.* ¶ 13 at 3. The V.A. has rated him as 80 percent disabled. *Id.* Exhibits at 19 – 21. In light of Airman Benfield's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Gloria R. Brown**, Airman Benfield's mother, is entitled to an award of $2.5 million against Defendants to compensate her for her emotional distress and pain and suffering. **Jimmy F. Brown**,

Airman Benfield's father, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Melena Collins,** Airman Benfield's sister, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Willard A. Brewster** was on the sixth floor of Building 133 at the time of the bombing. Willard A. Brewster Declaration and Exhibits, Decl. of Willard A. Brewster, ¶ 4 at 2. The blast propelled him into the opposite concrete wall and knocked him unconscious. *Id.* ¶ 4. He sustained multiple shrapnel wounds from glass and construction material shrapnel, a large open wound with severed tendons in his left elbow, and injuries from small pieces of broken glass to the top of his head. *Id.* He was taken to the Armed Forces Hospital at King Abdulaziz Air Base in Dhahran where he had surgery on his elbow. *Id.* Exhibits at 8 – 19. He was aeromedically evacuated to Landstuhl Regional Medical Center in Germany and then to at Andrews Air Force Base in Maryland where he received further care. *Id.* Decl.¶ 4; Exhibits at 20 – 27. He received more treatment at Misawa Air Force Base in Japan where he was stationed. *Id.* ¶ 5 at 2. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 28 – 30. The V.A. has rated him as 90% disabled for PTSD, sleep apnea, diabetes, knee injury, elbow injury, migraines, tinnitus, degenerative disc disease, cataracts, and scars. *Id.* Exhibits at 32 – 52. In light of Airman Brewster's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Bryan M. Brock** was in the common area of his dormitory in Khobar Towers at the time of the explosion. Bryan M. Brock Declaration and Exhibits, Decl. of Bryan M. Brock ¶ 5 at 1. The broken window glass blew in on him. He was treated at the Khobar Towers clinic where glass was removed from his wounds. *Id.* ¶ 5 at 1–2. Airman Brock was one of the few medics on station and dealt with the most seriously wounded. *Id.* ¶ 6 at 2. His office was used as a make-shift morgue. There was so much blood on the floor of his office he had to cut out the carpet and place a large rug

over the blood-stained concrete, and worked over the top of it for over a month. *Id.* He was treated at the Air Academy Hospital for PTSD upon his return home. *Id.* ¶ 7 at 2. He did not seek additional treatment out of fear that having to talk about the night of the bombing would trigger additional emotional trauma for him. *Id.* ¶ 7 at 2. For many years he was horrified by loud noises and large trucks and had paranoid thoughts. *Id.* ¶ 8 at 2. He and his wife divorced and he struggled with depression. *Id.* He still suffers from night terrors and survivor's guilt. *Id.* Loud noises and thunderstorms still cause him emotional distress and he still avoids large public gatherings. *Id.* He was offered the Purple Heart but turned it down out of respect for the people who were killed in the attack. *Id.* ¶ 9 at 2. He was awarded the Air Force Commendation Medal with Valor for heroism for providing life-saving treatment to injured airmen. *Id.* Exhibits at 6 – 7. This Court finds that he is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Joan C. Locke**, Airman Brock's mother, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Mark E. Broda** had extended his enlistment in order to volunteer for a 90-day temporary duty in Saudi Arabia. Mark E. Broda Declaration and Exhibits, Decl. of Mark E. Broda ¶ 5 at 2. At the time of the explosion he was in the community room of his dormitory in Building 128 in Khobar Towers, about 250 yards from the blast site, with his roommate and a colleague. *Id.* He was sitting on the couch in front of the sliding glass doors to the balcony when there was an extremely bright flash. *Id.* The blast threw him off the couch several feet into a cinder block wall. A tornado-like blast of hot air rushed in. The blast shattered the glass doors and he sustained multiple glass lacerations to his face, hands, and shoulders. *Id.* He saw that his friends were bleeding and they all huddled in the bathroom on their hands and knees. *Id.* They were ordered to evacuate and once outside, he went to the makeshift triage area set up at the Desert Rose dining facility to get his wounds stitched. *Id.* ¶ 7 at 3. He was trampled by a stampede of personnel who had been triggered

by a false alarm that Saudi foot soldiers were entering the perimeter of the complex. He was run over and lay in the fetal position, afraid he was going to be killed. *Id.* ¶ 6 at 2. A medic later stitched up his lacerations. *Id.* ¶ 7 at 3.

The next day, he suffered a bout of catatonia as he was being evaluated by the doctor. He could hear and understand the doctor's questions but he couldn't speak or move. *Id.* ¶ 9 at 3. He was released into the custody of his Staff Sergeant and put on 24-hour watch. *Id.*; Exhibits at 14. Later he helped load the flag-covered caskets of the dead airmen onto the cargo plane. *Id.* Decl. ¶ 10 at 3. Airman Broda was awarded the Purple Heart for his injuries. *Id.* Exhibits at 12 – 13. He returned to the U.S. in July and was out-processed to civilian life and went home to Indiana. He did not receive any psychiatric help from the Air Force as his enlistment was ending. *Id.* Decl. ¶ 12 at 4. After returning home, he developed PTSD which led to his divorce and caused him to turn to alcohol. *Id.* ¶ 12 at 4. He struggled with depression and sought treatment. He has received PTSD counseling on and off for the last twenty years and currently sees a therapist two to four times a month. *Id.* ¶ 15 at 4.; Exhibits at 20 – 38. He avoids crowds and is shaken by loud noises or unexpected camera flashes. He still suffers from depressed moods and uncontrollable emotions. He still gets severe headaches in the part of his head that hit the cinder block wall. *Id.* Decl. ¶ 15 at 4. The V.A. has rated him as 30 percent disabled for PTSD. *Id.* Exhibits at 38. A January 19, 2001 letter from his psychologist describes the Khobar Towers bombing as the cause of his PTSD. *Id.* Exhibits at 37. This Court finds that Airman Broda is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Pamela G. Broda**, Airman Broda's mother, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. **Alycia Broda**, Airman Broda's sister, is entitled to an award $1.25 million to compensate her for her emotional distress and pain and suffering.

**Kyle W. Brown** was in Building 130, sitting in the living areas watching television when the explosion occurred. Kyle W. Brown Declaration and Exhibits, Decl. of Kyle W. Brown ¶ 5 at 2. There was a bright flash and the power went out. *Id*. There was a loud ringing in his ear and he felt something wet and sticky. *Id*. He sustained multiple lacerations from broken glass to his head, right arm, and neck, and had lost hearing in his right ear. *Id*. ¶ 7 at 2. Heading down the stairs, he felt lightheaded and about to pass out. *Id*. Another airman grabbed him and helped him out of the building. *Id*. He was taken by ambulance to the base clinic and then to the local Aramco Hospital. He was aeromedically evacuated from Saudi Arabia to Landstuhl Regional Medical Center in Germany. *Id*. Exhibits at 7–9. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 10. After he returned home, he was diagnosed with PTSD and sought therapy. *Id*. Decl. ¶ 9 at 3. Before the bombing he was laid back but afterwards he became irritable and impatient. *Id*. He has problems sleeping and concentrating and often thinks about the attack. *Id*. He suffers from permanent facial scarring, hearing loss, tinnitus, memory loss, insomnia, and anxiety, all of which still impair his life to this day. *Id*. ¶ 8–9 at 2–3. Airman Brown has submitted a photo showing the stitched wounds on his head, face and right arm. *Id*. at 11. The V.A. has rated his disability at 40 percent for PTSD and tinnitus. *Id*. Decl. ¶ 11 at 3; Exhibits at 12–14. The V.A. rating decision states that the Khobar Towers bombing was the cause of both of these conditions. *Id*. Exhibits at 12–13. In light of Airman Brown's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Amanda Brown**, Airman Brown's wife, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Shannon K. Bump** had just finished showering and turned on the TV in the living room of his dormitory suite when the explosion occurred. Shannon K. Bump Declaration and Exhibits,

Decl. of Shannon K. Bump ¶ 5 at 2. He heard a huge sound like a thunderclap and watched the windows to the balcony disintegrate, seemingly in slow motion. He was thrown eight feet into the wall behind the couch and got up from the floor covered in glass, wondering what had happened. He sustained multiple lacerations to his legs. *Id.* ¶ 7 at 2–3. From the balcony he could see a huge mushroom cloud. *Id.* ¶ 5 at 2. The doors of the suite had been blown out of the walls still in their frames, furniture was flipped over, and tables had been tossed around by the blast pressure. *Id.* ¶ 6 at 2. He walked across the living room in bare feet before he realized he was walking on broken glass. *Id.* He evacuated everyone from his suite and helped rescue the wounded. *Id.* He helped haul the injured away on blankets and laid them on tables in the make-shift triage that was set up in the chow hall. *Id.* ¶ 7 at 2. He realized he should have had the lacerations on his leg stitched up. *Id.* ¶ 7 at 3. He still has scars on his legs. *Id.* ¶ 10 at 3. He was one of the last Air Force personnel to leave Khobar Towers. ¶ 9 at 3. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 8. Before the bombing, Airman Bump was a happy, easy going person who always had a smile on his face. After the bombing he became moody and easily agitated and angered. *Id.*, Decl. of Valerie Bump ¶ 9 at 11. To this day, he still suffers emotional distress but is unable to speak to most people about the bombing, even his wife. *Id.* Decl. of Shannon K. Bump ¶ 12 at 4. He has difficulty thinking that the bombing may have impacted him emotionally. *Id.* The stigma of being handicapped, disabled, or emotionally traumatized is overwhelming to him. *Id.* This Court finds that Airman Bump is entitled to $5 million for his pain and suffering as a survivor of the bombing.

**Valerie A. Bump**, Airman Bump's wife, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Dwayne A. Burnham** was asleep in his dormitory in Building 130 at the time of the blast. Dwayne A. Burnham Declaration and Exhibits, Decl. of Dwayne A. Burnham ¶ 5 at 2. Building 130 was at a slight angle to Building 131, the building closest to the bomb. He was awakened by a

bright flash and then "all Hell breaking around me." *Id.* ¶ 6 at 2. He opened his eyes and saw light coming in through the windows where light-blocking metal shudders had once been. The glass and metal window shutters had been blown on top of him. *Id.* He heard a loud ringing in his ears that blocked all other sounds. *Id.* He sustained lacerations from the broken glass to his arm and head. *Id.* ¶6 at 2. He helped evacuate his building. *Id.* He cleaned and bandaged his own wounds because so many injured airmen were arriving at triage. *Id.* ¶7 at 2. Early in the morning he was moved to another building for some sleep, but he was unable to sleep. He was able to call his wife and let her know he had survived. Learning about his wounded buddies and the deaths of fellow airmen was extremely difficult. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 11–12. When he returned home to the U.S., he began to experience flashbacks, nightmares, and difficulty concentrating. He was not the same person he was before the attack. He had excessive anxiety and he found he was easily startled by loud noises. He avoided windows, fuel trucks, and large crowds. *Id.* Decl. ¶ 10 at 3. His temper was erratic and he could erupt at any time, which had a tremendously negative impact on his family. *Id.* He sought treatment and was diagnosed with PTSD. *Id.* ¶ 11 at 3; Exhibits at 7–10. His medical records from 1998 state that his PTSD was caused by his experience in the Khobar Towers bombing. *Id.* Exhibits at 9. He has a V.A. disability rating of 50 percent including 30 percent for his PTSD and 20 percent for knee injuries. *Id.* Exhibits at 5–6. This Court finds that Airman Burnham is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

Airman Burnham's wife **Debra E. Burnham** is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. His father **Ralph K. Burnham** is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. His mother, **Margaret L. Burnham**, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. His son, **Dwight C. Burnham**,

is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

**Rondal G. Burns** was lying on a sofa watching TV in his dormitory building in Khobar Towers at the time of the bombing. Rondal G. Burns Declaration and Exhibits, Decl. of Rondal G. Burns ¶ 5 at 2. He had just showered and was wearing shorts. *Id*. He was about to get up when there was a bright light and an explosion. *Id*. The blast threw him across the room head first into the wall behind a second couch. *Id*. He found himself behind the couch, screaming his head off, crying loudly and with his ears clogged. *Id*. The sliding glass door had been blown out of the room. There was no electricity. His roommates helped him to a standing position. *Id*. ¶ 6 at 2. They were told to evacuate the building. *Id*. ¶ 7 at 2. He was sitting on a curb with the rest of his squadron when the First Sergeant told him that he was bleeding. *Id*. He had blood on his head and legs. *Id*. A medic was called to bandage him. *Id*. As result of the attack, he suffered lacerations and abrasions to his head and left leg, a traumatic brain injury (TBI), confusion, head pain, seizures, and short-term memory loss. *Id*. ¶ 11 at 3. These injuries developed complications that afterwards resulted in a debilitating stroke. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 11.

After returning home, Airman Burns began to suffer from daily headaches. *Id*. Decl. ¶ 12 at 3; Rondal G. Burns Supplemental Declaration and Exhibits at 11. One day he went to the emergency room with left arm numbness and was treated for muscle strain. *Id*. Supplemental Exhibits at 11. He then developed symptoms of nausea, vomiting and dizziness. *Id*. In November 1996, at the age of 31, he had a stroke while sitting on his living room couch and was taken to the emergency room. *Id*. Burns Decl. ¶¶ 12–14 at 3–4; Supplemental Exhibits at 4 - 25. While he was in the hospital, he was in a semi-comatose state and experienced aphasia. *Id*. Supplemental Exhibits at 16. While he was hospitalized with the stroke, he experienced two seizures and was treated with medication. *Id*. Supplemental Exhibits at 16- 17, 117. He has experienced seizures since that time.

*Id.* Supplemental Exhibits at 117. His seizures have been very difficult to control despite multiple medication regimens and the implantation of a vagus nerve stimulator to assist with seizure control. *Id.* As recently as 2018 he was experiencing seizures two to three times a week, which can last for 30 – 45 minutes, despite being on medications. *Id.*

Secondary to the stoke, Airman Burns has suffered speech impairment as well as significant cognitive dysfunction with memory loss, poor concentration, and easy distractibility. Supplemental Exhibits at 34. After leaving the hospital, he continued to experience seizures. Decl. ¶14 at 4. He was diagnosed with epilepsy. Supplemental Exhibits at 222. He struggled not only with the consequences of the stroke but with a traumatic brain injury (TBI), PTSD, and depression. *Id.* After his stroke, the Air Force placed him on Temporary Disability Retired List (TDRL) status. Supplemental Exhibits at 26 - 35. He was medically retired from the Air Force in 1997. Decl. ¶ 15 at 4. He has short term memory loss, cannot drive a car, and is dependent upon his family members for care. *Id.* ¶17 at 5. His PTSD makes him prone to nightmares and to startle at loud noises. *Id.* He is rated 100 percent disabled by the V.A. including 100 percent for "cognitive disorder, post-traumatic stress disorder", 60 percent for "residuals central venous thrombosis with seizure disorder" and 10 percent for tinnitus. Exhibits at 10. In light of Airman Burns' relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Rebekah J. Burns**, the wife of Airman Burns, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Emileigh L. Ledgerwood** and **Nickolaus A. Burns**, the daughter and son of Airman Burns, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Melinda J. Caines** was in her room in her dormitory in Khobar Towers when the explosion occurred. Melinda J. Caines Declaration and Exhibits, Decl. of Melinda J. Caines ¶ 6 at 2. The

lights went out and "from there it was chaos." *Id.* She froze and time seemed to slow as her senses were trying to figure out what had happened. *Id.* Walking the five flights to the bottom she found people running, screaming and crying and saw bloody footprints on the ground and blood on the hand railings and walls. She provided self-aid buddy care to the injured. *Id.* Once she returned to her duty station in the U.S., she noticed she was different. *Id.* ¶ 8 at 2. Loud noises, thunder, alarms, movies with breaking glass, and gunfire were too much for her to bear. *Id.* She began going to mental health doctors in 1996 and was diagnosed with PTSD, depression and anxiety in 1998. *Id.* She was treated with in vivo exposure therapy to help deal with her experience in the bombing. *Id.*; Exhibits at 21. Her PTSD has made it very difficult for her to function on a normal scale on a daily basis. *Id.* Decl. ¶ 9 at 2. She is constantly on guard, nervous around crowds, and even thunder scares her. *Id.* She suffers from nightmares and has difficulties sleeping. *Id.* The PTSD impacted her military career and led to her separation from the Air Force. *Id.* At her duty location and when she was deployed to Afghanistan she became very anxious following exposure to stressful events. *Id.* Exhibits at 16. She couldn't talk about the Khobar attack and became anxious just hearing the words "Khobar Towers". *Id.* Exhibits at 23. She sought therapy and medication for her PTSD. *Id.* Her medical record shows multiple references to the Khobar Towers bombing as the cause of her PTSD. *Id.* Exhibits at 12, 13, 14, 16, 21, 23. In 2009, as a result of her PTSD from the Khobar attack, she was placed on a work restriction with no deployment to hostile pay areas. *Id.* Exhibits at 23. In January 2010 the Air Force Physical Evaluation Board recommended her for temporary retirement with a disability rating of 50 percent because of her PTSD. *Id.* Exhibits at 50. The V.A. has rated her as 80 percent disabled but compensates her at the 100 percent rate because she is considered unemployable. *Id.* Exhibits at 5–11. Her VA rating decision documents her injury in the Khobar Towers bombing as a cause of her PTSD and traumatic brain injury (TBI). *Id.* Exhibits

at 9, 11. This Court finds that Airman Caines is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Alfreda Peak**, the mother of Airman Caines, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. **John L. Dean**, the father of Airman Caines, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Carmen R. Dean**, the sister of Airman Caines, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Salvatore Capaccio** was kneeling down to pray before bed in his dorm in Khobar Towers at the time of the bombing. Salvatore Capaccio Declaration and Exhibits, Decl. of Salvatore Capaccio ¶ 5 at 2. He was knocked off his knees to the floor and heard screams, sirens and people running. *Id.* He sustained cuts and bruises in the blast. *Id.* ¶ 8 at 2. He left his room and saw broken glass everywhere and the air was filled with cement dust which was setting off the fire alarms. *Id.* ¶ 5 at 2. He didn't know if the building was going to collapse on him. *Id.* The marble staircases were detached from the walls and he was terrified to walk down them but there was no other way out of the building. *Id.* At the center of the compound, he heard announcements to bring casualties to a certain building and he saw many injured being carried, along with two deceased in body bags. *Id.* ¶ 6 at 2. He was caught in a stampede when a group of locals entered the compound by climbing over the fence and were mistaken for a second wave attack. *Id.* ¶ 7 at 2. He was in the middle of the crowd and had no choice but to run or be trampled on. *Id.* As he was running, he grabbed a friend who was about to run into a construction ditch and pulled her to safety. *Id.* He was assigned to care for the vehicles in the following weeks after the attack because he was a vehicle-body mechanic. *Id.* ¶ 9 at 3. This assignment entailed cleaning out the blood and broken glass from the damaged vehicles. *Id.* All he could think about was hoping someone hadn't died in the vehicle he was fixing. *Id.* After the bombing he developed respiratory problems from inhaling cement dust.

*Id.* ¶ 8 at 2.   As a result of the bombing he has suffered with PTSD, severe depression, insomnia, panic attacks, dizziness, acute stress and anxiety, and a sleeping disorder, all of which he still suffers to this day.  *Id.* ¶ 8 at 2.   He retired from the Air Force in January 2017.  The V.A. has rated his disability at 90 percent, including 30 percent for PTSD.  *Id.* Exhibits at 6 – 8.  His PTSD has not abated over the years.   A 2018 psychological report finds that his PTSD and depressive disorder "have combined to impose very severe limitations of social and occupational functioning since at least January of 2017." *Id.* Exhibits at 12.  The report states that as a result of the Khobar Towers bombing, "he has intrusive thoughts of the event, avoids situation [sic] that remind him of the event or trigger flashbacks.  He cannot sit or stand or sleep next to a wall, and cannot be in small enclosed spaces. He is anxious and sleeps poorly…" *Id.* Exhibits at 12 - 13.  His PTSD causes him to be irritable and have angry outbursts, and this impacts his relationships with his children and close family.  *Id.* Decl. ¶ 8 at 3.  This Court finds that Airman Capaccio is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Diane Martucci**, the mother of Airman Capaccio, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Hilario C. Carrizales** was on the third or fourth floor of his building in Khobar Towers, and a couple of hundred feet away from where the truck bomb was parked, when the explosion occurred.  Hilario C. Carrizales Declaration and Exhibits, Decl. of Hilario C. Carrizales ¶ 5 at 2.  He was watching television in the living room with another airman.  *Id.*  He felt the floor vibrate and he saw a flash like a fireworks display out of the corner of his eye. *Id.*  He felt hot air and the other airman came flying towards him. *Id.* They were both thrown towards a concrete wall. *Id*. He was knocked unconscious for a few minutes and woke up to screams and chaos, dust and debris everywhere, and darkness.  *Id.* Other airman came to help and told him to look at his neck and chest, where there was blood flowing from the back of his head. *Id*. He had sustained multiple cuts

and lacerations and a concussion. *Id*. He was treated at the Khobar Towers clinic and then transported to a local hospital where his head wounds were closed with metal staples with no anesthesia. *Id*. ¶ 7 at 3. He had follow-up treatment at the Khobar Towers clinic a few days later where they cleaned and re-bandaged his wounds. *Id*. He had to undergo additional surgery at Cannon Air Force Base in New Mexico to remove more glass fragments from his head. *Id*. ¶ 8 at 3. His headaches, dizziness and spatial confusion led medical personnel to conclude that he had suffered a concussion. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 11 – 12. Years after the attack, he was diagnosed with a traumatic brain injury as a result of the blast. *Id*. ¶ 8at 3. To this day, he still suffers from headaches, memory loss, difficulty focusing and reading, and some loss of cognitive ability. *Id*. He is prone to be easily startled and is unable to handle sudden movements or loud noises. *Id*. The V.A. has prescribed special sunglasses and medication for his headaches and an Alpha-stim electrotherapy device. *Id*. The V.A. has rated his disability at 40 percent for TBI, migraines, tinnitus, and scars. *Id*. Exhibits at 13- 14. This Court finds that Airman Carrizales is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Juanita Carrizales**, the wife of Airman Carrizales, is entitled to an award of $4 million against Defendants to compensate her for her emotional distress and pain and suffering. **Olivia H. Carrizales** and **Sarah Carrizales**, the children of Airman Carrizales, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Eric Castor** was on the fifth floor, Room A, of Building 131, near the wall facing the truck bomb. Eric Castor Declaration and Exhibits, Decl. of Eric Castor ¶ 5 at 2. He was looking at his computer when he noticed the screen had gone black. *Id*. The windows blew out and were then sucked back into the room. *Id*. The wall behind him vaporized. *Id*. He was blown out of his office chair and slammed into the ceiling, sustaining broken ribs. *Id*. Then he fell to the floor, over ten

feet from where he had been sitting, injuring his shoulder. *Id.* He sustained lacerations from glass shrapnel causing severe bleeding from his back and shoulders, blast injuries to his head and neck, a triceps contusion, multiple puncture wounds to his head and scalp, and glass fragments in his right triceps and glass fragments in the base of his neck. *Id.* ¶ 8 at 3. His body was penetrated with glass and concrete shrapnel everywhere except where the back of his chair had protected him. *Id.* ¶ 5 at 2. He could not catch his breath because it felt as if all the air had been sucked out of the room. *Id.* As he lay on the floor in the fetal position trying not to move because it could risk paralysis, he realized he had no choice but to escape. *Id.* ¶ 5 at 2. There was a large piece of glass sticking halfway out of his right arm, so he used his left arm to force himself to a standing position, which made the piece of glass move further into his arm, causing a large arterial bleed which covered him completely in blood. *Id.*

He was taken to the Armed Forces Hospital at King Abdulaziz Air Base in Dhahran Id. Exhibits at 5 – 18. He was placed in a neck collar for his neck injury. *Id.* Exhibits at 11. He required transfusions due to his blood loss *Id.* Exhibits at 11. He had surgery under general anesthesia for suturing of lacerations in his right arm, neck and shoulder. *Id.* Exhibits at 8, 10, 17. He was aeromedically evacuated to Landstuhl Regional Medical Center in Germany for further surgery to remove glass fragments. *Id.* Exhibits at 19 – 35, 84. He was flown to Patrick AFB in Florida where he had further surgery to remove glass shrapnel from his arm, shoulder, back and scalp in July 1996. *Id.* Exhibits at 35, 38 – 40, 43 – 44. Additional surgeries to remove glass fragments followed in August and September 1996. *Id.* Exhibits at 45 - 48. He was awarded the Purple Heart. *Id.* Exhibits at 86.

Airman Castor's injuries caused permanent damage. Years after the blast he was still experiencing paresthesia in his right arm as well as pain in his neck and right arm due to nerve damage from the lacerations. *Id.* Exhibits at 58, 60, 61, 66. He retained glass shrapnel in his back

and shoulders and in February 1999 he had surgery to remove glass fragments from his shoulder at Moody Air Force base and in 2012 he had surgery to remove yet more glass shards from his trapezius muscle. *Id.* Exhibits at 59, 67. Imaging in 2012 showed he still had "innumerable" glass fragments in his back. *Id.* Exhibits at 71. In 2013 he reported muscle spasms and shoulder pain and pain radiating down his arm that interfered with his work in his post-military career as a dentist *Id.* Exhibits at 81. He reported severe forearm pain and burning in 2014. *Id.* Exhibits at 79.

Airman Castor still struggles with chronic pain, nerve damage in his right arm, and limited neck mobility. *Id.* Decl. ¶ 8 at 3. His PTSD has caused problems in his marriage and in his relationships with close family members. *Id.* ¶ 8 at 3.

The V.A. has rated Airman Castor as 60 percent disabled for his injuries from the Khobar Towers bombing.

In light of Airman Castor's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Kenneth R. Castor**, Airman Castor's father, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Nancy J. Castor**, Airman Castor's mother, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. **Laura L. Washer**, Airman Castor's sister, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Artis Coleman, Sr.,** was in his second floor dorm room at the time of the bombing. Artis Coleman, Sr. Declaration and Exhibits, Decl. of Artis Coleman, Sr. ¶ 5 at 1. He saw a very bright flash and the ceiling collapsed on him, covering him in concrete and shattered glass. *Id.* ¶ 5 at 1 - 2. He was knocked unconscious and sustained glass lacerations to his legs and feet. *Id.* ¶ 5 at 2. When he awoke, fellow airmen helped him out of the building. *Id.* His supervisor sent him to the hospital

to be looked at because he was concerned about Airman Coleman's eyes. *Id.* ¶ 6 at 1 - 2. He was taken to the hospital with his head wrapped up. *Id.* He was awarded the Purple Heart. *Id.* Exhibits at 26. When he returned to the U.S. he was unable to sleep and kept thinking the ceiling would collapse on him. *Id.* Decl. ¶ 8 at 2. Sudden loud noises caused him to be nervous. *Id.* Prior to the bombing he was in excellent health but after the bombing he started having severe headaches and was treated for stress and migraine headaches at Shaw Air Force Base. *Id.* ¶ 9 at 2. He passed out playing basketball in March 1997 (*id.* ¶ 10 at 2) "a syncopal episode associated with weakness and altered mental status" and went to the emergency room, where "he was presumed to have suffered vasovagal syncope related to dehydration and exertion." *Id.* Exhibits at 14. On April 22, 1997, he "suffered a sudden loss of consciousness during a severe headache." *Id.* He was taken by ambulance to the Air Force base emergency room, where "he presented with decorticate posturing and a Glasgow Coma Scale score of 3." *Id.* He was transferred to another hospital where doctors discovered that he had suffered an aneurysm on the right side of his brain. *Id.* He underwent a craniotomy and during surgery the doctors discovered another aneurysm on the left side of his brain. *Id.* Airman Coleman was in a coma for a week or more. *Id.* Decl. ¶ 10 at 3. He had surgery to repair the aneurysm on the left side of his brain in July 1997. *Id.* Exhibits at 14. A 1997 neuropsychological assessment diagnosed dementia secondary to the aneurysm, and PTSD secondary to the Khobar Towers bombing. *Id.* Exhibits at 8.

Airman Coleman began to have seizures and has had seizures or spells during medical examinations. *Id.* Exhibits at 6, 9. A neuropsychological evaluation in 1999 found a "global cognitive decline" and that he "had suffered significant neuropsychological deficits as a direct result of both brain injury and exposure to a terrorist attack." *Id.* Exhibits at 19 – 20. He was diagnosed with dementia due to cerebrovascular causes and posttraumatic stress disorder. *Id.* Exhibits at 19. It was noted that his PTSD complicated his other conditions and they in turn worsen his PTSD. *Id.*

His medical records confirm that his PTSD is a result of the Khobar Towers bombing. *Id*. He takes medication for seizures and depression. *Id*. ¶ 14 at 3. His personality changed because of the bombing and he became withdrawn. *Id*. ¶ 12 at 3. He was no longer able to be an active father. *Id*. ¶ 15 at 3. He still struggles with PTSD, sleep problems, and anxiety. *Id*. ¶ 17 at 3. The V.A. has rated him as 100 percent disabled, with 100 percent disability for PTSD with depression and dementia; speech impairment and expressive aphasia, hemiparesis, seizure disorder and hypertension. *Id*. Exhibits at 25. In light of Airman Coleman's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Betty A. Coleman**, the wife of Airman Coleman, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Artis Coleman, Jr.**, the son of Airman Coleman, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

**Paul S. Collins** was in the Fast-Cal Building housing the calibration laboratory, about a half mile from the explosion. Paul S. Collins Declaration and Exhibits, Decl. of Paul S. Collins ¶ 4 at 2. All the windows in the Fast-Cal Building imploded and the equipment on the walls and shelves was destroyed. It felt as though all the oxygen was pulled out of the building and he began to find it difficult to breath. *Id*. He ran out of the building and saw a huge mushroom cloud directly in front of him. *Id*. ¶ 5 at 2. It was pandemonium with everyone was running in every direction, and every siren went off. During the next two weeks, he assisted cleaning up debris and moving the dead bodies. *Id*. ¶ 8 at 2. Numerous times, he needed to speak to doctors and psychiatrists about the ordeal. *Id*. He was awarded the Air Force Achievement Medal for his dedication and hard work after the bombing and for assisting the FBI sifting through bomb site wreckage for evidence. *Id*. Exhibits at 21. After returning home, he was diagnosed with PTSD, anxiety and depression, all of

which he still suffers with. His PTSD destroyed his marriage and he was divorced within a year of his return from Saudi Arabia. *Id*. Decl. ¶ 9 at 2–3. He underwent five to six inpatient treatments for drug and alcohol abuse, with the most recent inpatient treatment lasting six months. *Id*. To this day, he is still under psychiatric treatment and takes medication. The V.A. has rated his disability at 70 percent. *Id*. Exhibits at 9–20. This Court finds that Airman Collins is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Robbie J. Cotterman** was asleep in his room in the building next to Building 131 at the time of the blast. Robbie J. Cotterman Declaration and Exhibits, Decl. of Robbie J. Cotterman ¶ 4 at 1. The explosion shattered the windows and he awoke to find himself with lacerations to his right arm, back and right leg*. Id*. Glass and concrete shrapnel were embedded all over his back and legs. *Id*. He and the other airmen had flashlights so they were able to check all the rooms on the way out of the building. *Id*. ¶ 4 at 2. He was one of the last to leave the building and he set up an area where he could locate all of his men. He was covered in blood but remained there until all of his men were accounted for. *Id*. He had medical treatment to suture his lacerations and remove the glass shrapnel. *Id*. ¶ 5 at 2. He received the Purple Heart for his injuries. *Id*. Exhibits at 5–6. He still struggles with the mental and emotional injuries resulting from the Khobar Towers attack. He suffers from anxiety and jumpiness and is easily startled. He is in the process of seeking a disability rating from the V.A. for PTSD. *Id*. Decl. ¶ 5 at 2. This Court finds that Airman Cotterman is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Shawn R. Clevenger** was in the living room of his dormitory building, watching TV with his roommates, when they stepped onto the balcony during a commercial. The lights flickered, and "then all Hell broke loose." Shawn R. Clevenger Declaration and Exhibits, Decl. of Shawn R. Clevenger ¶ 4 at 1. The sliding glass door to the balcony blasted into the room. *Id*. ¶ 4 at 2. He turned and grabbed his roommate to shield him from the glass and shrapnel. *Id*. He picked himself

up to get his bearings, and fell back to the ground with intense pain in his foot. *Id*. He looked down and saw blood all over his legs and on the floor. *Id*. He had sustained leg and nerve damage and back injuries. He was carried out of the building and heard radio chatter about a fuel truck explosion. *Id*. ¶ 5 at 2. He was carried to the court yard where he saw bodies all over the yard. He was bandaged up as he waited to be seen at triage. *Id*. He was taken by ambulance to a local hospital where he was treated without a local anesthetic because they were running low. *Id*. ¶ 7 at 2. He had a cut behind his right knee that exposed the tendon. *Id*. He was awarded the Purple Heart. *Id*. Exhibits at 7. He returned to the U.S. in August 1996. He served in the Air Force for two more years. *Id*. Decl. ¶ 10 at 3. After the bombing, Airman Clevenger developed anxiety. *Id*. ¶ 11 at 3. He has struggled with being in crowds and is always on alert wondering if he and his family are safe. *Id*. Loud noises and people approaching from behind make his mind race. *Id*. He has been prescribed anti-depressants and other medications. *Id*. ¶ 12 at 3. He has found other veterans going through the same feelings and they hunt and fish together and discuss their issues. *Id*. ¶ 12. The V.A. has rated him as 50 percent disabled, including 30 percent for adjustment disorder with anxiety, and ten percent each for residuals of an ankle fibula fracture, lumbar spine degenerative disc disease, and neuropathy. *Id*. Exhibits at 8 - 16. An evaluation of March 4, 2009, attached to his V.A. rating decision of April 13, 2009, describes symptoms of intrusive recollections of traumatic events, nightmares in which he is fighting people, difficulties with anger when triggered, difficulties sleeping, and exaggerated startle response to loud noises. *Id*. Exhibits at 17 – 21. The report documents that the Khobar Towers bombing is the cause of his symptoms. *Id*. Exhibits at 18 – 19. This Court finds that Airman Clevenger is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Jefferson A. Craven** was on the fourth floor of Building 133, facing the perimeter road left of the parking garage that was to the left of the targeted building at the time of the attack. Jefferson

A. Craven Declaration and Exhibits, Decl. of Jefferson A. Craven ¶ 5 at 2. A large foreign object, either a rock or concrete block, hit him in the head, causing a closed head injury. *Id.* He suffered a concussion and sustained multiple lacerations to his face, torso, back, arms and legs. *Id.* The right half of his face was impaled by glass and debris and the left side of his chin was lacerated, leaving a three inch cut. *Id.* His left shin had a six-inch laceration. *Id.* His right shin was impaled by shrapnel and debris. *Id.* He still has multiple scars from the wounds. *Id.* His shoulder blade muscles were torn from his spine during his rescue. *Id.* He was immediately transported to a local hospital in Dhahran and placed in the women's wing. *Id.* ¶ 6 at 2. After the hospital received threats because of the presence of American airmen, he was moved back to the base, and then aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id.* He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 14. After returning home, he developed PTSD, from which he suffers to this day. *Id.* Decl. ¶ 8 at 3. The attack changed his life forever and robbed him of his physical abilities. *Id.* ¶ 10 at 3. He has a V.A. disability rating of 100 percent for PTSD, congestive heart failure, traumatic brain injury (TBI), and multiple orthopedic conditions. *Id.* Exhibits at 8 – 13. In light of Airman Craven's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Tirana K. Craven**, the wife of Airman Craven, is entitled to judgment of $4 million against Defendants to compensate her for her emotional distress and pain and suffering. **Jessica M. Verboom**, the daughter of Airman Craven, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Deborah L. Danielsgale** was taking a shower in her dormitory building at Khobar Towers when the explosion occurred. Deborah L. Danielsgale Declaration and Exhibits, Decl. of Deborah L. Danielsgale ¶ 5 at 2. The force of the blast slammed her head on the shower wall and she

suffered a concussion. *Id.* Shrapnel cut her feet and legs and she was in severe pain and fear. *Id.* After the attack, her injuries were treated and she was given medications to help her sleep. *Id.* Despite her injuries, she assisted in the setup of the flight line memorial service for her nineteen fellow soldiers who were killed in the attack. *Id.* She was appointed by the commander to assist the FBI with loading evidence and coordinating transportation to crime labs in the U.S. *Id.* She was awarded the Purple Heart for her injuries and the Air Force Commendation Medal. *Id.* Exhibits at 5 – 6. When she returned home, she was diagnosed with PTSD and prescribed medication. *Id.* Decl. ¶ 6 at 2. She currently has no life outside her home. *Id.* She used to love going places and enjoying her friends and family. *Id.* She has problems sleeping which has left her unable to hold a job and kept her from social activities such as enjoying outings and moves. *Id.* These activities were a few of her favorites before the attack. *Id.* She is now unemployable. *Id.* She is very forgetful and can't locate her things after putting them away. *Id.* ¶ 7 at 3. She has recurring nightmares and cannot bear being in a crowd. *Id.* Airman Danielsgale's daughter, plaintiff Msichanna L. Alexander, describes in her declaration that every day after the bombing she started worrying more about her mother. *Id.* Decl. of Msichanna L. Alexander ¶ 8 at 10. Airman Danielsgale would call Msichanna confused, sad or angry because she could not remember where she had put the keys or if she had put her laundry away. *Id.* Msichanna would have to go over to her house and help her. *Id.* Msichanna kept asking her mother to retire. *Id.* ¶ 9 at 10. When her mother did retire a year later, Msichanna moved to be closer to her. *Id.* One day Airman Danielsgale called from the Walmart parking lot because she could not find her car. *Id.* Msichanna and her uncle found her roaming the parking lot and looking for her car, but she was standing in front of her car and didn't know it was hers. *Id.* Msichanna says her mother went downhill from there. *Id.* Msichanna and her daughter had to bathe, fee, and dress Airman Danielsgale for two weeks. *Id.* This was hard for Msichanna because her mother had always been the strongest person she knows. *Id.* Msichanna says that her mother

needed several surgeries since the attack on her shoulder and both of her hands. *Id*. ¶ 10 at 10. Msichanna took care of her mother before and after the surgeries. *Id*. Msichanna has taken her to the emergency room because her pain was so bad that she couldn't be touched. *Id*. Before the bombing, her mother was an outgoing and loving parent, grandparent, daughter, sister, aunt and friend, but afterwards she became reserved and withdrawn, fearful of loud noise, uncomfortable in crowds, and easily confused, sad, and angry. *Id*. This Court finds that Airman Danielsgale is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Msichanna L. Alexander**, the daughter of Airman Danielsgale, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Rose A. Davis** was preparing for bed in the building next door to Building 131 in Khobar Towers when the explosion occurred. Rose A. Davis Declaration and Exhibits, Decl. of Rose A. Davis ¶ 4 at 1. There was a very loud explosion and then she felt the blast wave, which knocked her into the wall. Everything went black and there was no sound. Seconds later, the screaming started and everyone was trying to get out of the building. *Id*. She sustained multiple lacerations and glass shrapnel wounds. While she was trying to evacuate the building, she found her boyfriend bleeding profusely from the severe glass lacerations. *Id*. ¶ 4 at 2. She tended to him to keep him from bleeding to death in front of her. . *Id*. She received medical treatment for her own injuries at the clinic. *Id*. After the attack, she was unable to sleep until the flight home several days later, when the flight doctor made her take sleeping pills. *Id*. ¶ 5 at 2. She was awarded the Purple Heart for her injuries. *Id*. Exhibits at 16. Since the attack, she has suffered from chronic back pain. *Id*. Decl. ¶ 6 at 2. She had a series of X-rays and MRI's in 2008 before retiring from the Air Force and was diagnosed with lumbar disc degeneration, spondylosis, lumbago, and lumbar facet arthropathy. *Id*.; Exhibits at 12, 13. She has received physical therapy and injections of corticosteroids into her spine. *Id*. Exhibits at 11, 12. She has been told that she will eventually need surgery because the

pain will never get better. *Id*. Decl. ¶ 6 at 2. To this day, she still suffers from claustrophobia, nightmares and has trouble sleeping. *Id*. ¶ 9 at 2. As a result of her experiences in the bombing, she has become distant from her loved ones, and still has problems trusting people. *Id*. ¶ 10 at 2. She can still replay every minute of the night of the bombing as if it were yesterday. *Id*. ¶ 7 at 2. Twelve of the airmen she deployed with were killed in the attack and several of them were her good friends. *Id*. The V.A. has given Airman Davis a disability rating of 20 percent. *Id*. Exhibits at 14-15. This Court finds that Airman Davis is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Gregory J. DeArman** was in a side building behind Building 131 in Khobar Towers at the time of the attack. Gregory J. DeArman Declaration and Exhibits, Decl. of Gregory J. DeArman ¶ 4 at 2. All the windows were blown in and shrapnel embedded in his skin. *Id*. He had cuts all over his back and shoulders. *Id*. ¶ 5 at 2. On his way out of the building he found a friend of his lying on the hallway floor and he carried him outside. *Id*. ¶ 4 at 2. Although he was covered in blood, he re-entered the building to look for his best friend. *Id*. ¶ 5 at 2. He found two more injured airmen and carried them out of the building on his shoulders. *Id*. His shoulders were injured from the strain of rescuing and carrying three injured airmen. *Id*. ¶ 6 at 2. His shoulder injuries eventually required three surgeries, with a fourth surgery upcoming. *Id*. He suffers from constant pain. *Id*. As a result of the trauma of the bombing he found he could not be in crowds or around loud noises. *Id*. ¶ 7 at 2. He doesn't leave his home except to go to work. *Id*. Airman DeArman was awarded a Purple Heart for his wounds. *Id*. Exhibits at 3. He has been rated 50 percent disabled by the V.A. *Id*. Decl. ¶ 6 at 2. This Court finds that Airman DeArman is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Robert L. DePyssler** was in the hallway foyer of his dormitory in Building 129 at the time of the explosion. Robert L. DePyssler Declaration and Exhibits, Decl. of Robert L. DePyssler ¶ 5

at 1. He saw a bright flash and then blacked out. *Id.* When he came to, he realized he had been blown from where he was standing and into the kitchen. *Id.* He was barefoot and wearing only a t-shirt and shorts. *Id.* He was in excruciating pain throughout his body, his ears were ringing, and the building was still shaking violently as he made his way to the door, grabbing an airman who was too shocked to move. *Id.* He ran barefoot over broken glass to Building 131. *Id.* ¶ 5 at 2. Later he realized he had been running in bare feet with a jagged shard of glass in his foot. *Id.* He could no longer run because of the pain. *Id.* He had the glass removed from the bottom of his feet. *Id.* It took several years for the feeling to return to the bottom of his feet and for them to start sweating again. *Id.* He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 5 – 6, 24. He retired from the Air Force in August 1996. *Id.* Exhibits at 7. His ears have not stopped ringing since the bombing and he was diagnosed with tinnitus. *Id.* Decl. ¶ 7 at 2. The tinnitus makes it difficult for him to hear people and he resorts to lip reading. *Id.* The V.A. has rated him 10 percent disabled for tinnitus from the noise of the Khobar Towers explosion. *Id.* at Exhibits at 8 - 18. After the bombing he had haunting nightmares about the attack. *Id.* Decl. ¶ 8 at 2. At his wife's request, he began seeing a private local psychiatrist who has diagnosed him with PTSD. *Id.* ¶ 8 at 3; Exhibits at 19 - 23. He cannot talk about the bombing without becoming upset. *Id.* Decl. ¶ 9 at 3. He avoids crowds and fireworks and needs to sit with his back against the wall in restaurants. *Id.* He has a constant feeling that something bad is about to happen. *Id.* He thinks about the bombing every day. He still struggles with survivor's guilt and grieves for his best friend who was killed, and for the other airmen who died in the bombing. *Id.* ¶ 10 at 3. This Court finds that Airman DePyssler is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Robert W. DePyssler**, the father of Airman DePyssler, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

**Richard D. Dupree** was in his room Building 127 in Khobar Towers at the time of the explosion. Richard D. Dupree Declaration and Exhibits, Decl. of Richard D. Dupree ¶ 4 at 2. He was in bed and starting to fall asleep when the bomb went off. *Id*. His bed was shaking and the windows blew in to the room. *Id*. He was covered in shrapnel, mostly in his leg and feet. *Id*. A door was blown off its hinges and flew straight at him, knocking him off the bed and pinning him to the wall. He heard horrible screaming and yelling in the building. *Id*. He was not able to move for what seemed the longest time. *Id*. When he was finally able to head towards the stairs, he saw blood all over the walls and stairs. *Id*. He had sustained multiple lacerations and wounds from the shattered window glass and from wood that splintered from the door as it unhinged and flew at him. *Id*. ¶ 5 at 2. Walking barefoot, he sustained multiple glass and wood shrapnel lacerations to his feet. *Id*. He treated his own wounds on the night of the attack. *Id*. He was awarded a Purple Heart for his injuries. *Id*. Exhibits at 6. To this day he suffers from pain in his right ear. *Id*. Decl. ¶ 10 at 3. The death in the bombing of twelve airmen from his home base of Eglin Air Force Base in Florida, many of whom he knew personally and worked with every day, had a profound impact on him. *Id*. ¶ 9 at 3. He has not been treated for PTSD but believes he has PTSD symptoms including hypervigilance, avoidance, and constant reliving of the event. *Id*. ¶ 9 at 3. He still has horrible nightmares and is easily startled by loud noise, and avoids crowds. *Id*. ¶ 10 at 3. He constantly relives the day of the attack. *Id*. ¶ 11 at 3. Airman Dupree was awarded the Purple Heart for his injuries. *Id*. Exhibits at 6. This Court finds that Airman Dupree is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Thomas F. Edman** was in a room in Building 131, on the side of the building closest to the location of the truck bomb, at the time of the explosion. Thomas F. Edman Declaration and Exhibits, Decl. of Thomas F. Edman ¶ 5 at 2; Exhibits at 10 - 11. The exterior walls of his suite were completely blown off in the blast. *Id*.; Exhibits at 9. He was thrown into the back wall and a

door frame and hit with flying debris including furniture, concrete, and glass. *Id.* The impact of his body hitting the wall and door frame split his side and fractured his pelvis in several places, jammed his left shoulder, bruised his left kidney, and bruised the left side of his body. *Id.* ¶ 6 at 2. He felt a stinging numbness through his left side. *Id.* There was a loud ringing in his ears and he had hearing loss for several days. *Id.* The building was completely dark and he had to crawl his way out of the suite where his suitemates rescued him. *Id.* He was taken to the makeshift trauma center at the Desert Rose cafeteria and taken by ambulance to a local hospital in Dhahran, Saudi Arabia where X-rays were taken and the deep laceration in his side was stitched. *Id.* ¶ 7 at 3. His left leg was placed in traction. *Id.* He was aeromedically evacuated to the Landstuhl Regional Medical Center in Germany for more treatment. *Id.* ¶ 8 at 3; Exhibits at 12 - 18. He was then aeromedically evacuated to his home station of Patrick Air Force base in Florida where he was reunited with his family. *Id.* Decl. ¶ 8 at 3; Exhibits at 19 – 26. He had sustained a fractured pelvis, a kidney contusion, a laceration to his left side requiring sutures, a left shoulder injury, a bruised left thigh and calf, hearing loss and tinnitus, and lacerations from glass shards. *Id.* ¶ 14 at 4; Exhibits at 12 - 28. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 29 - 30. After the bombing he found it difficult to sleep because of thoughts of his fellow squadron members and friends who had been killed. *Id.* Decl. ¶ 11 at 4. He avoided talking about the bombing. *Id.* He suffers from severe mental anguish, survivor's guilt, nightmares, and claustrophobia, which he still experiences to this day. *Id.* ¶¶ 12 – 13 at 4. He believes he has PTSD symptoms but has not sought treatment or a disability rating for PTSD because he doesn't want to be labelled as someone with mental issues. *Id.* ¶ 13 at 4. He still suffers from hip and shoulder pain and loss of mobility, hearing loss, and kidney issues. *Id.* ¶ 14 at 4. The V.A. has rated him as 40% disabled for his hip fracture and right shoulder injury. *Id.* Exhibits at 31 – 39. His V.A. decisions document that his left hip and pelvic fracture, left shoulder tendonitis, and bruised kidneys were caused by the Khobar Towers bombing.

*Id.* Exhibits at 33 - 35.  In light of Airman Edman's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Elizabeth H. Edman**, the wife of Airman Edman, is entitled to an award of  $4 million to compensate her for her emotional distress and pain and suffering.

**Brenda A. Eilers** was on the couch in the living room on the first floor of her dorm in Khobar Towers, getting ready to watch television at the time of the blast. Brenda A. Eilers Declaration and Exhibits, Decl. of Brenda A. Eilers ¶ 5 at 2.  She saw an incredibly bright light and felt immense heat.  *Id.*  She was knocked unconscious. *Id.* When she came to, she saw people's faces looking down at her.  *Id.*  Airman Eilers sustained bilateral shoulder injuries, multiple lacerations from broken glass, a traumatic brain injury, puncture wounds to her legs, overall trauma to her body, and dislocations of both shoulders.  *Id.*  She was evacuated from the building and transported to a hospital in downtown Khobar. *Id.* ¶ 6 at 2.  Her left shoulder was fully dislocated. *Id.*  Her shoulder was put back into place and her arm was put in a sling. *Id.*  She was awarded the Purple Heart. *Id.* Exhibits at 8 - 9.  She was placed on medical restriction due to her shoulder injuries.  *Id.* Exhibits at 10.   She was supposed to deploy to Korea in 1997 but it was cancelled due to her left shoulder requiring surgery and needing rehabilitation for both shoulders.  *Id.* Exhibits at 11.  In 1999 she was found to be unfit for the rigors of military service due to bilateral shoulder impingement and was recommended for discharge from the Air Force.  *Id.* Exhibits at 24.  She struggles with daily migraines with halos that cause near blindness; chronic back, neck, knee and leg pain for which she wears a leg brace and occasionally uses a cane or crutches; a TBI causing memory loss to the extent that she doesn't always recognize old friends; TMJ disorder; and tinnitus. *Id.* Decl. ¶¶  9 - 11 at 3.  Formerly athletic, she sometimes needs help dressing or tying her shoes. *Id.* ¶  8 at 3, ¶ 12 at 4.  Memory problems from the TBI and her physical struggles forced her to

drop out of an aeronautical engineering degree program. *Id*. ¶ 17 at 5. Later, she was unable to complete remedial courses due to increasingly frequent chronic migraines. *Id.;* Exhibits at 30. In 2007 her physician recommended that her work hours be restricted for 16 weeks due to her back pain, shoulder injuries, PTSD, and chronic migraines. *Id.* Exhibits at 31.

The V.A. has rated Airman Eilers as 90 percent disabled for migraines, PTSD, scoliosis, shoulder impingement, and other injuries, and compensates her at the 100 percent rate because she is unemployable. *Id.* Exhibits at 32 – 40. Airman Eiler's medical records document that her current medical conditions were caused by the Khobar bombing. *Id.* Exhibits at 13, 26 (migraines); at 12 (shoulder injury, knee and hip pain, upper back pain, insomnia, migraines, PTSD); at 20 (PTSD, shoulder injuries); at 18 (knee injury). She is currently in physical therapy twice a week. *Id*. ¶ Decl. 7 at 2. In light of Airman Eiler's relatively more numerous and severe injuries, this Court finds that she is entitled to an upward departure of $8 million for her pain and suffering as a survivor of the bombing.

**Rosemary A. Ritt**, the mother of Airman Eilers, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Larry Frank** was in a parking lot about 200 yards from Building 131, getting ready to gather his team to prepare their aircraft for the next morning's flight when he saw the sudden flash of the bomb exploding. Larry Frank Declaration and Exhibits, Decl. of Larry Frank ¶ 5 at 2. He saw the flash from the explosion. *Id.* He pushed one of his friends down to the ground as the blast wave hit them. *Id.* They were hit by flying debris and pebbled by rocks and glass. *Id.* He was bleeding from his ears and could not hear the screams of the people running from the burning and collapsing Building 131. *Id.* He tried to go back to his room to find his roommate, but his room had been destroyed in the blast. *Id.* He helped with the injured and carried the wounded. *Id.* He received treatment for the cuts to his hands and feet at the makeshift triage. *Id.* He was awarded the

Purple Heart for his injuries. *Id.* Exhibits at 14 – 15. He returned to Eglin Air Force Base in Florida and retired from the Air Force in 1998. *Id* ¶ 6 at 2. After the bombing he developed PTSD, nightmares, sleeping problems, memory loss, and flashbacks triggered by loud noises. *Id* ¶ 7 at 2. He dropped out of college where he was trying to get a computer degree because he couldn't concentrate. *Id.* He was depressed and anxious and having problems at work. *Id.* Eventually the strain on his marriage let him to seek sought treatment for PTSD. *Id* .

The V.A. has rated him 80 percent disabled including 70 percent for PTSD and 10 percent for tinnitus. *Id.* Exhibits at 11 – 13. This Court finds that Airman Frank is entitled to an award $5 million for his pain and suffering as a survivor of the bombing.

**Sonia M. Frank**, the wife of Airman Frank, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Dana P. Frank** and **Nathan R. Frank**, his children, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Christopher A. Freeman** was in his suite in his dormitory, two buildings away from Building 131 in Khobar Towers at the time of the explosion. Christopher A. Freeman Declaration and Exhibits, Decl. of Christopher A. Freeman ¶ 4 at 1. The blast threw him into a wall and he was knocked unconscious and suffered a concussion and trauma to his body. *Id.* ¶ 5 at 2. He sustained glass lacerations to his right leg from broken glass. *Id.* The lacerations were treated at the makeshift triage clinic at the Desert Rose Inn cafeteria, where he had five stitches to his right leg to stop the continuous blood flow. *Id.* He was awarded the Purple Heart for his wounds. *Id.* Exhibits at 4. This Court finds that Airman Freeman is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Jeffrey Gardner** was in the bathroom on the second floor of Building 130, in the section of the building closest to where the truck bomb was detonated, at the time of the explosion. Jeffrey

Gardner Declaration and Exhibits, Decl. of Jeffrey Gardner ¶ 4 at 1-2. He was knocked to the floor by the blast and was hit by a door that was blown off its hinges. He sustained lacerations and bruises to his right hip and behind his right ear, and he had difficulty hearing. He received medical attention for his injuries and he had follow-up hearing tests and was evaluated for a concussion. He was awarded the Purple Heart for his injuries. *Id.* at 8-10. The V.A. has rated him 30 percent disabled for lumbar radiculopathy, tinnitus, bronchitis, and painful scars. *Id.* at 6-7. He still struggles with nightmares about the bombing and avoids crowds, and loud noises. He no longer buys season tickets to the University of South Carolina football games, one of his favorite activities. Medical personnel have told him that he has PTSD symptoms and should seek treatment, but he has not done so due to the stigma that he feels is attached to PTSD. Airman Gardner has submitted photos showing the damage from the explosion to his dorm room, the bathroom where he was located at the time of the blast, the bathroom door that knocked him to the floor, the dormitory buildings, and the crater formed by the explosion. *Id.* at 11-16. This Court finds that Airman Gardner is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**William E. Giles IV** was walking out onto the balcony of his dorm, on the fourth or fifth floor of the building directly behind Building 131, when the explosion occurred. William E. Giles IV Declaration and Exhibits, Decl. of William E. Giles IV ¶ 5 at 2. He was blown across the room, through the door and into the kitchen, and hit the countertop with his lower back. *Id.* He sustained a concussion and injuries to his lower back where he collided with the kitchen countertop. *Id.* After the explosion, he remembers spinning around on the floor in the kitchen. *Id.* He was severely disoriented and couldn't see through the dust. Once the adrenaline wore off he realized he had severely injured his back. *Id.* He didn't seek treatment while he was in Saudi Arabia because he didn't want to be in the way of others who were more severely wounded. *Id.* He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 5. After returning home, he had his back evaluated at

Eglin Air Force Base. *Id.* Decl. ¶6 at 2. He was treated by V.A. doctors and prescribed anti-inflammatories, muscle relaxers, a TENS unit, and a back brace. *Id.* He has two fractures in his lower back from the blast that have not healed. *Id.* ¶ 8 at 2. He has undergone countless physical therapy sessions, cortisone shots, and a spinal fusion in an attempt to help his back pain but all of the treatments were futile. *Id.* ¶ at 2–3. After the bombing he began experiencing hypervigilance, insomnia, depression, flashbacks, nightmares, and anxiety. He was diagnosed with PTSD in 2007. *Id.* ¶ 8 at 2. He is uncomfortable in social situations and is fearful of thunderstorms, flashes of light, and people screaming. *Id* ¶ 7 at 2. He is unable to tolerate family gatherings with small children. His children have learned over the years how to cope with his PTSD. *Id.* He has been unable to maintain employment. *Id.* The V.A. has rated him as 60 percent disabled including 10 percent for his back injuries and 50 percent for PTSD. *Id.* Exhibits at 6–8. This Court finds that Airman Giles is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**William E. Giles III**, the father of Airman Giles, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Connie S. Love**, the mother of Airman Giles, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. **Tammy G. Adams**, the sister of Airman Giles, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Michael W. Goff** was in his bed in a dormitory building at Khobar Towers, with his back to a window when the explosion occurred. Michael W. Goff Declaration and Exhibits, Decl. of Michael W. Goff ¶ 4 at 2. The window exploded and he felt the sting of the broken glass impacting his neck, back and arms. *Id.* He was in pain and the building was significantly damaged but instead of escaping, he headed upstairs to see if other airmen needed help. *Id.* He remained with a severely injured airman, treating him for shock and controlling his bleeding, while he told the others to

evacuate the building and get help, all the while fearing that the building would collapse on them. *Id.* ¶ 5 at 2. While carrying him down the stairs on a comforter, Airman Goff slipped and hurt his lower back. *Id.* He later went to the morgue to help identify bodies where the gruesome injuries he saw there still haunt him to this day. *Id.* ¶ 8 at 3. One man he could only identify by his tattoo. *Id.* He still experiences flashbacks of the faces of his fellow airmen. *Id.* ¶ 13 at 4 - 5. The bombing had a profound effect on his life. The sound of breaking glass, even a dropped glass in a restaurant, will make him cringe, jump, and do an assessment of his body and those around him, making sure no one is hurt. *Id.* ¶ 11 at 4. Despite his heroism after the blast, he struggles with self-doubt and shame, asking himself if there was more he could have done to help. *Id*. ¶ 10 at 4. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 7 - 8. He was awarded the Air Force Commendation Medal with Valor for rescuing the injured airman after the bombing. *Id.* at 10. The V.A. has rated him as 60 percent disabled for PTSD, knee and back pain, and tinnitus. *Id.* Exhibits at 11 - 13. This Court finds that Airman Goff is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**The Estate of Hector Manuel Gonzalez Pastrana** seeks damages for **Airman** Gonzalez's wrongful death including damages for **Airman** Gonzalez's conscious pain and suffering, physical injury, emotional distress, and mental anguish from the time of his injury on June 25, 1996 to his death on March 4, 2017; the loss of his earnings from the date of his injury to the date of his death; loss of the prospective net accumulations of his estate; and medical and funeral expenses.

As to damages for **Airman** Gonzalez's conscious pain, several cases have awarded damages for the pain and suffering that occurred between a terrorist attack and the victim's death shortly thereafter. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007); *Haim,* 425 F.Supp.2d at 71-72 (citing *Eisenfeld v. Islamic Republic of Iran,* 172 F. Supp. 2d 1, 8 (D.D.C.2000) (Lamberth, J.)); *Elahi v. Islamic Republic of Iran,* 124 F. Supp. 2d 97, 112-13

(D.D.C.2000) (Green, J.).  When the victim endured extreme pain and suffering for a period of several hours or less, courts in these cases have rather uniformly awarded $1 million. *Haim v. Iran,* 425 F.Supp.2d 56, 71-72 (D.D.C. 2006). This award increases when the period of the victim's pain is longer. *Id.* at 72. In *Peterson*, the Court awarded $5 million in pain and suffering for a serviceman who was alive for nine years after the Khobar Towers attack, living with severe injuries. *Peterson*, 515 F. Supp. 2d at 53-54.

In light of the severe psychological and physical pain **Airman** Gonzalez lived with after the bombing (*see* Count V, *supra*), the Court finds that **Airman** Gonzalez's Estate is entitled to the baseline award of $5 million as compensation for his conscious pain and suffering from the time of the bombing in 1996 to the time of his death in 2017.  As plaintiffs submitted no evidence as to lost wages and loss of prospective net accumulations, no award for economic losses may be awarded. As the claim for compensation for **Airman** Gonzalez's conscious pain and suffering is the equivalent of the survival action brought by the Estate, the survival action need not be considered.

The Estate also seeks solatium damages for **Airman** Gonzalez's immediate family.  The Court finds that the appropriate award for wrongful death solatium damages for **Diana Gonzalez**, the surviving spouse of Hector Gonzalez, to be $8 million. The Court finds that the appropriate award for solatium damages for **Airman** Gonzalez's children, **Hector M. Gonzalez Jr.**, **Natasha Gonzalez**, and **José D. Gonzalez**, to be $5 million, per child.

**Rudolph I. Grimm II** was a Staff Sergeant for the United States Air Force at the time of the attack.  Rudolph I. Grimm II Declaration and Exhibits, Decl. of Rudolph I. Grimm II  ¶ 3 at 1.  He was sitting in a chair on the second floor of the medical building in Khobar Towers at the time of the attack.  *Id*. ¶ 4 at 1.  He heard a hissing noise and the lights flickered. *Id*. The next thing he knew, he was lying on the floor covered in glass and debris. *Id*. ¶ 4 at 1 - 2.  He sustained multiple lacerations and glass shrapnel wounds to his body and glass shards in his eyes.  *Id*. Outside the

building it was chaos. *Id.* Injured airmen were arriving at the medical building for triage. *Id.* He and others immediately began triage, placing the severely injured inside the building while other injured gathered in the courtyard area until additional help arrived. *Id.* Although Airman Grimm had lacerations throughout his body, it wasn't until he was performing CPR on a non-responsive airman that he realized he had a large shard of glass sticking out of his left hand. *Id.* ¶ 5 at 2. He had accidentally pushed it deeper into his hand before realizing it was there. He pulled out the glass shard, wrapped his hand with gauze and continued with CPR. *Id.* Airman Grimm continued to treat the wounded airmen until all the injured had been helped. *Id.* Only then did he receive medical attention for his own injuries, including the lacerations to his body and the glass shards in his eyes. *Id.* ¶ 6 at 2. He received treatment at the makeshift triage at the Desert Rose cafeteria and at the Khobar Towers clinic. *Id.* Exhibits at 5. They flushed the glass from his eyes and removed as much glass as they could from his eyes and bandaged him. He had to administer eye drops to his eyes for a week. *Id.* Decl. ¶ 6 at 2. He also carried the deceased to the temporary morgue in the commander's office. *Id.* ¶ 7 at 2. In the following days he assisted in the cleanup of the glass, debris and blood throughout the compound. *Id.* ¶ 8 at 2. Airman Grimm was awarded a Purple Heart for his wounds. *Id.* Exhibits at 9–10. He was awarded the Air Force Commendation Medal with Valor for providing life-saving treatment to hundreds of personnel with life-threatening injuries. *Id.* at 11-12. Upon returning to the U.S. in late July 1996 Airman Grimm began having problems adjusting after his experience in the bombing. *Id.* Decl. ¶ 9 at 3. He sought treatment and was diagnosed with PTSD. *Id.* He was placed on medication and attended counselling sessions. *Id.* Having witnessed death and injury on such a massive scale, treating the wounded, and having to bury his close friends and acquaintances, had taken a heavy toll on him. *Id.* ¶ 10 at 3. The V.A. has given Airman Grimm a 70 percent disability rating including 30 percent for PTSD, twenty percent for back conditions, and 10 percent for arthritis. *Id.* Exhibits at 6–8. The VA disability

rating decision states that the cause of Airman Grimm's PTSD was his exposure to traumatic events in the Khobar Towers attack. *Id.* at 8. This Court finds that Airman Grimm is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Shawn K. Hale** was sitting in the common area of his suite in Khobar Towers watching TV with the sliding glass patio door to his left at the time of the explosion. Shawn K. Hale Declaration and Exhibits, Decl. of Shawn K. Hale ¶ 4 at 1. The blast shattered the door and blew the broken glass inwards, sending shrapnel into the room and hitting Airman Hale into his right eye. *Id.* ¶ 4 at 2. Seconds after the blast he noticed blood hitting the floor and realized it was his own blood. *Id.* ¶ 5 at 2. There was broken glass everywhere. *Id.* Someone put a shirt over his face and put sandals on his feet and walked him to the clinic next door. *Id.* After 45 minutes he was taken by ambulance to a local hospital in Dhahran where he had surgery to remove the glass shrapnel from his right eye. *Id.* ¶ 6 at 2. He doesn't remember the next three days. He was aeromedically evacuated to Landstuhl Regional Medical Center in Germany for further surgery on his eye. *Id.* Exhibits at 6 - 9. He was diagnosed with a perforating corneoscleral laceration, traumatic cataract, vitreous hemorrhage, and a possible intraocular foreign body. *Id.* Exhibits at 7. On June 29 he was aeromedically evacuated to Washington DC where he had cataract surgery at Walter Reed Army Medical Center in order to replace the ruptured lens, as well as laser surgery to try to save his vision. *Id.* Exhibits at 10 - 14. He was hospitalized at Walter Reed for four weeks. *Id.* Exhibits at 12. He was sent home to Nellis Air Force Base in Nevada and received treatment twice a week for six months. *Id.* Decl. ¶ 8 at 3. He was then sent to Lackland Air Force Base where he received his fifth major procedure, a corneal transplant, and had continued care at Nellis Air Force Base, seeing an ophthalmologist every week. *Id.* Airman Hale's medical records document that his right eye injury was caused by the flying glass and debris entering his eye as a result of the Khobar Towers bombing. *Id.* Exhibits at 6, 9, 12, 15, 17.

In sum, the injury caused corneal, retina, and lens damage to Airman Hale's right eye leaving him with 20/400 vision in that eye as well as weakening the vision in his left eye. *Id*. Decl. ¶¶ 3 -4 at 2. The loss of vision in his right eye has left him with altered depth perception. *Id*. ¶ 9 at 3. His left eye has become so weak that he needs glasses to see any distance. *Id*. He also needs sunglasses outside to protect his right eye as the pupil does not dilate enough to protect the eye from sunlight. *Id*.

After the bombing Airman Hale developed PTSD. *Id*. ¶ 10 at 3. He has difficulty being in buildings with glass walls and being exposed to loud noises. *Id*. ¶ 11 at 3. If he hears a loud explosion it takes him back to the night of the bombing. *Id*. His heart starts pounding and for the next few nights he experiences haunting nightmares. *Id*. Airman Hale was awarded the Purple Heart for the injuries he sustained in the Khobar Towers bombing. The V.A. has rated him at 60 percent disabled. *Id*. Exhibits at 19. In light of Airman Hale's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Torrey S. Hardy** was cleaning the bathroom of his suite in Building 131 on the night of the explosion, on the opposite side of the building from where the truck bomb was located. Torrey S. Hardy Declaration and Exhibits, Decl. of Torrey S. Hardy ¶ 5 at 2. Earlier in the evening he had been playing cards across the hall with his two friends. *Id*. He decided to take a break from cleaning and walked across the hall to continue the card game. *Id.* His friends were on the phone with the families so Airman Hardy went back to finish cleaning. *Id*. By the time he had stepped across the doorway to the bathroom he felt a tremendous force and heard and felt a loud rumbling. *Id*. The building shook violently. *Id*. The blast brought part of the ceiling down on top of him. The bathroom mirrors shattered and pieces of the mirror and ceiling pierced his left knee. *Id*. He suffered multiple cuts and lacerations from the broken glass throughout his body. *Id*. ¶ 12 at 4. The

skin on his left knee was hanging off and he wrapped a sock around it to slow the bleeding. *Id*. ¶ 6 at 2. He guided his Staff Sergeant, who was covered in blood and unable to see, out of the building. *Id*. He went back to find his two friends but was unable to open their door. *Id*. His two friends would be killed in the blast. *Id*. ¶ 11 at 4. Despite the extreme pain in his knee he helped injured people to triage area until his leg gave out. *Id*. ¶ 7 at 4. He was transported to triage and then to a local hospital to have the glass removed from his back and feet. *Id*. ¶ 8 at 3. Surgery was performed to remove the shrapnel and debris from his left knee. *Id*. ¶ 12 at 4. He was awarded the Purple Heart. *Id*. Exhibits at 62.

After returning home, he developed PTSD and suffered from nightmares, insomnia and paranoia. *Id*. Decl. ¶ 15 at 4. Loud noises would startle him. And he would sometimes wake up crying or screaming. He became extremely distant from people, especially his loved ones. *Id*. His son was born four months after the attack. *Id*. ¶ 9 at 3. He found himself not wanting to get close to anyone because of the feeling that he might lose them. This hurt his marriage and his children and was a major factor in the end of his previous marriage. *Id*. ¶ 15 at 5.

Airman Hardy's knee injury still causes him pain. *Id*. ¶ 10 at 3. He has been on numerous waivers from the military for the pain associated with his knee injury. *Id*. ¶ 12 at 4. He has received medical treatment and physical therapy for his knee since the bombing. *Id.* Exhibits at 9-61. His medical records document that the Khobar Towers bombing was the cause of his knee injury. *Id.* Exhibits at 10, 17, 20, 22, 23, 35, 38, 40, 50, 54, 55, 57–60. He has received a 50 percent disability rating from the V.A. including 10 percent for his knee injury. *Id.* Exhibits at 63–65. He is currently seeking a disability determination for PTSD from the V.A. *Id*. Decl. ¶ 14 at 4. In light of Airman Hardy's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Michael J. Harner** was in his room on the 6th floor Building 133, which was adjacent to Building 131, at the time of the bombing. Michael J. Harner Declaration and Exhibits, Decl. of Michael J. Harner ¶ 5 at 2. He had just finished a 3-mile run. *Id.* Five minutes before the blast he was on the balcony of his suite overlooking the parking lot and the city of Dhahran. *Id.* He noticed a truck, enter the parking lot adjacent to Khobar Towers. *Id.* When the truck was detonated, he had just walked back inside the room and closed the sliding glass door behind him. *Id.* He was on the floor about three feet from the glass door. *Id.* The plate glass exploded over his head and face, right arm, right shoulder and right leg. *Id.* He was unable to see because of the blood running into his eyes. *Id.* It took ten to fifteen minutes to stop the bleeding so he could exit the building. *Id.* He made his way into the stairwell where he was found by other airmen who carried him down six flight of stairs to the triage area. *Id.* ¶ 6 at 2. He was stabilized with an IV in each arm and was treated for two hours before being transported by ambulance to King Fahd University Hospital, where he had surgery. *Id.* He was in shock and had lost a tremendous amount of blood. *Id.* Doctors sewed his face, head, ear, and shoulder. *Id.* ¶ 8 at 3. His right leg and foot were immobilized in a partial cast. *Id.* The doctors were unable to sew up his right leg for risk of infection. *Id.*; Exhibits at 10. The wounds in his leg had to be packed and unpacked with gauze every twelve hours, which caused severe pain. *Id.* Decl. ¶ 8 at 3. The experience of being alone in the hospital caused him severe anxiety with nightmares and hypersensitivity to sound and movements, which was later diagnosed as PTSD. *Id.* ¶ 7 at 3. He was aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id.* ¶ 8 at 3; Exhibits at 7. He returned to the U.S. for treatment at four separate hospitals. *Id.* ¶ 9 at 3. He finally had surgery to close up his leg laceration. *Id.*; Exhibits at 10. However, part of the wound was left open because there wasn't enough skin to cover the wound, and it had to be packed and unpacked every twelve hours. *Id.* Decl. ¶ 9 at 3.; Exhibits at 10, 15 - 16. He required months of physical therapy to regain his

strength. *Id.* Decl. ¶ 9 at 3; Exhibits at 11 - 14.  He had further surgery to remove glass imbedded in his leg.  *Id.* Exhibits at 17.  He was awarded the Purple Heart for his injuries. *Id.*  Exhibits at 6. He still suffers from lack of feeling and weakness in his right leg, painful scars in his head, and hearing loss. *Id.* Decl. ¶ 10 at 4.  Glass fragments still work their way out of his skin.  *Id.*

After the bombing he began to experience anxiety with nightmares and challenges being in large crowds or when exposed to loud noises. *Id.* ¶ 11 at 4; Exhibits at 19 - 22.  He was treated by mental health counselors at his Air Force base and by his pastor.  *Id.* ¶ 11 at 4.  He was later told that he suffered from PTSD.  *Id.*  He remembers the bombing every day.  *Id.* ¶ 12 at 4.

Airman Harner retired in 2019 after twenty-five years of military service. Michael J. Harner Supplemental Declaration and Exhibits, Supplemental Decl. of Michael J. Harner ¶ 5 at 1. He has received a disability rating of ninety percent from the V.A.  *Id.*  Supplemental Exhibits at 3.  In light of Airman Harner's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Julia N. Harner**, the wife of Airman Harner, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.  **Nancy S. Harner**, his mother, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.  His father, **James O. Harner**, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.  **Michelle A. Caldwell**, his sister, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Gregory R. Hedglin** was in the living room of his dormitory in Khobar Towers, watching television, when the explosion occurred.  Gregory R. Hedglin Declaration and Exhibits, Decl. of Gregory R. Hedglin ¶ 4 at 2.  He was sitting next to the sliding glass door to the patio. *Id.* He saw a very bright white light and then next thing he knew he was in darkness.  *Id.* All the lights were out and he was now facing the opposite way.  *Id.* He felt liquid on his face and throat and he could

smell and taste blood. *Id*. He suffered multiple cuts and lacerations to his face, neck, right arm and legs from the broken glass. *Id*. ¶ 6 at 2. His jugular vein was cut and he was bleeding profusely. Id. With the two other airmen in the room he evacuated but found the door to the staircase wouldn't open. *Id*. ¶ 4 at 2. Their Master Sergeant arrived with a flashlight and showed them that they were standing on a door that had blown off its hinges and was on the ground blocking the door they were trying to open. *Id*. Outside, he found his t-shirt was soaked in blood. *Id*. ¶ 5 at 2. He put his finger in his neck to stop the bleeding from his cut jugular vein, and wrapped it in a t-shirt. *Id*. He sat down from shock and fatigue and was transported to the makeshift triage area in the chow hall. *Id*. He was then taken by ambulance to a local hospital where he had emergency surgery to repair his jugular vein and stitch his other wounds. *Id*. His wounds required seventy stitches. *Id*. ¶ 6 at 2. His right ear drum was perforated. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 11. After returning home, he was diagnosed with PTSD, from which he still suffers to this day. *Id*. Exhibits at 10. PTSD has kept him from enjoying a normal life. *Id*. Decl. ¶7 at 3. He feels anxiety around large crowds and has a low tolerance for loud noises. *Id*. He has sought treatment and has been in intense therapy for the past two years. *Id*. He has received a disability rating of twenty percent from the V.A. *Id*. Exhibits at 6–9. In light of Airman Hedglin's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Randy W. Hooker** was walking back to his dormitory in Building 130, through the shared common area with Building 131, at the time of the bombing. Randy W. Hooker, Declaration and Exhibits, Decl. of Randy W. Hooker ¶ 4 at 2. There was a large flash of light, followed by a deafening noise and an immense pressure that threw him to the ground. *Id*. ¶ 5 at 2. Everything went dark and all he could hear was a loud ringing in his ears. *Id*. He sustained injuries to his left knee and right wrist and had lacerations from shrapnel on both arms. *Id*. ¶ 8 at 2. Despite his

injuries he went into Building 131 to help rescue injured airmen. *Id.* ¶ 6 at 2. Some of the airmen he found had already died from bleeding out or being crushed by debris or had been severely disfigured. *Id.* ¶ 7 at 2. The images of his fellow airmen with these devastating injuries still haunt him. *Id.* He was transported to the makeshift trauma area at the Desert Rose chow hall where medics pulled debris, glass and rock fragments from multiples areas of his body. *Id.* ¶ 8 at 2–3. He had follow-up treatment with on-site doctors. *Id.* ¶ 8 at 3. The bomb blast had damaged his dormitory building to the extent that it was uninhabitable and everything he owned had been destroyed. *Id.* Airman Hooker was awarded the Purple Heart for his injuries and the Air Force Commendation Medal with Valor for rescuing the wounded after the bombing. *Id.* Exhibits at 9–10. After returning to the U.S. he developed PTSD with flashbacks, which could be triggered by a smell, sound, news report, or social media. *Id.* Decl. ¶ 10 at 3. Before the bombing he had been very sociable with lots of friends but after the bombing he lost his trust in people and he lacks the attachment to loved ones that he once had. *Id.* ¶ 13 at 3. These problems led to his divorce. *Id.* He still needs medications to sleep due to vivid dreams of the event from the night of the bombing. *Id.* ¶ 10 at 3. The V.A. has rated him as 60 percent disabled including 50 percent for PTSD and 10 percent for tinnitus. *Id.* Exhibits at 7–8. This Court finds that Airman Hooker is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Dusty L. Huntley** was in the bathroom of his dormitory in Khobar Towers, getting ready to go to work, at the time of the attack. He heard and felt the blast. People started screaming, and someone told him to "get out of there." Dusty L. Huntley Declaration and Exhibits, Decl. of Dusty L. Huntley ¶ 5 at 2. After the explosion, he helped with the wounded and performed buddy care aid on many of the injured airmen. *Id.* ¶ 6 at 2. He witnessed first-hand the bulk of the casualties because he helped carry many of them. *Id.* Two of the airmen who were killed had worked under him. *Id.* After about four to five hours of assisting the wounded, he was informed that during that

time he had been listed as MIA, which caused him great distress as he knew his wife would be in anguish. *Id*. He was awarded the Air Force Commendation Medal and his unit was awarded the Outstanding Unit with Valor Award. *Id*. Exhibits at 16 – 17. After the bombing he developed PTSD from experiencing the attack and from witnessing the pain and suffering of his fellow airmen. *Id*. Decl. ¶ 7 at 2. He began to have nightmares, sleeping problems, mood swings, and depression. *Id*. To this day it is difficult for him to listen to the national anthem or watch war movies. *Id*. He isolates himself from others and sometimes seeks solitary places. *Id*. He still has vivid memories of the night of the bombing. *Id*. His struggle with PTSD has been very hard on his marriage and family life. *Id*. He received treatment from the V.A. for his PTSD. *Id*. ¶ 9 at 2; Exhibits at 6 – 14. According to clinical notes from 2008, Airman Huntley reported that his sleeping problems and anxiety started after his experience in the Khobar Towers bombing. *Id*. Exhibits at 7. Airman Huntley has a tribute to his fallen fellow airmen tattooed on his back. *Id*. Exhibits at 20 - 22. The V.A. has rated him as 80 percent disabled, including 50 percent for PTSD. *Id*. Exhibits at 15. This Court finds that Airman Huntley is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Roberta A. Huntley**, the wife of Airman Huntley, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Kevin L. Huntley** and **Kyle L. Huntley**, the sons of Airman Huntley, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Michael R. Jay** was in his bedroom on the fourth floor of Building 131 when the explosion occurred. Michael R. Jay Declaration and Exhibits, Decl. of Michael R. Jay ¶ 5 at 2. He had just put on his workout clothes, and was about to take a trip to the gym with his fellow airman. *Id*. Moments later, he was unconscious and lying face down with a metal locker on top of him. *Id*. When he came to, he saw that the entire front wall of his bedroom was gone. *Id*. He called out for

his friend but there was no reply. *Id*. He pushed himself from underneath the locker and was in pain from cuts and bruises. *Id*. He tried to find his friend but he heard shouts for everyone to evacuate. He made the difficult decision to evacuate the bombed building. *Id*. Airman Jay's friend had not survived. *Id*. As a result of the explosion, he suffered multiple cuts and lacerations including a severe cut to the front of his scalp, his left ear was sliced off by glass shrapnel, and he sustained a concussion and traumatic brain injury. *Id*. ¶ 6 at 2. He was brought to ARAMCO local hospital. *Id*. Exhibits at 6. The next day he was aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id*. Exhibits at 7 - 20. He was then aeromedically evacuated to Patrick Air Force Base for further treatment. *Id*. Exhibits at 21 – 25. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 42. After returning home, he was diagnosed with PTSD, causing him to be withdrawn, moody, and impatient. *Id*. Decl. ¶ 8 at 3. His PTSD symptoms alienated his family and his marriage ended in divorce and his relationships with his children and family were harmed. He sought treatment and still attends counselling. *Id*. Exhibits at 26. He has permanent disfiguring scars. *Id*. He has difficulty maintaining employment due to missed work days from headaches and chronic pain. *Id*. Decl. ¶ 7 at 3. The V.A. has rated Airman Jay as 100 percent disabled, including 100 percent for PTSD and 50 percent for post-traumatic vascular headaches. *Id*. Exhibits at 27 – 41. In light of his relatively more numerous and severe injuries, this Court finds that Airman Jay is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Robert M. Jay**, the father of Airman Jay, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering. **Donna Jay**, the mother of Airman Jay, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Stephen K. Johnson** was in his bedroom on the fourth floor of his dormitory in Building 129, which was behind Building 131, at the time of the explosion. The blast knocked him unconscious for fifteen to twenty minutes. Stephen K. Johnson Declaration and Exhibits, Decl. of Stephen K. Johnson ¶ 5 at 1–2 . He was rescued by other airmen on their fourth search of the building. *Id.* He was taken to the triage area set up in the chow hall where they ran him through a battery of tests to determine if he had a concussion. *Id.* ¶ 6 at 2. Despite his injuries, he helped evacuate other victims from the damaged buildings. *Id.* The blast caused major damage to his building. *Id.* ¶ 7 at 2. Airman Johnson has submitted six photographs of the damage to his bedroom from the blast. *Id.* Exhibits at 7–12. He was awarded the Purple Heart for his injuries. *Id.* Exhibit at 26–27. He was awarded the Air Force Achievement Medal with Valor for rescuing injured airmen after the bombing. *Id.* Exhibits at 28. When he returned home to the U.S. in July 1996, he received follow-up medical care at Grand Forks Air Force Base. *Id.* Exhibits at 13–14. Airman Johnson developed anxiety symptoms upon return to the U.S. in July 1996, with nightmares and panic attacks. *Id.* Decl. ¶8 at 2. He has trouble staying focused and has problems sleeping. *Id.* Airman Johnson was diagnosed with generalized anxiety disorder (GAD), and he was treated with medication and group therapy. *Id.* Exhibits 15–23. The GAD harmed his personal and social life and he cannot interact with other people in the same way as before the attack. *Id.* Decl. ¶10 at 2. He was given a 50% disability rating from the V.A. *Id.* Exhibits at 24–25. This Court finds that Airman Johnson is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Jessica D. Johnson**, the wife of Airman Johnson, is entitled to an award of $4 million against Defendants to compensate her for her emotional distress and pain and suffering. **Stephen K. Johnson II** and **Ryan W. Johnson**, the sons of Airman Johnson, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**David P. Jordan** was in his dormitory in Building 102 at Khobar Towers at the time of the bombing. David P. Jordan Declaration and Exhibits, Decl. of David P. Jordan ¶ 5 at 1. The shock wave from the explosion threw him against the wall and knocked him unconscious. *Id*. When he came to, he was covered in broken glass with multiple lacerations to his head, legs and arms. *Id*. He was treated at the makeshift triage location where his wounds were bandaged. *Id*. Exhibits at 4. He was referred to a Critical Incident Stress Debriefing. *Id*. Decl. ¶ 6 at 2. He was treated at Shaw Air Force base when he returned to the U.S. *Id*. After the bombing, he developed growing anger issues and the need to be alone in a calm, quiet place. *Id*. ¶ 7 at 2. He retired from the Air Force soon after the bombing in January 1997. *Id*. ¶ 8 at 2. This Court finds that Airman Jordan is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Ruth A. Jordan**, the wife of Airman Jordan, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Patrick H. Kick** had just returned to his room after his routine run around the perimeter at Khobar Towers and was in the common living area adjacent to a glass patio door when the explosion occurred. Patrick H. Kick Declaration and Exhibits, Decl. of Patrick H. Kick ¶ 4 at 1 -2. He suffered cuts and lacerations to both legs, hands and arms. *Id*. ¶ 4 at 2. He treated his own wounds by cleaning and bandaging them. *Id*. He went to the bomb site to assist the injured personnel in the evacuation, pull the deceased and injured from the damaged structures and provide security for the on-site commander and task force. *Id*. He was awarded the Purple Heart for his injuries and the Air Force Commendation Medal with Valor for his actions after the bombing. *Id*. Exhibits at 6-8. After the attack he developed PTSD which caused him to experience recurrent flashbacks and nightmares, insomnia, anxiety, paranoia, hypervigilance and survivor's guilt. *Id*. ¶ 5 at 2. The blast caused permanent damage to his knee and he has had treatment for osteoarthritis and rheumatoid arthritis. *Id*. Exhibits at 11–12. He experiences bouts of dizziness several times a year

that can last up to two weeks, headaches, sinusitis, and fatigue. *Id*. Decl. ¶ 5 at 2. He suffers from chronic back problems which cause intense pain and impede him from sitting or standing for several hours at a time. *Id*. ¶ 8 at 2. The V.A. has rated him as 30 percent disabled. *Id*. Exhibits at 10. This Court finds that Airman Kick is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Thomas A. Kininger** was in his room in his dormitory building in Khobar Towers, about 100 yards from the truck bomb, when the explosion occurred. Thomas A. Kininger Declaration and Exhibits, Decl. of Thomas A. Kininger ¶ 4 at 1. His dorm room window faced the blast. *Id*. He was asleep in his bunk when the force of the bomb blew away his window curtains and shattered glass all over the room. *Id*. ¶ 5 at 2. As a result of the explosion, he suffered cuts and lacerations on his abdomen, both legs, and both feet. *Id*. ¶ 4 at 1. He got dressed and ran downstairs, thinking that an RPG attack or equivalent had happened. *Id*. ¶ 5 at 2. Outside, he was met by darkness and the air felt "electric". *Id*. He re-entered his building and floor by floor, room by room, told everyone to evacuate. *Id*. He was awarded the Purple Heart. *Id*. Exhibits at 5. After returning home, he was diagnosed with PTSD and depression, from which he still suffers to this day. *Id*. Exhibits at 17. He suffers from nightmares, sleeping disorders, flashbacks, anxiety attacks and aggressive outbursts for which he takes medication. *Id*. Declaration ¶¶ 6,7 at 2 -3; Exhibits at 17 - 18. After the attack, Airman Kininger became introverted which has impacted his social life and work. *Id*. Declaration ¶ 7 at 2. He has problems focusing on simple tasks and he describes his memory as terrible. *Id*. He suffers panic attacks from boxes, bags or backpacks that seem out of place or whenever he sees people act suspiciously. *Id*. The V.A. has rated his disability at 70 percent. *Id*. Exhibits at 6. This Court finds that Airman Kininger is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Steven R. Kitis** was sitting in the common area of his dormitory building in Khobar Towers when the truck bomb exploded approximately 250 yards away. Steven R. Kitis Declaration and Exhibits, Decl. of Steven R. Kitis ¶ 5 at 2. He was seated in front of a sliding glass door that led to the balcony, which was in direct line with the truck bomb. *Id*. ¶ 5 at 2. The blast slammed him head first into the concrete wall behind him. *Id*. He was hit with dirt, rocks, glass, and other debris from the explosion. *Id*. He sustained lacerations to the head, neck, torso, arms, hands, and legs. *Id*. ¶ 6 at 2. He was bleeding extensively and was in great pain, especially from the head wound. *Id*. He ran to the bathroom, with three other airmen, for safety. *Id*. ¶ 5 at 2. After evacuating the building, he initially refused treatment so he could help carry and treat other airmen who needed help, while he was still bleeding from his head, arms, hands, and legs. *Id*. ¶ 6 at 2. Two hours later when medical personnel told him he needed to get his injuries treated, he was taken by ambulance to a local hospital. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 10. After the bombing, Airman Kitis began to struggle with anger and anxiety for which he has been prescribed medication. *Id*. Exhibits at 13. After retirement he took his wife's advice and sought professional help but he refused to be diagnosed with PTSD for personal reasons. *Id*. ¶ 8 at 3. Airman Kitis was rated as 100% disabled by the V.A. and is considered to be totally and permanently disabled. *Id*. Exhibits at 11 - 12. This Court finds that Airman Kitis is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Geraldine R. Hartman-Kitis**, the wife of Airman Kitis, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Aaron L. Lande** was in the dayroom at the Transportation Squadron Dorms in Khobar Towers watching television with some fellow airmen when the attack occurred. Aaron L. Lande Declaration and Exhibits, Decl. of Aaron L. Lande ¶ 4 at 1. He blacked out and woke up on the floor in a puddle of blood. *Id*. He realized he was bleeding from his legs and feet. *Id*. Someone

came with a towel to try to stop the bleeding. *Id*. ¶ 4 at 1 - 2. The pain was so intense that he screamed. *Id*. ¶ 4 at 2. He felt intense pain in his head and his ears were ringing for hours. *Id*. He sustained lacerations from glass shrapnel wounds to his feet. *Id*. ¶ 5 at 2. At first he treated his wounds with self-aid and buddy care and later was treated at the makeshift triage at Khobar Towers to remove glass fragments from his feet. *Id*. Later he still had glass fragments in his feet and had to seek treatment at hospital to have them removed. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 6. Airman Lande still suffers pain from his injuries to his feet in cold weather. *Id*. Decl. ¶ 7 at 2. He still suffers from hearing loss and tinnitus and mental and emotional distress from the bombing. *Id*. ¶ 6 at 2. Loud noises will send him into a panic. *Id*. ¶ 7 at 2. He believes he has PTSD and has sought counselling. *Id*. ¶ 9 at 3. He is easily angered which he had never experienced before the bombing, and does not like social settings. *Id*. ¶ 7 at 2. He has a disability rating of 40 percent from the V.A. *Id*. Exhibits at 5. This Court finds that Airman Lande is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Shane A. Little** was asleep in his dormitory bedroom on the sixth floor of Building 130 at the time of the attack. Shane A. Little Declaration and Exhibits, Decl. of Shane A. Little ¶ 4 at 1. Earlier that evening he had been joking with two of his fellow airmen who were leaving the next morning, while Airman Little and his roommate would be stuck there for a few more weeks. *Id*. at 2-3. The two airmen would be killed in the explosion. *Id*. at 2. He awoke to objects being propelled through his room and then being sucked back out by the blast. *Id*. He heard people moaning and screaming. *Id*. The door to his room was blasted off. *Id*. ¶ 5 at 2. With his roommate, he rescued his crew chief from under a window frame that had been blown out. *Id*.

Later he realized he was covered in blood from a hole in his right hip where a foreign object had embedded. *Id*. ¶ 8 at 3. Medical personnel tried to remove the foreign object from his hip

without success, so they stitched the wound closed when he could endure the pain no longer. *Id*. ¶ 9 at 3.

After the bombing Airman Little developed PTSD and suffers from nightmares and anxiety. *Id*. ¶ 11 at 4. He still flinches during thunderstorms and fireworks. *Id*. He began drinking heavily and avoiding group settings due to anxiety. *Id*. The news of the terrorist attack on the U.S.S. Cole and the September 11 attacks brought all the feelings and issues back to him. *Id*. ¶ 12 at 4. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 7. Airman Little has submitted photos showing the destruction to his dormitory, including photos of his bedroom, with the broken window directly over the bed, and photos showing the broken sliding glass door in the dayroom, the view from his window of the crater left by the bomb, and the window frame that trapped his crew chief. *Id*. Exhibits at 8 - 15. This Court finds that Airman Little is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Angeline Marsh** was in the living room of her suite in Building 121 when the attack occurred. Angeline Marsh Declaration and Exhibits, Decl. of Angeline Marsh ¶ 5 at 2. The force of the blast threw her across the room and she was cut by the glass and metal shrapnel. *Id*. As a result of the bombing she suffered multiple cuts and lacerations to both legs and her Achilles' tendon, cuts to her arms, and a scratched cornea. *Id*. ¶ 6 at 2. She had difficulty evacuating the room because of the injuries to her legs. *Id*. ¶ 5 at 2. She was carried to the triage area and taken to King Fizel University Hospital in Dhahran where her wounds were stitched and bandaged. *Id*. She received further care at the base clinic for her eye injury and to get her stitches removed. *Id*. Once she returned to the United States, she had to undergo physical therapy for the injury she suffered to her Achilles' tendon. *Id*. ¶ 7 at 2. She was awarded the Purple Heart for her injuries. *Id*. Exhibits at 20.

After returning home, she developed PTSD, from which she suffers to this day. She had trouble sleeping and when was able to fall asleep, she began having nightmares. *Id*. Decl. ¶ 9 at 3. As a result of the bombing, she no longer feels safe, is suspicious of most people she meets, and has to avoid large groups of people. *Id*. ¶ 8 at 3. She suffers from mood swings and tends to lack patience with her children. *Id*. ¶ 9 at 3. Airman Marsh still takes medications for her symptoms. *Id*. She still has nightmares, is very sensitive to loud noises and cannot stand being in large crowds for long periods of times. *Id*.

The V.A. has given her a disability rating of 90 percent including 30 percent for PTSD, 30 percent for migraines, 30 percent for facial scars, back pain, and tinnitus. *Id*. Exhibits at 24 - 29. This Court finds that Airman Marsh is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Minnie D. Herbert**, the mother of Airman Marsh, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Joe D. McDonald** was in his room at Khobar Towers when the attack occurred. He was falling asleep and he saw a bright flash of light but didn't hear any sound. Joe D. McDonald Declaration and Exhibits, Decl. of Joe D. McDonald ¶ 4 at 1. The walls and windows were blown inside. He sustained shrapnel wounds to his legs and ankles. He grabbed a pair of boots and went to gather his airmen. Twenty-three of his men had been injured. Id. ¶ 4 at 1. After a while his feet started to feel funny so he took off his boots and poured the blood out of them. He received basic first aid and a quick check by medical personnel at Khobar Towers. ¶ 6 at 1. He didn't sleep for the next forty-six hours. He remained in Saudi Arabia for another two months before returning to the U.S. After returning home, he was diagnosed with PTSD in 1997. He spent a month in psychiatric rehabilitation and started weekly counselling. *Id.* ¶ 7 at 2; Exhibits at 27. His PTSD has harmed his family relationships and he has lost all links to his family and relatives. *Id.* Decl. ¶ 7 at 2. He has

trouble sleeping and has recurring nightmares where he wakes up screaming and punching things. *Id*. ¶ 8 at 2. He is unable to attend places were large crowds gather and is prone to react poorly to what he perceives as danger events or other circumstances. *Id*. His medical records document his traumatic experiences in the Khobar Towers bombing. *Id*. Exhibits at 26. After psychological testing in 2015 he was determined to meet the criteria for PTSD, with the trauma of the Khobar Towers bombing listed as meeting the criteria for "threatened death". *Id*. Exhibits at 29. He still suffers from hearing loss. He was awarded the Purple Heart and the Air Force Achievement Medal with Valor for rescuing the injured after the blast. *Id*. Exhibits at 33 - 34. The V.A. has rated him as 90 percent disabled for PTSD, sleep apnea, tinnitus, arthritis, kidney stones, and shoulder strain. *Id*. Exhibits at 5–22. This Court finds that Airman McDonald is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Matthew E. McEndree** was in his room on the 5th floor of Building 133 at the time of the attack. Matthew E. McEndree Declaration and Exhibits, Decl. of Matthew E. McEndree ¶ 4 at 1. The explosion threw him from one side of the room to the other. He suffered a traumatic brain injury and lacerations from glass, metal and wood shrapnel to his head, arms, neck, back, legs and feet. *Id*. ¶ 4 at 1–2. Tragically his friend and fellow airman died in front of him. *Id*. ¶ 4 at 2. Despite his injuries he began assisting his fellow airmen to the triage site. *Id*. He was in shock and in extreme pain. *Id*. He was taken to the Armed Forces Hospital at the King Abdulaziz Air Base in Saudi Arabia. *Id*. He was awarded the Purple Heart and the Air Force Commendation Medal with Valor for rescuing the injured after the blast. *Id*. Exhibits at 14–19. After the attack, he began to suffer with depression, anxiety, and PTSD. *Id*. Decl. ¶ 5 at 2. He still suffers from night terrors at least twice a month. *Id*. He does not feel safe in crowds and has a low tolerance for loud noises. *Id*. He is on medication for anxiety and depression. *Id*. He tries not to think about the bombing but it is impossible because every morning he sees the scars on his body. *Id*. Decl. ¶ 6 at 2. He has

concentration difficulties that cause him to repeat simple tasks over again. *Id*.   He has a difficult time with relationships, having been through two divorces since the bombing. *Id.* The V.A. has rated him as 60 percent disabled. *Id*. Exhibits at 7–13.  This Court finds that Airman McEndree is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Phillip E. Miller** was standing in front of his wall locker in his room in Building 130 at Khobar Towers at the time of the explosion, getting ready for work while his roommate read a book on his bed.  Phillip E. Miller, Decl. of Phillip E. Miller ¶ 4 at 1 -2.  The force of the blast threw him back against the wall, blew the two wall lockers in separate directions and blew the window glass into the room.  *Id*. ¶ 4 at 2.   Airman Miller sustained glass and shrapnel wounds to his head, face and hands. *Id*.  He couldn't hear anything except ringing in his ears.  *Id*. ¶ 5 at 2.  He helped his roommate escape from under the fallen debris.  *Id*.  In the common room he found an airman in a state of shock and brought him out of the building to triage.  *Id*.  Airman Miller was awarded the Purple Heart for his injuries.  *Id*.  Exhibits at 6.  After the attack he began to suffer from flashbacks, nightmares, and panic attacks. *Id*. Decl. ¶ 9 at 3.   To this day, Airman Miller suffers from debilitating headaches.  *Id*.   There are many activities he no longer participates in because he avoids large crowds. *Id.*  The V.A. has rated Airman Miller as l00% disabled including 30 percent for PTSD.  *Id*. ¶ 10 at 3;  Exhibits at 7.  He is considered to be totally and permanently disabled. *Id*. Exhibits at 7.  This Court finds that Airman Miller is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Scott A. Miller** was in his dormitory room in Khobar Towers a few buildings away from the blast site, reading a book in bed when he felt the walls and ceiling began to shake.  Scott A. Miller Declaration and Exhibits, Decl. of Scott A. Miller ¶ 5  at 2.  The window and window frame above his head blew in on top of him, followed by a large wall locker, and he needed help from his roommate to get out from under them. *Id*. ¶¶ 5–6 at 2.  He was wearing only a t-shirt and shorts and

sustained lacerations and glass shrapnel wounds to his arms, legs, and feet. *Id.* Airman Miller was in a state of terror and shock, not knowing if another attack was coming, or whether his comrades were safe. *Id.* He received treatment on site at Khobar Towers and after he returned home to Eglin Air Force Base in Florida. *Id.* ¶ 7 at 2. Airman Miller was awarded the Purple Heart for his injuries. *Id.* Exhibits at 7 – 8. He ended his active duty military service at the end of his first enlistment because of the attack, losing income and benefits including active duty retirement. He started over in a new job at near minimum wage. *Id.* Decl. ¶ 8 at 2. He also suffers from PTSD and survivor's guilt, for which he has sought treatment from pastors, counselors and resilience experts. *Id.* ¶ 9 at 2. For the decade after the attack he endured frequent and severe depression, anxiety, panic attacks, and aversion to sudden loud noises, limiting his ability to perform at his job. *Id.* ¶ 10 at 3. They contributed to his separation from active military service and to his divorce in 2004. *Id.* The impact of the attack hindered his ability to develop new work and relationship opportunities. *Id.* ¶ 11 at 3. It was only in the second decade after the bombing that he was able to turn the cover on his recovery, and in the last three years that he has been able to face his fear and make progress. *Id.* ¶ 12 at 3. However, talking or thinking about the bombing is still extremely emotionally difficult. *Id.* ¶ 13 at 3. This Court finds that Airman Miller is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Shawn F. Mohammed** was on the fifth floor balcony of his dormitory building in Khobar Towers. The explosion blasted him sent him flying through the glass doors back into the room. Shawn F. Mohammed Declaration and Exhibits, Decl. of Shawn F. Mohammed ¶ 4 at 1. He was knocked unconscious and when he came to his wrists and hands were badly cut and bleeding. *Id.* As he escaped the building he carried an injured man on his back down five stories and took him to receive medical treatment. *Id.* ¶ 4 at 2. Airman Mohammed was awarded the Purple Heart for his injuries. *Id.* Exhibits at 4. After the attack Airman Mohammed began to suffer from sleep

disorders, suicidal thoughts, nightmares and cold sweats, as well as suicidal thoughts as a result of the bombing. *Id*. Decl. ¶ 5 at 2. He developed a closed off personality, keeping his feelings to himself, and feels emotionless. *Id*. Airman Mohammed still takes medication for depression and suicidal thoughts. *Id*. ¶ 7 at 2. The V.A. has rated him as 30 percent disabled for cervical strain and lumbosacral strain with degenerative arthritis. *Id*. Exhibits at 5 – 7. This Court finds that Airman Mohammed is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Erin L. Murphy** was talking to her roommate in the common area of her suite in Khobar Towers at the time of the attack. Erin L. Murphy Declaration and Exhibits, Decl. of Erin L. Murphy ¶ 4 at 1. Suddenly she felt an enormous rumble and shaking. *Id*. The sliding glass door exploded into the common area. *Id*. ¶ 4 at 1 - 2. The air was sucked out of the room and then imploded inward. *Id*. ¶ 4 at 2. She fell behind the couch. *Id*. After the explosion she looked for her roommates. *Id*. One of her roommates had broken her leg and she helped her to evacuate the building. *Id*. ¶ 5 at 2. In the wake of the bombing Airman Murphy was assigned to secure the perimeter of the impacted area near Building 131 where the fence had been blown away. *Id*. ¶ 8 at 2. She was "scared out of her mind." *Id*. ¶ 6 at 2. She saw that half of Building 131 had been sheared off in the explosion and saw large blood splatters out the top floor window on the back side of the building. *Id*. ¶ 7 at 2. Recovery teams began bringing the dead out of the building to the area of the perimeter near her post. *Id*. ¶ 8 at 2. This was extremely upsetting for her and she felt fear, sadness, helplessness, and anger. *Id*. She was at her post for twelve hours. *Id*. ¶ 9 at 3. During the following days the sights and smells in the building were horrible. *Id*. ¶ 10 at 3. Blood was splattered everywhere, with hand prints on the walls and pools of dried blood with flies feeding on them, and the smells of backed up bathrooms and rotten food. *Id*. She was awarded the Air Force Commendation Medal with Valor. *Id*. Exhibits at 17. Her life changed forever because of the

attack. *Id.* Decl. ¶ 11  at 3.   She has suffered from insomnia, flashbacks, depression, and anxiety. *Id.* ¶ 14 at 4.   Her anxiety has impacted her relationships with her friend, her family, and her children. *Id.* ¶ 11 at 3.   The V.A. has rated Airman Murphy as 60 percent disabled, including 50 percent for PTSD.   *Id.* Exhibits at 6 – 15.   This Court finds that Airman Murphy is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Ronald W. Neldon** was in his dormitory building in the security police barracks in Khobar Towers, approximately 200 yards from the blast site, at the time of the bombing.   Ronald W. Neldon Declaration and Exhibits, Decl. of Ronald W. Neldon ¶ 4 at 1.   He suffered multiple lacerations and glass shrapnel wounds. *Id.*  ¶ 6  at 2.   He bandaged his own wounds and reflexively began to help other injured airmen escape the building, carried an injured woman down six flights of stairs on his back. *Id.*  ¶ 4  at 2.   He led the establishment of a security barrier at the blast crater, searched dormitories for injured airmen, and provided first aid.   He sustained lacerations to his hands and shins while looking through the debris for bodies, which he bandaged himself with paper towels and tape.   *Id.*  ¶ 5  at 2.   Eventually he received medical treatment at the makeshift triage site.   *Id.*  ¶ 6  at 2.   He had numbness in his right ear from the force of the blast and sought treatment the next day at the Khobar Towers clinic. *Id.*  ¶ 7  at 2.   Medical staff advised that the pain and pressure in his ear was caused by the force of the blast.   He was prescribed numbing drops for his ear but they did not decrease the pain.   He still suffers from pain in his ear.  *Id.*  He still has scars on both shins and both hands from injuries he sustained while searching through debris. Airman Neldon was offered the Purple Heart but he turned it down. *Id.*  ¶ 15  at 3.   He was awarded the Air Force Commendation Medal with Valor for rescuing the injured. *Id.* Exhibits at 10–11. Upon returning home to Kirtland Air Force Base in New Mexico he was unable to control the intrusive thoughts and nightmares and began drinking excessively.  *Id.*  Decl. ¶ 9  at 3.   After eight months he was diagnosed with ulcers and a damaged esophagus.  *Id.*   He underwent laparoscopic Nissen

fundoplication (lap Nissen) surgery.  *Id.*  He eventually had complications requiring further surgery. *Id.*  ¶ 11  at 3 – 4.  He has also suffered with two inguinal hernia repairs that were directly related to the heavy lifting during the search for bodies after the blast. *Id.*  ¶ 11  at 3.

He was diagnosed with PTSD in early 1997 and received therapy and medication. *Id.*  ¶ 14 at 4.  He has gone through prolonged exposure therapy and both group and individual counselling sessions and he still sees a psychiatrist multiple times a year.  He still suffers with PTSD symptoms including hypervigilance, is easily startled by noise, and still sleeps with a full set of clothes next to the bed "just in case." *Id.*  ¶ 13 at 4.  He still takes multiple medications for PTSD symptoms, anger issues, and for sleep.  *Id.*  The V.A. has given Airman Neldon a disability rating of 30 percent for PTSD. *Id.*  Exhibits at 9.  This Court finds that Airman Neldon is entitled to an award  of $5 million for his pain and suffering as a survivor of the bombing.

**George P. Nicholaou** had just stepped off the balcony and re-entered the common area of his living quarters in Khobar Towers when the explosion occurred.   George P. Nicholaou Declaration and Exhibits, Decl. of George P. Nicholaou ¶ 5 at 2.  The explosion threw him twelve to fifteen feet. *Id.*  He sustained multiple lacerations from flying glass and a number of large fragments of glass embedded in his right arm, shoulder, and back. *Id.*  ¶ 6 at 2.  After assessing his wounds and removing the large pieces of glass, he covered his wounds as best as he could until he could be treated by the medical staff. *Id.*  He proceeded to assist in evacuating the building and accounting for  personnel. *Id.*  ¶ 5 at 2.   He later received stitches in his right arm and back at the makeshift triage area. *Id.*  ¶ 6 at 2.  He also felt stiffness in his knees, hips and back that he believes resulted from being thrown across the room. *Id.*  ¶ 6 at 2.  He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 11 – 12.  To this day, he experiences stiffness in his knees, hips and back. *Id.* Decl. ¶ 5 at 2.   He developed PTSD, from which he suffers to this day. *Id.*  ¶ 8 at 2.  He is constantly on guard, nervous around crowds, and is easily startled by loud noises. *Id.*  ¶ 9 at 3.  He

has been diagnosed with sleep apnea and suffers from insomnia. *Id.* He lives with terrible memories every day. *Id.* His PTSD symptoms have disrupted his marriage. *Id.* ¶ 10 at 3. The V.A. has rated his disability at 100 percent including 10 percent for PTSD. *Id.* Exhibits at 8 – 9. This Court finds that Airman Nicholaou is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Noreen B.H. Nicholaou**, the wife of Airman Nicholaou, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.

**Laurence P. Oliver** was approximately 300 yards from the site of the attack at the time of the bombing. Laurence P. Oliver Declaration and Exhibits, Decl. of Laurence P. Oliver ¶ 4 at 2. He had just gotten back from the city and was still in civilian clothing. *Id.* He retrieved a rifle and body armor and reported to the scene where he saw what he describes as a bloodbath. *Id.* There was blood everywhere and chaos ensued. *Id.* He saw the bodies of his fellow airmen with gruesome injuries that still haunt him to this day. *Id.* In the wake of the bombing, he assumed duties as the area supervisor and established and maintained a casualty holding area for the evacuated victims and ensured the identifies of the deceased were protected. *Id.* ¶ 5 at 2. He was awarded the Air Force Achievement Medal with Valor. *Id.* Exhibits at 6. After the attack, he was diagnosed with PTSD from which he suffers to this day. *Id.* Decl. ¶ 7 at 2. He also suffers from survivor's guilt. *Id.* He feels an immense sense of guilt because he was part of the security police and feels they failed to ensure the safety of everyone on the base. *Id.* His sleep has suffered and he averages 4 hours of sleep a night. *Id.* Decl. ¶ 8 at 3. He has permanent hearing loss. *Id.* He still has vivid flashbacks of the things he saw after the bombing. *Id.* Since he developed PTSD he has not been able to be in big crowds without having a fear of not being able to escape if something were to happen. *Id.* The V.A. has rated him as 90 percent disabled, including 70 percent for PTSD. *Id.*

Exhibits at 7 - 9. This Court finds that Airman Oliver is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Mary E. Ortiz** was in the office on the first floor of the building that housed the 79th Fighter Squadron, caddy corner to Building 131 when the explosion occurred. Mary E. Ortiz Declaration and Exhibits, Decl. of Mary E. Ortiz ¶ 4 at 1. She felt a painful blast from behind and what felt like thousands of needles hitting her. *Id.* She scrambled for cover under a table. *Id.* ¶ 4 at 2. She was covered in blood from a wound on her head and lacerations to her body. *Id.* She was taken by ambulance to a local hospital where she received stitches, and received follow-up care at Shaw Air Force Base. *Id.* Exhibits at 10–11. Airman Ortiz was awarded the Purple Heart for her injuries. *Id.* Exhibits at 9. When she returned home, she was diagnosed with PTSD, from which she still suffers to this day. *Id.* Decl. ¶ 5 at 2. Her medical records document her experience at Khobar Towers as the cause of her PTSD. *Id.* Exhibits at 17. She has been prescribed medication and received therapy. *Id.* She still experiences panic whenever a terrorist attack or shooting occurs. *Id.* Decl. ¶ 5 at 2. She is always hyper-vigilant when she is in public and is constantly looking around her for possible danger. *Id.* She is unable to handle loud noises and is fearful of the dark. *Id.* The V.A. has rated her disability at 60 percent, including 50 percent due to PTSD. *Id.* Exhibits at 6 – 8. This Court finds that Airman Ortiz is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Jennifer R. Parker** was talking to friends in the living room in Building 128 of the Khobar Towers complex at the time of the explosion. Jennifer R. Parker Declaration and Exhibits, Decl. of Jennifer R. Parker ¶ 4 at 2. She heard a loud "boom" that was louder than anything she had ever heard, and then the sound of glass pouring down like rain. *Id.* The sliding glass doors to the patio blasted into the room and she sustained cuts and lacerations from the glass shrapnel to her face, head and legs. *Id.*; Exhibits at 9 – 11. The back of her head was bleeding profusely and her friends

put a t-shirt over it to stop the bleeding.  *Id*. Decl. ¶ 4 at 2.  One of her friends carried her on his back down the stairs, where she saw fellow airmen bleeding and people who had been impaled by shrapnel being triaged. *Id*.  She was taken to the makeshift triage area at the Desert Rose dining facility for her head injury. *Id*. ¶ 5 at 2.  A doctor sent her by ambulance to a local hospital, King Fizel University Hospital, where she received stitches for the lacerations to the back of her head and both legs. *Id*.; Exhibits at 7-8.   After the stitches were removed the scabs healed into permanent scars.  *Id*. Decl. ¶ 5 at 2.  She also had lacerations under her left eye and across her nose that were not stitched and that left scars on her face, and there is still a scar across the top of her head.  *Id*. Airman Parker was awarded the Purple Heart for the injuries she sustained in the bombing.  *Id*. Exhibits at 6.   After the bombing she began to struggle with depression, anger issue, and stress issues.  She sought treatment in July 1996 for the trauma of her experience in the bombing. *Id*. Exhibits at 9 - 11.  In 2006 she was referred to the Air Force Medical Evaluation Board which led to her being medically retired. *Id*. Exhibits at 26 - 29.  Since her retirement she has consistently seen a therapist.  She has been prescribed different medications for depression and anxiety.  She still struggles with anger, depression, sleep problems, anxiety, and survivor's guilt which have contributed to problems with her relationships. *Id*. Decl. ¶  8 at 3.   She still suffers with flashbacks and nightmares. *Id*.  ¶ 6 at 3.  The V.A. has given her a disability rating of 80 percent.  *Id*. Exhibits at 30 – 31.  This Court finds that Airman Parker is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Kevin L. Pflaum** was getting ready for bed on the sixth floor of Building 131 at the time of the explosion.  Kevin L. Pflaum Declaration and Exhibits, Decl. of Kevin L. Pflaum ¶ 5 at 2.  He was thrown across the room from the impact of the blast.  *Id*.  He sustained shrapnel wounds to his right leg, torso, thigh, and face. *Id*. The wall on the other side of the room collapsed and he could see outside. *Id*. He was dazed and all he could hear was ringing in his ears. *Id*. Once he escaped

from the rubble of the building, he blacked out. *Id*. He woke up in a vehicle with a pararescuer on the way to a local hospital, where his wounds were treated. *Id*. ¶ 6 at 2. The next day he was able to call his wife, who had been told he had been killed. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 7. The Khobar Towers bombing was a life changing experience and he thinks about it often. *Id*. Decl. ¶ 8 at 2. To this day he has nightmares and will wake up in a cold sweat. *Id*. He has been rated as 10 percent disabled by the V.A. *Id*. Exhibits at 6. This Court finds that Airman Pflaum is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Donna Pflaum**, the wife of Airman Pflaum, is entitled to an award of $4 million against Defendants to compensate her for her emotional distress and pain and suffering.

**Leighton J. Reid** was working in his office on the ground floor of Building 133 at the time of the explosion. Leighton J. Reid Declaration and Exhibits, Decl. of Leighton J. Reid ¶ 5 at 2. Around 9:45pm, he walked out to his balcony to have a cigarette when he noticed a suspicious individual standing next to a vehicle about 150 feet away. *Id*. As he walked off his balcony to get his cigarette lighter he saw the individual flash the headlights three times. *Id*. He then heard a voice yelling on the security police frequency on his radio. *Id*. He heard the detonators go off, which sounded like rifle shots. *Id*. He saw a flash of light and tried to hit the floor, but the blast wave hit him and slammed him into his metal desk so hard that he lost consciousness. *Id*. When he came to, he found that he had suffered multiple physical injuries, including glass shrapnel wounds to his head, ears, neck, legs and feet. *Id*. ¶ 7 at 2. He improvised a bandage for his own wounds out of toilet paper and a t-shirt to contain the bleeding. *Id*. He was treated at the Khobar Towers clinic. *Id*. Exhibits at 18 – 19. Airman Reid submitted photographs taken after the blast that show the damage created by the blast to the dormitories, as well as of the desk where he hit his head. *Id*. Exhibits at 10 - 11.

Airman Reid was awarded the Purple Heart for his injuries and the Air Force Commendation Medal with Valor. *Id.* Exhibits at 12 – 13. After the bombing, he was diagnosed with PTSD. *Id.* Decl. ¶ 8 at 3. He has trouble sleeping and has a difficult time concentrating and remaining focused. *Id.* ¶ 9 at 4. He has suffered from tinnitus since the bombing. *Id.* ¶ 7 at 2. His neck and spine were compressed in the blast which caused chronic shoulder, back, and neck pain, numbness and tingling in his arms, and loss of movement. *Id.* ¶ 7 at 3; Exhibits at 28. In 2012 he had spinal decompression surgery. *Id.* Exhibits at 36 - 38. He still suffers from neck and back pain and receives physical therapy *Id.* Decl. ¶ 7 at 3; Exhibits at 62. He has recently discussed the option of further surgery with his medical providers. *Id.* Decl. ¶ 7 at 3; Exhibits at 63. His medical records document his injuries at Khobar Towers as the cause of his injuries. *Id.* Exhibits at 28. A recent medical note states that his "spondylosis is most likely a reaction to the trauma that the patient suffered in 1996." *Id.* Exhibits at 67. The V.A. has given Airman Reid a disability rating of 60 percent. *Id.* Exhibits at 14 – 17. In light of Airman Reid's relatively more numerous and severe injuries, this Court finds that Airman Reid is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Sean C. Reid**, the son of Airman Reid, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

**Dustin J. Rhode** had just returned to his room in Building 131 in Khobar Towers after taking a shower after working out at the gym when he heard the explosion. Dustin J. Rhode Declaration and Exhibits, Decl. of Dustin J. Rhode ¶ 5 at 1 - 2. He saw the lights flicker off and on, and then off. *Id.* ¶ 5 at 2. The floors of the building came crashing down, pancake style, from the top of the building downward, one floor on top of another. *Id.* Thinking he would be crushed, he threw his duffle bag on top of himself in an attempt to shield himself from the tons of building debris collapsing on him. *Id.* He sustained multiple lacerations from the glass shrapnel, especially

to his legs and feet. *Id*. ¶ 7 at 2. In the chaos, he tended his own wounds with a towel and gauze. *Id*. He put on his boots and headed down the stairs with the other building residents, trailing blood from his injuries. *Id*. ¶ 5 at 2. He found safety in the British building in Khobar Towers where the television was on and CNN was reporting the attack. *Id*. ¶ 6 at 2. The shock and reality of what had happened hit him and he realized he had friends and co-workers who had not made it out. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 4. To this day, he still lives with the trauma and has dreams about the friends he has lost. *Id*. Decl. ¶ 8 at 2. This Court finds that Airman Rhode is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Laurie R. Rhode**, the mother of Airman Rhode, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Andrea D. Richards** was in her bedroom in Building 131 in Khobar Towers when the explosion occurred. Andrea D. Richards Declaration and Exhibits, Decl. of Andrea D. Richards ¶ 4 at 2. She felt the building shake and collapsing. *Id*. She thought she was going to die. *Id*. She was struggling to breathe, as there was no air. *Id*. When she took a breath she felt only particles of dirt going into her mouth and lungs. *Id*. As a result of the explosion, she suffered multiple cuts and lacerations to her face, head, torso, arms and legs. *Id*. ¶ 12 at 4. Her bedroom doors had been blown off. *Id*. ¶ 5 at 2. The elevator doors were peeled back as if by a large can opener. *Id*. She grabbed her medic bag and ran to help, and began evacuating the building. *Id*. ¶ 5 - 6 at 2. A trained medic, she began to triage injured personnel despite her own injuries and was walking for hours with glass in her feet. *Id*. ¶ 11 at 3. As a medic, her first reaction was to help treat the other airmen who were injured in the blast and only then sat down to remove the glass shards from her feet. *Id*. ¶ 11 at 4. Eventually, she received medical treatment herself at the triage site to remove the glass shards that were embedded in her body. *Id*. Exhibits at 9. She had a large hematoma on the back side of her head, which swelled. *Id*. ¶ 12 at 4. She also developed large bruised areas on her upper legs. *Id*.

As a result she now suffers from peripheral vascular disease. *Id*. ¶ 14 at 4. She was awarded the Purple Heart for her injuries and the Air Force Commendation Medal with Valor, and received a stripes-for-exceptional-performers promotion (STEP promotion). *Id*. Exhibits at 7, 45 - 49. After returning home, she developed PTSD. *Id*. Decl. ¶ 15 at 4. She has trouble sleeping due to nightmares and she sometimes wakes up from heart palpitations. *Id*. The V.A. has rated her disability at 90 percent including 70 percent for PTSD and 20 percent for peripheral vascular disease. *Id*. Exhibits at 9. This Court finds that Airman Richards is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Richard E. Rollins** was in the dormitory building behind Building 131, writing a letter to Kendra, who is now his wife. Richard E. Rollins Declaration and Exhibits, Decl. of Richard E. Rollins ¶ 4 at 2. He suffered a concussion, asphyxiation, shrapnel to the back of his head and back, and three open wounds from the force of the blast. *Id*. ¶ 5 at 4. He was in severe pain and feared he might die by asphyxiation. *Id*. He received medical care at the triage area. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 5. After the blast, Airman Rollins found that his personality had changed. *Id*. ¶ 8 at 2. He had always considered himself outgoing, with lots of friends and was always positive, but after the attack, he never calls his friends and just wants to stay home. *Id*. He became hypervigilant, noticing people and always wary of his surroundings. *Id*. Airman Rollins suffers from disturbances in his sleep, mood, irritability, trust issues and motivational issues. *Id*. Exhibits at 30. Airman Rollins has a V.A. disability rating of 80 percent, including 50 percent for PTSD. *Id*. Decl. ¶ 6 at 2; Exhibits at 6 – 8. This Court finds that Airman Rollins is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Dana S. Rozelle** was in her suite in Building 127, studying for a college exam, when the explosion occurred. Dana S. Rozelle Declaration and Exhibits, Decl. of Dana S. Rozelle ¶ 4 at 2. All of a sudden there was a horrendous roar and objects began to fly at her. *Id*. She first thought a

grenade had just blown up outside her room. *Id*. She saw that her windows were missing and the metal window shades were on her nightstand. *Id*. The air conditioning unit was missing. *Id*. She suffered multiple cuts and lacerations to her feet and legs, tinnitus, and permanent hearing loss. *Id*. ¶ 10 at 4; Exhibits at 11 - 13. She was in severe pain and had to evacuate the building with glass shards encrusted in her feet and legs. *Id*. Decl. ¶ 5 at 2. She had a strong ringing in the ears. She helped evacuate the building. *Id*. Outside, she saw a huge orange fireball. There was a false alarm that enemies were coming over the fence and she ran in fear. *Id*. ¶ 6 at 2. When she returned to her building she found her own bloody footprints trailing out of her room. *Id*. ¶ 9 at 3. In the dining hall someone asked her about the blood in her shoes and she realized for the first time that her feet were bleeding. *Id*. She helped load the caskets of the airmen who had been killed. She was awarded the Purple Heart for her injuries. *Id*. Exhibits at 7. After returning home, she was diagnosed with PTSD and panic attacks. *Id*. Decl. ¶ 11 at 4. She is prone to irritability and emotional outbursts, gets anxious around large groups of people, and is unable to handle loud noises. *Id*. She has had panic attacks at sporting events when there is a loud noise. She has had to leave work early because of a panic attack triggered by a thunderstorm. *Id*. Her marriage suffered due to her struggles with PTSD and her marriage ended in divorce. *Id*. The V.A. has rated her disability at 70 percent, including fifty percent for PTSD with traumatic brain injury, and 10 percent each for impingement syndrome for each shoulder. *Id*. Exhibits at 14 – 26. Airman Rozelle's VA rating decision documents that her experience in the Khobar Towers bombing was the cause of her PTSD, and listed hearing loss, tinnitus and migraine headaches as symptoms of her traumatic brain injury. *Id*. Exhibits at 23 - 24. This Court finds that Airman Rozelle is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Michael J. Rusnak** was walking out of his dormitory in Building 131 in Khobar Towers, on his way to the gym, at the time of the bombing. Michael J. Rusnak Declaration and Exhibits, Decl.

of Michael J. Rusnak ¶ 4 at 2. He saw the lights flicker, heard a "whooshing" vacuum sound, and then a noise so loud it wasn't heard but felt. *Id.* The explosion picked him up and threw him against the wall of the adjacent building. *Id.* He was rendered unconscious and sustained a traumatic brain injury, multiple lacerations from glass shrapnel, and multiple, permanent orthopedic injuries. When he came to he saw a large mushroom cloud. *Id.* Building 131 was completely dark and the back wall had disintegrated. *Id.* He couldn't hear anything in the noise and chaos. He assisted the wounded and provide first aide before being treated at triage for his own injuries and returning to help others. *Id.* ¶ 5 at 2. Three of the airmen killed in the blast were members of his flight crew and were his close friends. *Id.* He was tasked with identifying them in the morgue, and the gruesome experience of seeing the unimaginable injuries his friends had sustained would haunt him. *Id.* ¶ 6 at 2 - 3. He had recurrent nightmares about what he saw for years. *Id.* Airman Rusnak was awarded the Air Force Commendation Medal with Valor. *Id.* Exhibits at 290. He was offered the Purple Heart but asked not to be considered because it felt wrong to him following the massive loss of life. *Id.* Decl. ¶ 14 at 5.

After the bombing Airman Rusnak developed PTSD and began to experience nightmares, severe anxiety, rage, suicidal thoughts, and alcohol abuse. *Id.* ¶ 7 at 3. The trauma caused by the blast to his head, neck and back cause daily pain and lack of mobility. *Id.* ¶ 9 at 4 -3. During flare-ups, he cannot function at all. *Id.* He suffers from chronic neck and back pain which requires treatment including daily traction, prescription painkillers, and braces and special pillows for sleep; pain and numbness in his arms and left leg; and frequent headaches, vertigo, and tinnitus. *Id.* ¶ 9 at 3 – 4. He suffers from memory loss, cervical spondylosis, reverse lordosis, foraminal stenosis, bulging and herniated discs, impingement on the spinal cord, desiccation of cervical discs, bone spurs, and nerve impingement. *Id.* ¶¶ 8–9 at 3–4. Airman Rusnak sustained a traumatic brain injury (TBI) caused by his head injury and loss of consciousness in the Khobar Towers blast. *Id.*

Exhibits at 38–41, 154. Medical records establish the connection between the Khobar explosion and Airman Rusnak's injuries. *Id*. Exhibits at 56, 90 - 91, 130 - 133, 148, 154, 187 - 188, 232. The V.A. has rated him 100 percent disabled. *Id*. Exhibits at 240 - 289. He is considered totally and permanently disabled. *Id*. Exhibits at 240. In light of Airman Rusnak's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Jon C. Schamber** was watching TV with other airmen in the common are of his dormitory in Building 129 in Khobar Towers at the time of the explosion. Jon C. Schamber Declaration and Exhibits, Decl. of Jon C. Schamber ¶ 4 at 1. He was watching television in the common area with several other security police when the television went black, and the blast pressure picked him up and threw him into a cement wall. *Id*. ¶ 4 at 1 – 2. He was knocked unconscious. *Id*. ¶ 4 at 2. He woke up in a pool of blood and debris. *Id*. He sustained glass lacerations to both legs, his left knee, calf, and ankle. *Id*. He was unable to walk because of severe lacerations to the inside of his knee. *Id*. ¶ 5 at 2. He was taken to the Armed Forces Hospital at the King Abdulaziz Air Base where he had three surgical operations to repair his quadriceps and to stitch the multiple lacerations on his legs. *Id*. Exhibits at 7 – 9. He was then aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id*. ¶ 6 at 3. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 24. In July 1997 he was placed on the Temporary Disability Retired List because of his injuries from the Khobar bombing. *Id*. Exhibits at 6. He developed post-traumatic arthritis in his left knee after the blast and he had knee surgery in 2011 for a torn meniscus. *Id*. Exhibits at 15 - 19. He still suffers from chronic pain from his leg injuries. *Id*. Decl. ¶ 6 at 3. After the bombing he developed PTSD. *Id*. ¶ 7 at 3. He sought help and was treated with medication and group and individual counselling. *Id*. ¶¶ 7 - 8 at 3. Before the bombing he was outgoing and adventurous but afterwards he became hypervigilant in crowds and is easy to anger. *Id*. ¶¶ 8 - 9 at 3. He overcame

a battle with alcohol abuse which he had used to numb the mental and physical pain. *Id.* ¶ 8 at 3. The V.A. has rated Airman Schamber as 90 percent disabled. *Id.* Exhibits at 22 – 23. In light of Airman Schamber's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Erich J. Schneider** had just entered the elevator of Building 131 in Khobar Towers when the bomb exploded. Erich J. Schneider Declaration and Exhibits, Decl. of Erich J. Schneider ¶ 5 at 2. He pressed the elevator button and at that moment he heard a loud sound. *Id.* The elevator door was still open and he saw a big flash of light and was thrown to the back of the elevator. *Id.* He was knocked unconscious. *Id.* He sustained a concussion, a traumatic brain injury (TBI), a back injury, and trauma to his body from being thrown around in the elevator. *Id.* He received medical treatment the next morning. *Id.* ¶ 7 at 2. He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 8. After returning home his experiences at Khobar Towers had affected him to the point that he couldn't function. *Id.* Decl. ¶ 9 at 3. He couldn't sleep, was forgetting things and was having difficulties performing his duties. *Id.* He was taken off of the flight line and sent to work at the snack bar which made him very unhappy. *Id.* ¶ 10 at 3. He was ordered to see an Air Force psychiatrist and was diagnosed with PTSD and prescribed several medications that he still takes to this day. *Id.* ¶¶ 10 - 11 at 3. He was given an Honorable Discharge from the Air Force. *Id.* ¶ 12 at 3. He started using alcohol to deal with the stress. *Id.* He would wake up in the middle of the night kicking, screaming and cursing in his sleep. *Id.* His struggles led to his divorce. *Id.* ¶ 10 at 3. He has received psychotherapy, biofeedback, and cognitive therapy for PTSD. *Id.* ¶ 14 at 4. He still suffers from insomnia, nightmares, depression, anxiety, anger, loss of memory, and social problems. *Id.* ¶ 16 at 4. His medical records document that the trauma he sustained in Khobar Towers is the cause of his TBI and PTSD. Erich J. Schneider Supplemental Declaration and Exhibits, Supplemental Exhibits at 4, 11, 13, 17, 18, 28, 35, 39, 42, 69, 71, 74, 75. The V.A. has

rated him as 70 percent disabled.  *Id*.  Exhibits at 9 - 10.   In light of Airman Schneider's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Diane M. Martinson**, the mother of Airman Schneider, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Jereme D. Schuchard** was in his dormitory building in Khobar Towers and sitting at the dinner table next to the sliding glass door when the explosion occurred.   Jereme D. Schuchard Declaration and Exhibits, Decl. of Jereme D. Schuchard ¶ 5 at 2.  He saw a bright flash light up the outside area.  *Id*.  The blast shattered the glass door into large shards and blew the doors off their hinges.  *Id*.  He dove behind a chair  and saw his friend being blasted from his seat at the table down the hall and into the kitchen.  *Id*. ¶ 6 at 2.  He was knocked unconscious and sustained injuries to his back, neck, left arm and left shoulder. *Id*. ¶ 7 at 2.  Later, while he was helping other airmen to the triage area, a medic told him that he was injured and in shock. *Id*.  The medic stitched him up without the use of anesthetics.  *Id*. He was awarded the Purple Heart for his injuries and the Air Force Commendation Medal with Valor.  *Id.* Exhibits at 6 - 7.  Despite his wish to remain in the Air Force, he retired from the military in 1999 due to the injuries he sustained in the Khobar Towers bombing.  Id. Decl. ¶ 9 at 2.  He has constant pain in his neck and back and receives ultrasound physical therapy. He was prescribed a neck brace. He has been diagnosed with anxiety, headaches, neck pain, shoulder pain, hearing loss, and PTSD.  *Id.* Exhibits at 12 - 13.  He completed a two month pain rehabilitation training with the V.A.  *Id.* Exhibits at 10.  He sees black spots from time to time.  He has been told by his doctor that he has a possible traumatic brain injury.  He was diagnosed with PTSD and he still suffers from frequent nightmares. The V.A. has rated him as 40 percent disabled, including 20 percent disabled from cervical osteoarthritis with rotoscoliosis with degenerative joint disease, 10 percent from tinnitus, and 10 percent from PTSD.  *Id.* Exhibits at 8 –

9.  This Court finds that Airman Schuchard is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Brenda G. Munoz**, the mother of Airman Schuchard, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Bryan D. Scott** was in his dormitory in Khobar Towers, sitting five feet from the sliding glass door to the balcony when the explosion occurred. Bryan D. Scott Declaration and Exhibits, Decl. of Bryan D. Scott ¶ 5 at 2. The blast threw him fifteen to twenty feet into the concrete wall and knocked him unconscious. *Id*. When he came to, he had glass shards embedded throughout his body. *Id*. Despite his pain he helped other airmen carry another injured person out of the building in a blanket. *Id*. Outside, he found he was bleeding from his head, arms, legs and body. *Id*. ¶ 6 at 2. He applied pressure to his head with a shirt to stop the bleeding. *Id*. He had sustained a concussion, multiple lacerations, trauma to his head and back and multiple injuries across his body. Airman Scott was awarded the Purple Heart for his injuries. *Id*. Exhibits at 86 - 87. He began to have chronic back pain from his injuries and he began to see a chiropractor three to four times a week starting in 1996. *Id*. Decl. ¶ 7 at 2. Eventually he had back surgery to try to ease the pain. *Id*. He still struggles with daily back pain and can't run, play sports, and is extremely limited in playing with his children. *Id*. ¶ 8 at 2. He was diagnosed with PTSD and a traumatic brain injury (TBI). *Id*. ¶ 9 at 3. The V.A. has rated him as 60 percent disabled, which he is currently appealing. *Id*. ¶ 10 at 3; Exhibits at 84 - 85. This Court finds that Airman Scott is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Michael G. Scott II**, the brother of Airman Scott, is entitled to an award of $1.25 million to compensate him for his emotional distress and pain and suffering. **Connie M. Sturgill**, the mother of Airman Scott, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. **Michael G. Scott**, the father of Airman Scott, is entitled to an award of $2.5

million to compensate him for his emotional distress and pain and suffering.  **Jonathan L. Scott**, the brother of Airman Scott, is entitled to an award of $1.25 million to compensate him for his emotional distress and pain and suffering.

**Brandie R. Shaffer** was on patrol at the front gate at the Khobar Towers complex when a suspicious activity alert came over the radio that a large tanker truck had been parked in front of Building 131.  Brandie R. Shaffer Declaration and Exhibits, Decl. of Brandie R. Shaffer ¶ 4 at 2. She was called to assist in evacuating Building 131.  *Id*.  Before she and her patrol partner arrived at the building she heard and felt a blast and a huge mushroom cloud in front of her.  *Id*.  Despite being in fear for her life she ran towards the explosion and began carrying the injured to the triage area.  *Id*.  She assisted in evacuating Building 131 and then in searching the buildings for survivors. carried out deceased personnel and provided first aid to the injured.  *Id*.  When she searched her own building, Building 129, it was a shock to walk into her own room.  *Id*.  If she had been in bed at the time of the explosion she would have been seriously injured by the air conditioning unit and the debris and glass that was everywhere.  She was awarded the Air Force Commendation Medal with Valor.  *Id*. Exhibits at 6 - 7.  As a result of the explosion, she started suffering from anxiety and began sleeping with a gun on her chest.  *Id*. Decl. ¶ 6 at 2.   She was prescribed medication which she still takes.  *Id*. To this day, she still gets very anxious when she needs to be around large groups of people, is unable to handle loud noises, and has problems trusting people.  *Id*.  ¶ 9 at 3.  She feels her inability to take part in different activities has been unfair to her children. *Id*. ¶ 6 at 2.   She suffers with survivor's guilt.  *Id*.  Airman Shaffer personally knew the nineteen airmen who were killed, and many of her co-workers were injured in the blast. *Id*. ¶ 9 at 3.  She has flashbacks for which she berates herself for feeling sorry for herself. *Id*. ¶ 6 at 2.  The V.A. has rated her as 70 percent disabled for chronic adjustment disorder. *Id*. Exhibits at 8 – 12. This Court finds that

Airman Shaffer is entitled to an award of $5 million for her pain and suffering as a survivor of the bombing.

**Robert G. Siler** was asleep in his dorm in the building next to Building 131 in Khobar Towers when the explosion occurred.  Robert G. Siler Declaration and Exhibits, Decl. of Robert G. Siler ¶ 4 at 1.  He was awakened by falling debris. *Id.*  It was completely dark and he had to feel his way around the walls. *Id.*  He stepped on his friend who was wet with blood, but breathing, and he carried him over his shoulder and evacuated the building. *Id.*  After taking his friend to triage, he realized that he was bleeding.  *Id.* ¶ 6 at 2.  People began to scramble for cover but he realized his pain was too intense for him to run.  *Id.*  He ducked behind a nearby building until the signal came that it was safe to come out.  *Id.*  He had sustained a dislocated right shoulder, a concussion, multiple cuts and lacerations from the glass shrapnel, and wounds to his head and body, black eyes, and facial bruising.  *Id.* ¶ 8 at 1. He received medical treatment at the Khobar Towers clinic where his wounds were stitched. *Id.* ¶ 8 at 2.  The doctor put his shoulder in a sling and prescribed pain medication for the concussion and to help him sleep. *Id.*  He was awarded the Purple Heart for his injuries and the Air Force Achievement Medal with Valor. *Id.* Exhibits at 5.  He still has chronic pain and only limited movement in the shoulder. *Id.* Exhibits at 15.  His right foot continued to give him pain. An x-ray in 2001 showed a spur that may be a residue of the earlier trauma.  *Id.* Exhibits at 16.  He was diagnosed with PTSD and he remains anxious and unable to cope with loud noises. *Id.* Decl. ¶ 11 at 3.  He has suffered from vertigo and dizziness for which he has taken medication and had an MRI in 2001.  *Id.* Exhibits at 7, 11, 13.  He still needs medication to help him sleep because of his insomnia.  *Id.* Decl. ¶ 11 at 3.  The V.A. has rated him as 40 percent disabled.  Id. Exhibits at 19.  In light of Airman Siler's relatively more numerous and severe injuries, this Court finds that Airman Siler is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**William F. Sine** was on the fourth floor of Building 131 near the elevator when the bomb was detonated. William F. Sine Declaration and Exhibits, Decl. of William F. Sine ¶ 5 at 2. The blast propelled debris which hit him in the back. He was knocked unconscious for thirty to forty-five minutes. *Id*. He sustained broken ribs, a concussion, crush injuries on his right calf, back injuries, and glass lacerations. *Id*. ¶ 6 at 3. After he regained consciousness Airman Sine, a pararescueman, assisted the other wounded to escape from the rubble and treated their injuries, despite his own serious injuries. *Id*. Eventually he was taken by ambulance to a local hospital in Dhahran for several days. *Id*. He was then aeromedically evacuated to Landstuhl Regional Medical Center in Germany. *Id*. Exhibits at 9. He was moved to Patrick Air Force Base for further treatment. *Id*. He was awarded the Purple Heart and the Airman's Medal for Heroism. *Id*. Exhibits at 33 – 35. He was later found to have also suffered from multiple broken ribs and a traumatic brain injury (TBI). *Id*. Decl. ¶ 7 at 2; ¶ 10 at 3. His range of motion is still very seriously limited. He was prescribed opioids for years for his chronic back pain, and the painkillers had a number of side effects. *Id*. ¶ 8 at 2. He was diagnosed with central sleep apnea, which was caused by his brain injury. *Id*. ¶ 9 at 2 - 3. In turn, his sleep apnea may have caused his persistent and uncontrolled high blood pressure. *Id*. The V.A. has rated him 80 percent disabled. *Id*. Exhibits at 11 – 21. In light of Airman Sine's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**William D. Sine**, the son of Airman Sine, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

**Rodney C. Smith** was in his dormitory Khobar Towers at the time of the bombing. Rodney C. Smith Declaration and Exhibits, Decl. of Rodney C. Smith ¶ 5 at 2. His commander had just told him he was getting a promotion. *Id*. Airman Smith suddenly saw a flash and then heard a very loud

sound, followed by a shockwave. *Id*. He was pelted with glass shrapnel and other debris from his face to his ankle. *Id*. Not realizing he was seriously injured, he managed to get all his people out to safety. *Id*. As he did a final check and tried to get to safety himself, he began to walk more slowly. *Id*. He looked down and realized he had been hit in multiple locations on his body but that his legs had taken the most damage. *Id*. He followed his own blood trail and saw that everywhere he had walked there was a path of his own blood. *Id*. He realized he was paralyzed and bleeding out. *Id*. He had sustained neck and back injuries, a dislocated right knee, a hold in his left knee, and was paralyzed in both legs. *Id*. The youngest member of his team came back to look for him. *Id*. ¶ 6 at 2. Special Forces in the area did field stitching to slow the bleeding. *Id*. He was not evacuated to the U.S. because of a shortfall of personnel in his field. *Id*. ¶ 9 at 3. Eventually he was recommended to be released for further medical care. *Id*. Airman Smith was awarded the Purple Heart for his injuries and the Military Outstanding Volunteer Service Medal. *Id*. Exhibits at 6, 17 – 8

Airman Smith returned home on July 4, 1996 on crutches. By this time he was not able to move his legs or wiggle his toes. *Id*. Decl. ¶ 11 at 3. His wounds were infected. *Id*. He needed six months of electric shock therapy, five days a week for 50 minutes a day before he could get back feeling in his legs. *Id*. ¶ 7 at 2. It took another 18 months of physical therapy for him to learn to walk again. *Id*.

He was diagnosed with a traumatic brain injury (TBI) which causes him headaches. *Id*. ¶ 11 at 3. He suffers with severe memory loss. *Id*. ¶ 12 at 3. He was also diagnosed with PTSD. *Id*. ¶ 11 at 3. His injuries have severely impacted his marriage. *Id*. ¶ 11 at 3. He had knee surgery and was told he would eventually need a knee replacement. *Id*. ¶ 13 at 4. He still takes medication for his back, neck, and head pain. *Id*. He has had physical therapy for his neck pain, which is sometime so severe that he has difficulty holding his head up. *Id*. It is still painful for him to walk

and he has difficulty walking down steps. *Id.* The V.A. has rated him as 90 percent disabled. *Id.* Exhibits at 8 - 11. In light of Airman Smith's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Jennie L. Smith**, the wife of Airman Smith, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. The children of Airman Smith, **A'Doria T. Smith**, **Alexandra C. Smith**, and **Romarus Smith**, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Joseph Stroud** was shaving in the bathroom of his suite in Building 130, which was close to Building 131, at the time of the bombing. Joseph Stroud Declaration and Exhibits, Decl. of Joseph Stroud ¶ 4 at 1 – 2; Exhibits at 6. He heard a loud gust of wind and doors slamming, and then he felt the explosion. *Id.* The door was blown off its hinges and slammed into Airman Stroud, pinning him to the floor. *Id.* The door's brass coat hook had a jagged edge that sliced into his shoulder. *Id.* He sustained multiple lacerations and glass shrapnel wounds to his head and back. *Id.* Glass fragments embedded themselves in his head and shoulder. *Id.* Still barefoot, Airman Stroud found his roommate bloodied and barely conscious, and carried him downstairs to the medical clinic. *Id.* ¶ 5 at 2. Airman Stroud continued to help the injured until he realized that he himself was injured and he received stitches without anesthetic on-site at Khobar Towers. *Id.* ¶ 8 at 3; Exhibits at 6. Airman Stroud was awarded the Purple Heart for his injuries. *Id.* Exhibits at 7. He still has back pain that he believes may be from broken glass retained in his spine. *Id.* Decl. ¶ 8 at 3. The sights and smells of that night are still as vivid in his mind as the night it happened. *Id.* ¶ 10 at 3. He has not sought a V.A. disability determination for PTSD because of the guilt he felt for having survived while other airmen did not. *Id.* He struggled for years with depression and nightmares. *Id.* This

Court finds that Airman Stroud is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Kenneth Sturdivant** was about to get into bed in his dormitory in the building next to Building 131 in Khobar Towers at the time of the explosion occurred. Kenneth Sturdivant Declaration and Exhibits, Decl. of Kenneth Sturdivant ¶ 4 at 2. As he turned the light switch off he heard a loud explosion. *Id.* He began to help evacuate people before realizing that he had sustained multiple cuts and lacerations on both legs from the glass shrapnel. *Id.* He treated his own wounds because there were so many other injured people. *Id.* ¶ 5 at 2. Airman Sturdivant was awarded the Purple Heart for his injuries. *Id.* Exhibits at 8 - 9. After returning home, he developed PTSD. He suffered from horrific nightmares. *Id.* Decl. ¶ 6 at 2. His symptoms caused him to withdraw from his family and friends and eventually led to his divorce. *Id.* He grew very skittish and paranoid. *Id.* ¶ 8 at 2. He becomes anxious when he hears a truck backfire. *Id.* He still has problems sleeping and suffers from dramatic and vivid dreams of the night of the attack. *Id.* The blast caused him permanent hearing loss. *Id.* ¶ 7 at 2. The V.A. has rated his disability at 20 percent. *Id.* Exhibits at 7. This Court finds that Airman Sturdivant is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Zachary S. Sutton** was in his bedroom in his dormitory building in Khobar Towers when the explosion occurred. Zachary S. Sutton Declaration and Exhibits, Decl. of Zachary S. Sutton ¶ 4 at 1. He was thrown from his bed by the blast. *Id.* ¶ 4 at 2. Despite being injured, he proceeded to administer first aid to his fellow wounded airmen. He sustained lacerations from broken glass to his head and face, and his left eye was pierced by a piece of glass. *Id.* ¶ 5 at 2. His wounds were stitched up and the glass removed from his eye at the triage area at Khobar Towers. *Id.* Airman Sutton was awarded the Purple Heart for his injuries and the Air Force Commendation Medal. *Id.* Exhibits at 9 – 10, 15 - 16. After returning home he began to suffer from PTSD as a result of his

experiences in the bombing, with night terrors, night sweats, hyper vigilance, irritability, lack of concentration, and an exaggerated startle response. *Id*. Decl. ¶ 7 at 2. He received therapy for his PTSD. *Id*. Exhibits at 7 – 8. He found that his entire personality had changed and he began to have problems with alcohol abuse, leading to his divorce. *Id*. Decl. ¶ 7 at 2. He avoids crowds and often suffers from panic attacks in public. *Id*. At home, his family had to change their sleeping arrangements so that his children would not wake him up because he can become violent when he is startled awake. *Id*. The V.A. has rated his disability at 60 percent. *Id.* Exhibits at 11 – 14. This Court finds that Airman Sutton is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Clifford L. Thomas** was in his bedroom inside building 130 when the explosion blasted him into a wall locker. The locker collapsed on top of him and knocked him unconscious. Clifford L. Thomas Declaration and Exhibits, Decl. of Clifford L. Thomas ¶ 5 at 2. When he regained consciousness he had a massive wound on his head. *Id*. Despite his injuries and state of shock, Airman Thomas evacuated the building. *Id*. He sustained a concussion and traumatic brain injury, multiple lacerations, and glass shrapnel wounds and trauma to his body. *Id.* He was taken to a local hospital for treatment. *Id*. Exhibits at 6. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 5. His experiences in the bombing caused him to developed PTSD. *Id*. Decl. ¶ 7 at 2. PTSD has caused him sleeping problems and caused difficulties with focusing. *Id.* He feels he cannot be among people. *Id.* He has become very moody and lacking motivation, which has caused difficulties at home, work and socially. *Id*. He becomes very fearful when he hears loud noises. *Id*. Airman Thomas has a V.A disability rating of 50 percent for PTSD and a combined rating of 100 percent. *Id*. Exhibits at 7 -8. This Court finds that Airman Thomas is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Margaret L. Thomas**, the wife of Airman Thomas, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. The children of Airman Thomas, **Camillia T. Thomas-Harris**, **Cedrick C. Thomas**, and **Adrian D. Thomas** are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Roland L. Tiner, Jr.** was in Building 131 in Khobar Towers when the explosion occurred. He was thrown across the room and the window air conditioner slammed into his back, knocking him unconscious. Roland L. Tiner, Jr. Declaration and Exhibits, Decl. of Roland L. Tiner, Jr. ¶ 5 at 2. Building material and broken glass was embedded into his body. *Id.* He sustained shrapnel wounds to his legs, arm, torso and head. *Id.* ¶ 6 at 2. Debris fell on his back and he was covered in blood. *Id.* He was wearing only shorts and a t-shirt and his feet were cut to pieces. *Id.* When he awoke he bandaged himself as well as he could. *Id.* He found his roommate with his arm almost completely severed. *Id.* ¶ 5 at 2. Unable to stop the bleeding, he found another airman to help escort his roommate to safety. *Id* Airman Tiner continued to search the building for survivors. *Id.* He was awarded the Purple Heart for his injuries. *Id.* Exhibits at 13 – 15. After returning home, he was diagnosed with PTSD and anxiety, from which he suffers to this day. *Id.* Decl. ¶ 7 at 3. He suffers from nightmares, sleeplessness, and a constant feeling of not being safe. *Id.* He cannot be in crowded places. *Id.* The V.A. has rated him 100 percent disabled for PTSD with depression and panic disorder. *Id.* Exhibits at 5 – 12. In light of Airman Tiner's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Annie L. Tiner**, the mother of Airman Tiner, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. The siblings of Airman Tiner, **Stacee L. Marcum** and **Thomas S. Tiner**, are entitled to an award of $1.25 million, each, to compensate them for their emotional distress and pain and suffering.

**Grady W. Tucker, Jr.,** was in his dormitory building in Khobar Towers when the explosion occurred. Grady W. Tucker, Jr. Declaration and Exhibits, Decl. of Grady W. Tucker, Jr. ¶ 5 at 2. He was blown across the room by the force of the blast. *Id.* He sustained blows to his head, neck and back and tore all the ligaments on his left wrist. *Id.* He underwent surgery on his wrist to repair the ligaments and lost the full range of motion. *Id.* ¶ 6 at 2. He still suffers from nerve damage. *Id.* He was awarded the Purple Heart for his injuries and the Air Force Commendation Medal with Valor. *Id.* ¶ 8 at 2; Exhibits at 5 - 7. After returning home, he was diagnosed with PTSD and anxiety, from which he suffers to this day. *Id.* Decl. ¶ 7 at 2. Because of his condition, he remains constantly on guard and nervous. *Id.* He can no longer be around loud noises. *Id.* The V.A. has rated him as 100 percent disabled. *Id.* Exhibits at 4. In light of Airman Tucker's relatively more numerous and severe injuries, this Court finds that Airman Tucker is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Grady W. Tucker, Sr.**, the father of Airman Grady, is entitled to an award of $2.5 million to compensate him for his emotional distress and pain and suffering.

. **Brian E. Vanhorn** was inside Building 127 of the Khobar Towers complex when the explosion occurred. Brian E. VanHorn Declaration and Exhibits, Decl. of Brian E. VanHorn ¶ 4 at 1. He was standing next to his bed near the window, packing his luggage to be deployed home, and getting ready for work. *Id.* When the bomb went off, he was thrown backwards against the wall and landed on the floor. *Id.* ¶ 4 at 2. He saw the wall locker fly across the room and land on his roommate's bed. *Id.* A window shutter fell on top of him. *Id.* ¶ 5 at 2. He sustained multiple lacerations and trauma to his head, and body from the metal blinds and broken window glass. *Id.* ¶ 8 at 2. The furniture in the suite was flipped upside down. *Id.* ¶ 5 at 2. To exit the suite he and his roommates had to pry open the door. *Id.* ¶ 6 at 2. There was blood on the walls, floors, and in the stairwells. *Id.* Outside, he saw a large mushroom cloud from the explosion. *Id.* ¶ 7 at 2. He treated

his own wounds because there were so many injured personnel waiting to be triaged. *Id.* Airman Vanhorn was awarded the Purple Heart for his injuries. *Id.* Exhibits at 7 – 8. After returning home, Airman Vanhorn was diagnosed with PTSD, from which he suffers to this day. *Id.* ¶ 9 at 3. He still struggles with survivor's guilt for having survived when twelve of his close friends died in the bombing. *Id.* ¶ 11 at 3. He can no longer attend funerals for family or friends because they can trigger a panic attack. *Id.* ¶ 12 at 3. He was not able to attend the funerals for his mother and father when they passed away, which caused him tremendous distress at the time and still upsets him. *Id.* The V.A. has rated him as 30 percent disabled. *Id.* Exhibits at 9 – 10. This Court finds that Airman VanHorn is entitled to an award of $5 million in damages for his pain and suffering as a survivor of the bombing.

**Brian E. Volk** was in the dayroom of Building 107 getting ready for work at the time of the bombing. Brian E. Volk Declaration and Exhibits, Decl. of Brian E. Volk ¶ 4 at 1. He watched the curtain of the sliding glass door get sucked against the glass and then explode into the room, covering him and his friend with glass and metal. *Id.* ¶ 4 at 1 - 2. The explosion threw into a concrete wall, knocking him unconscious for twenty seconds. *Id.* ¶ 4 at 2. When he woke up he and his friend were surrounded by their friends who were looking after them. *Id.* He sustained multiple wounds from the glass shrapnel, a cut above his right eye, and a piece of metal shrapnel near his right hip. *Id.* ¶ 5 at 2. His ears were ringing and his eyes were full of blood. *Id.* He and his friends bandaged his wounds with supplies from his medical kit. *Id.* He helped rescue the injured from Building 131. *Id.* ¶ 6 at 2. He went to the makeshift triage area at the Desert Rose and received medical care. *Id.* ¶ 7 at 2. He was awarded the Purple Heart for his injuries and the Airman's Medal. *Id.* Exhibits at 42 – 43. He was diagnosed with PTSD and a traumatic brain injury. *Id.* Exhibits at 12. He was temporarily retired in 2010 and in 2012 he was permanently retired from the Air Force due to his disabilities. *Id.* Exhibits at 27 – 33. He had surgery to repair

his torn right eyelid and required sutures on his right forearm. He required a kidney transplant, back surgery, and is still suffering from brain ischemia. *Id.* Decl. ¶ 9 at 3. He still has disfiguring scars on his face. The V.A. has rated him 100 percent disabled for PTSD, polycystic kidney disease, back injury and other orthopedic injuries, traumatic brain injury, vertigo, migraine headaches, temporomandibular joint disorder, tinnitus, and hiatal hernia. *Id.* Exhibits at 34 – 41. To this day, he suffers from memory loss and has trouble sleeping. In light of Airman Volk's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Aaron R. Weimer** was watching TV in his dormitory suite with his roommates at the time of the bombing. Aaron R. Weimer Declaration and Exhibits, Decl. of Aaron R. Weimer ¶ 4 at 2. The sliding glass door exploded inward and he heard the loudest noise he had ever heard. *Id.* He was frozen in his seat until he saw his roommates begin to move. *Id.* He grabbed his shoes and evacuated the building. *Id.* He saw a mushroom cloud where he had been playing volleyball twenty minutes earlier. *Id.* He ran towards the Building 131, administering first aid and helping injured airmen to the triage area. *Id.* He was awarded the Air Force Commendation Medal with Valor and a Certificate of Appreciation. *Id.* Exhibits at 14 – 15. The emotional stress that he experienced during the attack caused him to develop PTSD, from which he still suffers to this day. *Id*. Decl. ¶ 5 at 2. Loud noises, crowds, and even multiple doored restaurants cause him anxiety. He has been prescribed multiple medications for anxiety and depression. *Id*. ¶ 6 at 2. His PTSD symptoms caused problems with his family and he became withdrawn from everyone in his life. *Id*. ¶ 6 at 2 - 3. The Khobar Towers bombing has been burned into his memory and changed who he was to his core. *Id*. He thinks about the bombing every day. *Id*. The V.A. has rated him as 90 percent disabled including 70 percent for PTSD. *Id.* Exhibits at 8 – 14. This Court finds that

Airman Weimer is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**David G. Westrup** had just parked his truck in the parking lot outside of Building 129 and in sight of Building 131, where he was housed, when the explosion occurred. David G. Westrup Declaration and Exhibits, Decl. of David G. Westrup ¶ 5 at 2. The blast threw him to the ground like a rag doll. *Id.* ¶ 6 at 2. When he got to his feet, he saw a huge plume of fire and smoke hundreds of feet above Building 131. *Id.* Concrete, glass, and air conditioning units began to rain down on him in the parking lot. *Id.* He tried to go to Building 131 to help his roommates but was told not to go in that direction because of the belief they were under attack. *Id.* He helped load the caskets of the dead airmen onto the cargo plane. *Id.* ¶ 8 at 3. As a result of the explosion, he sustained a traumatic brain injury, trauma to his head and ears and hearing loss. *Id.* ¶ 11 at 3. He was unable to sleep for three days and started having nightmares, from which he suffers to this day. *Id.* ¶ 8 at 2. He had been such close friends with three of the airmen who were killed in Building 131 that he considered them to be family. *Id.* ¶ 10 at 3. He is no longer able to make close friends. *Id.* Airman Westrup was awarded the Purple Heart for his injuries. *Id.* Exhibits at 12. After returning home, he received hearing loss evaluations at Eglin Air Force Base for the blast injury to both ears. *Id.* ¶ 12 at 3. He still suffers with hearing loss, sharp pain and numbness in his left ear, tinnitus and anxiety. *Id.* He also began having nightmares. *Id.* ¶ 8 at 2. The V.A. has rated him as 30 percent disabled including ten percent each for back pain and tinnitus. *Id.* Exhibits at 10 – 11. This Court finds that Airman Westrup is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Rebecca Westrup**, the wife of Airman Westrup, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Angelena D. Mangnall** and

**Michael D. Westrup**, the children of Airman Westrup, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

     **Martin L. Wheeler** was in his room, on the 4th floor of Building 131, at the time of the bombing. Martin L. Wheeler Declaration and Exhibits, Decl. of Martin L. Wheeler ¶ 5 at 2. He had just returned from the flight line and taken a shower and dressed. *Id*. Before he knew it, he was thrown about 30 feet across the room against a brick wall. *Id*. He landed on a small refrigerator. *Id*. He was knocked unconscious. *Id*. When he came to he was covered in debris including a window frame, a dresser, and a door. *Id*. His leg was pinned behind the refrigerator. *Id*. He was rescued and taken to the triage area where he received stitches to his legs, knee and head. *Id*. He sustained multiple punctures, cuts, and scrapes from the broken glass, brick, metal and wood, severe damage to both knees, and hearing loss. *Id*. ¶ 8 at 2. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 21. When he returned to the U.S. he was medically evaluated and placed on light duty and was then medically discharged, despite his request to be rehabilitated to active duty. *Id*. ¶ 7 at 2. He was diagnosed with bilateral patella-femoral syndrome and had arthroscopic diagnostic surgery on his right knee in 1997 due to the injury he sustained in the blast. *Id*. Exhibits at 15 – 16. He still suffers from chronic back pain and tinnitus. *Id*. Decl. ¶ 9 at 3. The trauma to his head has caused short-term memory loss. *Id*. ¶ 8 at 3. He developed PTSD which caused insomnia, nightmares, and night sweats. *Id*. ¶ 10 at 3. He has struggled with depression and weight gain from his lack of mobility and ability to exercise. *Id*. His PTSD has driven his friends and family away and has sent his marriage to the brink of disaster. *Id*. ¶ 11 at 4. The V.A. has rated him as 40 percent disabled. *Id*. Exhibits at 19 – 20. In light of the severity of Airman Wheeler's injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Tracie L. Wheeler**, the wife of Airman Wheeler, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Ashlie L. Wheeler**, the daughter of Airman Wheeler, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

**Douglas T. Widdis** was in a first floor office of a building about four hundred yards from Building 131 in Khobar Towers, waiting to call his wife, at the time of the bombing. Douglas T. Widdis Declaration and Exhibits, Decl. of Douglas T. Widdis ¶ 4 at 1. There was a violent tremor reminiscent of an earthquake, followed by a negative pressure wave that felt like the air was being sucked out of the room. *Id*. ¶ 4 at 2. The glass patio windows exploded into the room, along with the air conditioner. *Id*. As a result of the explosion he sustained lacerations from numerous shards of glass that impaled his back, multiple deep lacerations from shrapnel, and trauma to his head from the falling air conditioner unit. *Id*. ¶ 6 at 2. Despite his injuries, he acted without regard for his own safety and began helping his fellow airmen. *Id*. ¶ 5 at 2. He refused treatment for his injuries until 5:00 am when he received multiple stitches for his wounds at the makeshift triage area. *Id*. ¶ 6 at 2; Exhibits at 6. Airman Widdis was awarded the Purple Heart for his injuries, and the Air Force Achievement Medal with Valor for helping the injured. *Id*. Exhibits at 5, 7. This Court finds that Airman Widdis is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Elliot Williams** was in the living room on the fifth floor of a dormitory building next to Building 131 at the time of the bombing. Elliot Williams Declaration and Exhibits, Decl. of Elliot Williams ¶ 5 at 2. He was watching television and sitting in a chair next to the sliding glass patio door. *Id*. He saw a bright flash out of his left eye and then everything went black. *Id*. It sounded like a freight train coming into the apartment. *Id*. The patio door was blown into him and the shard of glass and the frame of the door hit him. *Id*. He sustained multiple lacerations and bruises to his

body, including cuts on his face, hands, arms, and legs. *Id*. ¶ 6 at 2. His left eye was swollen shut where the door frame had hit him and he was fearful that he had lost his eye. *Id*. His roommate rescued him and helped him get medical attention. *Id*. Decl. ¶ 5 at 2. He received treatment in Germany where he was evaluated and treated by an orthopedic surgeon who debrided and closed his wounds. *Id*. Exhibits at 11. To this day, he still has pain in both knees, and his left hand suffers from nerve damage. *Id*. ¶ 6 at 2. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 20 – 21. After the bombing, Airman Williams developed PTSD with nightmares that caused him to wake up screaming. *Id*. ¶ 8 at 2. He is constantly on guard and still startled by loud noises. The V.A. has given Airman Williams a disability rating of 40 percent. *Id*. Exhibits at 5 – 10. This Court finds that he is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Dana L. Williams**, the wife of Airman Williams, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering. **Chad T. Williams**, his son; **Erik B. Lee**, his stepson; and his daughter, **Kelsie A. Williams**, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Kevin S. Williams** was sitting in his room in a dormitory in Khobar Towers, sitting near the exterior window, at the time of the explosion. Kevin S. Williams Declaration and Exhibits, Decl. of Kevin S. Williams ¶ 6 at 2. The blast shattered all the windows. *Id*. Airman Williams sustained lacerations all over his body, with cuts in the back and side of the head, shoulder, arms, hands, back, and legs. *Id*.; Exhibits at 8. He administered self-aid and was given buddy care by his fellow airmen and taken to the triage area at the Desert Rose chow hall where medical personnel treated him with additional bandaging and treated him for shock and dehydration, giving him four bags of IV fluid. *Id*. Decl. ¶ 7 at 2; Exhibits at 8. He was awarded the Purple Heart for his injuries as well as the Air Force Achievement Medal. *Id*. Exhibits at 9 – 11. After the bombing Airman Williams had

frequent nightmares, even rolling his wife out of bed and on to the floor to protect her during a bad thunderstorm a year after the bombing. *Id*. Decl. ¶ 10 at 2. Airman Williams developed PTSD, with bouts of depression, intense reflection, frequent and vivid nightmares, mood swings, and fear and anxiety. *Id*. ¶ 9 at 2. He continues to suffer emotional distress, including bouts of depression, anxiety, moodiness and night terrors. *Id*. The V.A. has given Airman Williams an 80 percent disability rating. *Id*. Exhibits at 12 – 20. In light of Airman William's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $7 million for his pain and suffering as a survivor of the bombing.

**Lorna M. McDermott**, the mother of Airman Williams, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering. His brother, **Eric R. Williams**, is entitled to an award of $1.25 million to compensate her for her emotional distress and pain and suffering.

**Joseph D. Wilson** was in the dayroom on the sixth floor of Building 131 in Khobar Towers at the time of the attack. Joseph D. Wilson Declaration and Exhibits, Decl. of Joseph D. Wilson ¶ 8 at 2. Just before the blast, security police knocked on his door and shouted for the occupants to evacuate. *Id*. He was in the center stairwell with two other airmen when the bomb exploded. *Id*. The force of the blast threw him to the floor, rendering him unconscious. *Id*. When he regained consciousness, he was surrounded by darkness, dust, smoke and broken glass. *Id*. He thought he had been hit by a rocket and was bracing for the next rocket to hit or for the floor to collapse from under him. *Id*. ¶ 9 at 2. He thought about his wife and their two sons. *Id*. He sustained a concussion, multiple lacerations and glass shrapnel wounds and trauma to his head, knees, legs and hands, as well as a dislocated knee and a lower back injury that still cause him pain today. *Id*. ¶ 10 at 2. He was taken to the makeshift triage area and treated for the wounds to his head, knees, legs and hands. *Id*. He was awarded the Purple Heart for his injuries. *Id*. Exhibits at 33 - 37. He was

devastated to learn his best friend, one of the airmen who served under him, was killed in the blast. *Id*. Decl. ¶ 11  at 3.  Airman Wilson was later awarded an award named in honor of his friend. *Id*. Exhibits at 10.

He received further medical treatment when he returned to his permanent duty station at Travis Air Force Base in California. *Id*. Decl. ¶ 13  at 3.   He began having migraines and problems falling asleep. *Id*.  He had nightmares about the bombing and would scream in his sleep.  *Id*. A military doctor prescribed migraine medication and sleep aids and determined that the migraines were directly related to PTSD.  *Id*. ¶ 14  at 4.  Airman Wilson retired from the Air Force in 1997. *Id*. ¶ 15  at 4.  His nightmares and migraines continued. *Id*.  He had flashbacks and would constantly re-live or think about the bombing. *Id*.   The experience changed his personality. *Id*. ¶ 16   at 4. Formerly he was easy  going and sociable but after the bombing he could become easily agitated and felt distant from his family. *Id*.  His brothers noticed that when they got together he wasn't fun and sociable like in the old days.  *Id*. He began to feel agitated and distant, and would not spend much time with his family. *Id*. He avoids things he used to enjoy like fishing, golfing, going to church, and family outings. *Id*. ¶ 17   at 4.   These changes have had a devastating impact on his family.  *Id*.   He was diagnosed with PTSD and has sought treatment *Id*. ¶ 20  at 5.   The V.A. has rated him as 30 percent disabled.  *Id*. Exhibits at 29 – 32.  This Court finds that Airman Wilson is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Toni Olsen Wilson**, the wife of Airman Wilson, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.  **Brandon C. Olsen**, the stepson of Airman Wilson and **Brenton M. Wilson**, the son of Airman Wilson, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Daryl B. Wilson**, **Eric L. Wilson**, **Joe T. Wilson, Jr**., **Richard T. Wilson,** the siblings of Joseph D. Wilson, are each entitled to an award of $1.25 million, each, to compensate them for their

emotional distress and pain and suffering. **Rodney S. Wilson**, a plaintiff and the sibling of Joseph D. Wilson, died on October 9, 2018. *See* Suggestion of Death Upon the Record as to Rodney Wilson. (ECF No. 28). The Estate of Rodney S. Wilson is represented by his brother, plaintiff Daryl B. Wilson. *See* Minute Order granting plaintiffs' Motion for Substitution of Proper Party, January 30, 2019. Daryl B. Wilson submitted a declaration on behalf of his brother Rodney S. Wilson, and also submitted the unsigned declaration that Rodney had drafted before he passed away. *See* Joseph D. Wilson Declaration and Exhibits, Decl. of Daryl B. Wilson as Personal Representative on Behalf of the Estate of Rodney S. Wilson at 71 – 74; Decl. of Rodney S. Wilson at 82 - 84. The **Estate of Rodney S. Wilson** is entitled to an award of $1.25 million.

**Michael A. Wilson** was in his dormitory building, which was located just behind Building 131, at the time of the bombing. Michael A. Wilson Declaration and Exhibits, Decl. of Michael A. Wilson ¶ 4 at 2. He was sitting in a chair in the living room next to the patio door. *Id*. He was just getting up to get ready for work when he saw a flash of light go past the door and the ground start to move. *Id*. He saw the glass in the sliding glass door start to move. *Id*. He was heading towards the hallway when the blast threw him against the wall. *Id*. His arm was sliced wide open at the elbow and he had glass embedded in his feet. *Id*. He was treated at the makeshift triage at the chow hall where a doctor picked the glass out of his elbow and stitched it up, without anesthetic. *Id*. ¶ 6 at 2. He wasn't able to sleep and was prescribed tranquilizers. *Id*. ¶ 7 at 2. His elbow wound developed a hematoma and required more treatment, during which more glass was removed. *Id*. ¶ 8 at 2. Airman Wilson was awarded the Purple Heart for his injuries. *Id*. Exhibits at 7. After returning to the U.S., Airman Wilson found that he didn't feel comfortable being in large groups or walking around town. *Id*. Decl. ¶ 9 at 3. If he heard a loud noise he would duck and take cover. *Id*. He wouldn't step on a manhole cover for fear of it being booby trapped. *Id*. Airman Wilson developed PTSD, from which he suffers to this day. *Id*. ¶ 10 at 3. He still has bad dreams and flashbacks

about the day of the attack. *Id*. He is still in touch with his friends from that day. He has to avoid crowds and loud noises. The V.A. has rated him as 40 percent disabled. *Id*. Exhibits at 8 – 9. This Court finds that Airman Wilson is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Scott A. Wolff** was in the bathroom of his dormitory in Khobar Towers getting ready to go to work at the time of the bombing. Scott A. Wolff Declaration and Exhibits, Decl. of Scott A. Wolff ¶ 4 at 1. The lights went out and a few seconds later the blast hit and the window shattered, blowing glass fragments and the metal window frame inside the room. *Id*. ¶ 4 at 1 – 2. He sustained lacerations including on the back of his right arm and the back of his head. *Id*. ¶ 4 at 2. He heard a rumbling noise and feared the building was going to collapse on top of him so he ducked and covered. *Id*. As he evacuated the building he saw that furniture had been blown around and the stairwell was slippery with blood. *Id*. ¶ 5 at 2. He then re-entered the building to search for survivors and transported injured airmen to the clinic. *Id*. ¶¶ 7 – 8 at 2. He was treated at the makeshift triage area at the dining facility where his wounds were stitched by medical personnel. *Id*. ¶¶ 9 - 10 at 3. Airman Wolff was awarded the Purple Heart for his injuries as well as the Air Force Achievement Medal with Valor for his actions helping the injured after the bombing. *Id*. Exhibits at 6, 15 - 16. Airman Wolff has received a disability rating of 60 percent from the V.A. *Id*. Exhibits at 8 – 14. Airman Wolff is still impacted by the experience, becoming anxious and emotional when he speaks of the event. *Id*. Decl. ¶14 at 4. He believes he has PTSD from the attack on Khobar Towers but has not sought treatment for it. *Id*. ¶ 15 at 4. This Court finds that he is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**Mitchell D. Wright** was in Building 127, cleaning the dormitory bathroom to prepare to return to the U.S. days later, at the time of the explosion. Mitchell D. Wright Declaration and Exhibits, Decl. of Mitchell D. Wright ¶ 5 at 2. Shockwaves shattered the bathroom window,

sending glass shards flying into his face. *Id*. Broken glass pierced both of his eyes, detached both retinas, and shattered tissue in his eyes. *Id*. He sustained wounds to the lower lid of the right eye and the upper lid of his left eye, and large perforating wounds to the cornea and sclera of both eyes. *Id*. The lens and the iris of each eye was lost. *Id*. Exhibits at 8 – 9. He also sustained multiple lacerations from glass shrapnel to his head, body, and extremities. *Id*. ¶ 5 at 2. He was taken by ambulance to King Fahd University Hospital where surgery was performed. *Id*. Exhibits at 8 – 9. He was aeromedically evacuated to Landstuhl Regional Medical Center at Ramstein Air Base in Germany. *Id*. ¶ 6 at 2; Exhibits at 9. He was then flown to Walter Reed Amy Medical Center in Washington, DC, where he underwent repair to his detached retinas in both eyes. *Id*. Exhibits at 11 – 16. He was hospitalized for three months under the care of the ophthalmology department. *Id*. ¶ 6 at 2. Surgery was performed to repair the retinas in both eyes. *Id*. He underwent two eight hour surgeries. *Id*. The recovery was very painful. *Id*. After each surgery he had to lie face down for 24 hours a day, for weeks at a time. *Id*.

In November 1996 he went before the Medical Evaluation Board to determine whether his medical condition had left him unfit for medical duty. *Id*. Exhibits at 14 – 17. The Board's November 1996 report stated "The patient has severe decreased vision in the right eye to the level of 20/80 and in the left eye to hand motion at 8-10 feet, making him blind to the extent that he was unable to drive during night or day. He will be unable to read except the very largest print without the assistance of low vision aids. Any future work endeavors will have to take this decrease in vision into consideration." *Id*. Exhibits at 15.

In February 1997 he began treatment at Southwestern Medical Center at the University of Texas. *Id*. Exhibits at 18 – 23. Reports at this time showed that he "has had as successful and anatomic corrections as appears to be possible" and "the optic nerve on the left is pale and may have been separately injured. There does not appear to be anything that one could do to either eye

to improve the visual acuity or visual field, at this time. The 20/80 recordable vision in the right eye is not as useful a 20/80 as one might hope, because of the severe constriction of the visual field and the fact that the defect comes to within 2 to 3° fixation in one quadrant. It should also be noted that the stability of this gentleman's eyes is anything but secure. He has had severe injuries that have resulted in abnormalities that could result in problems in the future that could very well result in the development of total blindness. I therefore think that any plans for this gentleman's future should be done realistically and include the possibility of his having to function being totally blind." *Id*. Exhibits at 18 – 19. He was placed on convalescent leave and sent to the VA's Blind Rehabilitation Center at the VA Medical Center in Birmingham, Alabama *Id*. Exhibits at 25 – 38.

Prior to the Khobar Tower blast, Airman Wright had 20/20 vision *Id*. Exhibits at 18 – 19. He is now legally blind. *Id*. Exhibits at 160. According to his V.A. disability rating, his right eye has corrected near and far vision of 20/200. *Id*. Exhibits at 160. His left eye has light perception only, which the V.A. considers as 5/200 for rating purposes. *Id*. Exhibits at 161.

Airman Wright cannot drive or read regular print, and needs his wife to read for him. He needs a flashlight and a large magnifying glass to look for something in a drawer or cabinet. His depth perception is so poor that he often falls when walking. His disability has impacted his employment opportunities. *Id*. Decl. ¶ 9 at 3.

Airman Wright developed PTSD after the bombing. *Id*. ¶ 10 at 3. He has nightmares and chronic sleep impairment. *Id*. He suffers from panic attacks, anxiety, and memory loss. *Id*. Twelve of the airmen who were killed in the Khobar Towers bombing were his friends. *Id*. Exhibits at 29.

The V.A. has rated him as 90 percent disabled, including 80 percent disabled for visual impairment in both eyes. *Id*. Exhibits at 160, 162. He is compensated by the V.A. at the 100 percent rate because he is considered unemployable and is considered totally and permanently disabled. *Id*. at 162. His VA rating shows that his PTSD was connected to the Khobar Towers bombing. *Id*.

Exhibits at 160 – 164.  He was awarded the Purple Heart for his injuries.  *Id*. Exhibits at 165.  In light of Airman Wright's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Patricia E. Wright**, the wife of Airman Wright, is entitled to an award of $4 million to compensate her for her emotional distress and pain and suffering.  **Elin C. Brown** and **Erik M. Wright**, the children of Airman Wright, are entitled to an award of $2.5 million, each, to compensate them for their emotional distress and pain and suffering.

**Travis W. Wyatt** had gone to bed in his dormitory bedroom in Building 130 in Khobar Towers when the bomb went off.  Travis W. Wyatt Declaration and Exhibits, Decl. of Travis W. Wyatt ¶ 4 at 2.  He was going to sleep when he suddenly felt pressure all around him. *Id*. Everything was sucked out of the room, and everything went black and the room filled with smoke.  *Id.*  The air conditioner blew in on his roommate.  *Id*.  Glass and wood were scattered everywhere.  *Id*.  He was treated at the Khobar Towers clinic, where glass was removed from his feet with a needle and, because he supplies had run out, no anesthetic. *Id*. ¶ 6 at 2; Exhibits at 6 – 8 . He was awarded the Purple Heart for his injuries.  *Id*. Exhibits at 5.   He returned home to Shaw Air Force Base where his wife was expecting their first child. *Id*. Decl. ¶ 7 at 2.   He began experiencing PTSD as a result of the bombing and was given individual therapy and medication for anxiety. *Id*. Exhibits at 9 - 24 Airman Wyatt was best friends with two of the airmen killed by the blast. *Id*. ¶ 8 at 3.   He had grown close to them during basic training at Shaw Air Force Base and he still suffers from survivor's guilt. *Id.*  Within two weeks of returning home he overdosed on pills in a suicide attempt and his wife rushed him to the hospital. *Id*. ¶ 7 at 2 – 3.   His psychological issues resulting from the bombing led to four divorces and three suicide attempts. *Id*. ¶ 8 at 3.  When his grandfather died, he put his Purple Heart in his casket.  *Id*. ¶ 10 at 3 . The V.A. has given him a V.A. disability rating of

70 percent.  *Id.* Exhibits at 25 – 27.  This Court finds that Airman Wyatt is entitled to an award of $5 million for his pain and suffering as a survivor of the bombing.

**John J. Yeichner** was walking up the stairs back to his room in Building 131 at the time of the bombing.  John Yeichner Declaration and Exhibits, Decl. of John Yeichner  ¶ 4 at 2.  He was in the stairwell between the first and second floors when he was blasted down the stairs and landed face down. *Id.*  The fall dislocated his right shoulder. *Id.*  He sustained lacerations to his hands, feet and knees from broken window glass.  *Id.* ¶ 5 at 2.  Once he got to his feet he was knocked over as personnel evacuated the building.  *Id.* ¶ 4 at 2.  He made his way to the center of the compound, in fear for his life in apprehension of another bomb exploding.  *Id.*  Three of the airmen who were killed in Building 131 were his close friends.  *Id.* ¶ 9 at 3.  Losing his friends, who were as close as family, had a devastating impact on his life. *Id.* ¶ 12 at 3.  He still thinks about his friends constantly and he is still close with their families. *Id.* ¶ 10 at 3.

Airman Yeichner did not accept a Purple Heart at the time after his close friends had been killed.  *Id.* ¶ 5 at 2.

Airman's Yeichner's shoulder injury continued to cause him pain and he received physical therapy.  *Id.* Exhibits at 13.  Medical records document that the Khobar blast was the cause of the injury. *Id.* Exhibits at 9, 10, 11, 12, 13, 14, 15.   He was diagnosed with an anterior subluxation and had a right anterior reconstruction surgery on his shoulder in 1998.  *Id.* Decl.¶ 7 at 2; Exhibits at 9, 15, 37. His shoulder injury continued to cause pain and he gave up a seven-year career as a police officer due to his shoulder injury.  *Id.* Decl. ¶ 7 at 3.  His shoulder still gives him pain to this day *Id.* Exhibits at 37.  His right shoulder has continued to cause him pain.   He had an MRI on the right shoulder in March 2018 and may require a shoulder replacement. *Id.* ¶ 7 at 2 – 3; Exhibits at 40 – 41.

Airman Yeichner also developed pain in his left shoulder and left elbow *Id.* Exhibits at 45 – 48. He was recently diagnosed with a distal biceps tendon tear and an extensor tendon tear in his left elbow. *Id.*, Exhibits at 44. He had surgery on his left elbow to repair these injuries in December 2018. *Id.* Exhibits at 42 – 44. The pain in his left shoulder and left elbow was a result of the right shoulder injury that he had sustained in the Khobar Towers bombing, as for years he had been compensating for the right shoulder injury by the overuse of his left arm and shoulder. John Yeichner Supplemental Declaration and Exhibits, Supplemental Decl. of John Yeichner ¶ 5 at 1; Supplemental Exhibits at 3- 4.

After the bombing Airman Yeichner developed PTSD, from which he suffers to this day. He has sought therapy and takes medication for sleep and anxiety. John Yeichner Declaration and Exhibits, Exhibits at 16, 20. Airman Yeichner's medical records document that the Khobar bombing is the cause of his PTSD and sleep problems. *Id.* Exhibits at 20, 27, 35. His symptoms include a sleep disorder, anxiety, and trust issues while in public. *Id.* Exhibits at 16, 20. His PTSD led to relationship problems and he has been married and divorced four times. His PTSD has also harmed his ability to maintain employment. The V.A. has rated him as 60 percent disabled. *Id.* Exhibits at 8. In light of Airman Yeichner's relatively more numerous and severe injuries, this Court finds that he is entitled to an upward departure of $8 million for his pain and suffering as a survivor of the bombing.

**Selena P. Zuhoski** was in the Khobar Towers recreation C=center across the parking lot from Buildings 130 and 131 at the time of the blast. Selena P. Zuhoski Declaration and Exhibits, Decl. of Selena P. Zuhoski ¶ 5 at 2. She was sitting at a table with friends when the lights flickered and there was a deep, muffled boom. *Id.* The blast slammed her against the wall and she was knocked unconscious, sustaining a traumatic brain injury. *Id.* When she came to she saw tables and chairs had been turned over and grey, smoke-like debris was blowing through the windows. *Id.* Her

friends helped her to her feet. *Id*. Outside, she saw a large mushroom cloud. *Id*. Despite her injuries she participated in the search and rescue for survivors in the damaged buildings. *Id*. ¶ 6 at 2. She sustained a coup contrecoup injury and was rendered unconscious, suffering a concussion and a TBI. She was awarded the Purple Heart and the Airman's Medal for Heroism. *Id*. Exhibits at 9 – 10, 107, 144 - 145. When she returned home to Florida she had spells where she felt she was "zoning out" and feeling very tired afterwards. *Id*. Decl. ¶ 11 at 4. Her work performance declined and she was often late, forgot important tasks, and went to sick hall often. *Id*. ¶ 11 at 4. She made major mistakes at work and was short-tempered with customers and would get frustrated and angry with coworkers and supervisors. *Id*. She argued daily with her husband and was divorced within a year of the Khobar Towers bombing. *Id*. After a very bad spell she went to the emergency room where neurological tests determined that she had frontal lobe epilepsy. *Id*. ¶ 13 at 4. The spells and episodes of "zoning out" were actually seizures characterized by loss of consciousness and a postictal period of confusion and fatigue. *Id*. Exhibits at 127. Further testing concluded that she had suffered a coup contrecoup injury where her brain slammed against her skull, most likely when she was rendered unconscious by the blast. *Id*. Decl. ¶ 13 at 4; Exhibits at 131, 135. Her insomnia makes seizures more likely even if she is taking medication. *Id*. ¶ 14 at 5. In 2000, she had her driving privileges revoked for six months and her insurance was cancelled after a seizure caused by not sleeping. *Id*. Airman Zuhoski has been on seven different anti-seizure medications, each with their own side effect and is not on a thrice daily anti-seizure medication. *Id*. ¶¶ 13 -14 at 4 - 5. Airman Zuhoski's VA disability Rating Decision and medical records establish that her seizure disorders, TBI, PTSD and other medical problems were caused by with the head injury and trauma she sustained in the Khobar Towers bombing. *Id*. Exhibits at 85, 89, 124, 131, 135, 138, 157, 164, 166, 169, 173. As a result of the Khobar Towers bombing she also began to suffer from PTSD, nightmares, sleeplessness which can trigger a seizure, chronic headaches, chronic pain, and

depression in the wake of the Khobar Towers bombing. *Id.* Decl. ¶ 19 at 6. She has memory problems, and forgets things like turning off the stove or her own address and telephone number. *Id.* ¶ 15 at 5. Airman Zuhoski retired from active military service in 2007. *Id.* Exhibits at 86. She was removed from her work as a paralegal specialist in 2016 due to being found medically unfit for her position. *Id.* ¶ 18 at 5; Exhibits at 179. She has been rated as 90 percent disabled by the V.A. and is currently rated 80 percent disabled, including for TBI, PTSD, sleep apnea, post-traumatic seizure disorder, and psychomotor epilepsy. *Id.* Exhibits at 104 – 105. In light of Airman Zuhoski's relatively more numerous and severe injuries, this Court finds that she is entitled to an upward departure of $8 million for her pain and suffering as a survivor of the bombing.

**Linda L. Robinson**, the mother of Airman Zuhoski, is entitled to an award of $2.5 million to compensate her for her emotional distress and pain and suffering.

## VI. CONCLUSION

For the forgoing reasons, final judgment will be entered in favor of plaintiffs and against the defendants, jointly and severally, in the amounts set forth above, plus any applicable post-judgment interest at the statutory rate, 28 U.S.C. § 1961(a)[2] which shall be allocated in the following manner:

---

[2] *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) (allowing post-judgment interest against a foreign sovereign under the FSIA).

| CLAIMANT | RELATIONSHIP TO INJURED CLAIMANT | AMOUNT OF COMPENSATORY DAMAGES |
|---|---|---|
| **William M. Schooley** | Injured claimant | $5 million |
| **Jimmy N. Adams** | Injured claimant | $8 million |
| Carol S. Adams | Spouse | $4 million |
| **Timothy L. Albritton** | Injured claimant | $5 million |
| Sandra Albritton | Spouse | $4 million |
| Erika A. Weinfurter | Child | $2.5 million |
| **Billy G. Allen, Jr.** | Injured claimant | $8 million |
| **Josephine E. Alston** | Injured claimant | $5 million |
| Brittany R. Alston | Child | $2.5 million |
| Marcus A. Alston | Child | $2.5 million |
| **Michael D. Atkins** | Injured claimant | $8 million |
| Patricia D. Atkins | Parent | $2.5 million |
| **Angel M. Ayala** | Injured claimant | $8 million |
| Fernando Ayala | Parent | $2.5 million |
| Zandra M. Ayala | Parent | $2.5 million |
| John J. Ayala | Sibling | $1.25 million |
| **John M. Baldwin** | Injured claimant | $5 million |
| Kathy L. Beach | Parent | $2.5 million |
| Bobby F. Baldwin, Jr. | Parent | $2.5 million |
| Steven L. Baldwin | Sibling | $1.25 million |
| Bobby F. Baldwin, III | Sibling | $1.25 million |
| **Stacey D. Benfield** | Injured claimant | $8 million |

| | | |
|---|---|---|
| Gloria R. Brown | Parent | $2.5 million |
| Jimmy F. Brown | Parent | $2.5 million |
| Melena Collins | Sibling | $1.25 million |
| **Willard A. Brewster** | Injured claimant | $8 million |
| **Bryan M. Brock** | Injured claimant | $5 million |
| Joan C. Locke | Parent | $2.5 million |
| **Mark E. Broda** | Injured claimant | $5 million |
| Pamela G. Broda | Parent | $2.5 million |
| Alycia A. Broda | Sibling | $1.25 million |
| **Kyle W. Brown** | Injured claimant | $8 million |
| Amanda M. Brown | Spouse | $4 million |
| **Shannon K. Bump** | Injured claimant | $5 million |
| Valerie A. Bump | Spouse | $4 million |
| **Dwayne A. Burnham** | Injured claimant | $5 million |
| Debra E. Burnham | Spouse | $4 million |
| Ralph K. Burnham | Parent | $2.5 million |
| Margaret L. Burnham | Parent | $2.5 million |
| Dwight C. Burnham | Child | $2.5 million |
| Keelan C. Burnham | Child | $2.5 million |
| **Rondal G. Burns** | Injured claimant | $8 million |
| Rebekah J. Burns | Spouse | $4 million |
| Emileigh L. Ledgerwood | Child | $2.5 million |

| | | |
|---|---|---|
| Nickolaus A. Burns | Child | $2.5 million |
| **Melinda J. Caines** | Injured claimant | $5 million |
| Alfreda Peak | Parent | $2.5 million |
| John L. Dean | Parent | $2.5 million |
| Carmen R. Dean | Sibling | $1.25 million |
| **Salvatore Capaccio** | Injured claimant | $5 million |
| Diane Martucci | Parent | $2.5 million |
| **Hilario C. Carrizales** | Injured claimant | $5 million |
| Juanita Carrizales | Spouse | $4 million |
| Olivia H. Carrizales | Child | $2.5 million |
| Sarah Carrizales | Child | $2.5 million |
| **Eric A. Castor** | Injured claimant | $8 million |
| Kenneth R. Castor | Parent | $2.5 million |
| Nancy J. Castor | Parent | $2.5 million |
| Laura L. Washer | Sibling | $1.25 million |
| **Artis R. Coleman Sr.** | Injured claimant | $8 million |
| Betty A. Coleman | Spouse | $4 million |
| Artis R. Coleman, Jr. | Child | $2.5 million |
| **Paul S. Collins** | Injured claimant | $5 million |
| **Robbie J. Cotterman** | Injured claimant | $5 million |
| **Shawn R. Clevenger** | Injured claimant | $5 million |

| | | |
|---|---|---|
| **Jefferson A. Craven** | Injured claimant | $8 million |
| Tirana K. Craven | Spouse | $4 million |
| Jessica M. Verboom | Child | $2.5 million |
| **Deborah L. Danielsgale** | Injured claimant | $5 million |
| Msichanna L. Alexander | Child | $2.5 million |
| **Rose A. Davis** | Injured claimant | $5 million |
| **Gregory J. DeArman** | Injured claimant | $5 million |
| **Robert L. DePyssler** | Injured claimant | $5 million |
| Robert W. DePyssler | Parent | $2.5 million |
| **Richard D. Dupree** | Injured claimant | $5 million |
| **Thomas F. Edman** | Injured claimant | $8 million |
| Elizabeth H. Edman | Spouse | $4 million |
| **Brenda A. Eilers** | Injured claimant | $8 million |
| Rosemary A. Ritt | Parent | $2.5 million |
| **Larry Frank** | Injured claimant | $5 million |
| Sonia M. Frank | Spouse | $4 million |
| Dana P. Frank | Child | $2.5 million |
| Nathan R. Frank | Child | $2.5 million |
| **Christopher A. Freeman** | Injured claimant | $5 million |
| **Jeffrey J. Gardner** | Injured claimant | $5 million |
| **William E. Giles IV** | Injured claimant | $5 million |

| | | |
|---|---|---|
| William E. Giles III | Parent | $2.5 million |
| Connie S. Love | Parent | $2.5 million |
| Tammy G. Adams | Sibling | $1.25 million |
| **Michael W. Goff** | Injured claimant | $5 million |
| **Estate of Hector Manuel Gonzalez Pastrana** | Injured claimant (deceased) | Wrongful death (Count V) Pain and suffering before death: $5 million |
| Diana Gonzalez | Spouse | Wrongful death (Count V): $8 million solatium |
| Hector M. Gonzalez Jr. | Child | Wrongful death (Count V): $5 million solatium |
| José D. Gonzalez | Child | Wrongful death (Count V): $5 million solatium |
| Natasha Gonzalez | Child | $ Wrongful death (Count V): $5 million solatium |
| **Rudolph Grimm II** | Injured claimant | $5 million |
| **Shawn K. Hale** | Injured claimant | $8 million |
| **Torrey S. Hardy** | Injured claimant | $7 million |
| **Michael J. Harner** | Injured claimant | $8 million |
| Julia N. Harner | Spouse | $4 million |
| Nancy S. Harner | Parent | $2.5 million |

| | | |
|---|---|---|
| James O. Harner | Parent | $2.5 million |
| Michelle A. Caldwell | Sibling | $1.25 million |
| **Gregory R. Hedglin** | Injured claimant | $7 million |
| **Randy W. Hooker** | Injured claimant | $5 million |
| **Dusty L. Huntley** | Injured claimant | $5 million |
| Roberta A. Huntley | Spouse | $4 million |
| Kevin L. Huntley | Child | $2.5 million |
| Kyle L. Huntley | Child | $2.5 million |
| **Michael R. Jay** | Injured claimant | $8 million |
| Robert M. Jay | Parent | $2.5 million |
| Donna Jay | Parent | $2.5 million |
| **Stephen K. Johnson** | Injured claimant | $5 million |
| Jessica D. Johnson | Spouse | $4 million |
| Stephen K. Johnson, II | Child | $2.5 million |
| Ryan W. Johnson | Child | $2.5 million |
| **David P. Jordan** | Injured claimant | $5 million |
| Ruth A. Jordan | Spouse | $4 million |
| **Patrick H. Kick** | Injured claimant | $5 million |
| **Thomas A. Kininger** | Injured claimant | $5 million |
| **Steven R. Kitis** | Injured claimant | $5 million |

| | | |
|---|---|---|
| Geraldine R. Hartman-Kitis | Spouse | $4 million |
| **Aaron L. Lande** | Injured claimant | $5 million |
| **Shane A. Little** | Injured claimant | $5 million |
| **Angeline Marsh** | Injured claimant | $5 million |
| Minnie D. Hebert | Parent | $2.5 million |
| **Joe D. McDonald** | Injured claimant | $5 million |
| **Matthew E. McEndree** | Injured claimant | $5 million |
| **Phillip E. Miller** | Injured claimant | $5 million |
| **Scott A. Miller** | Injured claimant | $5 million |
| **Shawn F. Mohammed** | Injured claimant | $5 million |
| **Erin L. Murphy** | Injured claimant | $5 million |
| **Ronald W. Neldon** | Injured claimant | $5 million |
| **George P. Nicholaou** | Injured claimant | $5 million |
| Noreen B. H. Nicholaou | Spouse | $4 million |
| **Laurence P. Oliver** | Injured claimant | $5 million |
| **Mary E. Ortiz** | Injured claimant | $5 million |
| **Jennifer R. Parker** | Injured claimant | $5 million |

| | | |
|---|---|---|
| **Kevin J. Pflaum** | Injured claimant | $5 million |
| Donna Pflaum | Spouse | $4 million |
| **Leighton J. Reid** | Injured claimant | $7 million |
| Sean C. Reid | Child | $2.5 million |
| **Dustin J. Rhode** | Injured claimant | $5 million |
| Laurie R. Rhode | Parent | $2.5 million |
| **Andrea D. Richards** | Injured claimant | $5 million |
| **Richard E. Rollins** | Injured claimant | $5 million |
| **Dana S. Rozelle** | Injured claimant | $5 million |
| **Michael J. Rusnak** | Injured claimant | $8 million |
| **Jon C.  Schamber** | Injured claimant | $8 million |
| **Erich J. Schneider** | Injured claimant | $7 million |
| Diane M. Martinson | Parent | $2.5 million |
| **Jereme D. Schuchard** | Injured claimant | $5 million |
| Brenda G. Munoz | Parent | $2.5 million |
| **Bryan D. Scott** | Injured claimant | $5 million |
| Michael G. Scott, II | Sibling | $1.25 million |
| Connie M. Sturgill | Parent | $2.5 million |
| Michael G. Scott | Parent | $2.5 million |
| Jonathan L. Scott | Sibling | $1.25 million |

| | | |
|---|---|---|
| **Brandie R. Shaffer** | Injured claimant | $5 million |
| **Robert G. Siler** | Injured claimant | $7 million |
| **William F. Sine** | Injured claimant | $8 million |
| William D. Sine | Child | $2.5 million |
| **Rodney C. Smith** | Injured claimant | $8 million |
| Jennie L. Smith | Spouse | $4 million |
| A'Doria T. Smith | Child | $2.5 million |
| Alexandra C. Smith | Child | $2.5 million |
| Romarus Smith | Child | $2.5 million |
| **Joseph D. Stroud** | Injured claimant | $5 million |
| **Kenneth L. Sturdivant** | Injured claimant | $5 million |
| **Zachary S. Sutton** | Injured claimant | $5 million |
| **Clifford L. Thomas** | Injured claimant | $5 million |
| Margaret L. Thomas | Spouse | $4 million |
| Camillia T. Thomas-Harris | Child | $2.5 million |
| Cedrick C. Thomas | Child | $2.5 million |
| Adrian D. Thomas | Child | $2.5 million |
| **Roland L. Tiner, Jr.** | Injured claimant | $7 million |
| Annie L. Tiner | Parent | $2.5 million |
| Stacee L. Marcum | Sibling | $1.25 million |
| Thomas S. Tiner | Sibling | $1.25 million |
| **Grady W. Tucker, Jr**. | Injured claimant | $7 million |

| | | |
|---|---|---|
| Grady W. Tucker, Sr. | Parent | $2.5 million |
| **Brian E. VanHorn** | Injured claimant | $5 million |
| **Brian E. Volk** | Injured claimant | $8 million |
| **Aaron R. Weimer** | Injured claimant | $5 million |
| **David G. Westrup** | Injured claimant | $5 million |
| Rebecca Westrup | Spouse | $4 million |
| Angelena D. Mangnall F/K/A Westrup | Child | $2.5 million |
| Michael D. Westrup | Child | $2.5 million |
| **Martin L. Wheeler** | Injured claimant | $7 million |
| Tracie L. Wheeler | Spouse | $4 million |
| Ashlie L. Wheeler | Child | $2.5 million |
| **Douglas T. Widdis** | Injured claimant | $5 million |
| **Elliott Williams** | Injured claimant | $5 million |
| Dana L.  Williams | Spouse | $4 million |
| Chad T. Williams | Child | $2.5 million |
| Erik B. Lee | Child | $2.5 million |
| Kelsie A. Williams | Child | $2.5 million |
| **Kevin S. Williams** | Injured claimant | $7 million |
| Lorna M. McDermott | Parent | $2.5 million |
| Eric R. Williams | Parent | $1.25 million |
| **Joseph D. Wilson** | Injured claimant | $5 million |

| | | |
|---|---|---|
| Toni Olsen Wilson | Spouse | $4 million |
| Brandon C. Olsen | Child | $2.5 million |
| Brenton M. Wilson | Child | $2.5 million |
| Daryl Wilson | Sibling | $1.25 million |
| Eric Wilson | Sibling | $1.25 million |
| Joe Wilson Jr. | Sibling | $1.25 million |
| Richard Wilson | Sibling | $1.25 million |
| Estate of Rodney Wilson | Sibling (deceased) | $1.25 million |
| **Michael A. Wilson** | Injured claimant | $5 million |
| **Scott A. Wolff** | Injured claimant | $5 million |
| **Mitchell D. Wright** | Injured claimant | $8 million |
| Patricia E. Wright | Spouse | $4 million |
| Elin C. Brown | Child | $2.5 million |
| Erik M. Wright | Child | $2.5 million |
| **Travis W. Wyatt** | Injured claimant | $5 million |
| **John J. Yeichner** | Injured claimant | $8 million |
| **Selena P. Zuhoski** | Injured claimant | $8 million |
| Linda L. Robinson | Parent | $2.5 million |
| TOTAL | | $916.75 million |

Total compensatory damages: $916,750,000.00

IT IS FURTHER ORDERED that Plaintiffs, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and Conclusions of Law issued this date to Defendants.

SO ORDERED.


Respectfully submitted,

___/s/ Joshua M. Ambush_____
Joshua M. Ambush
Bar No. MD 27025
Law Offices of Joshua M. Ambush, LLC
1726 Reisterstown Road, Suite 206
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
joshua@ambushlaw.com


Dated: February 11,  2019                        Attorney for Plaintiffs.