# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM M. SCHOOLEY, *et al.*,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

Defendants.

Civil Action No. 17-1376 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

On June 25, 1996, a gasoline tanker, modified to serve as a bomb, exploded with the force of 20,000 pounds of TNT next to the Khobar Towers complex, a residential complex in Dhahran, Saudi Arabia housing coalition forces "charged with monitoring compliance with U.N. Security Council Resolutions." Pls.' Amend. Compl. ("Compl.") ¶¶ 19–21, ECF No. 21. Nineteen U.S. Air Force personnel were killed, and hundreds more were injured, including the 101 service member plaintiffs in this case. *Id.* ¶¶ 22, 38. The total of 219 plaintiffs in the instant case also include 118 "immediate family members" of the 101 injured service members. *Id.* ¶ 6. The plaintiffs allege that the three defendants, the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Islamic Revolutionary Guard Corps ("IRGC"), are responsible for the terrorist attack on Khobar Towers, *id.* ¶ 13, and seek to hold these defendants liable as foreign state sponsors of international terrorism under the Foreign Sovereign Immunities Act ("FSIA") terrorism exception, 28 U.S.C. § 1605A. The defendants have failed to enter appearances, or defend against this action, despite being properly served, pursuant to 28 U.S.C. § 1608(a)(4). *See* Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 13; Clerk's Entry of Default, ECF No. 15. The plaintiffs now seek the entry

of a default judgment against the defendants as to liability and damages. Pls.' Mot. for Judicial

Notice of Prior Related Cases and for Default J. as to Liability and Damages Against Iranian

Defendants ("Pls.' Mot."), ECF No. 146. For the reasons detailed below, the plaintiffs' motion

is granted.

## I.      BACKGROUND

"'[T]he history of litigation' in this Court 'stemming from the bombing of Khobar

Towers . . . is extensive.'" *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C.

2018) (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 167 (D.D.C. 2010)

(Lamberth, J.) (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006)

(Lamberth, J.) and *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248

(D.D.C. 2006) ("*Heiser I*") (Lamberth, J.))). Specifically, in *Heiser I*, the Court heard evidence

and witness testimony for 17 days, *see Heiser I*, 466 F. Supp. 2d at 250, including from 7 expert

witnesses.[1] The plaintiffs correctly point out that in prior cases "the Court found that the three

[instant] Iranian Defendants were liable for the Khobar Towers bombing," Pls.' Mem. Supp.

Pls.' Mot. Judicial Notice of Prior Related Cases ("Pls.' Mem.") at 2, ECF No. 146, and that they

"dealt with identical issues regarding the liability [of these defendants]," *id.* In light of this prior

litigation, plaintiffs request that this Court take "[j]udicial notice of these proceedings." *Id.*

Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice, on its

own or at the request of a party, of adjudicative facts that are "not subject to reasonable dispute

---

[1]      Expert witnesses testifying in *Heiser I* included: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"), (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism, (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism, and (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65, as well as (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268, (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70, and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a)–(c). "'[A]djudicative facts are simply the facts of the particular case' while 'legislative facts . . . are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body.'" *Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting Advisory Committee Note to FED. R. EVID. 201(a)). Rule 201 has been applied frequently in this Court to take notice of, and rely on, facts found in earlier proceedings, "without necessitating the formality of having that evidence reproduced," *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)), "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("Relying on the pleadings and the . . . findings of other judges in this jurisdiction.")).

In this way, rather than require litigants to present such evidence anew in each lawsuit stemming from the same terrorist attack, courts have "determined that the proper approach is one 'that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced,'" so that "courts may reach their own independent findings of fact" predicated "on judicial notice of the evidence presented in the earlier cases." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, J.) (quoting *Rimkus*, 750 F. Supp. 2d at 172); s*ee also Foley*, 249 F. Supp. 3d at 191 (Kollar-Kotelly, J.) (finding same "approach appropriate" and "tak[ing] judicial notice of the requested findings"); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d

44, 50 (D.D.C. 2012) (Lamberth, J.) (quoting *Rimkus*, 750 F. Supp. 2d at 163) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation"); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, J.) (taking "judicial notice of the evidence presented in the earlier cases").

Factual evidence developed in other cases "involving the same conduct by the same defendants is admissible and may be relied upon in this case." *Akins*, 332 F. Supp. 3d at 11. While factual evidence may be relied upon, judicial findings derived from that evidence are not dispositive because courts must "reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172. Persuaded that this approach is both "efficient and sufficiently protective of the absent defendants' interests," *Akins*, 332 F. Supp. 3d at 11, this Court will adopt it and grant the plaintiffs' request to take judicial notice of the evidence presented in *Heiser I, Blais, Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010), and *Rimkus*.[2] The evidence regarding the terrorist attack at issue is summarized below, followed by an overview of the procedural history of this case.

### A.     The Attack on Khobar Towers

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with U.N. security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Ten minutes before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; Compl. ¶ 20. The guards on the top of the building "started to give

---

[2]     The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014), the D.C. Circuit held that the plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, *id.*, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. *See also Owens v. Republic of Sudan*, 864 F.3d 751, 789 (D.C. Cir. 2017).

warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Id.* ¶ 21. The resulting explosion was the "largest non-nuclear explosion ever up to that time" and was the "equivalent of 20,000 pounds of TNT." *Id.* The blast "sheared off the face of Building 131 and damaged every other building in the complex" and killed nineteen U.S. Air Force personnel. *Id.* ¶ 22.

**B.    The Defendants' Role**

Iran is "a foreign state and has been designated a state sponsor of terrorism . . . continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited June 27, 2019). "[T]he IRGC is a non-traditional instrumentality of Iran," serving as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." *Blais*, 459 F. Supp. 2d at 47. "The IRGC, with its own separate ministry, has evolved into one of the most powerful organizations in Iran and functions as an intelligence organization, both within and beyond Iran's borders." Compl. ¶ 10.

"The terrorist attack on the Khobar Towers was . . . approved and supported by the Iranian Minister of Intelligence and Security ('MOIS') at the time." *Heiser I*, 466 F. Supp. 2d at 252. The attack was also "approved by Ayatollah Khameini, the Supreme leader of Iran at the time." *Id.* The truck bomb that was used was "assembled at a terrorist base in the Bekaa Valley which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah," *id.*, and recruited individuals "drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia," *id.*

The Federal Bureau of Investigation ("FBI"), led by then-director Louis Freeh, "conducted a massive and thorough investigation of the attack, using over 250 agents," *id.*, under the "day to day oversight" of Dale Watson, then deputy counterterrorism chief of the FBI, *id.* at 264 n.19. "Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezballah organization." *Id.* at 252. The FBI "obtained a great deal of information linking the defendants to the bombing from interviews with six admitted members of the Saudi Hezbollah organization." *Id.* at 252–53. These six members "admitted to the FBI their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on Khobar Towers," *id.* at 253, and also "indicated that the selection of the target and the authorization to proceed was done collectively by Iran, MOIS, and IRGC, though the actual preparation and carrying out of the attack was done by the IRGC," *id.* "[B]ased on [this] evidence gathered by the FBI," Freeh has "publicly and unequivocally stated his firm conclusion" that "Iran was responsible for planning and supporting the Khobar Towers attack." *Id.*

Dr. Patrick Clawson provided expert testimony in *Heiser I*, "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject," *id.*, that "the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack," *id.* Based on these facts, Clawson "stated conclusively his opinion that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.* Dr. Buce Teft additionally supported Clawson's "expert opinion," based on "publicly available sources that were not

inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253–54.

## C. The Instant Plaintiffs

The plaintiffs in this action include 101 service members who "suffered physical and/or mental and/or emotional injuries as a result of the terrorist attack" on Khobar Towers, Compl. ¶ 6, and 118 of their immediate family members. The service member plaintiffs, and, where applicable, their family member plaintiffs, are described below.[3]

### 1. *Stacey D. Benfield and Three Family Members*

On June 25, 1996, Stacey D. Benfield was a Senior Airman in the United States Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Stacey D. Benfield ("Benfield Decl.") (Sept. 5, 2018) ¶ 4, ECF No. 35 (sealed), ECF No. 157 (public version). At the time of the bombing, Benfield was on the third floor of a building near Building 131, the building closest to the detonated gasoline tanker. *Id.* ¶ 5. He was looking through his patio glass doors when the tanker exploded. *Id.* "There was a bright flash and a deafening explosion" and Benfield was blown across the room. *Id.* Benfield regained consciousness as he was being carried from the rubble to the triage center. *Id.* At the triage center, he was bandaged and sent to a Saudi hospital for treatment. *Id.* ¶ 6. His "nose was shattered, and [his] lip was ripped in half and hanging from the left side of [his] face, and up into [his] naval cavity. The flesh from [his] nose was hanging on the left side of [his] face." *Id.* In

---

[3] Every plaintiff in this case has submitted a sealed declaration, with supporting documentation containing sensitive personal information, and a redacted, public version. The docket numbers for both the public and the sealed versions are reflected in the first citation to each plaintiff's declaration. Otherwise sealed content referenced in this Memorandum Opinion is unsealed as necessary to explain the Court's reasoning. *See In re WP Co. LLC*, 201 F. Supp. 3d 109, 116 n.4 (D.D.C. 2016) (citing *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *United States v. Parnell*, 524 F.3d 166, 167 n.1 (2d Cir. 2008) (per curiam)).

addition, he suffered from a "large hole in [his] left eye socket and deep lacerations from the front of [his] hairline to the center/top of [his] head." *Id.* He additionally injured his knee and right shoulder. *Id.* ¶¶ 6, 11. The attack left him with "permanent disfiguring scars on [his] nose, eye, forehead and the top and left side of [his] head." *Id.* ¶ 10. A piece of flesh is missing from his upper left eye socket. *Id.* Though he had surgery to correct the shoulder injury, his knee still causes him pain. *Id.* ¶ 11. In addition to suffering physical injury, Benfield also suffers from PTSD which has caused "significant hardships in [his] life." *Id.* ¶ 12. As a result of his PTSD, Benfield cannot attend fireworks, movies, or football games with his family. *Id.* He suffers from startle reactions, which have led to threatening behavior. *Id.* His PTSD has affected his short term memory, which limits his ability to receive an education, *id.* ¶ 13, and his ability to form relationships, *id.* ¶ 14. The Department of Veterans Affairs ("VA") has rated Benfield 80% disabled. *Id.* ¶ 15; *id.*, Att. (VA Rating Decision, undated), ECF No. 35 at 20; *id.*, Att. (Letter from VA, dated Feb. 22, 2018), ECF No. 35 at 21; *see also id.*, Att. (medical records), ECF No. 35 at 8–17.

Three of Benfield's family members are plaintiffs in this lawsuit: his mother, Gloria J. Brown; his father, Jimmy F. Brown; and his sister, Melena R. Collins. Benfield Decl. ¶ 2; Decl. of Gloria J. Brown ("Gloria Brown Decl.") (Sept. 5, 2018) ¶ 3, ECF No. 35 (sealed), ECF No. 157 (public). After hearing about the bombing on the television, Benfield's mother called Benfield's wife to see if she knew anything. *Id.* ¶¶ 6–7. She also called the military liaison, who confirmed the attack and informed her that she should call every hour on the hour. *Id.* ¶ 8. "Finally, shortly before 2:20 a.m. the next morning" the liaison called to advise that Benfield was alive but wounded. *Id.* Benfield himself called at 6:10 a.m., at which point his mother "finally felt some relief knowing he was indeed alive." *Id.* Although relieved, the "effects of the attack

on [her] daily life and family life were devastating." *Id.* ¶ 9. She was "very proud to have raised [Benfield] to be a happy go lucky, charismatic and loving person that everyone loved," but since the bombing has had to watch "[her] son change into a withdrawn person who has trouble fitting into life." *Id.* ¶ 9. She experiences "extreme grief and distress as a result of the injuries to [her] son" and the "profound impact on [their] relationship." *Id.* ¶ 14. She has additionally had to financially support her son "when he was not able to make money because of his injuries." *Id.* ¶ 13.

Prior to the attack, Benfield's father and Benfield enjoyed "going to sporting events and watching live music together." Decl. of Jimmy F. Brown ("Jimmy Brown Decl.") (Nov. 11, 2018) ¶ 6, ECF No. 35 (sealed), ECF No. 157 (public). Due to the effects of the attack, Brown "[has] not been able to share new experiences with [his] son and create new memories." *Id.* ¶ 7. Brown experiences "extreme grief and distress as a result of the injuries to [his] son" and the "profound impact on [their] relationship." *Id.* ¶ 11. Due to the effects of Benfield's PTSD, he no longer enjoys his old favorite hobbies. *Id.* ¶ 6. Prior to the explosion, Benfield "was never a person prone to engage in fights," but now "his relationships, including [that with his father], are strained." *Id.* ¶ 7. Brown has additionally supported his son when he "found himself out of work or unable to earn enough money" causing him to "[incur] economic losses." *Id.* ¶ 8. The inability to aid his son in getting his life back on track has left Brown with overwhelming feelings of helplessness. *Id.* ¶ 5. The situation has taken a "toll on [Brown's] overall well-being." *Id.* ¶ 7.

Benfield's only sibling, his younger sister, is Melena R. Collins. Decl. of Melena R. Collins ("Melena Collins Decl.") (Oct. 15, 2018) ¶ 5, ECF No. 35 (sealed), ECF No. 157 (public). Upon hearing of the attack, Collins was unsure if her brother was alive. *Id.* Even after

knowing that he survived, "knowing he was alive, but now how bad he was injured was grueling." *Id.* Collins stayed close to the TV and phone for a day or two "waiting to hear or see something, anything." *Id.* At midnight on TV, she finally saw her brother being wheeled off a plane in Germany. *Id.* Upon seeing her brother, she was "overwhelmed with so many emotions. [She] just dropped to the floor and cryied [sic] 'He is alive!!!'" *Id.* After the attack, Collins "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries to [her] brother" and the "profound impact on [their] relationship." *Id.* ¶ 11. She finds it "heartbreaking to know he struggles to be a part of a family he was so close to and loved by." *Id.* ¶ 6. She additionally finds it "hard to watch [her] parents worry about their son and not be able to help him." *Id.*

### 2. *Bryan Brock and One Family Member*

On June 25, 1996, Bryan Brock was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Bryan Brock ("Brock Decl.") (Oct. 24, 2018) ¶ 4, ECF No. 36 (sealed), ECF No. 159 (public). At the time of the bombing, Brock was in the common area of his dorm room. *Id.* ¶ 5. As a result of the explosion, glass shards were blown at him and were later "surgically removed from [his] body." *Id.* As one of the few medics at the station, Brock dealt with the most seriously injured. *Id.* ¶ 6. "[His] office was the make-shift morgue and [he] had to work with dead bodies lying on the floor of [his] office for hours while [they] waited on a freezer truck." *Id.* Even after the explosion, "there was so much blood [he] had to cut out the carpet and place a large rug over the blood-stained concrete below and worked over the top of it for over a month." *Id.* Upon return home, he was treated at the Air Academy Hospital for PTSD. *Id.* ¶ 7. He was prescribed medication for trauma, but did not seek additional treatment because of his fear that "having to

talk about that night may trigger additional emotional trauma." *Id.* As a result of the attack, he was "horrified of loud noises and large trucks and had paranoid thoughts," *id.* ¶ 8, and still suffers from the after-effects, *id.* Brock was offered the Purple Heart for his wounds during the attack but turned it down. *Id.* ¶ 9. He was also awarded an Air Force Commendation Medal for providing medical treatment in the wake of the blast. *Id.*, Att. (The Air Force Commendation Medal Certificate, dated Dec. 17, 1996), ECF No. 36 at 6; *id.*, Att. (Citation to Accompany the Award of The Air Force Commendation Medal Certificate, no date), ECF No. 36 at 7.

Brock's mother, Joan Locke, is a plaintiff in this lawsuit. At the time of the attack, Locke was at work and informed of the bombing by a colleague. Decl. of Joan C. Locke ("Locke Decl.") (Oct. 18, 2018) ¶ 5, ECF No. 36 (sealed), ECF No. 159 (public). Upon hearing that the Khobar Towers had been bombed, she "collapsed into [her] chair" because she was "panic stricken, crying in disbelief." *Id.* She was driven home and then waited by the phone for hours for news about Brock. *Id.* ¶ 6. Finally, Brock's then-wife received news that he was alive. *Id.* ¶ 7. Locke was later able to communicate with her son over AOL mail and he detailed some of the trauma that he experienced. *Id.* ¶ 8. As a result of the attack, Locke's daily and family life have been devastatingly affected. *Id.* ¶ 10. She has missed days of work due to the stress, and found focusing on her work or her other children hard. *Id.* She was prescribed medication and sought other medical attention to "help [her] cope with life" and "[her] worry about Bryan." *Id.*

### 3. *Mark E. Broda and Two Family Members*

On June 25, 1996, Mark E. Broda was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Mark E. Broda ("Broda Decl.") (Oct. 8, 2018) ¶ 4, ECF No. 37 (sealed), ECF No. 160 (public). Broda had just extended his enlistment voluntarily to go on a 90-day temporary duty. *Id.* During the bombing,

Broda was sitting on his couch in front of sliding glass doors when there was "an extremely bright flash in the room." *Id.* ¶ 5. He turned to look at the doors and "was thrown off the couch and into the cinder-block wall a few feet away." *Id.* When he looked at his two friends in the room he saw that "there was blood seeping from all over them." *Id.* Broda himself had "sustained lacerations on [his] face, hands and shoulder" from the sliding glass door. *Id.* They were ordered to evacuate and were bussed to local hospitals. *Id.* ¶¶ 6–7. He was pulled out of line, however, and taken into "the sick call building where others were lying on the floor being treated" and had his lacerations sewn up. *Id.* ¶ 7. The next day he was ordered for re-evaluation and suffered from "a bout of catatonia when the doctor began asking [him] questions." *Id.* ¶ 9. Broda was prescribed a sedative and was put under watch. *Id.* Broda still stayed to help load the "flag covered caskets of our dead Airmen into an empty cargo plane" and went home as scheduled a few days later. *Id.* ¶ 10. As a result of the attack, Broda suffers from PTSD, *id.* ¶ 13, for which he has received counseling "on and off for the last twenty years." *Id.* ¶ 15. Even 20 years after being thrown into the cinderblock wall, he "still get[s] severe headaches in the area of [his] head where it hit." *Id.* ¶ 15. Broda received the Purple Heart for the injuries he sustained. *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated Aug. 6, 1996), ECF No. 37 at 12. The VA has rated Broda as 30% disabled, for which he receives monthly benefits. *Id.* ¶ 14; *id.*, Att. (Letter from VA, dated Dec. 6, 2012), ECF No. 37 at 38; *see also id.*, Att. (medical records), ECF No. 37 at 14–37.

Two of Broda's family members are plaintiffs in this lawsuit: his mother, Pamela G. Broda, and his sister, Alycia Broda. Broda's mother first learned of the attack when her oldest daughter called and asked if she had seen the news. Decl. of Pamela G. Broda ("Pamela Broda Decl.") (Sept. 7, 2018) ¶ 5, ECF No. 37 (sealed), ECF No. 160 (public). This simple question

"put her in a sudden panic," and she turned on the TV to watch and wait for news of her son. *Id.* She waited "in limbo, fearing for the worst and not knowing the fate of [her] son" for hours until Mark made contact. *Id.* Upon return home, her son "tried to put up a good front for [Pamela's] sake" but she knew "he was suffering" and this caused her "a great deal of emotional stress," which she "inadvertently took [] out on [her] youngest daughter." *Id.* ¶ 7. During this time, Broda's mother "lived under a cloud of emotional stress." *Id.* As a result of the attack and Broda's injuries, his mother experiences "extreme grief and distress." *Id.* ¶ 8.

Mark Broda's sister, Alycia A. Broda, also suffered from the ramifications of the attack. His sister first learned of the attack with her mother when her sister called to tell them to turn on the news. Decl. of Alycia A. Broda ("Alycia A. Broda Decl.") (Sept. 10, 2018) ¶ 5, ECF No. 37 (sealed), ECF No. 160 (public). They were "left in limbo, fearing for the worst and not knowing the fate of [her] brother" for four to five hours until he called. *Id.* Upon his return home, Broda lived with Alycia and his mother, where they provided "physical and emotional support." *Id.* Alycia "started struggling in school, worrying about [her] brother's mental health." *Id.* ¶ 6. Mark's issues resulting from the attack created tension within the family, and the "mental and emotional strain [their] family endured for years was very hard to overcome." *Id.* Alycia still "deal[s] with the secondary stress from Mark's PTSD." *Id.* ¶ 8.

### 4. *Shannon Bump and One Family Member*

On June 25, 1996, Shannon Bump was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Shannon Bump ("Bump Decl.") (Sept. 6, 2018) ¶ 4, ECF No. 39 (sealed), ECF No. 162 (public). Bump had just finished showering when the attack occurred. *Id.* ¶ 5. The explosion threw him eight feet back against a wall and showered him with glass. *Id.* Bump, as the highest-ranking person in his

suite, coordinated the evacuation, *id.*, and then ran to the source of the explosion and helped carry the injured away on blankets, *id.* ¶ 7. At this time, he noticed that he had received a cut on his leg from the initial explosion. *Id.* This cut left him with scarring. *Id.* ¶ 10. Bump and the rest of the squadron were made to sit in the gym for two hours while news of the explosions and deaths played on TVs before he was able to contact his wife. *Id.* ¶ 8. After the compound was shut down, Bump remained behind to load the equipment. *Id.* ¶ 9. As a result of the attack, Bump "still suffer[s] from emotional distress." *Id.* ¶ 12. Bump has difficulty discussing the attack with people, including his wife, and worries about "the stigma of being handicapped, disabled, or emotionally traumatized." *Id.* ¶ 12. Bump received the Purple Heart for his injuries. *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 39 at 8; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 39 at 7.

Bump's wife, Valerie Bump, is a plaintiff in this lawsuit. She was running errands when she saw a special news report about the bombing. Decl. of Valerie Bump ("Valerie Bump Decl.") (Sept. 6, 2018) ¶ 5, ECF No. 39 (sealed), ECF No. 162 (public). She struggled with "the thought that there could even be a chance that [their children] could grow up without their father in their lives." *Id.* ¶ 6. She called her husband's squadron, but they were unable to confirm anything beyond numerous injuries and deaths. *Id.* ¶ 7. After four to five hours waiting to hear more information, she left the house to get food and returned to a voicemail from her husband. *Id.* ¶ 8. As a result of the attack, Shannon Bump "experienced, and continue[s] to experience, extreme grief and distress." *Id.* ¶ 10. She fears that "something might happen to him" when her husband leaves her for any period of time, and has "anxiety about it before he leaves." *Id.* ¶ 10.

### 5. *Rondal G. Burns and Three Family Members*

On June 25, 1996, Rondal G. Burns was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Rondal G. Burns ("Rondal Burns Decl.") (Sept. 18, 2018) ¶ 4, ECF No. 41 (sealed), ECF No. 164 (public). At the time of the attack, Burns was lying on his couch watching television. *Id.* ¶ 5. The force of the explosion "threw [him] off the couch and head first into the wall behind the second couch in the room." *Id.* The next thing he knew, Burns was "behind the second couch on [his] knees screaming [his] head off, crying loudly, and [his] ears were clogged." *Id.* Burns' squadron evacuated and "a medic was called and they bandaged [Burns]." *Id.* ¶ 7. While outside after the attack, an additional panic ensued when people mistakenly believed insurgents were coming over the fence. *Id.* ¶ 8. Burns returned home, where he continued to suffer from headaches, but when he went to the emergency room, "whatever doctor was on duty told [him] it was different things." *Id.* ¶ 12 Burns suffered a stroke on November 3, 1996, approximately four months after the attack. *Id.* ¶ 14. Burns was sitting on his couch "watching something, and the next thing [he] knew [he] was crouched over." *Id.* ¶ 13. The stroke required treatment in the intensive care unit, and included treatment for epilepsy, speech therapy, and physical therapy. *Id.* ¶ 14. Burns now suffers from "PTSD because of the bombing, and [] seizures [he has] had since leaving the intensive care unit." *Id.* In addition, he has short-term memory loss and depression. *Id.* ¶¶ 14, 17. As a result of his PTSD, he is "unable to carry out normal life." *Id.* ¶ 17. Burns received the Purple Heart, and has a disability rating of 100% by the VA. *Id.* ¶¶ 17–18; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 41 at 11; *id.*, Att. (Letter from VA, dated July 19, 2017), ECF No. 41 at 10.

Three of Burns' family members are plaintiffs in this lawsuit: his wife, Rebekah J. Burns; his daughter, Emeleigh Ledgerwood; and his son, Nickolaus Burns. On the day of the terrorist

attack, Burns' wife returned home from a "leisurely day out with [her] children" to "hysterical phone calls from family." Decl. of Rebekah J. Burns ("Rebekah Burns Decl.") (Sept. 17, 2018) ¶ 5, ECF No. 41 (sealed), ECF No. 164 (public). After listening to messages, Burns' commander called to say that "[her] husband was wounded and given the situation, a full estimate of injuries was going to take days or even months." *Id.* When Burns came home, Rebekah "notice[d] differences in his behavior and state of mind," *id.* ¶ 8, with his "state of mind [] deteriorating," *id.* Burn's wife has "remained at Rondal's side every minute of each day," *id.* ¶ 11, and this "has impacted [her] personal health, in an enormously negative way," *id.* ¶ 10. In addition, the Burns have "incurred substantial economic loss" and loss of property. *Id.* ¶¶ 15–16. Due to time missed at her work, Rebekah "lost over four years in [her] retirement plan." *Id.* ¶ 16. As a result of the attack and the injuries to her husband, Rebekah experiences "extreme grief, distress and emotional injuries" that have yielded a "profound impact on [their] family dynamics." *Id.* ¶ 18.

Burns' daughter, Emeleigh, was seven years old at the time of the attack. Decl. of Emeleigh L. Ledgerwood ("Ledgerwood Decl.") (Oct. 15, 2018) ¶ 8, ECF No. 41 (sealed), ECF No. 164 (public). Even as an adult, Emeleigh has "had to work through [her] baggage" and has "cried over the fact that except for pictures and videos, [her] dad won't remember walking [her] down the aisle, [her] graduation, or the birth of his grandchildren." *Id.* ¶ 9. Emeleigh has had to deal with her father's condition all her life, and learned to "recognize warning signs that he was going to have a seizure." *Id.* ¶ 8. She "worried every time [they] got separated, truly afraid that he had forgotten how to get back to where [they] were supposed to meet." *Id.*

Burns' son, Nickolaus, who was six years old at the time of the attack, has also been affected. Decl. of Nickolaus A. Burns ("Nickolaus Burns Decl.") (Sept. 17, 2018) ¶ 8, ECF No. 41 (sealed), ECF No. 164 (public). Nickolaus found the "effects of the attack on [his] daily life

and family life" to be "devastating." *Id.* From a young age, he realized that he "would no longer be a child," but rather "a man, who only had a short time with his father." *Id.* ¶ 13. Nickolaus attended speech therapy with his father "as the therapist noticed he responded better when [he] was there." *Id.* ¶ 19. While his father suffered from post-traumatic-stress-disorder, "[they] all suffered as he suffered." *Id.* ¶ 21.

### 6. *Richard D. Dupree*

On June 25, 1996, Richard D. Dupree was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Richard D. Dupree ("Dupree Decl.") (Oct. 17, 2018) ¶ 3, ECF No. 49 (sealed), ECF No. 182 (public). Just as he was about to fall asleep, "the bed [began] shaking horribly, and the windows blew into the room." *Id.* ¶ 4. His door additionally blew off its hinges and "knocked [him] off the bed against the wall, and pinned [him] there," *id.*, with his legs and feet covered in shrapnel, *id.* ¶ 5. Ever since the attack, Dupree's right ear hurts from loud noises. *Id.* ¶ 6. Though not officially diagnosed, Dupree suffers from PTSD-like symptoms such as "hyper vigilance, avoidance, [and] constant reliving of the event." *Id.* ¶ 8. Dupree constantly relives the day of the attack and has "numbing feelings" whenever he is reminded of it. *Id.* ¶ 11. Dupree received the Purple Heart for his injuries. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 49 at 6.

### 7. *Thomas F. Edman and One Family Member*

On June 25, 1996, Thomas F. Edman was a Captain in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Thomas F. Edman ("Edman Decl.") (Nov. 4, 2018) ¶ 4, ECF No. 50 (sealed), ECF No. 183 (public). Edman was in the building adjacent to the bomb, and his room was on the side where the explosion occurred.

*Id.* ¶ 5. The exterior walls of his apartment were "completely blown in and off." *Id.* Edman was

blown "up and against the back wall and door frame," where he was hit with "flying debris that

included furnishings in the room, concrete, glass, and other building materials." *Id.* The impact

of Edman hitting the wall "split [his] side open, fractured [his] pelvis in several places, jammed

[his] left shoulder, and bruised the left side of [his] body including [his] left kidney." *Id.* ¶ 6.

Though his physical wounds "healed after several weeks," Edman still has "mobility issues with

[his] left shoulder and left hip, hearing loss and tinnitus, and kidney issues." *Id.* ¶ 10. Due to his

injuries in the attack, Edman has received a 40% disability rating from the VA. *Id.* ¶ 10; *id.*, Att.

(VA Rating Decision, no date), ECF No. 50 at 31; *id.*, Att. (VA Rating Decision, dated Jan. 4,

2005), ECF No. 50 at 32; *see also id.*, Att. (medical records), ECF No. 50 at 12–27. In addition

to the physical trauma that Edman incurred, he suffers from PTSD-like symptoms, including lack

of sleep and other trauma. *Id.* ¶¶ 12–14. These issues have "persisted for over twenty years."

*Id.* ¶ 13. Edman was awarded the Purple Heart for the injuries he sustained. *Id.* ¶ 9; *id.*, Att.

(Purple Heart Certificate, dated July 2, 1996), ECF No. 50 at 29.

Edman's wife, Elizabeth Edman, is a plaintiff in this lawsuit. She was at home with her

children watching the news when they saw a report of the bombings, and she had the "overriding

impulse" to hide the news from her children. Decl. of Elizabeth Edman ("Elizabeth Edman

Decl.") (Oct. 5, 2018) ¶ 5, ECF No. 50 (sealed), ECF No. 183 (public). Edman's wife received

an initial phone call from the squadron an hour after the news report informing her to "sit tight"

as they learned more. *Id.* ¶ 6. After hours passed, she called to ask for news of her husband and

was informed "his name was not on any of their three lists (injured, deceased, or okay)." *Id.*

Finally, thirteen hours later, she received a call that he was in a hospital. *Id.* As a result of the

attack, Elizabeth has suffered "emotional distress that also has physical manifestations." *Id.* ¶ 7.

She is "highly anxious" and has an "extreme fear of bad news," and additionally has "extreme guilt" that Edman returned home, while other wives' husbands did not. *Id.* ¶ 8. In addition to the anxiety and guilt, Elizabeth "still cannot think or talk about Khobar Towers without crying." *Id.* ¶ 9. The attack has "robbed [her husband] of spontaneous joy, left [her] anxiety ridden, and has cast a sorrow and sadness upon both of [them] that still lasts twenty-one years later." *Id.* ¶ 10.

### 8. *Christopher A. Freeman*

On June 25, 1996, Christopher Freeman was a First Lieutenant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Christopher A. Freeman ("Freeman Decl.") (Oct. 12, 2018) ¶ 3, ECF No. 51 (sealed), ECF No. 187 (public). Freeman was located two buildings back from the site of the explosion. *Id.* ¶ 4. The force of the explosion "threw [him] against the wall and knocked [him] out." *Id.* ¶ 5. The force of the explosion broke glass which caused him to suffer multiple lacerations. *Id.* He was rendered unconscious and suffered from a concussion. *Id.* He was taken to a makeshift hospital where he received five stitches to stop the "continuous blood flow." *Id.* Freeman received the Purple Heart for his injuries. *Id.* ¶ 6; *id.*, Att. (Special Order GB-458, dated Aug. 5, 1996), ECF No. 51 at 4.

### 9. *Michael W. Goff*

On June 25, 1996, Michael W. Goff was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Michael W. Goff ("Goff Decl.") (Sept. 6, 2018) ¶ 3, ECF No. 55 (sealed), ECF No. 190 (public). Goff was in bed at the time of the attack, and felt the "sharp sting and burning sensation" from the glass from his window when the explosion occurred. *Id.* ¶ 4. Immediately after the

explosion, Goff ran out of his suite to check on the safety of others.  *Id.*  He was directed to an injured airman who was "lying in a puddle of blood and in a lot of pain."  *Id.* ¶ 5.  Goff applied towels to his wounds to stop the bleeding and directed the remaining service members to evacuate and bring a stretcher back.  *Id.*  As a result, Goff was left alone in the building with the airman, where they could "hear wall lockers fall, electricity arcing, and water running from broken pipes."  *Id.* ¶ 5.  While tending to the airman, Goff watched as a "paint crack [grew] into a crack an inch wide" and thought the building would collapse underneath them.  *Id.*  No stretcher came, and Goff and three others carried the injured member out on a bed comforter.  *Id.* While carrying him out, Goff slipped twice, injuring his lower back.  *Id.*  Goff then worked with his commander to compile a list of missing personnel, which he then read to the squadron.  *Id.* ¶ 6.  While doing so he "had to look into the eyes" of the squadron who were looking to him for "help in understanding what had just happened."  *Id.* ¶ 6.  Goff then went to the morgue to help identify bodies, something that has "haunted" him ever since.  *Id.* ¶ 13.  At the morgue, Goff saw things that he "never thought could happen to the human body."  *Id.* ¶ 8.  As a result of the attack, Goff suffers from PTSD, *id.* ¶¶ 9–10, 13, which has affected his emotional state and ability to be in closed spaces, such as elevators, *id.* ¶ 9.  The VA has rated Goff as 60% disabled because of the attack at Khobar Towers.  *Id.* ¶ 13; *id.*, Att. (Letter from VA, dated Dec. 14, 2017), ECF No. 55 at 11; *id.*, Att. (VA Rating Decision, dated July 9, 2007), ECF No. 55 at 12–13.  Goff was awarded the Purple Heart and Air Force Commendation Medal for wounds he received during the attack.  *Id.* ¶ 12; *id.*, Att. (Purple Heart Certificate, undated), ECF No. 55 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 55 at 8; *id.*, Att. (Citation to Accompany the Award of Air Force Commendation Medal), ECF No. 55 at 10.

**10. *Rudolph Grimm***

On June 25, 1996, Rudolph Grimm II was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Rudolph Grimm II ("Grimm Decl.") (Sept. 16, 2018) ¶ 3, ECF No. 56 (sealed), ECF No. 192 (public). When the attack occurred, Grimm was sitting on a chair in the medical building, and the "next thing [he] knew [he] was lying on the floor covered in glass and debris." *Id.* ¶ 4. Grimm evacuated the building and began triage immediately, helping other injured airmen. *Id.* While performing CPR on a non-responsive airman, Grimm noticed that he "had a large shard of glass sticking out of [his own] left hand." *Id.* ¶ 5. By performing CPR, he had unintentionally pushed it in further. *Id.* Grimm removed the shard before resuming the aid. *Id.* After four hours, Grimm was seen for the lacerations on his body, including the glass in his eyes. *Id.* ¶ 6. After flushing out his eyes, Grimm assisted in relocating the deceased airmen to the temporary morgue. *Id.* ¶ 7. Upon return to the United States, Grimm was diagnosed with PTSD that "changed [his] life forever." *Id.* ¶¶ 9, 11. "Sights, sounds, and even smells trigger [his] PTSD." *Id.* ¶ 11. As a result of the attacks, Grimm was awarded the Purple Heart and the VA has rated Grimm 70% disabled, 30% attributable to his PTSD. *Id.* ¶¶ 10–12; *id.*, Att. (Purple Heart Certificate, dated Aug. 6, 1996), ECF No. 56 at 9; *id.*, Att. (VA Rating Decision, dated Apr. 24, 2007), ECF No. 56 at 6–8. For his actions during the Khobar Towers bombing, Grimm was awarded the Air Force Commendation Medal. *Id.* ¶ 12; *id.*, Att. (Air Force Commendation Medal Certificate, dated Dec. 2, 1996), ECF No. 56 at 12.

**11. *Shawn K. Hale***

On June 25, 1996, Shawn K. Hale was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of

Shawn K. Hale ("Hale Decl.") (Nov. 30, 2018) ¶ 3, ECF No. 57 (sealed), ECF No. 193 (public).

Hale was watching TV when the explosion shattered the sliding glass door to his left. *Id.* ¶ 4.

The explosion sent shrapnel into the room, hitting Hale in the face and in his right eye. *Id.* This

laceration "caused corneal damage, along with retina and lens damage" such that he is now

virtually blind in his right eye. *Id.* Hale was escorted out of the building and to the clinic where

he could "hear yelling, crying, and sounds of people moving around [him]." *Id.* ¶ 5. Hale was

then taken by ambulance to a hospital where he had the first surgery to remove the shards of

glass from his eye. *Id.* ¶ 6. He had additional surgery when he was transported to Germany, and

again in the District of Columbia to replace the lens that was ruptured from the glass. *Id.* ¶¶ 7–8.

In total, Hale has had five surgeries in an attempt to rectify his injuries sustained at Khobar

Towers. *Id.* ¶ 12. His left eye has started to be affected by "a heavier load trying to compensate"

for the loss of vision to his right eye. *Id.* ¶ 4. The injury has "affected [his] life tremendously"

as Hale is now forced to wear sunglasses anytime he is outside and has trouble driving at night

and with depth perception. *Id.* ¶ 9. In addition to the physical trauma sustained by his eye, Hale

suffers from PTSD that has made it difficult for him to be in certain locations. *Id.* ¶¶ 10–11.

Due to the attack, the VA has given Hale a disability rating of 60%. *Id.* ¶ 10; *id.*, Att. (Letter

from VA, dated April 7, 2017), ECF No. 57 at 19; *see also id.*, Att. (medical records), ECF No.

57 at 6–18. Hale received the Purple Heart for his injuries. *Id.* ¶ 13; *id.*, Att. (Purple Heart

Certificate, dated July 2, 1996), ECF No. 57 at 24.

### 12. *Torrey S. Hardy*

On June 25, 1996, Torrey S. Hardy was an Airman First Class in the U.S. Air Force

deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of

Torrey S. Hardy ("Hardy Decl.") (Sept. 21, 2018) ¶ 4, ECF No. 58 (sealed), ECF No. 194

(public).  When the attack occurred, Hardy was cleaning the bathroom.  *Id.* ¶ 5.  Suddenly, Hardy

felt a "tremendous force" and "a portion of the ceiling" fell on him.  *Id.*  The mirror in the

bathroom shattered and pieces "went into [his] left knee."  *Id.*  After the explosion, Hardy helped

his Staff Sergeant evacuate other personnel.  *Id.* ¶ 6.  He realized then that the skin "on [his] left

knee was hanging down and [he] could literally reach down and move [his] actual knee cap."  *Id.*

Hardy "pulled the debris" from his left knee and wrapped a sock around the wound to slow the

bleeding.  *Id.*  He continued to assist the injured until his leg gave out on him.  *Id.* ¶ 7.  Hardy

was then transported to a hospital to have the glass removed from his back and feet.  *Id.* ¶ 8.

Hardy retains no feeling in his "left foot right over the top of [his] big toe" and attends physical

therapy for both his knee and feet.  *Id.* ¶ 10.  Though given the option to retire, Hardy completed

twenty years of service.  *Id.*  Hardy received the Purple Heart for his injuries.  *Id.* ¶ 13; *id.*, Att.

(Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 58 at 62; *id.*, Att. (Certificate of

Release or Discharge from Active Duty, confirming medal), ECF No. 58 at 8.  Beyond physical

injury, Hardy additionally suffers from PTSD, the effects of which persist to this day.  *Id.* ¶ 15.

Hardy has received a combined disability rating of 50% from the VA for service-related injuries.

*Id.* ¶ 14; *id.*, Att. (Letter from VA Regional Office, undated), ECF No. 58 at 65; *see also id.*, Att.

(medical records), ECF No. 58 at 9–61.

### 13. *Michael J. Harner and Four Family Members*

On June 25, 1996, Michael J. Harner was a service member in the U.S. Air Force

deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of

Michael J. Harner ("Harner Decl.") (Sept. 7, 2018) ¶ 4, ECF No. 59 (sealed), ECF No. 195

(public); *see also* Plaintiff Michael J. Harner's Notice of Filing of Supplemental Declaration and

Exhibit (Feb. 7, 2019), ECF No. 143 (sealed), ECF No. 196 (public).  Harner had just finished a

run when he returned to his building, adjacent to the site of the bomb. *Id.* ¶ 5. Harner had just closed his sliding glass door when the explosion shattered the glass, shooting the pieces "into [his] body over [his] entire head and face, right arm, right shoulder and right leg." *Id.* Harner had "a compelling need to exit [his] room" but could not until he stopped the bleeding to his "head and body, which took approximately ten to fifteen minutes." *Id.* Harner then made his way to a stairwell where he was carried down six flights of stairs and transported to the triage area. *Id.* ¶ 6. After being stabilized with "an IV in each arm," Harner was moved to a local hospital where surgery was performed to repair his wounds. *Id.* During this time, he was not spoken to in English and only had access to medical staff for twenty-four hours, causing him "severe anxiety with recurring nightmares and hypersensitivity to sounds, movements and personnel which was later diagnosed as PTSD." *Id.* ¶¶ 6–7. Harner next was transported to Germany where he underwent further surgery on his "face, head, ear and shoulder." *Id.* ¶ 8. The physical injuries sustained by Harner "have been everlasting," and he continues to have "no feeling in [his] right leg causing [him] to have less strength [than] normal." *Id.* ¶ 10. He continues to have "glass ejected through [his] skin" as a result of his head trauma, and the forehead scar tissue he has built up "severely hurts every time it is bumped, even after twenty-two years." *Id.* The attack has also caused "severe emotional distress" and PTSD. *Id.* ¶¶ 11–12; *id.*, Att. (medical records), ECF No. 59 at 7–22. Harner received the Purple Heart for his injuries. *Id.* ¶ 4; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 59 at 6. Harner continued to serve in the Air Force, until January 1, 2019, despite the "severe emotional distress and life-long physical injuries that [] limit [his] full capabilities." *Id.* ¶ 12. Harner has received a combined disability rating of 90% from the VA for service-related injuries. *See* Supp. Decl. of

Pl. Michael J. Harner ("Harner Supp. Decl.") ¶ 6, ECF No. 143-1; *id.*, Att. (VA Benefits Decision Letter, dated Jan. 17, 2019), ECF No. 143-1 at 3–22.

Four of Harner's family members are plaintiffs in this lawsuit: his wife, Julia N. Harner; his mother, Nancy Harner; his father, James Harner; and his sister, Michelle Caldwell. On the morning of June 26, 1996, Harner's wife received a call from her mother-in-law informing her of the attack on her husband's complex. Decl. of Julia N. Harner ("Julia Harner Decl.") (Oct. 30, 2018) ¶ 5, ECF No. 59 (sealed), ECF No. 195 (public). At the time, Julia "didn't realize that 'Khobar Towers' was a whole complex" and instead thought that "it was just two high rises that [her] husband lived and worked in." *Id.* Julia thought that "the likelihood of him being dead or injured was very high." *Id.* She attempted to call to receive more information, but "was not able to get any answers." *Id.* Her mother-in-law finally received a call that Harner was alive but injured. *Id.* When Harner returned home, Julia assisted Harner with his recuperation and had to "pack and unpack his leg with gauze, since part of it could not be closed surgically." *Id.* ¶ 6. Julia had to live through a second terrorist attack when her husband was in the Pentagon on 9/11. *Id.* ¶ 8. Each of Harner's deployments have been stressful for Julia who has needed therapy "to cope." *Id.* Even now, certain situations "can bring all of the emotional turmoil back to the surface" for Julia. *Id.*

Harner's mother, Nancy Harner, was watching the news with her family while eating dinner when she learned of the bombing at Khobar Towers. Decl. of Nancy S. Harner ("Nancy Harner Decl.") (Sept. 7, 2018) ¶¶ 4–5, ECF No. 59 (sealed), ECF No. 195 (public). "The horror and grief [she] felt thinking [she] had lost [her] only son, or that he was wounded and [she] could not help, was overwhelming." *Id.* ¶ 5. Nancy tried "for hours" to get information until she received a call from someone who said that they "had held [Nancy's] gravely wounded son until

an ambulance came, and that he had lost a lot of blood." *Id.* Nancy then saw her son's "bandaged and bruised face on CNN." *Id.* For weeks after the attack, Nancy "could not sleep nor work" and her "hair turned snow white along [her] temples and forehead." *Id.* Harner's transition home has been tough for Nancy, who felt like "he was not himself" which caused her to feel "powerless and vulnerable." *Id.* ¶ 6.

Harner's father, James O. Harner, was watching the news with family while eating dinner when he learned of the bombing at Khobar Towers. Decl. of James O. Harner ("James Harner Decl.") (Sept. 7, 2018) ¶¶ 4–5, ECF No. 59 (sealed), ECF No. 195 (public). He could not get through for information on the phone and "felt like there was no hope." *Id.* ¶ 5. Hours later, a nurse called to inform them that Harner was "seriously hurt" and "it sounded like he may not survive." *Id.* ¶ 6. James would not be reunited with his son for days "because of the distance and the mass confusion of the transport." *Id.* The attack on his son has caused James to be "unable to sleep and [to suffer] from insomnia." *Id.* ¶ 7. James felt responsible for the injuries that Harner suffered as he "encouraged him to join the military." *Id.* ¶ 8. James' relationship with his son has changed, "not for the better because of the attack" and finds himself constantly worrying "that something might happen to him." *Id.*

Harner's sister, Michelle Caldwell, first learned of the attack from a news report as she ate dinner with her family. Decl. of Michelle A. Caldwell ("Caldwell Decl.") (Sept. 7, 2018) ¶¶ 4, 6, ECF No. 59 (sealed), ECF No. 195 (public). Michelle was informed hours later that her brother "was alive, but had lost a lot of blood and had severe head and leg injuries." *Id.* ¶ 7. As a result of the attack on her brother, Michelle experiences "extreme grief and distress," *id.* ¶¶ 5, 9, and avoids certain locations.

**14. *Gregory R. Hedglin***

On June 25, 1996, Gregory Richard Hedglin was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Gregory Richard Hedglin ("Hedglin Decl.") (Nov. 8, 2018) ¶ 3, ECF No. 60 (sealed), ECF No. 197 (public). Hedglin was sitting next to a sliding glass door on his patio when he saw "a very bright white light." *Id.* ¶ 4. The explosion knocked out the lights and Hedglin was left in darkness, and then "felt liquid on [his] face and throat. [He] could smell and taste blood." *Id.* After evacuating the building with two other service members, he checked himself once he got outside and realized that his "tee shirt was soaked in blood" and he "wrapped [his neck] with a tee shirt someone gave [him]." *Id.* ¶¶ 4–5. He was moved to the triage area, and then to the hospital to be treated for wounds on his face, neck, right arm and leg. *Id.* ¶ 5. Hedglin underwent surgery for "life threatening wounds" as his "external jugular was nicked" and was hemorrhaging. *Id.* ¶ 6. Hedghlin's right ear drum was also perforated. *Id.* Hedglin also suffers from PTSD from the attack and this condition "[impedes him] from enjoying a normal life." *Id.* ¶ 7; *id.*, Att. (medical records), ECF No. 60 at 10. He received the Purple Heart for his injuries. *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 60 at 11; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 60 at 5. As a result of the injuries received during the attack, Hedglin received a 20% disability rating from the VA. *Id.* ¶ 6; *id.*, Att. (Letter from VA Regional Office, Oct. 21, 2002), ECF No. 60 at 7–8.

**15. *David P. Jordan and One Family Member***

On June 25, 1996, David P. Jordan was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of David P. Jordan ("Jordan Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 61 (sealed), ECF No. 203 (public). The force of the explosion threw him against the wall, knocking him unconscious. *Id.* ¶ 5. When

Jordan "came to" he was "covered in broken glass with multiple lacerations and cuts on [his] legs, arms, and head." *Id.* Jordan was treated at the clinic at Khobar Towers, where they bandaged his wounds. *Id.* ¶ 6. Jordan has "developed PTSD from the blast," along with associated issues. *Id.* ¶ 7.

Jordan's wife, Ruth Gordon, is a plaintiff in this lawsuit. On June 25, 1996, his wife learned of the attack when her brother-in-law called to inform her. Decl. of Ruth A. Jordan ("Ruth Jordan Decl.") (Sept. 20, 2018) ¶ 5, ECF No. 61 (sealed), ECF No. 203 (public). After she learned of the attack, "it took the base two days to let [her] know [Jordan] was not among the dead." *Id.* Since the attack, Jordan's "quality of life changed dramatically" and the "situation has been difficult to handle" for his wife. *Id.* ¶ 6. As a result of the attack, she has "endured extreme mental pain, suffering, grief and anguish, and sustained emotional injury and loss." *Id.* ¶ 7.

### 16. *Patrick Kick*

On June 25, 1996, Patrick H. Kick was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Patrick H. Kick ("Kick Decl.") (Sept. 10, 2018) ¶ 3, ECF No. 62 (sealed), ECF No. 204 (public). Kick had just finished a run at the time of the explosion. *Id.* ¶ 4. Immediately after the explosion, and even though Kick was injured in the attack, receiving cuts and lacerations to both legs, hands, and arms, he cleaned his own wounds "and responded to the bomb site" and "assisted with pulling comrades out, [and] secured the deceased." *Id.* Kick was then tasked to provide "personal security for the on-site commander and task force." *Id.* Kick suffers from dizziness "that last[s] up to two weeks at a time and happens a few times a year, headaches, sinusitis, and fatigue." *Id.* ¶ 5. Kick additionally suffers from PTSD which, in addition to other symptoms, makes it hard

for him to visit "[c]rowded areas" and hear loud noises.  *Id.* ¶ 8.  Kick has received a 30%

disability rating from the VA as a result of the attack on Khobar Towers.  *Id.* ¶ 7; *id.*, Att. (Letter

from VA, dated Sept. 5, 2017), ECF No. 62 at 10; *see also id.*, Att. (medical records), ECF No.

62 at 11–12.  Kick was awarded both an Air Force Commendation Medal and the Purple Heart.

*Id.* ¶¶ 6, 11; *id.*, Att. (Air Force Commendation Medal Certificate, dated Jan. 14, 1997), ECF No.

62 at 13; *id.*, Att. (Purple Heart Certificate, dated May 13, 1999), ECF No. 62 at 7; *id.*, Att.

(Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 62 at 5.

### 17. *Willard A. Brewster*

On June 25, 1996, Willard A. Brewster was a service member in the U.S. Air Force

deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of

Willard A. Brewster ("Brewster Decl.") (Sept. 12, 2018) ¶ 3, ECF No. 63 (sealed), ECF No. 158

(public).  Brewster had his back to a large window in the building adjacent to the explosion.  *Id.*

¶ 4.  "The force of the blast propelled [him] into the opposite concrete wall."  *Id.*  Brewster was

knocked unconscious, and when he woke up he tried to make his way out of the building.  *Id.* ¶¶

4–5.  He was stopped and advised "not to move [his] left arm too much," as he had a "substantial

open wound" on his left elbow, with "severed tendons."  *Id.* ¶ 5.  He was triaged in a parking lot,

and then had surgery in a Saudi Arabian hospital.  *Id.*  Brewster continues to experience pain in

his elbow during cold weather.  *Id.*  In addition to physical injury, Brewster suffers from PTSD

as a result of the attack.  *Id.* ¶ 9.  His PTSD causes him to have nightmares, sleepless nights, and

high anxiety "whenever there are sudden noises."  *Id.*  The VA has given Brewster a disability

rating of 90% because of injuries suffered during the attack.  *Id.*; *id.*, Att. (VA Rating Decision,

dated March 17, 2015), ECF No. 61 at 32–52; *see also id.*, Att. (medical records), ECF No. 61 at

8–27.  Brewster received the Purple Heart for his injuries.  *Id.* ¶ 7; *id.*, Att. (Purple Heart

Certificate, dated July 2, 1996), ECF No. 61 at 28.

      **18. *Randy W. Hooker***

      On June 25, 1996, Randy W. Hooker was an Airman First Class in the U.S. Air Force

deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of

Randy W. Hooker ("Hooker Decl.") (Sept. 6, 2018) ¶ 3, ECF No. 64 (sealed), ECF No. 198

(public).  Hooker was walking back to the barracks when a large flash of light happened,

followed by "an immense amount of pressure and deafening noise" that knocked him to the

ground.  *Id.* ¶¶ 4–5.  Hooker entered Building 131, the site of the blast, to rescue the wounded.

*Id.* ¶ 6.  On one of "multiple trips to the upper floors," Hooker provided self-aid and buddy care

to an airman who had been "impaled by debris in his chest and abdomen."  *Id.* ¶¶ 6–7.  After

evacuating the injured airmen, Hooker returned to make "several more trips into the building and

[assist] where [he] could."  *Id.* ¶ 7.  "Some of the airmen [they] found had already died from

bleeding out or being crushed by debris.  Others were severely disfigured by flying debris or

were impaled by other objects."  *Id.*  Hooker then was transported to the makeshift trauma area

where he was treated for injuries to his left knee and right wrist and the lacerations on his arms.

*Id.* ¶ 8.  As a result of the attack, Hooker suffers from PTSD.  *Id.* ¶ 10.  Just to be able to sleep,

Hooker has to take medication "due to vivid dreams of the events from the night of the

bombing."  *Id.*  Hooker additionally suffers from flashbacks and does not feel comfortable in

crowds.  *Id.* ¶¶ 11–12.  Hooker finds it hard to trust people and can "easily detach from people."

*Id.* ¶ 13.  He has received a disability rating of 60% from the VA for injuries sustained during the

attack.  *Id.* ¶ 14; *id.*, Att. (VA Rating Decision, dated May 7, 2018), ECF No. 64 at 7.  Hooker

was awarded the Purple Heart and an Air Force Commendation Medal.  *Id.* ¶ 15; *id.*, Att. (Purple

Heart Certificate, dated Aug. 8, 1996), ECF No. 64 at 9; *id.*, Att. (Air Force Commendation Medal Certificate, dated June 26, 1996), ECF No. 64 at 10; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 64 at 6.

### 19. *Stephen K. Johnson and Three Family Members*

On June 25, 1996, Stephen K. Johnson was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Stephen K. Johnson ("Johnson Decl.") (Sept. 10, 2018) ¶ 4, ECF No. 65 (sealed), ECF No. 202 (public). Johnson was in his bedroom at the time of the attack, and the blast knocked him unconscious for "fifteen to twenty minutes," until he was found by fellow residents in the building and taken to the triage area where he was tested for a concussion. *Id.* ¶¶ 5–6. Though Johnson had a traumatic brain injury, he then helped to evacuate other victims. *Id.* ¶ 6. When Johnson returned to the United States, he developed symptoms of anxiety and was diagnosed with generalized anxiety disorder, including avoiding loud noises and crowds. *Id.* ¶¶ 8, 10. As a result of the attack, the VA has assigned Johnson a disability rating of 50%. *Id.* ¶ 9; *id.*, Att. (Letter from VA, dated June 27, 2018), ECF No. 65 at 24–25; *see also id.*, Att. (medical records), ECF No. 65 at 13–23. Johnson was awarded the Purple Heart and the Air Force Achievement Medal for his injuries. *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 65 at 26; *id.*, Att. (Air Force Commendation Medal Certificate, dated Nov. 26, 1996), ECF No. 65 at 28; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 65 at 6.

Three of Johnson's family members are plaintiffs in this lawsuit: his wife, Jessica Jordan; and his two sons, Stephen Johnson II, and Ryan Johnson. Johnson's wife learned of the attack while watching CNN, Decl. of Jessica D. Johnson ("Jessica Johnson Decl.") (Oct. 29, 2018) ¶¶

4–5, ECF No. 65 (sealed), ECF No. 202 (public), and she contacted the squadron, "who advised they had no idea about the attack," *id.* ¶ 5. She was "terrified [her] husband may have died in the attack." *Id.* She received a very brief call from Johnson, enough for him to say "I'm alive. I love you, goodbye," but she did not learn that he was injured until she spoke to him again two weeks later. *Id.* ¶ 6. When Johnson returned home, his wife "immediately noticed that he was no longer focused, easily distracted, and always staring off into space." *Id.* ¶ 7. She feels that Johnson has "abandoned the family mentally, physically and emotionally as a direct or indirect result of the Khobar Towers attack," *id.* ¶ 9, and as a result, she experiences extreme grief and distress due to the injuries to her husband, *id.* ¶¶ 10–11.

Stephen Johnson was six years old at the time of the attack, Decl. of Stephen K. Johnson II ("Stephen Johnson Decl.") (Sept. 10, 2018) ¶¶ 4–5, ECF No. 65 (sealed), ECF No. 202 (public), and remembers "feeling very scared for [his] father, who [he] had not seen for a month" and being scared for his mother who was "juggling taking care of him and [his] one-year old brother." *Id.* ¶ 5. Stephen Johnson experiences "extreme grief and distress" as a result of the injuries to his father. *Id.* ¶ 7.

Ryan Johnson "experienced and continue[s] to experience, extreme grief and distress as a result of the injuries to [his] father." Decl. of Ryan W. Johnson ("Ryan Johnson Decl.") (Oct. 31, 2018) ¶¶ 4, 6, ECF No. 65 (sealed), ECF No. 202 (public). He has "grown up with a father who has anxiety issues" which led Ryan Johnson to be "anxious and apprehensive as well, particularly when around him." *Id.* ¶ 6.

### 20. *Dana S. Rozelle*

On June 25, 1996, Dana Rozelle was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Dana S. Rozelle

("Rozelle Decl.") (Nov. 8, 2018) ¶ 3, ECF No. 80 (sealed), ECF No. 226 (public). Rozelle was preparing for a college final at the time that the blast occurred. *Id.* ¶ 4. "All of a sudden there was this horrendous roar and stuff flying at [her]." *Id.* Rozelle noticed that her "windows were missing and the metal shades that covered the windows were on [her] nightstand." *Id.* She began to exit the room, but returned to grab a pair of shoes and towels for an injured airman. *Id.* ¶ 5. Rozelle then assisted in searching other suites to make sure other airmen were not trapped. *Id.* "[She] had to crawl under and over doors that were blown off the hinges and other debris blown around in the rooms." *Id.* When she was outside helping to bring bedding and water from the orderly room, Rozelle saw "a huge orange fireball along the fence," and a panic ensued because it was believed that insurgents were climbing the fence. *Id.* ¶ 6. She fled to the dining hall, which was so full of injured people that "[y]ou had to step over them to move about." *Id.* ¶ 7. As a result of the attack on Khobar Towers, Rozelle suffered from hearing loss, multiple lacerations and bruises, and trauma to her extremities. *Id.* ¶ 10. She additionally has developed PTSD, which causes her to "get angry easily" and become "very anxious in crowds and heavy traffic." *Id.* ¶ 11. Rozelle has had panic attacks brought on by "a flash of lightening and a clap of thunder." *Id.* She attended therapy for her PTSD for a short time. *Id.* ¶ 13. The VA has given Rozelle a combined 70% disability rating, 50% for her PTSD, 10% for tinnitus, and 20% for shoulder issues. *Id.* ¶ 13; *id.*, Att. (Letter from VA Regional Office, dated Aug. 13, 2012), ECF No. 80 at 16–18; *id.*, Att. (VA Rating Decision, dated Aug. 8, 2012), ECF No. 80 at 22–26; *see also id.*, Att. (medical records), ECF No. 80 at 11–13. Rozelle was awarded the Purple Heart for her injuries. *Id.* ¶ 14; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 80 at 27; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 80 at 9.

### 21. *Joseph D. Stroud*

On June 25, 1996, Joseph D. Stroud was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Joseph D. Stroud ("Stroud Decl.") (Dec. 27, 2018) ¶ 3, ECF No. 81 (sealed), ECF No. 239 (public). Stroud was shaving in his bathroom when he "heard a loud gust of wind and doors slamming, then felt the explosion." *Id.* ¶ 4. The broken end of a coat hook on the door penetrated his shoulder and the door pinned him to the floor. *Id.* Stroud was able to exit the bathroom and found his roommate "badly injured and barely conscious." *Id.* ¶ 5. He picked him up and carried him down two flights of stairs and "what must have been two or three city blocks" to the clinic. *Id.* Stroud then went back to the building to find his other roommate and help sweep the building. *Id.* ¶¶ 5–6. Stroud returned to the clinic where he helped carry the injured and mop blood until his own injuries were noticed. *Id.* ¶ 7. Stroud was sent to the makeshift hospital in the dining hall, where he was told that they were low on Novocain and asked if he could be stitched up without it. *Id.* The attack on Khobar Towers has left Stroud with "severe back pain" that he has endured for years and he has even been told that there "may still be glass shards on [his] spine." *Id.* ¶ 8. In addition to physical injury, Stroud has suffered from severe depression, which he has attempted to self-medicate with alcohol. *Id.* ¶ 10; *see also id.*, Att. (medical records), ECF No. 81 at 6. Stroud received the Purple Heart for his injuries. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 81 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 81 at 5.

### 22. *Kenneth L. Sturdivant*

On June 25, 1996, Kenneth L. Sturdivant was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of

Kenneth L. Sturdivant ("Sturdivant Decl.") (Sept. 20, 2018) ¶ 3, ECF No. 82 (sealed), ECF No. 240 (public). Sturdivant was getting ready for bed and was about to turn out his lights when he "heard a loud explosion, which caused [him] to be disoriented." *Id.* ¶ 4. Sturdivant gathered himself and began to help people evacuate the building. *Id.* His commander then told him that he was bleeding, and he found that he had glass fragments in his leg. *Id.* The attack resulted in Sturdivant sustaining multiple lacerations and glass shrapnel wounds on both of his legs. *Id.* ¶ 5. In addition to these physical injuries, Sturdivant now suffers from PTSD as a result of the attack, which "changed [his] life forever." *Id.* ¶¶ 8–9. The VA has assigned Sturdivant a disability rating of 20% from the bombing. *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated Dec. 26, 2013), ECF No. 82 at 7. Sturdivant received the Purple Heart for his injuries. *Id.* ¶ 10; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 82 at 8; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 82 at 5.

### 23. *Bryan D. Scott and Four Family Members*

On June 25, 1996, Bryan Scott was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Bryan Scott ("Scott Decl.") (Sept. 25, 2018) ¶ 4, ECF No. 84 (sealed), ECF No. 234 (public). At the time of the explosion, Scott was standing five feet from a large sliding glass door. *Id.* ¶ 5. The force of the explosion threw him twenty feet across the room, head first into a concrete wall. *Id.* "When [he] woke up, [he] had glass shards throughout [his] body." *Id.* Scott got up and helped to carry another injured service member out of the building on a blanket. *Id.* Once outside, Scott realized that his wounds were worse than he thought, and used a shirt to staunch the bleeding from his head, arms, legs and body. *Id.* ¶ 6. Scott has had significant and severe back issues since returning from deployment. *Id.* ¶ 7. Scott saw a chiropractor at least three times a week

for thirteen years until "[e]ventually [he] had back surgery to try to ease the pain. When the doctor performed the surgery, it was worse than he thought." *Id.* Even after his back surgery, Scott is still in daily pain and is unable to "run, or play sports." *Id.* ¶ 8. The VA has assigned a disability rating of 60% to Scott in connection with the Khobar Towers attack. *Id.*, Att. (Letter from VA, dated July 4, 2018), ECF No. 84 at 84–85; *cf. id.* ¶ 9 (stating that service member plaintiff's VA disability rating is 70%, but without supporting documentation); *see also id.*, Att. (medical records), ECF No. 84 at 7–83. Scott received the Purple Heart for his injuries. *Id.* ¶ 12; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 84 at 86; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 84 at 5–6.

Four of Scott's family members are plaintiffs in this lawsuit: his mother, Connie Sturgill; his father, Michael Scott; and his two brothers, Michael Scott II, and Jonathan Scott. On the day of the attack, Scott's mother, Connie Sturgill, had just returned home from a shift as a surgical nurse when she received a call from a friend of her son asking if she had heard from him since the attack. Decl. of Connie Sturgill ("Sturgill Decl.") (Dec. 27, 2018) ¶¶ 4–5, ECF No. 84 (sealed), ECF No. 234 (public). "There are no words to even begin to describe the numb anguish, hollow panic [she] felt, not knowing if [her] son was dead or alive." *Id.* ¶ 6. Sturgill called various numbers but was unable to receive any information about the bombing. *Id.* In the afternoon of the next day, Sturgill finally received a call from Scott stating that he was alive and safe. *Id.* ¶ 8. Though her "son's return home was joyous," Sturgill suffered and continues to suffer extreme grief and distress as result of the attack. *Id.* ¶¶ 9, 11. Sturgill has supported Scott, and has even taken off work to care for him while he recovered from surgery. *Id.* ¶ 10.

After Scott's father, Michael G. Scott, learned that his son "was wounded from the attack, [he] was concerned because [he] could not contact him and find out the extent of his injuries."

Decl. of Michael G. Scott ("Michael G. Scott Decl.") (Dec. 27, 2018) ¶¶ 4–5, ECF No. 84 (sealed), ECF No. 234 (public). Scott was reunited with his son after six months and found it "extremely painful" to wait to see his son in person to "judge his recovery condition." *Id.* ¶ 6. As a result of the attack, Scott experiences "extreme grief and distress." *Id.* ¶ 7.

Scott's brother, Michael, first learned about the attack from one of Scott's friends. Decl. of Michael Scott II ("Michael Scott II Decl.") (Sept. 11, 2018) ¶ 5, ECF No. 84 (sealed), ECF No. 234 (public). They did not have any news of whether Scott had survived until he was able to call their mother to say that he was alive. *Id.* ¶ 7. "During that time, each of [them] suffered painfully not knowing what the outcome was going to be for him, and how it would change [their] family." *Id.* ¶ 5. This "uncertainty affected [Michael Scott's] focus and job performance at work." *Id.* ¶ 6. The attack on his brother has also "altered [his] mood, which affected [his] personal relationships." *Id.* Since his brother's return, Michael has "suffered mental anguish, experienced anger and aggression by watching him suffer." *Id.* ¶ 8.

Scott's other brother, Jonathan, learned from his mother that his brother was at the site of the bombing. Decl. of Jonathan L. Scott ("Jonathan Scott Decl.") (Dec. 27, 2018) ¶¶ 4–5, ECF No. 84 (sealed), ECF No. 234 (public). "[They] didn't hear from Bryan for almost a full day. As the hours got longer [they] all thought that the news was bad." *Id.* ¶ 6. When Jonathan finally saw his brother get off the plane in Kentucky it was "like Christmas Day." *Id.* ¶ 7. Jonathan decided to "postpone [his] career for a year to help him recover," *id.* ¶ 8, but "it [has] been terrible" watching his brother struggle with his back injuries, "and even worse his behavior quirks since the attack," *id.* ¶ 9.

**24. *Brian E. Volk***

On June 25, 1996, Brian Volk was a Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Brian E. Volk ("Volk Decl.") (Nov. 6, 2018) ¶ 3, ECF No. 85 (sealed), ECF No. 246 (public). Volk was preparing for work when the bomb went off. *Id.* ¶ 4. The force of the bomb caused the nearby sliding glass door to shatter and cover Volk and his friend with glass and metal. *Id.* "[They] flew into the concrete wall behind [them], and [he] was knocked unconscious for about 20 seconds." *Id.* Volk woke up to a cut over his right eye, glass in his arm, and metal in his hip. *Id.* ¶ 5. Though his "ears were ringing" and his "eyes were full of blood," Volk used his medical kit and headed towards the blast site to assist others. *Id.* ¶¶ 5–6. After Volk assisted in rescuing two service members, Volk was treated at the trauma center. *Id.* ¶¶ 6–7. As a result of the attack, Volk required surgery to repair a "torn right eyelid; [] approximately seven sutures on [his] right forearm; and one suture on the right eye." *Id.* ¶ 8. The explosion has left Volk's face "disfigured." *Id.* Volk has additionally required a kidney transplant, and suffers from a brain ischemia. *Id.* ¶ 9. Besides physical injury, Volk has been diagnosed with PTSD. *Id.* ¶ 7. The VA has assigned Volk a combined disability rating of 100%. *Id.* ¶ 10; *id.*, Att. (Letter from VA, dated July 8, 2018), ECF No. 85 at 40; *id.*, Att. (VA Rating Decision, dated Jan. 27, 2014), ECF No. 85 at 34–39; *see also id.*, Att. (medical records), ECF No. 85 at 6–33. Volk received the Purple Heart Award for his injuries. *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 85 at 42.

### 25. *Zachary S. Sutton*

On June 25, 1996, Zachary S. Sutton was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Zachary S. Sutton ("Sutton Decl.") (Sept. 21, 2018) ¶ 3, ECF No. 86 (sealed), ECF No. 241 (public). Sutton

was just falling asleep when the explosion threw him from his bed. *Id.* ¶ 4. Despite the fact that Sutton had received several cuts to his head and face, he remained on site to administer first aid and transport wounded service members to triage. *Id.* ¶¶ 4–5. Sutton then went to the triage area where he received sutures and had a piece of glass removed from his eye. *Id.* ¶ 5. Sutton now suffers from PTSD as a result of the attack, *id.* ¶ 6, and no longer goes out in public if there are crowds due to panic attacks, *id.* ¶ 7. Sutton has received a combined disability rating of 60% from the VA due to service-related injuries. *Id.* ¶ 6; *id.*, Att. (Letter from VA, dated Dec. 12, 2016), ECF No. 86 at 14; *see also id.*, Att. (medical records), ECF No. 86 at 7–8. Sutton received the Purple Heart and Air Force Commendation Medal. *Id.* ¶¶ 5, 8; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 86 at 9; *id.*, Att. (Air Force Commendation Medal Certificate, dated Oct. 23, 1996), ECF No. 86 at 15–16; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 86 at 5–6.

### 26. *Clifford L. Thomas and Four Family Members*

On June 25, 1996, Clifford L. Thomas was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Clifford L. Thomas ("Thomas Decl.") (Oct. 23, 2018) ¶ 4, ECF No. 87 (sealed), ECF No. 242 (public). Thomas was in his bedroom when the explosion forced him into his wall locker which collapsed on him, knocking him unconscious. *Id.* ¶ 5. When he became conscious, Thomas made his way outside the building and was helped to his meeting place. *Id.* The explosion had caused multiple lacerations, shrapnel wounds from glass, and a concussion and traumatic brain injury. *Id.* Thomas was taken for treatment to King Fizel University Hospital, where he was hospitalized for the concussion for three days. *Id.* ¶¶ 5–6. In addition to physical injury, Thomas now suffers from PTSD from the attack, which condition has caused him "difficulty at home, at

work, and at all social functions." *Id.* ¶ 7. The VA has assigned Thomas a 50% disability rating for his PTSD, and a combined disability rating of 100%. *Id.*; *id.*, Att. (VA Rating Decision, undated), ECF No. 87 at 7–8; *id.*, Att. (medical records), ECF No. 87 at 6. Thomas received the Purple Heart Award for his injuries. *Id.* ¶ 8; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 87 at 5.

Four of Thomas' family members are plaintiffs in this lawsuit: his wife, Margaret Thomas; his daughter, Camilla Thomas-Harris; and his two sons, Cedrick Thomas and Adrian Thomas. Thomas' wife, Margaret Thomas, was at a class when she received an "extremely disturbing" call from her children that their father was in the Khobar Towers attack. Decl. of Margaret L. Thomas ("Margaret Thomas Decl.") (Sept. 10, 2018) ¶¶ 4–5, ECF No. 87 (sealed), ECF No. 242 (public). Her "children were screaming and crying, totally in fear and upset as they screamed that their father had been blown up in a bombing. They had heard a news report on the evening news." *Id.* ¶ 5. She raced home to comfort her children and was in "total fear and heart-wrenching agony for at least twelve to eighteen hours, not knowing if [her] husband was alive or dead" until she received a call the next day from her husband's First Sergeant. *Id.* She was told that he had been injured and was at an off-base hospital. *Id.* Once Thomas returned home, Margaret Thomas took care of her husband as she was not working that summer. *Id.* ¶ 6. The "psychological and emotional distress and memory" of the attack still affect Margaret Thomas to this day, and she has "suffered watching [her] husband suffer from the symptoms of PTSD." *Id.* ¶ 7.

Thomas' daughter, Camilla Thomas-Harris, was fourteen years old at the time of the attack. Decl. of Camilla T. Thomas-Harris ("Camilla Thomas-Harris Decl.") (Sept. 11, 2018) ¶¶ 4–5, ECF No. 87 (sealed), ECF No. 242 (public). Camilla was at home when a relative called to

tell her to turn on the news, where she saw the remnants of her father's dorm after the bombing. *Id.* ¶ 5. This news was "traumatic" and she "immediately thought [her] father was dead." *Id.* Her brother called to alert her mother, but they did not learn anything about their father for twelve to eighteen hours. *Id.* Once her father returned home, she "helped where [she] could" and helped her mother care for her father by "giving him his medication and [] proper wound care." *Id.* ¶ 6. While most of her classmates "were preparing for their first year of high school, [she] was preparing and dealing with helping [her] father get back to normal, and learning how to cope with him having PTSD." *Id.* She suffers from the effects of the "emotional and psychological distress" that the memory of the event has on her. *Id.* ¶ 7. Even now, when she "see[s] or hear[s] of a bombing or shooting, [she] regress[es] back to [her] experience from that evening in 1996." *Id.*

Thomas' son, Cedrick Thomas, was sixteen years old at the time of the attack. Decl. of Cedrick C. Thomas ("Cedrick Thomas Decl.") (Oct. 15, 2018) ¶¶ 4–5, ECF No. 87 (sealed), ECF No. 242 (public). Cedrick received a call from a relative that he should turn on the news, where he saw the bombed building in which his father was staying. *Id.* ¶ 5. Cedrick then had to call his mother and inform her of the news of the attack on Khobar Towers. *Id.* ¶ 6. "Experiencing her reaction by phone while managing [his] siblings' reactions and, at the same time, believing [his] father had been killed made the situation the most emotionally fearful time in [his] life." *Id.* Cedrick did not know that his father survived until eighteen hours later. *Id.* ¶ 5. Once his father was home, his father began displaying signs of PTSD. *Id.* ¶ 7. Cedrick has "continued to feel the effects of his [father's] PTSD, even after [he] left home and began [his] own family well into [his] late twenties." *Id.* He had to act "as an emotional care-giver" to both his mother and his

father. *Id.* ¶ 8.  Having to "assist [his] parents in this manner proved to be difficult and stressful for [him]."  *Id.*

Thomas' other son, Adrian Thomas, was twelve at the time of the attack.  Decl. of Adrian D. Thomas ("Adrian Thomas Decl.") (Sept. 20, 2018) ¶¶ 4–5, ECF No. 87 (sealed), ECF No. 242 (public).  Once he saw the news report that there was a bombing at Khobar Towers, Adrian was "scared, crying, screaming and overtaken with grief."  *Id.* ¶ 5.  He was in "total fear, heart-wrenching agony, and unprecedented grief for at least eighteen hours, not knowing the state of [his] father."  *Id.*  The effects of the attack on his father have taken "many forms" in Adrian Thomas' life, causing "severe anxiety" and other symptoms.  *Id.* ¶ 8.  The "traumatic experience" has been "life lasting" and is an "ongoing healing process" for Adrian Thomas.  *Id.* ¶ 9.

### 27. *Robert G. Siler*

On June 25, 1996, Robert G. Siler was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Robert G. Siler ("Siler Decl.") (Oct. 26, 2018) ¶ 3, ECF No. 88 (sealed), ECF No. 236 (public).  Siler was asleep at the time of the attack and was woken by falling debris.  *Id.* ¶ 4.  He felt his way out of the room and accidentally stepped on his friend who was on the ground "wet with blood, but breathing."  *Id.*  Siler instructed another service member to exit and carried his friend out of the building over his shoulder.  *Id.*  Once outside, he loaded his friend on a bus to be taken to triage. *Id.* ¶ 5.  At triage, "personnel saw that [he] was covered in blood" and transferred Siler to a safe zone, where he was given pain medication.  *Id.* ¶ 6.  Siler would have to wait thirty-six hours before he was able to make a three-minute phone call to his family.  *Id.* ¶ 7.  As a result of the attack, Siler suffered from "a separated shoulder, [] a concussion, multiple lacerations, [] glass

shrapnel wounds to [his] head and body, black eyes, and facial bruising." *Id.* ¶ 8.  Siler continues to have "chronic pain and limited use of [his] shoulder." *Id.* ¶ 10.  The VA has given Siler a disability rating of 40% due to physical injuries.  *Id.* ¶ 11; *id.*, Att. (Letter from VA, dated July 29, 2014), ECF No. 88 at 19; *see also id*., Att. (medical records), ECF No. 88 at 6–18.  In addition, Siler suffers from PTSD which causes him to have trouble sleeping, become "very jumpy" when startled, and "fearful." *Id.* ¶ 11.  Siler received the Purple Heart and the Air Force Achievement Medal.  *Id.* ¶ 9; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 88 at 5.

### 28. *Leighton Reid and One Family Member*

On June 25, 1996, Leighton Reid was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Leighton J. Reid ("Reid Decl.") (Nov. 11, 2018) ¶ 4, ECF No. 89 (sealed), ECF No. 222 (public).  Reid was taking a smoke break when he first noticed "a suspicious individual standing next to a vehicle parked on the grass" close to his building.  *Id.* ¶ 5.  Reid observed as the individual "flashed the headlights of the vehicle three times." *Id.*  A couple of minutes later, he heard "what [he] thought were three distinct rifle shots, that turned out to be the detonators on the explosive laden vehicle that was trying to back into building 131 next door." *Id.*  The force of the explosion slammed Reid into a metal desk, knocking him out briefly.  *Id.*  He immediately began to provide aid for injured airmen and helped to initiate the search and rescue for his building.  *Id.* ¶ 6.  Though he attempted to staunch the bleeding of one profusely injured airman, that airman passed away in Reid's arms.  *Id.*  Reid himself was injured but received only self-aid for "several nights." *Id.* ¶ 7.  The explosion had caused Reid to suffer from "glass wounds to [his] ears, head, neck, legs, and feet." *Id.*  His neck and spine were compressed, requiring decompression

surgery. *Id.* He has additionally been diagnosed with PTSD as a result of the attack. *Id.* ¶ 8. Reid has received a combined disability rating of 60% from the VA. *Id* ¶ 8; *id.*, Att. (Letter from VA, dated May 25, 2018), ECF No. 89 at 16–17; *id.*, Att. (Letter from VA, dated May 10, 2018), ECF No. 89 at 14–15; *id.*, Att. (medical records), ECF No. 89 at 18–67. Reid received an Air Force Commendation Medal for his actions after the bombing and the Purple Heart for the injuries he sustained. *Id.* ¶ 7; *id.*, Att. (Air Force Commendation Medal Certificate, dated Jan. 4, 1997), ECF No. 89 at 13; *id.*, Att. (Special Order from Department of the Air Force, dated Aug. 6, 1996, confirming Purple Heart), ECF No. 89 at 12; *id.*, Att. (Certificate of Release or Discharge from Active Service, confirming medals), ECF No. 89 at 7.

One of Reid's family members is a plaintiff in this lawsuit: his son, Sean Reid, who was babysitting when his step-mother called and told him about the attack. Decl. of Sean C. Reid ("Sean Reid Decl.") (Sept. 12, 2018) ¶¶ 4–5, ECF No. 89 (sealed), ECF No. 222 (public). He turned on the TV and saw what "reminded [him] of the Oklahoma City Bombing and it made [him] very distraught thinking that [his] father could suffer the same fate as the victims of that bombing." *Id.* ¶ 5. Sean spent "the rest of the day glued to the television," but was not able to hear from his father that he survived until "twenty-four to thirty-six hours after [he] first heard of the incident." *Id.* ¶ 6. The effects of the attack on Sean Reid's life have been "devastating." *Id.* ¶ 7. He still suffers from anxiety, for which he takes medication, and the "profound impact" the attack has had on his relationship with his father causes him "extreme grief and distress." *Id.* ¶ 9.

### 29. *Brandie R. Shaffer*

On June 25, 1996, Brandie R. Shaffer was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Brandie R. Shaffer ("Shaffer Decl.") (Sept. 10, 2018) ¶ 3, ECF No. 90 (sealed), ECF No. 235

(public).  Shaffer was on patrol at the front gate when she received a report over the radio about suspicious activity.  *Id.* ¶ 4.  Immediately afterwards she received a call requesting "immediate assistance to evacuate the building."  *Id.*  Before she was able to arrive, Shaffer "heard and felt the blast and saw the huge mushroom cloud" and thought they "would all die."  *Id.*  Shaffer ran towards the blast site and aided an injured airman to triage and then helped with the evacuation and search of the buildings.  *Id.*  When she reached her room she realized that if she "had been there and in the bed, [she] would have been seriously injured by the air conditioning unit that fell on [her] bed and all of the debris and glass that seemed to be everywhere."  *Id.*  To this day, Shaffer suffers from survivor's guilt and doesn't "understand why [she] was sparred and nineteen others were not."  *Id.* ¶ 5.  When she first returned home, she "slept with a gun on [her] chest."  *Id.* ¶ 6.  As a result of the attack, Shaffer suffers from anxiety and Chronic Adjustment Disorder.  *Id.* ¶¶ 6–7.  The VA has assigned Shaffer a 70% disability rating due to her Chronic Adjustment Disorder.  *Id.* ¶ 10; *id.*, Att. (Letter from the VA, dated July 2, 2018), ECF No. 90 at 8–9; *id.*, Att. (Fax from VA, dated July 3, 2018), ECF No. 90 at 10–12.  Shaffer was awarded the Air Force Commendation Medal.  *Id.* ¶ 8; *id.*, Att. (Air Force Commendation Medal Certificate, dated Jan. 14, 1997), ECF No. 90 at 6–7.

**30.  *Artis R. Coleman and Two Family Members***

On June 25, 1996, Artis R. Coleman was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Artis R. Coleman ("Coleman Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 91 (sealed), ECF No. 173 (public).  Coleman was in his room when he saw a "very bright flash" and the ceiling collapsed "burying [him] in concrete and shattered glass," knocking him unconscious.  *Id.* ¶ 5.  When he awoke, fellow airmen were wrapping his head and then helped him out of the building.  *Id.*  Coleman

was taken via ambulance to a hospital where he was seen for head trauma, lacerations and glass in his feet. *Id.* ¶ 6. After the bombing, Coleman started having "headaches [that] were so severe that it seemed like something was trying to get out of [his] head." *Id.* ¶ 9. A year after the attack, Coleman had a brain aneurysm on his right side and underwent surgery where they then found an unruptured aneurysm on his left side. *Id.* ¶ 10. After the two aneurysm surgeries, Coleman's "legs and feet began to hurt all the time." *Id.* ¶ 14. Coleman additionally suffers from depression, for which he takes anti-depressants, and PTSD. *Id.* ¶¶ 11, 17. The VA has assigned Coleman a disability rating of 100% due to his PTSD and mental ailments. *Id.* ¶ 18; *id.*, Att. (Letter from VA, dated Feb. 16, 2017), ECF No. 91 at 25; *id.*, Att. (medical records), ECF No. 91 at 6–20. Coleman received the Purple Heart for his injuries. *Id.* ¶ 19; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 91 at 26.

Two of Coleman's family members are plaintiffs in this lawsuit: his wife, Betty Coleman; and his son, Artis Coleman Jr. Betty first learned of the attack when she was told, by the wife of Coleman's co-worker, that Coleman had died. Decl. of Betty A. Coleman ("Betty Coleman Decl.") (Sept. 5, 2018) ¶ 5, ECF No. 91 (sealed), ECF No. 173 (public). "This was the most catastrophic news [she had] ever received, and [she] was told this alone, at night with no one to console [her] or offer comfort." *Id.* The next morning, Betty called her husband's squadron and was informed that she would be contacted later with information. *Id.* ¶ 6. During a two-day wait for information, she "sustained an insurmountable amount of anguish." *Id.* She then received a call informing her that her husband was not inside the building and was fine, but then received a call later stating that he was inside the building and had passed away. *Id.* Finally, she received the news that her husband had been inside the building but was alive and injured in a hospital. *Id.* "The contradictory information about [her] husband's life fueled [her] with anguish and

grief." *Id.* ¶ 7. Coleman returned home, and a year after the attack, had his first aneurysm surgery. *Id.* ¶ 10. While her husband was in a coma, Betty was told that she had complications to her pregnancy at the same time she "didn't know if [her] husband would live or die." *Id.* Betty is her husband's primary caregiver and has sustained "severe economic losses" as a result of her husband's complete disability. *Id.* ¶ 11. In addition, she has started having "symptoms of body aches, migraine[] headaches, vertigo and sleep problems." *Id.* ¶ 13. Her headaches have become so severe that she has had to go to the hospital for CT scans. *Id.* The attack on Khobar Towers has caused Betty Coleman to "endure[] extreme mental pain, suffering, grief and anguish." *Id.* ¶ 14.

Coleman's son, Artis Coleman Jr., had his "life [] changed forever" and the "effects of the attack on [his] daily and family life have been devastating." Decl. of Artis Coleman Jr. ("Artis Coleman Decl.") (Sept. 21, 2018) ¶¶ 4, 6, 10, ECF No. 91 (sealed), ECF No. 173 (public). He had a father who could no longer demonstrate "all the techniques he learned from playing basketball" and he "cannot remember the last time [his father] rode a rollercoaster, ran or jumped." *Id.* ¶¶ 5–6. Artis Coleman Jr. has done the best he can "physically and emotionally," but the attack has caused him "extreme mental pain, suffering, grief and anguish." *Id.* ¶¶ 9–10.

### 31. *Laurence P. Oliver*

On June 25, 1996, Laurence P. Oliver was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Laurence P. Oliver ("Oliver Decl.") (Sept. 11, 2018) ¶ 3, ECF No. 92 (sealed), ECF No. 218 (public). Oliver had just returned from the city and was still in his civilian clothes at the time of the attack. *Id.* ¶ 4. He was "approximately three hundred yards" from the attack, which "took [them] completely by surprise." *Id.* After the attack, Oliver gathered himself and went to the

armory for a weapon and body armor before returning to help.  *Id.*  Once back at the site of the attack, Oliver realized that "there was blood everywhere and chaos ensued all around."  *Id.*  He assumed duties as the area supervisor and coordinated "clearing and controlling the entry control point for responding emergency units."  *Id.* ¶ 5.  The attack on Khobar Towers has caused Oliver to develop PTSD.  *Id.* ¶ 7.  He has been "in a high state of high anxiety for over twenty years" and gets "maybe 4 hours of sleep a night."  *Id.* ¶ 8.  Oliver has received a combined total disability rating of 90% from the VA.  *Id.* ¶ 7; *id.*, Att. (VA Rating Decision, undated), ECF No. 92 at 7; *id.*, Att. (Letter from VA, dated Aug. 24, 2018), ECF No. 92 at 8–9.  Oliver received an Air Force Achievement Medal for the injuries he sustained.  *Id.* ¶ 6; *id.*, Att. (Air Force Achievement Medal Certificate, dated Dec. 19, 1996), ECF No. 92 at 6.

### 32. *Grady W. Tucker Jr. and One Family Member*

On June 25, 1996, Grady W. Tucker Jr. was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Grady W. Tucker Jr. ("Tucker Jr. Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 93 (sealed), ECF No. 244 (public).  Tucker Jr. was in his dormitory building when the force of the explosion threw him across the room, causing "blows to the head, neck, and back," in addition to tearing all the ligaments in his left wrist.  *Id.* ¶¶ 5–6.  He had surgery to repair the torn ligaments and still suffers from permanent nerve damage in his left wrist.  *Id.*  In addition to physical injury, Tucker Jr. suffers from PTSD and anxiety, which contribute to a "poor quality of life."  *Id.*  Tucker Jr. was assigned a combined disability rating of 100% by the VA.  *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated May 11, 2017), ECF No. 93 at 4.  Tucker received the Purple Heart for his injuries.  *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 93 at 5.

One of Tucker's family members is a plaintiff in this lawsuit: his father, Grady W. Tucker Sr. Decl. of Grady W. Tucker, Sr. ("Tucker Sr. Decl.") (Dec. 19, 2018) ¶ 4, ECF No. 93 (sealed), ECF No. 244 (public). Tucker's father was playing cards when he first learned of the attack and turned on the news. *Id.* ¶ 5. Though the news did not provide much information at first, his father became "very scared" when they said the word "barracks." *Id.* He returned home to a voicemail that his son was alive, but he "just knew" that something was wrong. *Id.* He later received a call from his son informing him that he was injured. *Id.* Tucker's father has "sustained emotional distress due to the injuries [his] son suffered," and remains "emotionally scarred." *Id.* ¶¶ 7–8.

### 33. *Jon C. Schamber*

On June 25, 1996, Jon C. Schamber was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Jon C. Schamber ("Schamber Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 94 (sealed), ECF No. 228 (public). Schamber was watching television when the "TV went black and the sudden blast pressure picked [him] up and threw [him] into a cement wall." *Id.* ¶ 4. Schamber was knocked unconscious and woke up "in a pool of blood and debris," with "severe lacerations to the inside of [his] right knee that made it impossible to walk." *Id.* ¶¶ 4, 5. He later woke up in a Saudi Arabian hospital. *Id.* ¶ 5. After three surgeries on his legs to "attempt to repair a quadriceps tendon, [and] close up several severe lacerations," Schamber suffers from "drop foot," "peroneal nerve damage" and "traumatic arthritis," as well as "chronic pain to this day." *Id.* ¶ 6. He additionally suffers from PTSD and has been prescribed anti-anxiety medication. *Id.* ¶¶ 8–9. Schamber has received a combined disability rating of 90% from the VA. *Id.* ¶ 10; *id.*, Att. (Letter from VA, dated Mar. 9, 2017), ECF No. 94 at 22–23; *see also id.*, Att. (medical records),

ECF No. 94 at 7–19. Schamber received the Purple Heart for his injuries. *Id.* ¶ 11; *id.*, Att.

(Purple Heart Certificate, dated July 2, 1996), ECF No. 94 at 24.

### 34. *Brian E. Vanhorn*

On June 25, 1996, Brian E. Vanhorn was a Senior Airman in the U.S. Air Force deployed

to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Brian E.

Vanhorn ("Vanhorn Decl.") (Dec. 27, 2018) ¶ 3, ECF No. 101 (sealed), ECF No. 245 (public).

Vanhorn was packing to be deployed home when the bomb went off. *Id.* ¶ 4. He was "thrown

backwards up against the wall" and landed on the floor. *Id.* After gathering himself and

removing "bits of glass" embedded in his skin, he "had to pry open the door that had been

jammed shut" to exit the suite. *Id.* ¶¶ 5–6. Vanhorn made his way "[t]hrough the chaos" to the

stairs, seeing "blood everywhere on the walls, floors and even in the stairwell." *Id.* ¶ 6. He was

directed to a triage area where, after seeing the severity of the injuries, he declined treatment. *Id.*

¶ 7. Vanhorn sustained "multiple lacerations and glass shrapnel wounds" in addition to "trauma

to [his] head, body and extremities." *Id.* ¶ 8. The attack on Khobar Towers has caused Vanhorn

to develop PTSD. *Id.* ¶ 9. He lost "not just one but twelve of [his] very close friends" and lives

with survivors' guilt. *Id.* ¶ 11. Vanhorn has received a combined disability rating of 30% by the

VA. *Id.* ¶ 9; *id.*, Att. (Letter from VA, dated June 30, 2018), ECF No. 101 at 9. Vanhorn

received the Purple Heart for his injuries. *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated Aug.

26, 1996), ECF No. 101 at 8; *id.*, Att. (Certificate of Release or Discharge from Active Duty,

confirming medal), ECF No. 101 at 5.

### 35. *Travis W. Wyatt*

On June 25, 1996, Travis W. Wyatt was a 19-year-old service member in the U.S. Air

Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of

Travis W. Wyatt ("Wyatt Decl.") (Dec. 27, 2018) ¶¶ 3, 7, ECF No. 102 (sealed), ECF No. 257 (public). He was in bed going to sleep when he suddenly "felt pressure all around [him]" and "[e]verything went black, and the room filled with smoke." *Id.* ¶ 4. After evacuating, he saw "total chaos outside," where there were "bodies and blood everywhere." *Id.* ¶ 5. Wyatt had some glass removed from his feet, and three days later had shards of glass removed with a needle without anesthetic. *Id.* ¶ 6. When he returned home, Wyatt was prescribed medicine for "acute anxiety." *Id.* ¶ 7. Due to the "traumatic psychological issues resulting from the attack," Wyatt has developed PTSD and received a combined VA disability rating of 70%. *Id.* ¶¶ 8, 9; *id.*, Att. (VA Rating Decision, dated Jan. 3, 2008), ECF No. 102 at 25–27; *see also id.*, Att. (medical records), ECF No. 102 at 6–24. Wyatt received the Purple Heart. *Id.* ¶ 10; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 102 at 5.

### 36. *William M. Schooley*

On June 25, 1996, William M. Schooley was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of William M. Schooley ("Schooley Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 103 (sealed), ECF No. 231 (public). On the night of the bombing, Schooley was in his bedroom, when, "[w]ithout warning the whole room began violently shaking." *Id.* ¶¶ 4–5. A metal wall locker "began to shimmy its way across the room" toward Schooley, who "curled up in a ball on [his] bed, covering [his] head with [his] arms, as the rumbling and shaking continued on and on." *Id.* The locker eventually fell on Schooley, who "shoved it off." *Id.* ¶ 6. When the "chaos subsided," Schooley made his way out to the hallway to check on his suitemates. *Id.* "Broken glass was everywhere and [they] had to make [their] way through rubble." *Id.* ¶ 7. Schooley and his suitemates began checking to see if people they saw were seriously injured. *Id.* ¶ 9. All around

him, he saw "airmen tending to their fallen comrades." *Id.* ¶ 10.  Schooley used his bare hands to move barbed wire and debris in order to clear a pathway for the injured to be removed from the building closest to the truck bomb.  *Id.* ¶ 12.  He then "went to the nearby picnic tables to provide first aid to the wounded," but he "felt completely helpless because [they] had no medical supplies and [their] training was so limited." *Id.* ¶¶ 13, 14.  After the bombing, Schooley began to suffer from PTSD, with "nightmares, insomnia, anxiety, hypervigilance, headaches, and constant[] [thoughts] about the bombing." *Id.* ¶ 20.  Due to his symptoms, the attack "changed [his] life forever." *Id.* ¶ 23.  Schooley was medically retired from the Air Force in 1999 because of his PTSD.  *Id.* ¶ 21.  The VA has rated Schooley 70% disabled for PTSD.  *Id.* ¶ 25; *id.*, Att. (Letter from VA, dated Feb. 25, 2017), ECF No. 103 at 73; *id.*, Att. (Letter from VA, dated Oct. 31, 2003), ECF No. 103 at 75; *see also id.*, Att. (medical records), ECF No. 103 at 10–12, 36–38, 40, 43–46, 70–72.  Schooley was approved for Combat-Related Special Compensation because of his PTSD.  *Id.* ¶ 26; *id.*, Att. (Letter from Department of the Air Force Headquarters Air Force Personnel Center, dated Jan. 29, 2009), ECF No. 103 at 76.  Schooley was awarded an Air Force Achievement Medal and a Certificate of Appreciation.  *Id.*, Att. (Air Force Achievement Medal Certificate, dated Aug. 21, 1997), ECF No. 103 at 79; *id.*, Att. (Certificate of Appreciation, dated June 27, 1996), ECF No. 103 at 86.

### 37. *Jereme D. Schuchard and One Family Member*

On June 25, 1996, Jereme Schuchard was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Jereme D. Schuchard ("Schuchard Decl.") (Sept. 11, 2018) ¶ 4, ECF No. 110 (sealed), ECF No. 232 (public); *see also* Plaintiff Jereme D. Schuchard's Notice of Errata (Jan. 24, 2019), ECF No. 136 (sealed), ECF No. 233 (public).  Schuchard was at his dinner table when the "concussion

wave explode[d] through the window and shatter[ed] it into large shards." Schuchard Decl. ¶ 5.

Even though he dove "toward the floor behind a chair" to shield himself from the "flying broken glass," Schuchard was knocked unconscious. *Id.* ¶¶ 6–7. When he woke up, he helped to triage other people. *Id.* ¶ 7. While helping, he was told that he was injured on his "back, neck, left arm and left shoulder" and received sutures with no anesthesia. *Id.* Schuchard now suffers from "constant neck and back pain," for which he will have to wear a brace for the rest of his life. *Id.* ¶ 9. His doctor also believes that he suffers from a Traumatic Brain Injury, and has occasional vision problems and tinnitus. *Id.* In addition to physical injury, Schuchard suffers from PTSD and has "frequent nightmares." *Id.* ¶ 12. The VA has assigned Schuchard a disability rating of 40% as a result of the attack. *Id.* ¶ 10; *id.*, Att. (VA Rating Decision, dated May 10, 2011), ECF No. 110 at 8–9; *see also id.*, Att. (medical records), ECF No. 110 at 10–19. Though Schuchard would have wanted to stay in the Air Force, he was forced to retire in 1999 due to his injuries from the attack. *Id.* ¶ 9. Schuchard received the Purple Heart and Airforce Commendation Medal. *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 110 at 6; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 110 at 5; *id.*, Att. (Air Force Commendation Medal Certificate, dated Dec. 23, 1996), ECF No. 110 at 7.

One of Schuchard's family members is a plaintiff in this lawsuit: his mother Brenda Munoz. Decl. of Brenda G. Munoz ("Munoz Decl.") (Sept. 13, 2018) ¶¶ 2, 4, ECF No. 110 (sealed), ECF No. 232 (public); *see also* Plaintiff Jereme D. Schuchard's Notice of Errata, ECF No. 136 (sealed), ECF Nos. 232, 233 (public). His mother first learned of the attack when her daughter called her "almost hysterical." Munoz Decl. ¶ 5. Munoz drove home and turned on the news for more information about her son. *Id.* ¶ 6. "I could not eat or sleep. All I could do was pray that my son was alive." *Id.* "Approximately eighty hours later," she received a short call

from Schuchard letting her know that he was alive.  *Id.*  Schuchard would not return home for

one hundred and thirty-four days.  *Id.* ¶ 7.  Munoz has experienced "extreme grief and distress"

as a result of the attack.  *Id.* ¶¶ 5, 12.  She feels like "the young man he was no longer exists" and

"mourn[s] his loss every day."  *Id.* ¶ 12.  The "[p]rolonged stress" has caused her health to

deteriorate.  *Id.*

38. ***Mitchell D. Wright and Three Family Members***

On June 25, 1996, Mitchell D. Wright was a Technical Sergeant in the U.S. Air Force

deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of

Mitchell D. Wright ("Wright Decl.") (Nov. 12, 2018) ¶ 4, ECF No. 112 (sealed), ECF No. 256

(public).  Wright was cleaning his dormitory bathroom, in preparation for returning home, when

the explosion "shattered a bathroom window, sending glass flying into [his] face."  *Id.* ¶ 5.

"Broken glass pierced both of [his] eyes, detached both retinas, and shattered tissue in [his]

eyes."  *Id.*  Wright was taken by ambulance to a Saudi hospital, later evacuated to Germany, and

then transferred to the Walter Reed Medical Center in Washington, D.C. where he was

hospitalized for three months.  *Id.* ¶ 6.  After two eight-hour operations to restore his vision,

Wright has only "corrected near and far vision of 20/200" in his right eye, and only "light

perception" in his left eye.  *Id.* ¶¶ 6–7.  Wright cannot drive or "read regular print" and often

falls while walking due to his poor depth perception.  *Id.* ¶ 9.  In addition to his visual

impairment, Wright suffers from PTSD from the attack, which includes "constant nightmares."

*Id.* ¶ 10.  As a result of his injuries, the VA has assigned Wright a disability rating of 90%.  *Id.* ¶

8; *id.*, Att. (Letter from VA, dated Feb. 10, 2017), ECF No. 112 at 162–63; *see also id.*, Att.

(medical records), ECF No. 112 at 6–142.  Wright received the Purple Heart for injuries

sustained in the attack.  *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No.

112 at 165.

Three of Wright's family members are plaintiffs in this lawsuit: his wife, Patricia Wright;

his daughter, Elin Brown; and his son, Erik Wright.  On the day of the attack, his wife Patricia

was leaving her house when she received a phone call that there had been an attack on her

husband's housing unit.  Decl. of Patricia Wright ("Patricia Wright Decl.") (Sept. 11, 2018) ¶ 5,

ECF No. 112 (sealed), ECF No. 256 (public).  Patricia was left in "grueling limbo" for almost

two days before she received a call that her husband had been badly injured.  *Id.* ¶¶ 5–6.  She

was reunited with her husband a few days later and accompanied him to Washington, D.C. for

treatment for three months.  *Id.* ¶¶ 7, 10.  The attack on Khobar Towers has impacted Patricia's

personal health and well-being "in an enormously negative way," including causing depression.

*Id.* ¶¶ 12–13.  She has incurred economic loss as she can no longer work full time and is the

"primary and sole care-giver" of her husband.  *Id.* ¶ 15.  She had worked as a preschool teacher

before the attack but resigned due to her husband's injuries.  *Id.* ¶ 17.

Wright's daughter, Elin Brown, was at a band meeting with a friend when her mother

told her to spend the night at her friend's house.  Decl. of Elin C. Brown ("Brown Decl.") (Sept.

11, 2018) ¶¶ 4–5, ECF No. 112 (sealed), ECF No. 256 (public).  The next day, she returned

home and her mother told her that her father was in an attack and she did not know if he

survived.  *Id.*  "[She] immediately started to cry, fearing that [they] had lost [her] father."  *Id.*  It

was not until the next night when they learned that he had survived but was seriously injured.  *Id.*

The family was asked to be "the face of the families" and greet the injured when returning home.

*Id.* ¶ 6.  After seeing her father carried out of the plane on a stretcher, Elin and her brother were

sent to live with their grandparents for the summer while her father recovered.  *Id.* ¶ 7.  As a

result of the attack, Elin suffers from depression. *Id.* ¶ 11. She is "unable to watch anything regarding military servicemen or women and their families without crying, even a simple commercial." *Id.*

Wright's son, Erik Wright, learned about the attack when he heard his sister crying and asked his mom what had happened. Decl. of Erik Mitchell Wright ("Erik Wright Decl.") (Sept. 11, 2018) ¶¶ 4–5, ECF No. 112 (sealed), ECF No. 256 (public). He did not know if his father had survived and "[t]he feelings of anguish and uncertainty were truly overwhelming." *Id.* ¶ 5. The next night, he learned that his father was badly injured, but alive. *Id.* ¶ 6. Erik was able to see his father briefly at the Air Force base, but then would not see his father again for twelve weeks. *Id.* ¶ 7. He has had to take care of his father since he was nine years old, and still is his father's "guide" when they walk anywhere. *Id.* ¶ 8. Erik suffers from various emotional problems as a result of the injuries to his father. *Id.* ¶ 12.

### 39. *The Estate of Hector M. Gonzalez-Pastrana and Four Family Members*

On June 25, 1996, Hector Manuel Gonzalez-Pastrana was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.[4] Decl. of Diana Gonzalez-Pastrana, Personal Representative of the Estate of Hector Manuel Gonzalez-Pastrana ("Estate of Hector Manuel Gonzalez-Pastrana Decl.") (Dec. 27, 2018) ¶ 10, ECF No. 113 (sealed), ECF No. 191 (public). Gonzalez-Pastrana had just fallen asleep when the attack occurred. *Id.* ¶ 11. "He sustained lacerations to both feet from walking barefoot on broken glass, glass fragments embedded in his head, and trauma to his body." *Id.* Although he was in "great pain," Gonzalez-Pastrana returned to his dorm multiple times to rescue the

---

[4]     Hector Manuel Gonzalez-Pastrana is deceased and this declaration was filed on behalf of his estate by his wife Diana Gonzalez. Decl. of Diana Gonzalez-Pastrana, Personal Representative of the Estate of Hector Manuel Gonzalez-Pastrana ("Estate of Hector Manuel Gonzalez-Pastrana Decl.") (Dec. 27, 2018) ¶ 10, ECF No. 113 (sealed), ECF No. 191 (public).

wounded. *Id.* ¶ 12. "The blast had knocked out the electricity and it was so dark that they had to move slowly, pressing their bodies against the walls to ensure there was a floor, not a hole that they could fall through." *Id.* ¶ 13. He "had never seen so much blood in his life." *Id.* ¶ 12. After the attack, his "personality completely changed" and "[h]e began to drink excessively, and no longer participated in family activities and outings." *Id.* ¶¶ 16–17. Gonzalez-Pastrana was diagnosed with "PTSD featuring paranoia, panic attacks, anxiety, patrolling behavior, flashbacks, anger, nightmares, disorientation, and controlling behavior." *Id.* ¶ 20. "He was also diagnosed with hypertension; chronic fatigue . . . chronic lower back pain . . . tinnitus; and migraines" and the VA has rated him 100% disabled. *Id.* ¶¶ 21, 26; *id.*, Att. (Letter from VA, dated Dec. 12, 2016), ECF No. 113 at 33. Even though he was prescribed "a number of medications for his medical and psychiatric conditions," his condition deteriorated to the point that he "wouldn't even take a shower in the house." *Id.* ¶¶ 23–27. Gonzalez-Pastrana died at home "on March 4, 2017, when he was only forty-eight years old, from a heart attack caused by his hypertension." *Id.* ¶ 31. The VA determined that his death was service connected. *Id.* ¶ 33; *id.*, Att. (VA Rating Decision, dated May 2, 2017), ECF No. 113 at 37–38. Gonzalez-Pastrana received the Purple Heart for his injuries. *Id.* ¶ 15; *id.*, Att. (Purple Heart Certificate, dated Oct. 8, 1996), ECF No. 113 at 19; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 113 at 18.

Gonzalez-Pastrana is survived by three family members who are plaintiffs in this lawsuit: his wife, Diana Gonzalez-Pastrana; his two sons, Hector Gonzalez Jr. and Jose D. Gonzalez; and his daughter, Natasha Gonzalez. Decl. of Diana Gonzalez-Pastrana ("Diana Gonzalez-Pastrana Decl.") (Dec. 27, 2018) ¶¶ 2, 8, ECF No. 113 (sealed), ECF No. 191 (public). For his wife Diana, "[l]osing [her] husband was like losing a part of [herself]." *Id.* ¶ 34. They "grew up in

Puerto Rico together" and had been married since 1985. *Id.* ¶ 5. In 1992, Diana was diagnosed with lupus and her husband "always supported [her] and was [her] caregiver during the most difficult moments of [her] illness." *Id.* ¶ 6. When her husband returned from the attack, he "became [] physically and mentally distant." *Id.* ¶ 14. He began going on tours of duty more frequently, even choosing to go to Korea by himself for a year, leaving her to take care of their three children alone while sick. *Id.* ¶ 17. Her husband's health declined until he ultimately passed away at home due to his hypertension. *Id.* ¶¶ 27, 32. For her, this was the "worst day of [her] life. All of [her] hopes and dreams of him one day getting better went up in flames." *Id.* ¶ 27.

Gonzalez-Pastrana's oldest son, Hector Gonzalez Jr., was ten years old when he learned that his father's housing complex had been bombed. Decl. of Hector Gonzalez Jr. ("Hector Gonzalez Jr. Decl.") (Dec. 27, 2018) ¶¶ 4–5, ECF No. 113 (sealed), ECF No. 191 (public). His mother received a phone call and "started screaming and crying" and "[s]he immediately turned on the TV and started to watch the reports coming in." *Id.* ¶ 5. Hector would not see his father for a month until he came home. *Id.* ¶ 7. As a result of the attack, and the death of his father, he has suffered from "profound grief and sadness." *Id.* ¶ 9. When his father was not breathing, his mother called Hector, who, based on his own training, "knew that they wouldn't be able to revive him." *Id.*

Gonzalez-Pastrana's youngest son, Jose Gonzalez, was one year old at the time of the bombing in Khobar Towers. Decl. of Jose D. Gonzalez ("Jose D. Gonzalez Decl.") (Dec. 27, 2018) ¶¶ 4–5, ECF No. 113 (sealed), ECF No. 191 (public). His father was still "a very good father," though his family said that "he was a very different man" before the attack. *Id.* ¶ 5. His father did suffer from alcoholism and paranoia, which got worse in the months leading up to his

father's death.  *Id.* ¶¶ 8–9.  "The most painful part" for Jose was when his dad passed away suddenly.  *Id.* ¶ 12.  His sister had gone to check on their father and found that he was not breathing, and he "rushed to start performing CPR on him."  *Id.*  The death of his father "devastated [him] and [his] whole family."  *Id.*  Jose felt "terrible grief knowing that [he] would never have the chance to spend more time with him."  *Id.*

Gonzalez-Pastrana's daughter, Natasha Gonzalez, was playing in the yard of their house when her mother received a call that there had been an attack.  Decl. of Natasha Gonzalez ("Natasha Gonzalez Decl.") (Oct. 22, 2018) ¶¶ 4–5, ECF No. 113 (sealed), ECF No. 191 (public).  "Given [her] age, [she] didn't understand the situation" but when her father returned he "did not interact with [them] as usual."  *Id.* ¶¶ 5–6.  "Through the years things only worsened."  *Id.* ¶ 7.  As a result of the injuries to her father and the "profound impact" of losing him, Natasha "experienced, and continue[s] to experience, extreme grief and distress."  *Id.* ¶ 11.  "His death . . . has left [her] bereaved, devastated, and terribly sorrowful."  *Id.*

**40.** *Scott A. Wolff*

On June 25, 1996, Scott A. Wolff was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Scott A. Wolff ("Wolff Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 115 (sealed), ECF No. 255 (public).  Wolff was in the bathroom preparing for work when the light went out and "the blast hit and the window shattered blowing glass fragments and the metal frame inside."  *Id.* ¶ 4.  After hearing a rumbling, Wolff thought the building was collapsing so he covered himself.  *Id.*  He then made his way out and helped his suitemates exit.  *Id.* ¶ 5.  Wolff returned to the building to search for the injured and also to retrieve the keys to the bus to use as an ambulance.  *Id.* ¶ 8.  Wolff made three trips driving the bus to the clinic.  *Id.*  One of his friends finally noticed that he was

bleeding on the arm and back and sent him to be treated. *Id.* ¶ 9. Even twenty-two years later, Wolff is "still overwhelmed with emotion when anyone asks [him] about the attack." *Id.* ¶ 14. The VA has assigned Wolff a combined disability rating of 60% for injuries suffered from the attack. *Id.* ¶ 15. Wolff received the Purple Heart for his injuries. *Id.* ¶ 16; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 115 at 5.

**41.** *John J. Yeichner*

On June 25, 1996, John Yeichner was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of John J. Yeichner ("Yeichner Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 116 (sealed), ECF No. 258 (public); *see also* Supp. Decl. of John J. Yeichner ("Yeichner Supp. Decl.") (Jan. 31, 2019) ¶ 4, ECF No. 140 (sealed), ECF No. 259 (public). Yeichner was walking up the stairs of Building 131 at the time of the explosion, which "blasted [him] down the stairs" where he landed face down, dislocating his shoulder. Yeichner Decl. ¶ 4. He made his way out of the building and to the center of the compound "in fear for [his] life as [he] thought another bomb would go off." *Id.* In addition to his shoulder injury from the attack, Yeichner received "numerous lacerations on [his] hands, feet and knees." *Id.* ¶ 5. Though Yeichner was injured in the attack, he chose not to list his injuries and declined the Purple Heart because his very close friends "who truly earned it" had died. *Id.* Yeichner now suffers from PTSD and survivor's guilt, with symptoms including anxiety and sleep disorders. *Id.* ¶¶ 6–8. Yeichner additionally had complete reconstructive surgery on his shoulder and may still need a replacement. *Id.* ¶ 7. He cannot do "any sort of physical activities" involving his shoulder, such as swimming and running, as a result of the injury to his shoulder. *Id.* The VA has assigned Yeichner a combined disability rating of 60%. *Id.*; *id.*, Att.

(Letter from VA, dated June 30, 2018), ECF No. 116 at 8; *see also id.*, Att. (medical records), ECF No. 116 at 9–48.

**42. *Aaron R. Weimer***

On June 25, 1996, Aaron R. Weimer was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia on the day of the attack. Decl. of Aaron R. Weimer ("Weimer Decl.") (Dec. 27, 2018) ¶ 3, ECF No. 120 (sealed), ECF No. 247 (public). Weimer was watching television when "suddenly" the sliding glass door of his dormitory "exploded inward, and [he] heard the loudest noise [he] [has] ever heard in [his] life." *Id.* ¶ 4. Weimer evacuated the building and "immediately noticed a mushroom cloud of dust" and "headed in that direction." *Id.* He helped evacuate others and "proceeded to assist treating the injured as they arrived." *Id.* As a result of this attack, Weimer suffers from "emotional distress and anxiety." *Id.* ¶ 5. He has additionally been diagnosed with PTSD, and reacts to "[l]oud noises, large crowds" and must "have an escape plan at all times." *Id.* ¶ 6. He has been "prescribed multiple medications to battle [his] anxiety and [his] depression at the same time." *Id.* The VA has assigned Weimer a disability rating of 70% for his PTSD. *Id.*; *id.*, Att. (VA Rating Decision, dated Mar. 12, 2018), ECF No. 120 at 8. Weimer received an Air Force Commendation Medal and a Certificate of Appreciation from the Air Force. *Id.* ¶ 7; *id.*, Att. (Air Force Commendation Medal, dated Dec. 23, 1996), ECF No. 120 at 14; *id.*, Att. (Certificate of Appreciation, undated), ECF No. 120 at 15.

**43. *Gregory DeArman***

On June 25, 1996, Gregory DeArman was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Gregory J. DeArman ("DeArman Decl.") (Feb. 05, 2019) ¶ 3, ECF No. 141 (sealed), ECF No.

180 (public).  DeArman was in the building behind the blast site when "[a]ll the windows were blown in and [he] had shrapnel embedded in [his] skin."  *Id.* ¶ 4.  DeArman left his room and carried a friend laying in the hallway out of the building.  *Id.*  "Although [he] was covered in blood," DeArman returned to the building and carried two more injured airmen out "on [his] shoulders."  *Id.* ¶ 5.  As a result of his efforts in rescuing airmen, DeArman now suffers from shoulder damage and has had "three major surgeries on [his] shoulder."  *Id.* ¶ 6.  These surgeries were performed by civilian doctors as the VA "will not authorize the surgeries" though DeArman is in "constant pain."  *Id.*  DeArman also has developed "psychological issues" and only leaves his home to "go to work and back."  *Id.* ¶ 7.  The VA has assigned DeArman a disability rating of 50%.  *Id.* ¶ 6.

44. ***Jimmy N. Adams and One Family Member***

On June 25, 1996, Jimmy N. Adams was a Senior Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Jimmy N. Adams ("Adams Decl.") (Dec. 18, 2018) ¶ 9, ECF No. 30 (sealed), ECF No. 150 (public).  At the time of the bombing, Adams was standing in the parking lot and was thrown approximately 25 yards to land under a vehicle in the parking lot.  *Id.* ¶ 10.  The explosion ruptured his ear drums and caused lacerations and bruises all over his body.  *Id*.  After the bombing, Adams' "kidneys were bruised" and his "kidneys continue to bleed, and [his] body continues to encapsulate the blood, which results in the formation of continuous kidney stones" at least once or twice a week.  *Id.*  The attack "caused so much damage to [his] hearing" that he requires hearing aids.  *Id.* ¶ 11.  As a result of the bombing, Adams "can't handle large crowds" and is "apprehensive" about "movie theaters, restaurants, [and] essentially any place where groups of people gather."  *Id.* ¶ 12.  He had been "on a positive track to ultimately achieve the

rank of Chief Master Sergeant E-9," but the attack caused him to "end [his] military career ten years early." *Id.* ¶ 14. Adams subsequently retired from the military, but the pain of his physical injuries has prevented him from working. *Id.* ¶¶ 13, 14. The VA rated Adams 90% disabled and compensates him at a 100% rate because he is unemployable. *Id.* ¶ 13; *id.*, Att. (Letter from VA, dated Jan. 22, 2018), ECF No. 30 at 19–20. Adams was awarded the Purple Heart for his injuries. *Id.* ¶ 14; *id.*, Att. (Special Order from Department of the Air Force, dated Aug. 2, 1996), ECF No. 30 at 21.

One of Adams' family members is a plaintiff in this lawsuit: his wife, Carol S. Adams. Carol Adams was engaged to Jimmy Adams at the time of the attack on Khobar Towers. Decl. of Carol S. Adams ("Carol Adams Decl.") (Dec. 18, 2018) ¶ 3, ECF No. 30 (sealed), ECF No. 150 (public). After the attack, she received a call "informing [her that] Jim was alive but injured." *Id.* ¶ 9. She felt "agony" as she waited to hear more and "waiting to finally see him seemed like eternity." *Id.* When he returned home, they "needed time to focus on [her husband's] recovery from his injuries so [they] postponed [their upcoming] wedding." *Id.* ¶ 5. They later got married on September 25, 1997, but the attack "affected [her] life in so many negative ways." *Id.* ¶¶ 6, 11. Prior to the attack, Carol Adams and her husband had a "very normal life," and they enjoyed "socializing with friends, going to the movies, plays, concerts, and restaurants." *Id.* ¶ 9. After the attack, however, she "left the workforce to take care of [him] full-time, which stripped [her] of a career that [she] worked years to build." *Id.* ¶ 11. Their income has "dramatically diminished," and due to her husband's injuries, they can no longer travel or socialize. *Id.* The uncertainty of each day "has mentally brought [her] down" and "[t]o this day, what happened on that day still plays on [her] mind." *Id.* ¶¶ 11, 12. She continues to

experience "extreme grief and distress as a result of the injuries sustained by [her] husband . . . and the profound impact they have had on [their] relationship." *Id.* ¶ 13.

### 45. *Timothy L. Albritton and Two Family Members*

On June 25, 1996, Timothy L. Albritton was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Timothy L. Albritton ("Albritton Decl.") (Oct. 19, 2018) ¶ 4, ECF No. 31 (sealed), ECF No. 151 (public). At the time of the attack, Albritton was filling his cup with water in the kitchen, "approximately 100 yards from the blast," which caused him to lose consciousness. *Id.* ¶ 5. When he woke up, he "was being hit in the back by rocks, debris, and glass" from the blast wave. *Id.* After the blast wave stopped, Albritton kicked open the kitchen door that was wedged shut from the pressure and damage, and went to check on his suitemates, "one of whom was cut up but receiving first aid from another." *Id.* ¶ 7. He then began moving downstairs to exit the building and assisted however he could. *Id.* One floor below, Albritton and another sergeant discovered an injured officer in the doorway with a sheet soaked in blood wrapped around his leg. *Id.* ¶ 8. They carried the injured officer outside. *Id.* Albritton then went looking for the sergeant that worked for him, and discovered her suite destroyed. *Id.* ¶ 9. He feared she might be dead and went to get help outside. *Id.* "It was six hours of thinking [he] had failed to keep [his] charge safe before [he] found out she was elsewhere and ok." *Id.* Albritton made his way out of the building, but once there, the crowd began running toward the interior of the compound thinking they would be attacked again. *Id.* ¶ 12. Albritton realized that injured personnel on stretchers were unable to walk, so he "turned around and moved against the flow until [he] was able to see all the stretchers were gone." *Id.* As a result of the attack, Albritton "sustained multiple lacerations, glass shrapnel wounds and trauma to [his] body and extremities." *Id.* ¶ 16.

He was unable to get his wounds stitched because he "spent two to three hours [helping the medics] . . . until [he] couldn't take the smell of blood and cries of pain and anger." *Id.* ¶¶ 11, 14. His wound "eventually 'healed,' but it still aches." *Id.* ¶ 14. Albritton believes "[t]he attack on Khobar Towers changed [his] life forever." *Id.* ¶ 18. A psychologist that treated him "told [him that he] had PTSD, put [him] on medication, and had [him] come back for counseling twice a week." *Id.*; *id.*, Att. (medical records, dated June 27, 1996), ECF No. 31 at 11. Albritton has "not contacted the V.A. or ever attempted to petition for Veteran's Benefits," because he fears that "it will bring that night crashing back on [him]." *Id.* ¶ 20. Albritton received the Purple Heart for his injuries. *Id.* ¶ 17; *id.*, Att. (Purple Heart Certificate, dated Aug. 6, 1996), ECF No. 31 at 12.

Two of Albritton's family members are plaintiffs in this lawsuit: his wife, Sandra B. Albritton; and his daughter, Erika Weinfurter. Sandra Albritton was married to Albritton at the time of the attack on Khobar Towers, and was with their two daughters at a softball practice. Decl. of Sandra B. Albritton ("Sandra Albritton Decl.") (Sept. 6, 2018) ¶¶ 4–5, ECF No. 31 (sealed), ECF No. 151 (public). She first learned about the attack from a voice message. *Id* ¶ 5. She "was aghast" as she "raced to the TV and turned on the news" to hear more. *Id.* She "had no idea if Tim was alive or dead [and she] kept going to the door expecting to see the Chaplain and [her husband's] commander coming to tell [her that he] was indeed gone." *Id.* Hours later, she "discovered Tim had called and said he was hurt but alive, and he would try to call me back." *Id.* ¶ 6. She did not get to talk to him until several days later, and she "was worried sick about what type of injury he sustained." *Id.* She also "worried about [their] children's emotional health" during this time. *Id.* After her husband came home, "he was different[,] withdrawn and constantly worried about [their] safety." *Id.* ¶ 7. He returned with "a quick temper that he did

not have when [they] first got married," *id.* ¶ 9, in addition to other emotional issues. Sandra Albritton experienced and continues "to experience, extreme grief and distress as a result of the injuries sustained by [her] husband." *Id.* ¶ 11.

Albritton's daughter, Erika A. Weinfurter, was eleven years old on the day of the attack. Decl. of Erika A. Weinfurter ("Erika Weinfurter Decl.") (Sept. 5, 2018) ¶ 5, ECF No. 31 (sealed), ECF No. 151 (public). She learned about the attack from the "unusual number of messages" on their answering machine. *Id.* She does not "really remember how long it took to find out if [her] father was ok," but it "seemed like a lifetime had passed." *Id.* She "feared never seeing him again," and crawled into a ball after watching the news reports, "crying out, 'my dad is dead, my dad is dead.'" *Id.* Later that night, she learned that "there was a message from [her] father telling [the family] he was alive, but injured." *Id.* ¶ 6. When her father returned, he "struggled with PTSD and he would be very quick to get angry." *Id.* ¶ 8. In public, "he walks in a box-pattern around [them] . . . planning an exit strategy in the event that an attack would happen again." *Id.* "It was difficult" for her during her high school years because her father had to travel and she "didn't know what would happen and if he would return." *Id.* ¶ 7. As a result of the attack, she has "horrible anxiety" if she has not heard about a loved one after a while, and "begin[s] fearing the worst." *Id.*

### 46. *Josephine E. Alston and Two Family Members*

On June 25, 1996, Josephine E. Alston was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Josephine E. Alston ("Alston Decl.") (Sept. 7, 2018) ¶ 4, ECF No. 32 (sealed), ECF No. 153 (public). On the night of the attack, Alston and her suitemates were in their dorm room, about three buildings away from the blast. *Id.* ¶ 5. She then "heard the loudest explosion [she has]

ever heard in [her] life. The building shook . . . [and she] was so scared." *Id.* After the blast, she "stood there in the middle of [her] bedroom in tears." *Id.* She was shocked and felt like she was in a "bad dream." *Id.* She left her room and saw the destruction. *Id.* She "didn't know what happened to" her suitemates and she made her way to the stairwell to exit the building. *Id.* "People were bleeding[,] and everyone was running, crying and trying to figure out what happened." *Id.* She eventually arrived at the "medical area to have the glass [she] had stepped on while escaping the building taken out of [her] foot." *Id.* Alston volunteered after the attack to "search the damaged buildings." *Id.* ¶ 6. "Seeing all the blood and destruction is something that will remain etched in [her] memory forever." *Id.* She has had "trouble sleeping since the attack, and [she] take[s] over the counter sleep aids to help [her] sleep." *Id.* ¶ 7. Alston "was in severe pain immediately following the injury," and is seeking a disability rating from the VA. *Id.* Alston received the Purple Heart for wounds received in action. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 32 at 9; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 32 at 7.

Two of Alston's family members are plaintiffs in this lawsuit: her daughter, Brittany R. Alston; and her son, Marcus A. Alston. Brittany Alston was a child when she first learned of the attack on Khobar Towers. Decl. of Brittany R. Alston ("Brittany Alston Decl.") (Sept. 21, 2018) ¶ 5, ECF No. 32 (sealed), ECF No. 153 (public). Her father explained to her that "[her] mom's building was bombed and that [her] mother was injured in her foot." *Id.* He told her of "[her] mother's bravery in going back into the building to help others injured by the bomb despite being injured herself." *Id.* When Brittany Alston's mother returned, she was "incredibly distant, withdrawn, and significantly less nurturing." *Id.* ¶ 7. She believes her mother's "emotional and mental scarring" affected their personal relationship and contributed to her parent's divorce. *Id.*

¶¶ 6–7.  She attributes her mother's "overall decline in the ability to show emotion, bond with people, and have empathy towards the difficult times of others" to the attack.  *Id.* ¶ 8.  The relationship she has with her mother "is still actively impacted by this tragic event." *Id.*  The effects of the attack on Brittany Alston's "daily life and family life" were "devastating." *Id.* ¶ 6.  She "needed counseling services privately and in school to help [her] cope with everything." *Id.* ¶ 7.  She also began "to have screaming fits in the middle of the night, yelling for [her] mother when [she] was living with my father" and she knew her mother was away. *Id.*  As a result of the attack, her "own mental health" was affected and she felt "extremely uneasy" whenever her mother was away from home for an extended period. *Id.*

Alston's son, Marcus A. Alston, was two years old on the day of the attack.  Decl. of Marcus A. Alston ("Marcus Alston Decl.") (Dec. 19, 2018) ¶ 5, ECF No. 32 (sealed), ECF No. 153 (public).  He has "little to no memory of the attack," but remembers that in the years after the attack his mother "ha[d] migraine headaches, and [was] hyper-vigilant and over protective." *Id.*  He had a "difficult upbringing" as a result of his mother's "anxiety and hypervigilance." *Id.*  The attack created a "strain, nervousness, and anxiety" on his life because he "grew up with a parent who was continuously" distressed. *Id.* ¶ 6.  His mother's "experiences and injuries had a profoundly negative impact on [their] relationship." *Id.* ¶ 7.

### 47. *Angel M. Ayala and Three Family Members*

On June 25, 1996, Angel M. Ayala was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Angel M. Ayala ("Ayala Decl.") (Oct. 8, 2018) ¶¶ 4, ECF No. 33 (sealed), ECF No. 155 (public).  On the night of the attack, Ayala was in the living room of his dormitory, next to a glass sliding door, on the second story of Building 133, which was next to the building closest to the truck

bomb. *Id.* ¶ 5. The explosion "broke the sliding glass door and blew glass shards into the room." *Id.* ¶ 6. The force of the blast knocked Ayala unconscious, and when he woke up, "it was dark and [his] entire left side was numb." *Id.* He had "sustained glass shrapnel wounds to the left side of [his] face, neck, and abdomen, and the noise of the blast had perforated [his] left eardrum." *Id.* He walked into the hallway, but he "felt as if [he] was going to pass out." *Id.* ¶¶ 7–8. He saw several airmen "who appeared to be yelling at [him], but [he] couldn't hear anything." *Id.* ¶ 8. He read their lips and learned they were telling him "not to move because [he] was bleeding badly." *Id.* He "was covered in blood," and they "applied pressure over [his] body to slow the blood loss." *Id.* He was taken to the triage area, but it "was packed to capacity" and he "began having panic attacks and feeling nauseated." *Id.* ¶ 9. Ayala was taken to the hospital and "rushed into emergency surgery." *Id.* ¶ 10. After this surgery, he was then "aeromedically evacuated" to a hospital in Germany for further treatment. *Id.* ¶ 11. Ayala received treatment again in Florida and New Mexico. *Id.* ¶ 12. After two weeks, he "was processed to go home" and went "back to work as usual." *Id.* ¶ 15. Ayala had "a hard time because [he] only felt secure in [his] dormitory room." *Id.* ¶ 15. He continued to "have panic attacks, and sometimes would leave work to seek refuge in [his] dormitory room." *Id.* The attack "changed [his] life forever." *Id.* ¶ 17. Ayala had to receive "plastic surgery on [his] face and neck." *Id.* ¶ 16. His ruptured eardrum "caused hearing loss and tinnitus in [his] left ear [and he has] permanent disfiguring scars on [his] face and neck." *Id.* ¶ 17. Ayala also suffered from PTSD, with symptoms including "extreme anxiety, panic attacks, avoidance," and others. *Id.* The VA rated Ayala 40% disabled as a result of the injuries sustained in the attack. *Id.* ¶ 19; *id.*, Att. (Letter from VA, dated May 21, 2017), ECF No. 33 at 60–61; *see also id.*, Att. (medical records), ECF No. 33 at 7–53. Ayala was awarded the Purple Heart for wounds he received

during the attack. *Id.* ¶ 13; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 33 at 6; *id.*, Att. (Special Order GB-276, dated July 2, 1996), ECF No. 33 at 57.

Three of Ayala's family members are plaintiffs in this lawsuit: his father, Fernando Ayala; his mother, Zandra M. Ayala; and brother, John J. Ayala. Fernando Ayala first learned of the attack "the day after when it was on the news." Decl. of Fernando Ayala ("Fernando Ayala Decl.") (Sept. 4, 2018) ¶ 5, ECF No. 33 (sealed), ECF No. 155 (public). He experienced "extreme grief and distress" when he learned of the bombing, and he did not know whether his son was "injured or even alive." *Id.* Before he learned of his son's status, he could not "eat, sleep or work because [he] was so afraid [that he] had lost [his] oldest son." *Id.* He was unable to see his son in person until three weeks after the attack. *Id.* His son "looked like a completely different person" and "like an empty shell of a man." *Id.* Ayala's son "had untreated PTSD from that attack" and his physical wounds "were bad." *Id.* ¶ 7. Ayala helped his son "with his wound care by buying products and trying to treat him," but found it difficult to get his son the "psychological help he needed." *Id.* Ayala was financially strained as a result of his son's injuries because he "tried to support him," and "took time off work and spent money on wound care." *Id.* The injuries Ayala's son received in the attack caused "so much stress and turmoil," with "sleepless nights wondering if [his] son was going to be okay." *Id.* ¶¶ 6, 8. It has "been a horrible experience [that he] wouldn't wish on any parent." *Id.* ¶ 8.

Ayala's mother, Zandra M. Ayala, learned of the attack on the news the day after it occurred. Decl. of Zandra M. Ayala ("Zandra Ayala Decl.") (Sept. 4, 2018) ¶¶ 4–5, ECF No. 33 (sealed), ECF No. 155 (public). She "experienced extreme grief and distress when [she] found out that [her] son was injured in the attack on Khobar Towers." *Id.* ¶ 5. She "immediately began

70

to panic, and [she] did not know if he was dead or alive." *Id.* She "called military bases to get information" but several days passed before she learned her son was alive and she "feared for the worst." *Id.* The attack on her son had a "devastating" effect on her "daily life and family life." *Id.* ¶ 6. As a registered nurse, she cared for her son on his return, treating his wounds and helping him buy treatment products. *Id.* She was not able, however, to "help [her son] with his psychological problems" and he "was out of [their] control." *Id.* She had "many sleepless nights wondering if [her] son was going to be okay." *Id.*

Ayala's brother, John J. Ayala, "experienced extreme grief and distress when [he] found out that [his brother] was injured in the attack." Decl. of John J. Ayala ("John Ayala Decl.") (Oct. 18, 2018) ¶¶ 4–5, ECF No. 33 (sealed), ECF No. 155 (public). Their mother woke John Ayala up "in a panic to tell [him] about the attack," and asked him to "pray for [his] brother with her." *Id.* ¶ 5. Days later, he learned that his brother had "survived and was among the injured." *Id.* When his brother returned, it felt "like [he was] a different person" and "as if [the family] had lost him in some way." *Id.* ¶ 6. John Ayala spent many moments upset about his brother's outburst and other moments "worried about him because he couldn't sleep at night from the nightmares." *Id.* John Ayala "helped the family financially because Angel was struggling with taking care of himself." *Id.* ¶ 7. He "remember[s] times [he] couldn't sleep because [he] would worry about [Angel] hurting himself or getting into trouble with the law." *Id.* ¶ 6. It was "heart-breaking to see someone who [he] looked up to go through all that." *Id.* ¶ 7.

### 48. *Shawn R. Clevenger*

On June 25, 1996, Shawn R. Clevenger was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Shawn R. Clevenger ("Clevenger Decl.") (Sept. 30, 2018) ¶ 3, ECF No. 44 (sealed), ECF No.

172 (public).  On the night of the bombing, Clevenger was with his roommates looking out from the balcony.  *Id.* ¶ 4.  He "remember[s] the lights flickering, and then all [h]ell broke loose."  *Id.* The sliding glass door shattered, and Clevenger "grabbed [his] roommate to shield him from the glass and shrapnel."  *Id.*  When Clevenger tried to pick himself up, he "fell back to the ground with intense pain in [his] foot.  [He] looked down and saw blood all over [his] legs and the floor."  *Id.*  He was carried into the courtyard where he saw "bodies all over the yard."  *Id.* ¶ 5. Clevenger began to worry about another attack, and whether he would ever see his family again or even walk again.  *Id.* ¶ 6.  Clevenger received stitches and learned that he had a cut behind his right knee "that revealed the tendon."  *Id.* ¶ 7.  After the attack, Clevenger has struggled with crowds.  *Id.* ¶ 11.  He is "always on alert" and "[l]oud noises [and] people approaching [him] from behind, makes [his] mind race."  *Id.*  He struggles with conversations with his family, and his "anxiety gets the best of [him]."  *Id.* ¶ 12.  He has been "prescribed anti-depressants, and other medications to help deal with [his] issues."  *Id.*  Clevenger's family has witnessed his "outbreaks, and walk on pins and needles to avoid [his] triggers."  *Id.* ¶ 13.  The VA has rated Clevenger 50% disabled because of his symptoms.  *Id.*; *id.*, Att. (VA Rating Decision, dated Apr. 13, 2009), ECF No. 44 at 12–16; *see also id.*, Att. (medical records), ECF No. 44 at 17–21. Clevenger was awarded the Purple Heart for the injuries he received.  *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 44 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 44 at 6.

### 49. *Paul S. Collins*

On June 25, 1996, Paul S. Collins was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Paul S. Collins ("Collins Decl.") (Oct. 17, 2018) ¶ 3, ECF No. 45 (sealed), ECF No. 174 (public).  On the night

of the bombing, Collins was in the "Fast-Cal building," about half a mile from the explosion. *Id.* ¶ 4. "When the explosion went off, the windows in the Fast-Cal building imploded and all of the equipment on the walls and shelves [was] destroyed." *Id.* Collins "felt as though all the oxygen was pulled out of the building," making breathing difficult, so he ran outside, *id.,* where he saw "pandemonium with people running in every direction and all of the sirens going off," *id.* ¶ 5. He ran with "hundreds of other people to fox holes" for safety. *Id.* ¶ 6. Collins "felt like a trapped rat . . . and [he] still didn't know what was going on or what really happened." *Id.* He returned to the Towers in the morning and saw the bomb's damage. *Id.* ¶ 7. Over the next two weeks, Collins "assisted cleaning up debris and moving the dead bodies. While [he] was there, [he] spoke to many doctors and psychiatrists about the ordeal." *Id.* ¶ 8. Collins developed PTSD as a result of the bombing. *Id.* ¶ 9. "The trauma was so severe that it has affected every day of [his] life." *Id.* He has received "five or six inpatient treatments for drug and alcohol abuse." *Id.* Whenever he has tried to write about the attack, he "break[s] down every time and start[s] to cry." *Id.* ¶ 10. Collins is "still under psychiatric treatment and evaluation." *Id.* ¶ 11. The VA has rated Collins 70% disabled because of his PTSD. *Id.* ¶ 12; *id.*, Att. (Statement of the Case from VA, dated Sept. 28, 2009), ECF No. 45 at 9–20. Collins received the Air Force Achievement Medal for his service. *Id.* ¶ 15; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 45 at 6; *id.*, Att. (Memorandum for 46 MS, Eglin AFB, dated Nov. 1, 1996), ECF No. 45 at 21.

**50.** ***Robbie J. Cotterman***

On June 25, 1996, Robbie J. Cotterman was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Robbie J. Cotterman ("Cotterman Decl.") (Sept. 22, 2018) ¶ 3, ECF No. 46 (sealed), ECF No.

175 (public).  On the night of the bombing, Cotterman was asleep "next to building 131."  *Id.* ¶
4.  The bomb detonation shattered windows and caused Cotterman to "sustain[] lacerations on
the back of [his] right arm, right leg, and [his] back" such that his body was "completely
imbedded with glass and concrete shrapnel."  *Id.*  He received medical treatment to "remove the
glass shrapnel and suture [his] wounds."  *Id.* ¶ 5.  As a result of the attack, Cotterman is
"scarred."  *Id.*  He suffers from "anxiety and jumpiness that impact [his] life."  *Id.*  Cotterman is
in "the process of seeking a disability rating from the V.A. for PTSD."  *Id.*  Cotterman has
received the Purple Heart for the wounds he sustained in the bombing.  *Id.* ¶ 6; *id.*, Att. (Purple
Heart Certificate, dated Aug. 8, 1996), ECF No. 46 at 5; *id.*, Att. (Certificate of Release or
Discharge from Active Duty, confirming medal), ECF No. 46 at 4.

### 51. *Rose A. Davis*

On June 25, 1996, Rose A. Davis was a service member in the U.S. Air Force deployed
to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Rose A. Davis
("Davis Decl.") (Sept. 5, 2018) ¶ 3, ECF No. 47 (sealed), ECF No. 179 (public).  At the time of
the bombing, Davis was preparing for bed in the "building right next door to Building 131."  *Id.*
¶ 4.  The blast wave knocked Davis into the wall and "[e]verything went completely black and
there was no sound."  *Id.*  "Seconds later, the screaming started and everyone was trying to get
out."  *Id.*  Davis sustained lacerations and glass shrapnel wounds.  *Id.*  Davis saw her boyfriend
"bleeding profusely from several glass lacerations" outside the building and she "tended to him
to try to keep him from bleeding to death."  *Id.*  "The horrors of that night and its memories will
remain with [her] until [her] memory is gone."  *Id.* ¶ 7.  Davis suffered "chronic back pain" as a
result of the attack and has "had a series of x-rays and MRI's right before [she] retired."  *Id.* ¶ 6.
Davis also "began physical therapy and pain shots," but has "been told [she] will eventually need

surgery because the pain will never get better." *Id.* "The bombing changed [her] life forever. Since the attack, [she has] suffered from claustrophobia, nightmares and sleeping problems." *Id.* ¶ 9. The VA rated Davis 20% disabled for the physical injuries she sustained. *Id.* ¶ 8; *id.*, Att. (Letter from VA, dated June 30, 2018), ECF No. 47 at 14–15; *see also id.*, Att. (medical records), ECF No. 47 at 7–13. Davis was awarded the Purple Heart for wounds she received during the attack. *Id.* ¶ 11; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 47 at 6; *id.*, Att. (Special Order GB-725, dated Aug. 21, 1996), ECF No. 47 at 16.

### 52. *Robert L. DePyssler and One Family Member*

On June 25, 1996, Robert L. DePyssler was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Robert L. DePyssler ("DePyssler Decl.") (Oct. 19, 2018) ¶ 4, ECF No. 48 (sealed), ECF No. 181 (public). At the time of the bombing, DePyssler was "standing in building 129," "wearing a t-shirt and shorts," and the blast made him lose consciousness and "pushed [him] from where [he] was standing into the kitchen." *Id.* ¶ 5. When he regained consciousness, he "had excruciating pain throughout [his] entire body and [his] ears were ringing horribly." *Id.* DePyssler then "ran barefoot over broken glass" to a nearby building, believing another attack was imminent. *Id.* ¶ 6. When he tried to escape, he "realized [he] had jagged shards of glass in [his] feet . . . and [he] could no longer run." *Id.* He had to have pieces of glass removed from his feet, and only after several years did he regain full feeling and normal sweat glands in his feet. *Id.* Since the attack, his ears "have not stopped ringing" and he has been diagnosed with tinnitus. *Id.* ¶ 7. DePyssler has had to "read lips many times when people are talking to [him] because the ringing makes it hard to hear." *Id.* He "cannot talk about the terrorist bombing without becoming emotionally

and visually upset." *Id.* ¶ 9.  The attack has caused "turmoil in [his] marriage due to mood swings." *Id.*  He has been recently diagnosed with PTSD.  *Id.* ¶ 8.  The VA has rated DePyssler 80% disabled because of his PTSD and hearing loss.  Supp. Decl. of Robert L. DePyssler ("DePyssler Supp. Decl.") (June 6, 2019) ¶ 4, ECF No. 277-1 (sealed), ECF No. 278-1 (public); *id.*, Att. (VA Rating Decision, dated Apr. 24, 2019), ECF No. 277-2.  DePyssler received the Purple Heart for his injuries.  DePyssler Decl. ¶ 11; *id.*, Att. (Purple Heart Certificate, dated Aug. 21, 1996), ECF No. 48 at 5.

One of DePyssler's family members is a plaintiff in this lawsuit: his father, Robert W. DePyssler.  His father first learned about the attack on the news.  Decl. of Robert W. DePyssler ("Robert DePyssler Decl.") (Sept. 21, 2018) ¶ 5, ECF No. 48 (sealed), ECF No. 181 (public).  He "knew without a doubt that [his] son was involved" and he was "devastated by the news."  *Id.* He called the Pentagon to learn about his son's status, but was instructed to wait for news.  *Id.* ¶ 6.  His family members "were all crying, and pounding [him] with questions [he] couldn't answer" because "of the terror and panic [he] was experiencing."  *Id.* ¶ 7.  Within forty-eight hours, which seemed like an "eternity" to him, he finally received a call telling him that his son was injured, but alive.  *Id.* ¶ 8.  Until his son was back home, he found himself "withdrawn from many things, including participation in activities with [his] other children and wife."  *Id.* ¶ 9.  He was "finally able to reengage [his] life" when his son returned home.  *Id.*  "As a result of the attack on Khobar Towers, [he has] had to provide [his] son with emotional support."  *Id.* ¶ 10.

### 53. *Shawn F. Mohammed*

On June 25, 1996, Shawn F. Mohammed was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Shawn F. Mohammed ("Mohammed Decl.") (Sept. 10, 2018) ¶ 3, ECF No. 70 (sealed), ECF No.

214 (public).  At the time of the attack, Mohammed was on a fifth-floor balcony and "was blown through the glass door leading back into the room."  *Id.* ¶ 4.  Mohammed lost consciousness and when he came to, his "wrists and hands were badly cut up and bleeding."  *Id.*  Mohammed attempted to leave the building, but in the middle of the hallway was an injured airman who could not walk anymore.  *Id.*  Mohammed "carried him down five stories and out of the building."  *Id.*  He spent the day after the attack "going through the bombed building carrying out the dead bodies.  Some of the dead people [he] knew personally."  *Id.*  As a result of the attack, Mohammed suffers from "sleep deprivations and [has] suicidal thoughts, as well as nightmares and cold sweats."  *Id.* ¶ 5.  He has been prescribed medication for his depression and suicidal thoughts.  *Id.* ¶ 7.  The VA has rated Mohammed 30% disabled as a result of the physical injuries he sustained from the bombing.  *Id.*; *id.*, Att. (VA Rating Decision, dated July 18, 2017), ECF No. 70 at 5–7.  Mohammed received the Purple Heart for his injuries.  *Id.* ¶ 6; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 70 at 4.

### 54. *Joe D. McDonald*

On June 25, 1996, Joe D. McDonald was a Captain in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Joe D. McDonald ("McDonald Decl.") (Sept. 11, 2018) ¶ 3, ECF No. 71 (sealed), ECF No. 210 (public).  On the night of the bombing, McDonald was in his bedroom attempting to fall asleep.  *Id.* ¶ 4.  He saw a bright flash of light and then the "walls and windows were blown completely inside."  *Id.*  He "had shrapnel imbedded in [his] lower legs and ankles" due to the blast.  *Id.*  Twenty-three of his men were injured, and McDonald and others helped move them to a makeshift medical area.  *Id.*  His feet then "started to feel funny" and he realized he was bleeding profusely.  *Id.*  He did not sleep for "at least forty-six hours" after the attack.  *Id.* ¶ 5.  For McDonald, the "attack on

Khobar Towers was a life changing experience." *Id.* ¶ 12. As a result of the attack, McDonald received cuts and punctures in both of his legs, and has been diagnosed with PTSD. *Id.* ¶¶ 6–7. McDonald also suffers from hearing loss, and is unable to sleep due to his "frequent and recurring nightmares where [he] wake[s] up screaming and punching things." *Id.* ¶ 8. McDonald cannot attend "concerts or ballgames due to fear of crowds" and reacts "poorly" to what he perceives as "danger events." *Id.* The VA rates McDonald 90% disabled from his physical injuries, PTSD diagnosis, and sleep apnea. *Id.* ¶¶ 6, 9; *id.*, Att. (VA Rating Decision, dated Oct. 26, 2017), ECF No. 71 at 5–20; *id.*, Att. (Letter from VA, dated Dec. 4, 2017), ECF No. 71 at 21–22; *see also id.*, Att. (medical records), ECF No. 71 at 23–32. McDonald received the Purple Heart and Air Force Achievement Medal for the injuries he sustained. *Id.* ¶ 11; *id.*, Att. (Purple Heart Certificate, dated August 5, 1996), ECF No. 71 at 33; *id.*, Att. (Air Force Achievement Medal Certificate, dated Oct. 23, 1996), ECF No. 71 at 34.

### 55. *Erin L. Murphy*

On June 25, 1996, Erin L. Murphy was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Erin L. Murphy ("Murphy Decl.") (Sept. 10, 2018) ¶ 3, ECF No. 72 (sealed), ECF No. 215 (public). On the night of the bombing, Murphy was in her suite with her roommate. *Id.* ¶ 4. "Suddenly [they] felt an enormous rumble and shaking, and then the sliding glass door exploded into the common area." *Id.* Murphy fell behind the couch as a result. *Id.* After she found her roommate, they both helped another suitemate with a broken leg down the stairs. *Id.* ¶ 5. Murphy and others were given orders to protect the base, and she "was scared out of [her] mind." *Id.* ¶ 6. When she took her post, she could see "half of the building sheared off, and very large blood splatter out the top floor window on the back side of the building." *Id.* ¶ 7. Murphy remembers feeling

"fearful, sad[], helpless, and angry." *Id.* ¶ 8. She remembers "hand prints on the walls, pools of dried blood with flies feeding on it, and the smells of backed up bathrooms and rotten food." *Id.* ¶ 10. She "lived that bombing every day for the next ninety days, never getting away from it." *Id.* Murphy's life "changed forever" after the attack. *Id.* ¶ 11. She suffers from "insomnia, flashbacks, depression and anxiety [and has] experienced difficulties in personal and work relationships." *Id.* ¶ 14. Murphy has been diagnosed with PTSD. *Id.* ¶¶ 12, 14. The VA rates Murphy 60% disabled as a result of her PTSD and depressive disorder, knee injury, and tinnitus. *Id.* ¶ 14; *id.*, Att. (Letter from VA, dated June 21, 2018), ECF No. 72 at 14; *id.*, Att. (VA Rating Decision, dated Jan 23, 2017), ECF No. 72 at 7–8. Murphy received an Air Force Commendation Medal for her bravery. *Id.* ¶ 15; *id.*, Att. (Air force Commendation Medal Certificate, dated Jan. 14, 1997), ECF No. 72 at 17.

### 56. *Michael J. Rusnak*

On June 25, 1996, Michael J. Rusnak was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Michael J. Rusnak ("Rusnak Decl.") (Sept. 14, 2018) ¶ 3, ECF No. 73 (sealed), ECF No. 227 (public). At the time of the bombing, Rusnak was leaving the building and walking to the gym. *Id.* ¶ 4. He noticed the lights flicker and felt "as if [he] had been picked up and thrown against the exterior wall of the adjacent building." *Id.* Rusnak does not remember the next sequence of events, but he remembers "[p]eople were running in all directions, with unbelievable injuries." *Id.* Rusnak also had wounds and felt as if his "head had been hit with a bat." *Id.* ¶ 5. After receiving treatment, he returned to the building to help others. *Id.* Ever since the night of the bombing, Rusnak has had the same nightmare, waking up in "a sweat [and] in terror." *Id.* ¶ 6. "Since the day of the attack, [he has] suffered from serious physical and mental injuries,

concussions, back and neck trauma, chronic headaches, memory loss from the traumatic brain injury, PTSD[,] as well as neurologic and orthopedic conditions." *Id.* ¶ 9. Rusnak's doctors have told him that his injuries "will never go away and will never get better." *Id.* ¶ 10. Rusnak is also diagnosed with PTSD and severe depression. *Id.* ¶ 11. Rusnak takes medication for his mental symptoms every day, and without it, "the anxiety creeps up on [him] at night, and the dreams come back." *Id.* The VA has rated Rusnak 100% disabled as a result of his physical and mental injures. *Id.* ¶ 13; *id.*, Att. (Letter from VA, dated Feb. 4, 2016), ECF No. 73 at 240; *id.*, Att. (VA Rating Decision, dated Nov. 3, 2015), ECF No. 73 at 285–89; *see also id.*, Att. (medical records), ECF No. 73 at 9–176, 178–95, 201–08, 219–39. Rusnak received the Air Force Commendation Medal. *Id.* ¶ 15; *id.*, Att. (Citation to Accompany Air Force Commendation Medal, undated), ECF No. 73 at 196; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 73 at 7–8.

### 57. *Matthew E. McEndree*

On June 25, 1996, Matthew E. McEndree was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Matthew E. McEndree ("McEndree Decl.") (Sept. 11, 2018) ¶ 3, ECF No. 74 (sealed), ECF No. 211 (public). On the night of the bombing, McEndree was in his room on the fifth floor of the building that "took a direct hit from the explosion." *Id.* ¶ 4. The explosion "threw [him] from one side of the room to the other," causing him to sustain a Traumatic Brain Injury ("TBI") and lacerations to his "head, arms, neck, back, legs, and feet." *Id.* While providing assistance to other injured occupants in the building, McEndree saw a "friend of [his] and fellow Airman[] die[] in front of [him]." *Id.* McEndree was awarded the Purple Heart and an Air Force Commendation Medal for his injuries and heroism. *Id.* ¶¶ 8, 9; *id.*, Att. (Purple Heart Certificate,

dated Aug. 6, 1996), ECF No. 74 at 14; *id.*, Att. (Air Force Commendation Medal Certificate, dated Nov. 27, 1996), ECF No. 74 at 18. After the attack, McEndree was "in shock and in extreme pain" and was taken to the hospital for "procedures to remove glass from [his] foot, [receive] numerous sutures and treatments for TBI." McEndree Decl. ¶ 4. McEndree's life "changed forever" after the attack. *Id.* ¶ 5. McEndree suffers from depression, anxiety, and PTSD, and is "still suffering from night terrors at least twice a month from that night, twenty-two years ago." *Id.* Since the attack, McEndree has "lived with concentration difficulties that cause [him] to repeat simple tasks over and over again." *Id.* ¶ 6. The VA has rated McEndree 30% disabled for PTSD and gives him a combined rating of 60%. *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated July 15, 2018), ECF No. 74 at 7.

### 58. *Scott A. Miller*

On June 25, 1996, Scott A. Miller was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Scott A. Miller ("Scott Miller Decl.") (Sept. 11, 2018) ¶ 3, ECF No. 75 (sealed), ECF No. 213 (public). On the night of the bombing, Miller was in his bedroom reading a book. *Id.* ¶ 5. Then, the walls and the ceiling in his room began to shake, and the window and large wall locker next to his bed were blown on top of him. *Id.* After freeing himself, Miller escaped his room with his roommate. *Id.* ¶ 6. As they escaped, Miller discovered that "glass shrapnel from the window had cut [his] arms, legs, and feet." *Id.* Miller was in a "state of terror and shock." *Id.* He saw "increasingly worse damage, blood, friends with broken bones, lacerations, head injuries, and bodies being carried out on stretchers." *Id.* "The mental and emotional damage that [he] sustained from the Khobar Towers attack was immediate [and] severe." *Id.* ¶ 9. As a result of the attack, Miller left active duty at the end of his first enlistment. *Id.* ¶ 8. Counselors told

Miller that he was suffering from "PTSD and Survivor's Guilt." *Id.* ¶ 9. For the first ten years after the attack, "[his] depression, anxiety, panic attacks, and aversion to sudden loud noises were frequent and severe to the point of limiting [his] ability to perform at [his] job without massive stress and exhaustion." *Id.* ¶ 10. Miller's "quality of life has been severely compromised because of the trauma of [the attack] and the pain, depression, and anxiety that came with it." *Id.* ¶ 13. Miller was awarded the Purple Heart for injuries received in action. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 75 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 75 at 6.

### 59. *Ronald W. Neldon*

On June 25, 1996, Ronald W. Neldon was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Ronald A. Neldon ("Neldon Decl.") (Sept. 12, 2018) ¶ 3, ECF No. 76 (sealed), ECF No. 216 (sealed). At the time of the bombing, Neldon was approximately "two hundred yards from the blast site." *Id.* ¶ 4. After the blast, Neldon "self-attended [his] wounds and labored on" to clear the building. *Id.* Neldon "helped provide security, searched and cleared more dormitories, and provided logistical support to posted sentries while performing first aid to critically injured service members." *Id.* As a result of the attack, Neldon suffered lacerations and glass shrapnel wound injuries to his body. *Id.* ¶ 6. He experienced "minor numbness in [his] right ear" that is "still bothersome to this day." *Id.* ¶ 7. Neldon was also diagnosed with PTSD, for which he is being treated. *Id.* ¶ 8. Since the attack, Neldon has trouble sleeping a full night without his prescribed medication and is hypervigilant and "easily startled." *Id.* ¶¶ 10, 13. The VA has rated Neldon 30% disabled because of his PTSD. *Id.* ¶ 14; *id.*, Att. (VA Rating Decision, dated Jan. 30, 2004), ECF No. 76 at 9. Neldon was awarded the Purple Heart for his injuries. *Id.* ¶ 15; *id.*,

Att. (Purple Heart Certificate, dated Nov. 13, 1996), ECF No. 76 at 10; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 76 at 7.

**60.** *Jennifer R. Parker*

On June 25, 1996, Jennifer R. Parker was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Jennifer R. Parker ("Parker Decl.") (Sept. 17, 2018) ¶ 3, ECF No. 77 (sealed), ECF No. 220 (public). On the night of the bombing, Parker was in her living room talking to other service members when she heard a large sound, "louder than anything [she] had ever heard." *Id.* ¶ 4. She was hit by glass from the sliding glass doors of the patio. *Id.* The back of her head was "bleeding profusely," and a t-shirt was placed on the back of her head "to hold pressure." *Id.* She "remember[s] seeing blood everywhere." *Id.* Parker was transported to a hospital where she received stitches in both of her legs and the back of her head. *Id.* ¶ 5. She did not receive stitches for cuts on her face, and she now has scars on her face and her head. *Id.* ¶ 5. Parker has "been in therapy on and off since the bombing." *Id.* ¶ 6. Parker was diagnosed with depression and continues to suffer from "bouts of depression brought on by anger, survivors' guilt, and memories." *Id.* ¶¶ 7–8. She was medically retired from the Air Force due to an episode of major depression. *Id.* ¶ 8. The VA has rated Parker 80% disabled for her major depression and PTSD. *Id; id.*, Att. (Letter from VA, dated Mar. 14, 2018), ECF No. 77 at 30–31; *see also id*., Att. (medical records), ECF No. 77 at 7–29. Parker received the Purple Heart for the injuries she sustained. *Id.* ¶ 5; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 77 at 6; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 75 at 5.

**61.** *Mary E. Ortiz*

On June 25, 1996, Mary E. Ortiz was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Mary E. Ortiz ("Ortiz Decl.") (Nov. 7, 2018) ¶ 3, ECF No. 78 (sealed), ECF No. 219 (public). At the time of the bombing, Ortiz was on the first floor of a building that was near Building 131 and then felt a "painful blast from behind [that] felt like thousands of needles were hitting [her]." *Id.* ¶ 4. She feared she would never see her family again. *Id.* She was "covered in blood from a wound on [her] head and lacerations on [her] body," and was transported to the hospital to receive treatment and stitches. *Id.* ¶¶ 4, 5. As a result of the bombing, Ortiz is "hypervigilant when in public" and experiences "panic whenever an event such as a terrorist attack or shooting occurs." *Id.* ¶ 5. Ortiz suffers from PTSD, avoids crowds and fears public places. *Id.* The VA has rated Ortiz 60% disabled because of her PTSD. *Id.*; *id*, Att. (Letter from VA, dated Jan. 22, 2018), ECF No. 78 at 6; *see also id*., Att. (medical records), ECF 78 at 10–30. Ortiz received the Purple Heart for her injuries. *Id.* ¶ 6; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 78 at 9; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 78 at 4.

**62. *Dustin J. Rhode and One Family Member***

On June 25, 1996, Dustin J. Rhode was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Dustin J. Rhode ("Rhode Decl.") (Sept. 20, 2018) ¶ 4, ECF No. 79 (sealed), ECF No. 223 (public). At the time of the bombing, Rhode was in his bedroom, when he heard the explosion and then watched as the "floors of the building came crashing down, pancake style, from the top of the building downward, one floor on top of another." *Id.* ¶ 5. He thought he would be crushed by the collapsing building and used a large bag to shield his body. *Id.* He left the building, "trailing

blood," and sought refuge elsewhere.  *Id.*  When he learned details of the attack, he was "in shock and the reality of what had happened hit [him]."  *Id.* ¶ 6.  As a result of the attack, Rhode sustained "multiple lacerations and glass shrapnel wounds and trauma to [his] body, most specifically [his] legs and feet."  *Id.* ¶ 7.  Years later, Rhode is "severely scarred and traumatized" because of the attack.  *Id.* ¶ 8.  He is "sad" and "dreams of the friends [he] lost" during the attack.  *Id.*  Rhodes received the Purple Heart for his injuries.  *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 79 at 4.

One of Rhode's family members is a plaintiff in this lawsuit: his mother, Laurie R. Rhode.  Laurie Rhode was at work when she learned of the attack.  Decl. of Laurie R. Rhode ("Laurie Rhode Decl.") (Nov. 8, 2018) ¶ 4, ECF No. 79 (sealed), ECF No. 223 (public).  She continued to work in "disbelief," and when she went home later that evening, she could not sleep as she waited to hear news about her son's "whereabouts and safety."  *Id.*  She only learned that her son was alive but injured when he called her the next morning.  *Id.* ¶ 5.  After hearing from her son, she was "relieved and full of tears."  *Id.*

### 63. *Eric A. Castor and Three Family Members*

On June 25, 1996, Eric A. Castor was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Eric A. Castor ("Castor Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 97 (sealed), ECF No. 170 (public); *see also* Plaintiff Eric A. Castor's Notice of Errata (Jan. 24, 2019), ECF No. 133 (sealed), ECF No. 171 (public).  At the time of the bombing, Castor was sitting at his desk on the fifth floor of Building 131 until "[t]he next thing [he] realized," the windows in the room and the wall behind him "totally vaporized."  Castor Decl. ¶ 5.  Castor was "blown out of [his] office chair and slammed into the ceiling," breaking his ribs.  *Id.*  He fell to the floor, "over ten feet from where [he] was

sitting," leading to an injured shoulder. *Id.* The chair protected parts of Castor's body, but the rest of his body "was penetrated with glass and cement shrapnel." *Id.* Castor noticed a large piece of glass sticking out of his arm, and as he attempted to stand up and flee the room, the glass moved deeper into his arm and "created a large arterial bleed." *Id.* ¶ 6. Castor fled the building and also helped a fellow injured service member escape. *Id.* Outside the building, Castor could hear "horrible screaming sounds." *Id.* As a result of the bombing, Castor sustained fractures in his chest and "extreme glass [and] concrete shrapnel [wounds] all over [his] body." *Id.* ¶ 7. He has undergone multiple surgeries in order to remove the foreign objects, and as a result, has "limited mobility of [his] neck, and [his] right arm has nerve damage." *Id.* ¶ 8. Castor was also diagnosed with anxiety disorder and suffers from "violent mood swings," which have adversely affected his relationship. *Id.* ¶¶ 7–8, 10. The VA has rated Castor 60% disabled as a result of his anxiety disorder and physical injuries. *Id.* ¶ 8; *id.*, Att. (VA website displaying Total Combined Disability), ECF No. 97 at 85; *see also id.*, Att. (medical records), ECF No. 97 at 5–84. Castor received the Purple Heart for his injuries. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 97 at 86.

Three of Castor's family members are plaintiffs in this lawsuit: his father, Kenneth R. Castor Jr.; his mother, Nancy J. Castor; and sister, Laura L. Castor. Kenneth Castor first learned of the attack when his wife told him to watch the news. Decl. of Kenneth R. Castor ("Kenneth Castor Decl.") (Nov. 1, 2018) ¶ 5, ECF No. 97 (sealed), ECF No. 170 (public). He was "truly shocked and nervous," and afraid for his son. *Id.* When he was informed that his son was alive but injured with "over one hundred stitches," the "anguish was overwhelming." *Id.* After the attack, Kenneth Castor and his wife "helped [their son] with his wound care, personal hygiene, and meal preparation." *Id.* ¶ 6. He was "crushed with sadness thinking about [his] son's

suffering at such a young age." *Id.* ¶ 7. The effects of the bombing had a "devastating" impact on their family's daily life. *Id.* ¶ 8. Kenneth Castor "endure[s] anxiety" when watching the news, and as a result of the attack, he "cannot totally relax." *Id.* He had to take time off from work to help care for his son after the bombing. *Id.* ¶ 9. Kenneth Castor has "endured extreme mental pain, suffering, grief and anguish, and sustained emotional injuries and loss." *Id.*

Castor's mother, Nancy J. Castor, learned of the attack when a friend called to ask her where her son was deployed and told her to turn on the news. Decl. of Nancy J. Castor ("Nancy Castor Decl.") (Nov. 1, 2018) ¶ 5, ECF No. 97 (sealed), ECF No. 170 (public). "Panic immediately set in" for Nancy Castor, and she stayed "glued to the news trying to get information." *Id.* She worried about her son's status as the "numbers of injured or dead kept increasing." *Id.* She was in "anguish being left in limbo for over twenty-four hours" after the attack, not knowing about her son. *Id.* ¶ 6. When she learned that her son was alive, she took time off from work to travel to the Florida hospital where he was located. *Id.* ¶ 7. Nancy Castor "did everything within [her] reach to support him" and assisted with caring for his wounds. *Id.* The attack has changed "many things" in her life. *Id.* ¶ 8. She is "immediately overwhelm[ed]" with anxiety whenever she thinks about the attack, and as a result, she has become "overprotective of [her] loved ones." *Id.* She also has "enormous anguish," which has "impaired [her] ability to experience and enjoy daily happiness." *Id.* ¶ 9.

Castor's sister, Laura Washer, learned of the attack during a news broadcast. Decl. of Laura L. Washer ("Laura Washer Decl.") (Nov. 12, 2018) ¶ 5, ECF No. 97 (sealed), ECF No. 170 (public). The hours waiting to learn whether her brother was alive or dead were "devastating and heart wrenching." *Id.* The next day, their family learned that her brother was alive and injured, and he would be flown to Germany for treatment. *Id.* ¶ 6. Washer was

eighteen years old at the time and "could not emotionally deal with the thought of seeing [her] brother in such pain." *Id.* ¶ 7. Seeing her brother after the attack, in "as much physical pain as he was, was truly a life altering time for [her]." *Id.* Washer flew to the hospital to be with her brother, and she remembers "picking glass out of his head, arms and neck with tweezers daily, and sitting with him talking about his thoughts and feelings of what happened." *Id.* ¶ 8. It is "heartbreaking" and "upsetting" for her to know that their family had to "go through this traumatic ordeal." *Id.* ¶ 9. Washer continues to experience "extreme grief and distress" as a result of the attack and her brother's injuries. *Id.* ¶ 10.

### 64. *Andrea D. Richards*

On June 25, 1996, Andrea D. Richards was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Andrea D. Richards ("Richards Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 98 (sealed), ECF No. 224 (public). On the night of the bombing, Richards was in her bedroom located in Building 131. *Id.* ¶ 4. When the blast occurred, she "felt the building shaking and felt it collapsing," and she "thought [she] was going to die." *Id.* She struggled to breathe and felt pain throughout her body and her head. *Id.* After the blast, Richards retrieved her medic bag, and began helping individuals in need. *Id.* ¶¶ 4, 5. Richards helped triage injuries and control the bleeding of other service members she encountered. *Id.* ¶¶ 5, 6. She remembers the "guilt of not being able to move and work faster" due to the pain and fatigue that she felt. *Id.* ¶ 9. After helping others, Richards was able to get treatment for own wounds. *Id.* ¶ 11. As a result of the attack, Richards "suffered severe disabling injuries" and developed PTSD which "has severely impacted [her] life to this day." *Id.* ¶ 3. Richards sustained multiple lacerations and wounds to her body, and suffered painful bruising on her upper front thighs and a hematoma on the back of her head. *Id.*

¶ 12. Due to her thigh injuries, Richards suffers from vascular disease on her left leg. *Id.* ¶ 14. She also endures chronic pain and has "a lot of cognitive problems," as well as "problems with mood, emotions, and memory" and trouble "sleeping from nightmares" due to her PTSD. *Id.* ¶¶ 13, 15. The VA has rated Richards 70% disabled for PTSD and 20% disabled for her left leg peripheral vascular disease. *Id.* ¶¶ 14–15; *id.*, Att. (VA Rating Decision, dated June 1, 2012), ECF No. 98 at 8; *see also id.*, Att. (medical records), ECF No. 98 at 9–44. Richards was awarded the Purple Heart and Air Force Commendation Medal. *Id.* ¶ 17; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 98 at 7; *id.*, Att. (Air Force Commendation Medal Certificate, dated June 26, 1996), ECF No. 98 at 45.

### 65. *Kevin J. Pflaum and One Family Member*

On June 25, 1996, Kevin L. Pflaum was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Kevin L. Pflaum ("Pflaum Decl.") (Dec. 18, 2018) ¶ 3, ECF No. 99 (sealed), ECF No. 221 (public). At the time of the bombing, Pflaum was getting ready for bed but was "thrown across the room from the impact of the blast." *Id.* ¶ 5. He received shrapnel wounds to his right leg, thigh, torso, and face. *Id.* Pflaum got out of the building and then "blacked out." *Id.* When he woke up, he was being transported to the hospital. *Id.* ¶ 6. After "eight days of recovery," Pflaum had his stiches removed and returned to work. *Id.* ¶ 7. He feels "blessed to still be alive," but still has "nightmares and wake[s] up with cold sweats." *Id.* ¶ 8. The VA has rated Pflaum 10% disabled for his physical injuries. *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated Aug. 3, 2005), ECF No. 99 at 6. Pflaum received the Purple Heart for his injuries. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 99 at 7.

One of Pflaum's family members is a plaintiff in this lawsuit: his wife, Donna Pflaum. Donna Pflaum learned of the attack when uniformed men appeared outside her home. Decl. of Donna Pflaum ("Donna Pflaum Decl.") (Dec. 18, 2018) ¶ 5, ECF No. 99 (sealed), ECF No. 221 (public). She became "full of fear" and "distraught" after the men told her that they did not have additional information, but they believed her husband was dead. *Id.* Donna Pflaum had hope and waited to receive more information. *Id.* ¶ 6. The next morning, she received a call from Pflaum informing her that he was alive. *Id.* After several months, she was able to see her husband again, and it "felt like a dream to finally see him, touch him, and hold him again." *Id.* After Pflaum deployed again, Donna Pflaum was "fearful that he wouldn't return," and this experience made her "appreciate life more." *Id.* As a result of the bombing and the injuries her husband sustained, Donna Pflaum continues to experience "extreme grief and distress." *Id.* ¶ 7.

**66. *Dusty L. Huntley and Three Family Members***

On June 25, 1996, Dusty L. Huntley was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Dusty L. Huntley ("Huntley Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 100 (sealed), ECF No. 199 (public). At the time of the attack, Huntley was getting ready for work when he "heard and felt the blast," and heard others screaming. *Id.* ¶ 5. After the attack, Huntley helped other airmen by providing "buddy care aid." *Id.* ¶ 6. He "witnessed first-hand the bulk of the casualties because [he] helped carry many of them" and assisted the wounded for about four hours before learning that he was "listed as MIA." *Id.* After the attack, Huntley began to have PTSD symptoms as a result of "witnessing the pain and suffering of [his] fellow Airmen." *Id.* ¶ 7. He began to have "terrible mood swings, nightmares, depression, and problems sleeping," and other symptoms for which he has received treatment. *Id.* ¶¶ 7, 9. The VA has rated Huntley 50% disabled for PTSD.

*Id.* ¶ 10; *id.*, Att. (Letter from VA, dated Dec. 14, 2017), ECF No. 100 at 15; *see also id.*, Att. (medical records), ECF No. 100 at 6–14. Huntley was awarded an Air Force Commendation Medal. *Id.* ¶ 11; *id.*, Att. (Citation to Accompany the Award of the Air Force Commendation Medal, undated), ECF No. 100 at 16; *id.*, Att. (Service Medal Award Verification, undated), ECF No. 100 at 17–19; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 100 at 5.

Three of Huntley's family members are plaintiffs in this lawsuit: his wife, Roberta A. Huntley; and his sons, Kevin L. Huntley and Kyle L. Huntley. Roberta A. Huntley first learned of the attack when she received a phone call at work informing her that there had "been an explosion" and her husband could not be found. Decl. of Roberta A. Huntley ("Roberta Huntley Decl.") (Sept. 12, 2018) ¶ 5, ECF No. 100 (sealed), ECF No. 199 (public). That phone call "changed [her] entire life." *Id.* Roberta Huntley was a "young mother of two children under the age of ten," and she "panicked" when she heard this news. *Id.* After "forty-five minutes of sheer terror," she learned her husband had been found helping the injured. *Id.* When her husband returned home, she noticed he was "different." *Id.* ¶ 6. His emotions "seemed to get the best of him" and "he jumped in his sleep." *Id.* She "never knew which person [she] was going to be with" and what emotional state that he would present on a given day. *Id.* ¶ 7. Later, they learned PTSD was the "root cause" of her husband's issues and it put her on "the path of trying to understand how to deal with it." *Id.* ¶ 8. "Some days[,] it is more than [she] can even understand." *Id.* ¶ 9. Roberta Huntley continues to experience "extreme grief and distress" as a result of her husband's injuries. *Id.* ¶ 10.

Huntley's son, Kevin L. Huntley, learned of the extent of his father's injuries after his father returned home and he noticed that his "father wasn't doing ok after all." Decl. of Kevin L.

Huntley ("Kevin Huntley Decl.") (Sept. 8, 2018) ¶ 6, ECF No. 100 (sealed), ECF No. 199 (public). Kevin Huntley saw that after the attack, his father "became more jumpy and emotional" and did not "want to do as many things as he did before." *Id.* He saw that his father had to sleep with "his arm [] over his eyes and to have a blanket cover his face and upper body" in order to sleep without having "flashback dreams" or night terrors. *Id.* Kevin Huntley believed his father's symptoms were "taking a toll on [his] parent's relationship." *Id.* ¶ 7. He remembers "telling [his parents] to stop arguing at the top of [his] lungs." *Id.* "Seeing all the emotional stress that attack put on him made [Kevin Huntley] feel as if [he] needed to grow up faster to control situations that would escalate, and calm and comfort him in his time of need." *Id.* As a result of his father's symptoms, his father was not as present in his life as he was for his younger brother. *Id.* ¶ 8. Kevin Huntley continues to experience "extreme grief and distress" as a result of his father's injuries. *Id.* ¶ 9.

Huntley's youngest son, Kyle A. Huntley, remembers learning of the attack when his mother told him and his brother of the incident. Decl. of Kyle A. Huntley ("Kyle Huntley Decl.") (Sept. 13, 2018) ¶ 5, ECF No. 100 (sealed), ECF No. 199 (public). Kyle Huntley was young when his father returned home but remembers that "he would get very sad at times and go to the bedroom where it was quiet." *Id.* ¶ 6. He remembers walking by his father's bedroom and seeing him sitting down and crying. *Id.* Seeing his father "emotionally break down" was difficult and Kyle Huntley knows that "the attack affected him in ways [he] will never understand." *Id.* ¶¶ 6, 7. It makes him "feel helpless" when he sees the emotions on his father's face because he "can't do or say anything to make him feel better." *Id.* ¶ 8. Kyle Huntley continues to experience "extreme grief and distress" as a result of his father's injuries. *Id.* ¶ 9.

**67.** *Selena P. Zuhoski and One Family Member*

On June 25, 1996, Selena P. Zuhoski was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Selena P. Zuhoski ("Zuhoski Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 104 (sealed), ECF No. 260 (public). At the time of the bombing, Zuhoski was in the Khobar Towers recreational center sitting with her friends when the lights flickered and "there was a deep, muffled boom." *Id.* ¶ 5. She was slammed against a wall and briefly knocked unconscious, causing her to sustain a traumatic brain injury. *Id.* When she woke up, she "noticed tables and chairs turned over [and] thick, gray, smoke-like debris was blowing in through the small windows along the top part of the building." *Id.* Zuhoski and others started to move in the direction of the bombing, and as she went, Zuhoski provided aid to the injured by helping apply pressure to wounds or alerting medics of those in need of critical care. *Id.* ¶¶ 6–9. After helping pick up glass and find spaces for the survivors, Zuhoski was prescribed medication so that she could sleep. *Id.* ¶ 10. After the bombing, Zuhoski returned home, "continued to have episodes" and still had trouble sleeping. *Id.* ¶ 11. At work, her "performance began to decline" as she had a short temper and was frequently frustrated with co-workers and supervisors. *Id.* ¶ 12. She often cried at work and at home, and "argued daily with [her] husband." *Id.* Within a year of her return, she was divorced from her husband. *Id.* After a series of tests, Zuhoski learned that her "spells" were a result of "frontal lobe epilepsy." *Id.* ¶ 13. Since then, Zuhoski has been receiving treatment for seizures. *Id.* Today, Zuhoski still has nightmares and wakes up "screaming or crying." *Id.* ¶ 15. She has a "difficult time going to unfamiliar places and places with crowds of people" and she suffers from "cognitive and memory issues." *Id.* ¶¶ 15, 18. The VA has rated Zuhoski 80% disabled for PTSD, traumatic brain injury, psychomotor epilepsy, obstructive sleep apnea, and adjustment disorder. *Id.* ¶ 20; *id.*, Att. (VA Rating Decision, dated Jan. 13, 2016), ECF No. 104 at 104–05;

*see also id.*, Att. (medical records), ECF No. 104 at 11–83. Zuhoski was awarded the Purple Heart and the Airman's Medal. *Id.* ¶ 21; *id.*, Att. (Purple Heart Certificate, dated Jan. 5, 2005), ECF No. 104 at 10; *id.*, Att. (Airman's Medal Certificate, dated May 7, 1999), ECF No. 104 at 107.

One of Zuhoski's family members is a plaintiff in this lawsuit: her mother, Linda L. Robinson. Linda Robinson first learned about the attack from her husband, after a parent in another state called him to inform him of the bombing. Decl. of Linda L. Robinson ("Linda Robinson Decl.") (Dec. 27, 2018) ¶ 5, ECF No. 104 (sealed), ECF No. 260 (public). Linda Robinson had "horrible nightmares and worried constantly about how [the] terrible event was going to affect [her] daughter." *Id.* She later learned that her daughter was alive but continued to "feel anguish" when she saw news of the attack on TV. *Id.* When her daughter returned home, it was "very hard to talk to her." *Id.* ¶ 6. Her daughter would "start crying out of nowhere" and "mentally drifted away in the middle of [their] conversations." *Id.* Linda Robinson felt "helpless" because she could not help her daughter. *Id.* As a result of the attack, Linda Robinson has "endured extreme mental pain, suffering and anguish" and lives in fear of her daughter experiencing stronger and frequent seizures. *Id.* ¶ 7. Her emotional injury is "a deep wound that does not heal." *Id.* She continues to experience "extreme anguish" as a result of her daughter's injuries. *Id.* ¶ 8.

### 68. *Michael R. Jay and Two Family Members*

On June 25, 1996, Michael R. Jay was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Michael R. Jay ("Jay Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 105 (sealed), ECF No. 200 (public); *see also* Plaintiff Michael R. Jay's Sealed Notice of Errata Regarding Michael R. Jay's Declaration, ECF

No. 127; Plaintiff Michael R. Jay's Notice of Errata Regarding Michael R. Jay's Declaration, ECF No. 201. At the time of the bombing, Jay was in his bedroom preparing to go to the gym but "[m]oments later, [he] was unconscious lying face down with a metal locker on [his] back." *Id.* ¶ 5. When he regained consciousness, Jay saw that the "entire front wall of [his] bedroom was gone . . . [and] the fourth floor was hanging over into the open area of [his] room." *Id.* As a result of the bombing Jay sustained lacerations and shrapnel wounds to his body and head, traumatic brain injury and a concussion, and lost his left ear. *Id.* ¶ 6. Jay became "disfigured and scarred" because of the scarring to his ear, scalp, arms and legs. *Id.* ¶ 7. Since the bombing, he has become withdrawn from people and he is unable to "experience normal relationships" with his loved ones. *Id.* He has missed days of work because of his "headaches and chronic pain." *Id.* Jay also developed PTSD, which made him "very moody and impatient" and led him to alienate his family. *Id.* ¶ 8. The memories of the attack and survivor's guilt "will haunt [him for] the remainder of [his] life." *Id.* Jay attends "routine counseling to deal with [his] feelings." *Id.* The VA has rated Jay 100% disabled for PTSD and related symptoms. *Id.*; *id.*, Att. (Letter from VA Regional Office, dated Mar. 9, 2012), ECF No. 105 at 28–29; *id.*, Att. (VA Rating Decision, dated Mar. 5, 2012), ECF No. 105 at 32–34; *see also id.*, Att. (medical records), ECF No. 105 at 6–26. Jay has received the Purple Heart for his injuries. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 105 at 42; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 105 at 5.

Two of Jay's family members are plaintiffs in this lawsuit: his mother, Donna L. Jay; and his father, Robert M. Jay. Donna Jay first learned of the attack from her mother. Decl. of Donna L. Jay ("Donna Jay Decl.") (Dec. 27, 2018) ¶ 5, ECF No. 105 (sealed), ECF No. 127 (public). She "feared for his life" when she did not receive a call from the Air Force about her son's

status.  *Id.*  She did not learn that her son was alive until several days later when he called to say that he was injured.  *Id.*  Although her son lived, some of his injuries are visible, "while others are not."  *Id.* ¶ 7.  Donna Jay experienced "extreme grief and distress" as a result of her son's injuries.  *Id.* ¶ 8.

After Jay's father, Robert Jay, learned of the attack, he "felt helpless [about] not being able to protect [his] son [on] that horrible night."  Decl. of Robert M. Jay ("Robert Jay Decl.") (Dec. 27, 2018) ¶ 5, ECF No. 105 (sealed), ECF No. 127 (public).  He received information about his son's condition with severe injuries, after waiting four days.  *Id.*  As a result of the attack, Robert Jay experienced grief because of his son's injuries and still worries and prays for his son's health "every single day."  *Id.* ¶¶ 6–7.

### 69. *George P. Nicolaou and One Family Member*

On June 25, 1996, George P. Nicholaou was a Senior Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of George P. Nicholaou ("Nicholaou Decl.") (Nov. 7, 2018) ¶ 4, ECF No. 117 (sealed), ECF No. 217 (public).  The bombing blew Nicholaou "between twelve to fifteen feet away from where [he] was standing."  *Id.* ¶ 5.  He was "a bit disoriented," but assessed his wounds and proceeded to assist in evacuating the building and accounting for military personnel.  *Id.*  Later, Nicholaou received stitches in his right arm and his back as a result of lacerations from large flying glass fragments embedded in his body.  *Id.* ¶ 6.  He also experienced stiffness and reduced mobility in his knees, hip and back from "being blown across the room."  *Id.*  Nicholaou developed PTSD from the attack and has been "constantly on guard" since then.  *Id.* ¶ 9.  Memories of the attack "can come back at any time" and he cannot sleep for more than four hours each night.  *Id.*  Nicholaou is startled by loud noises and he does not like large crowds.  *Id.*  The VA has rated

Nicholaou 100% disabled for his physical injuries and PTSD. *Id.* ¶ 8; *id.*, Att. (Letter from VA, dated June 7, 2018), ECF No. 117 at 8; *see also id.*, Att. (medical records), ECF No. 117 at 13–14. Nicholaou received the Purple Heart for his injuries. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 2, 1996), ECF No. 117 at 11; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 117 at 5.

One of Nicholaou's family members is a plaintiff in this lawsuit: his wife, Noreen B. Nicholaou. His wife first learned of the attack when a coworker told her to check the news because her husband's base had "just got blown up." Decl. of Noreen B. Nicholaou ("Noreen Nicholaou Decl.") (Oct. 11, 2018) ¶ 5, ECF No. 117 (sealed), ECF No. 217 (public). She immediately phoned her husband's base, but was told to go home and wait for a call when information was available. *Id.* Hours later, she received a phone call that her husband was on the list of survivors. *Id.* ¶ 6. Later in the day, she finally received a phone call from her husband informing her that "he was going to be ok[ay]." *Id.* After the attack, Noreen Nicholaou was "in and out of work" due to her inability to focus caused by the uncertainty regarding when her husband could come home. *Id.* ¶¶ 7–8. When her husband returned, she took time off from work so that she could attend his doctors' appointments with him. *Id.* ¶ 9. Her husband's PTSD has adversely affected their social lives and relationship. *Id.* ¶¶ 10–11. She finds it "very difficult" to accomplish tasks without her husband's help and she feels "emotional distress" as a result of his injuries. *Id.* ¶¶ 10–11.

**70.** *Larry Frank and Three Family Members*

On June 25, 1996, Larry Frank was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Larry Frank ("Frank Decl.") (Sept. 5, 2018) ¶ 4, ECF No. 118 (sealed), ECF No. 185 (public); *see also*

Plaintiff Larry Frank's Notice of Errata, ECF No. 135 (sealed), ECF No. 186 (public). On the night of the bombing, Frank was in the parking lot standing two hundred yards from the bombed building, Building 131, getting ready to gather his team to prepare their aircraft for the next morning's flight, when he saw the flash from the explosion. *Id.* ¶ 5. Frank "pushed one of [his] friends to the ground as the blast wave hit [them]." *Id.* Frank was pelted by debris, rocks and glass. *Id.* He was bleeding from his ears, and he could not hear the "screaming of the people running out of the burning and collapsing barracks." *Id.* "It was total chaos." *Id.* He tried to reenter the building to find his roommate, but "the room was gone." *Id.* After the explosion, Frank helped provide aid to the injured. *Id.* Later, he received treatment for the cuts to his hands and feet from the debris and shrapnel. *Id.* As a result of the attack, Frank developed "PTSD, nightmares, sleeping problems, memory loss, and flashbacks triggered by loud noise." *Id.* ¶ 7. He dropped out of college because he "just couldn't concentrate" and was "depressed and anxious and having problems at work." *Id.* He later decided to seek treatment for his PTSD. *Id.* The VA has rated Frank 80% disabled. *Id.* ¶ 8; *id.*, Att. (VA Rating Decision, dated Aug. 22, 2014), ECF No. 118 at 11–13. Frank received the Purple Heart for wounds received in action. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 118 at 14.

Three of Frank's family members are plaintiffs in this lawsuit: his wife, Sonia M. Frank; his son, Nathan R. Frank; and his daughter, Dana P. Frank. Sonia Frank first learned of the attack while she was with her children in Spain visiting her family. Decl. of Sonia M. Frank ("Sonia Frank Decl.") (Dec. 27, 2018) ¶ 5, ECF No. 118 (sealed), ECF No. 135 (public). She received two calls from her cousin in the early hours of the morning informing her about a terrorist attack on the base where her husband was stationed. *Id.* She was shocked by the phone calls and "was under terrible distress." *Id.* ¶ 6. When she turned on the television and saw the

aftermath of the attack, she "dropped to [her] knees in agony, screaming that [her] husband was gone." *Id.* She experienced such panic that she was rushed to the hospital and diagnosed with a severe panic attack, and learned that she "may have suffered a minor stroke." *Id.* ¶ 7. She spent the next few days calling her husband's base in Florida and the Pentagon. *Id.* ¶ 8. For four days, she thought her husband was dead and she had no knowledge of his status until one of his close friends called to inform her that her husband was "ok[ay]." *Id.* ¶ 9. Three days after this first phone call, she finally received a call from her husband. *Id.* She was in a "daze" and could not believe "it was him." *Id.* Her husband's return was and has been difficult due to his PTSD. *Id.* ¶¶ 10–11, 14. As a result of the attack, she is the "primary resource in handling the finances" and has had to "resign from [her] career" so that she could focus on caring for her husband and their children. *Id.* ¶ 12.

Frank's son, Nathan R. Frank, was sixteen years old at the time of the attack. Decl. of Nathan R. Frank ("Nathan Frank Decl.") (Dec. 27, 2018) ¶ 5, ECF No. 118 (sealed), ECF No. 135 (public). When he saw news of the attack on TV, the "emotions and fear were overwhelming to deal with." *Id.* He did not learn that his father was alive until a friend of his father called the family. *Id.* When his father returned home, "he was never the same." *Id.* ¶ 6. His father's fear of fireworks and large crowds "restricted [them] from everyday life." *Id.* The "mental stress and what [he and his] family had to go through was beyond what any human could handle." *Id.* Today, the attack is "still a source of pain and anguish." *Id.* ¶ 7. Nathan Frank still experiences "extreme grief and distress" as a result of the bombing. *Id.*

Frank's daughter, Dana P. Frank, was nearly twelve years old at the time of the attack. Decl. of Dana P. Frank ("Dana Frank Decl.") (Oct. 17, 2018) ¶ 5, ECF No. 118 (sealed), ECF No. 135 (public). Although she did not know all the details of the attack, she "could tell

something was wrong by the reactions on the adult's faces." *Id.* "The feeling of not knowing if [her] dad [was] dead or alive was completely horrifying." *Id.* Thinking about the attack still "brings [her] to tears." *Id.* Upon her father's return, his emotional episodes and mood changes were difficult for Dana Frank. *Id.* ¶¶ 6–7. She continues to experience "extreme grief and distress" as a result of her father's injuries. *Id.* ¶ 8.

**71.** ***Hilario C. Carrizales and Three Family Members***

On June 25, 1996, Hilario C. Carrizales was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Hilario C. Carrizales ("Carrizales Decl.") (Oct. 16, 2018) ¶ 4, ECF No. 121 (sealed), ECF No. 169 (public). At the time of the bombing, Carrizales was sitting on the couch in "a building a couple hundred feet southwest" of the explosion, when he "felt the floor vibrate" and the sliding glass doors on the balcony "came flying towards" him. *Id.* ¶ 5. He felt hot air, and Carrizales and the airman next to him were thrown against a concrete wall. *Id.* Carrizales lost consciousness, and woke up to "screams and chaos, dust and debris everywhere and darkness." *Id.* He looked at his chest and he could see a "large amount of blood collecting on [his] muscle shirt and chest[,]" with blood flowing from the back of his head and "the stinging and pain from that area and other parts of [his] body." *Id.* Carrizales was taken to a local hospital where he was treated by a doctor and received staples to the back of his head. *Id.* ¶ 7. After the bombing, Carrizales experienced headaches, dizzy spells and confusion, and was diagnosed with a concussion. *Id.* ¶ 8. Carrizales continues to experience "headaches, memory loss, difficulty focusing and reading material, and loss of some cognitive ability." *Id.* ¶ 9. He is startled easily, and he reacts poorly to loud noises and sounds. *Id.* He has been prescribed special sunglasses and pain medication to treat his headaches. *Id.* The VA has rated Carrizales 40% disabled as a

result of his injuries. *Id.* ¶ 10; *id.*, Att. (Letter from VA, dated July 20, 2018), ECF No. 121 at

13–14. Carrizales received the Purple Heart for his injuries. *Id.* ¶ 4; *id.*, Att. (Purple Heart

Certificate, dated July 2, 1996), ECF No. 121 at 11.

Three of Carrizales' family members are plaintiffs in this lawsuit: his wife, Juanita

Carrizales; and his daughters, Olivia H. Carrizales and Sarah Carrizales. His wife first learned of

the attack when she came home to over 30 messages on her answering machine. Decl. of Juanita

Carrizales ("Juanita Carrizales Decl.") (Oct. 16, 2018) ¶ 5, ECF No. 121 (sealed), ECF No. 169

(public). After listening to the first two or three messages, she turned on the TV to watch the

news. *Id.* She "experienced extreme grief and distress" when she learned that her husband was

injured in the attack. *Id.* She received a call later that night informing her that all personnel

were "accounted for," but she spent the next several days watching "the devastation left behind"

on TV and waiting to learn more about her husband's status. *Id.* ¶¶ 5–6. Juanita Carrizales

finally received a call from her husband, about three days later. *Id.* ¶ 7. When he returned, he

often complained to her about the pain in the back of his head and suffered memory loss. *Id.* ¶¶

8, 10. Juanita Carrizales has been "concern[ed]" about her husband, and the symptoms of his

injuries "affect [their] daily life." *Id.* ¶ 10.

Carrizales' daughter, Olivia H. Carrizales, was only five years old at the time of the

bombing, but she has "suffered emotionally" and continues to suffer as a result of her father's

injures. Decl. of Olivia H. Carrizales ("Olivia Carrizales Decl.") (Oct. 16, 2018) ¶ 5, ECF No.

121 (sealed), ECF No. 169 (public). The impact of the attack on her and her family "is still felt

today." *Id.* She experiences "stress" as a result of her father's memory loss and his inability to

recall his previous statements. *Id.* She continues to experience "extreme grief and distress" as a

result of the attack. *Id.* ¶ 6.

Carrizales' youngest daughter, Sarah Carrizales, was only eighteen months old at the time of the attack, but as she has grown older, the effects of the attack have had a "severe effect" on her and her father's relationship. Decl. of Sarah Carrizales ("Sarah Carrizales Decl.") (Jan. 1, 2019) ¶ 5, ECF No. 121 (sealed), ECF No. 169 (public). Growing up, Sarah Carrizales would experience anxiety whenever her father was deployed to a "hostile environment." *Id.* As a child, she "had to be careful not to make too much noise" because her father would become easily startled and uneasy. *Id.* ¶ 6. While she was growing up, her parents did not talk about the bombing, and this "made things more stressful for [her] because [she] didn't always understand what was happening." *Id.* ¶ 9. She is "worried that [her father's] memory will become worse" as a result of the injuries he sustained in the bombing. *Id.* ¶ 8. She also continues to "worry and stress" about the further medical treatments that her father will need and the strain it places on their family. *Id.* ¶ 9. She continues to experience "extreme grief and distress" as a result of the injuries he sustained. *Id.* ¶ 10.

### 72. *Kyle W. Brown and One Family Member*

On June 25, 1996, Kyle W. Brown was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Kyle W. Brown ("Brown Decl.") (Sept. 5, 2018) ¶ 4, ECF No. 38 (sealed), ECF No. 161 (public). At the time of the bombing, Brown was in Building 130 in his living room watching television, when "[a]ll of a sudden there was a bright flash and the power simontaneously [sic] went out." *Id.* ¶ 5. Brown "had a loud ringing in [his] right ear, and [he] felt something wet and sticky." *Id.* He then joined his other injured suitemates and attempted to leave the building. *Id.* "Halfway down the stairs," Brown began to feel "lightheaded and about to pass out" and a suitemate needed to assist him in leaving the building. *Id.* "Once outside, [he] sat on a curb and

prayed." *Id.* ¶ 6. Brown was then taken to a room at the on-base clinic, but was moved, as a fellow airman was "brought in on a stretcher" and the medics "us[ed] the paddles." *Id.* Afterwards, Brown was transported to an intensive care unit and received medical treatment for a "two-inch laceration on the top of [his] head, over twelve lacerations at [his] right arm, and a one-inch laceration at the base of [his] neck." *Id.* ¶ 7; *id.*, Att. (medical records), ECF No. 38 at 7–9.

Since the bombing, Brown has suffered from physical and emotional injuries. *Id.* ¶¶ 8–10. He has permanent facial scarring and "[e]very day [when he] wake[s] up . . . [and] look[s] in the mirror . . . [he is] reminded of that night by the scars on [his] face." *Id.* ¶ 8. Brown was also diagnosed with PTSD, with symptoms that make him "irritable and impatient," disturb his sleep, and affect his concentration. *Id.* ¶¶ 9–10. Although before the attack [Brown] was "laid-back," he became "irritable and impatient." *Id.* ¶ 9. He has "difficulty sleeping," as "[i]t often takes [him] one to two hours to fall asleep and even then, [Brown] awaken[s] once or twice during the night[,] which makes [him] overly tired in the morning." *Id.* His PTSD also affects his concentration and makes him "very uncomfortable around large glass windows," bothered by thunderstorms, and he "startle[s] easily, especially by sudden flashes of light," which causes him to "feel real [sic] tense" and that his "heart gets in [his] throat." *Id.* ¶ 10. Brown also suffers from hearing loss in his right ear due to recurrent tinnitus. *Id.* ¶ 8. The attack "changed [his] life forever." *Id.* ¶ 8. On July 2, 1996, Brown was awarded the Purple Heart for the wounds that he sustained in the attack. *Id.* ¶ 7.; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 38 at 6; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 38 at 10. Brown was honorably discharged from the Air Force because of his medical condition and the VA has rated Brown 30% disabled from PTSD and 10% disabled from

recurrent tinnitus. *Id.* ¶¶ 7, 11; *id.*, Att. (VA Rating Decision, dated June 22, 1999), ECF No. 38 at 12–14.

One of Brown's family members is a plaintiff in this lawsuit: his wife, Amanda Brown. Amanda Brown learned about the Khobar Towers attack when "the television news broke with a special report at around 3:00 pm." Decl. of Amanda M. Brown ("Amanda Brown Decl.") (Sept. 5, 2018) ¶ 5, ECF No. 38 (sealed), ECF No. 161 (public). She contacted First Sergeant Penny who advised her that "everyone was accounted for, but that did not indicate dead or alive." *Id.* "By 6:00 p.m. [the] other wives had heard from their husbands," but Amanda Brown still had not "heard a thing from or about" Brown and feared that "she was going to be a widow at a mere twenty years old." *Id.* Amanda Brown was unable to sleep, and as "more time dragged on without hearing from [her husband]," she began "bouncing between complete shock and feeling hopeless." *Id.* ¶ 6. At 3:30 a.m., Amanda Brown received a phone call from a friend whose husband stated that Brown was in the hospital. *Id.* This report made Amanda Brown "incredibly anxious because [she] kept wondering why hadn't [her husband] been able to call yet," and she felt that it was "the hardest night of [her] life to get through." *Id.* The next morning, on June 26, 1996, Amanda Brown received a phone call confirming that her husband was alive, and minutes later she spoke with her husband. *Id.* ¶ 7. After Brown returned home, she noticed that his "emotional [injuries] started to show up," because he was "sleeping A LOT more than usual," "[h]e wasn't interested in his usual fun activities . . . or even me," and "was noticeably putting on weight." *Id.* ¶ 8. She also noted that he "became withdrawn and not his normal happy self," and was "very concerned about being deployed again." *Id.* This has had a "devastating" impact on Amanda Brown's daily life, as she has needed to assist Brown with getting to his appointments and encouraged him to get help when "he started to get depressed." *Id.* ¶ 9. She becomes

"anxious" when Brown leaves "to go somewhere overnight." *Id.* Amanda Brown "still suffer[s] from emotional distress" because of the attack and continues to experience "extreme grief and distress" due to the "profound impact" that Brown's injuries have had on their relationship. *Id.* ¶¶ 9–10.

73. ***Dwayne Allen Burnham and Five Family Members***

On June 25, 1996, Dwayne A. Burnham was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Dwayne A. Burnham ("Burnham Decl.") (Sept. 20, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). Burnham was sleeping in Building 130 when the bomb detonated; he was "awakened by a bright flash and all Hell breaking around [him]." *Id.* ¶ 5. He initially felt a "loud ringing in [his] ears that blocked all the sound from coming to [him]" and was covered in glass from a shattered window. *Id.* When Burnham moved he could feel the glass cutting into his skin and with "[e]very breath [he] took [he] could taste and smell dust." *Id.* ¶¶ 5–6. During the "[c]haos [that] ensued as [he] exited the building," Burnham assisted in checking that everyone was evacuated and on the extent of people's injuries. *Id.* ¶ 6. He was treated for "cuts to [his] arms and glass embedded into [his] scalp," and was told to rest, but was unable to, as "'[w]hat the Hell just happened' kept going through [his] mind." *Id.* ¶¶ 7–8. After the bombing, Burnham began suffering from "excessive anxiety" and nightmares. *Id.* ¶ 10; *see also id.*, Att. (medical records), ECF No. 40 at 7–10. He is "easily startled by loud noises," and avoids "windows, fuel trucks, [and] large crowds." *Id.* His temper is "erratic" and can "erupt at any time," which has had a "tremendously negative impact on [his] family." *Id.* Burnham is aware that he is "not the same person [he] was before the attack," and that his "wife lost the husband she had before the bombing." *Id.* On August 8, 1996, Burnham was awarded the Purple Heart

for the wounds that he sustained in the attack. *Id.* ¶ 12; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 40 at 11. The VA diagnosed Burnham with PTSD and patellofemoral syndrome in each knee, for a combined service-connected disability rating of 50%. *Id.* ¶ 11; *id.*, Att. (VA Rating Decision, dated Dec. 22, 1998), ECF No. 40 at 5–6.

Five of Burnham's family members are plaintiffs in this lawsuit: his father, Ralph K. Burnham; his mother, Margaret L. Burnham; his wife, Debra E. Burnham; and his two sons, Dwight C. Burnham and Keelan C. Burnham. Burnham's father, Ralph K. Burnham, learned about the Khobar Towers attack "from the news on television." Decl. of Ralph K. Burnham ("Ralph Burnham Decl.") (Sept. 20, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). While he waited the next "eight to ten hours" for word of his son's condition, Ralph Burnham "felt that [he] was in limbo" and was "very anxious," as he "feared that [Burnham] could be severely hurt or [dead]." *Id.* ¶ 5. He received a phone call from Burnham "[a]bout a day later" that "[h]e was alive, but had suffered injuries." *Id.* As he was unaware of the "extent of these injuries," Ralph Burnham "feared the worst" and was "emotionally distressed" until he saw his son "about a month after his return." *Id.* He noticed that Burnham has "distanced himself from family and friends because he is emotionally distraught over the loss of friends and fellow airmen" and "the destruction he witnessed during the attack." Ralph Burnham is "devastat[ed]" that he is "no longer as close to [his son] as [he] used to be before the attack" and remains "concerned about [Burnham's] emotional well-being." *Id.* ¶¶ 6–7.

Burnham's mother, Margaret L. Burnham, learned about the Khobar Towers attack "from [her] daughter who heard it on the radio" and "turned on the news on the TV to try to get information about what was happening." Decl. of Margaret L. Burnham ("Margaret Burnham Decl.") (Sept. 20, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). She was "scared" as

the "[f]ear and anxiety . . . of not knowing how [her son] was" settled in. *Id.* "All [she] could do was pray to God to keep his hand on [Burnham]." *Id.* About a day later, she found out from her daughter-in-law that Burnham "had a few injuries, but also suffered emotional trauma." *Id.* ¶ 6. Margaret Burnham remained "emotionally distressed" until she was "able to physically see [her son]." *Id.* After Burnham returned, she observed that he became "very quiet and distant, and didn't want to talk much, especially about the attack." *Id.* ¶ 7. She is "concerned about [her son's] emotional well-being" as "he still has issues dealing with the bombing." *Id.* ¶ 8.

Burnham's wife, Debra E. Burnham, learned about the Khobar Towers attack from her father-in-law. Decl. of Debra E. Burnham ("Debra Burnham Decl.") (Sept. 13, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). She had no "indicat[ion] whether [Burnham] was dead or alive" and "[f]or a time that day, [she] did not know if [she] was a single parent [for two children, a four-year old and a five-month old], and lost the love of [her] life." *Id.* "Several hours later," she spoke with Burnham and discovered that he was injured, but alive. *Id.* After the bombing, however, he became a "very angry man," and which had a "devastating" effect on their relationship. *Id.* ¶¶ 6–7. She "would often ask [him] what happened [but] . . . [h]e would respond, 'you wouldn't understand. You were not there.'" *Id.* ¶ 6. She also noticed that Burnham "[could not] stand thunderstorms" and would have "anxiety when passing a gas truck on the interstate." *Id.* ¶ 7. Due to Burnham's emotional injuries, Debra Burnham started suffering from panic attacks for which she was treated. *Id.* ¶ 8.

Burnham's son, Dwight C. Burnham, was four years old at the time of the Khobar Towers attack. Decl. of Dwight C. Burnham ("Dwight Burnham Decl.") (Sept. 14, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). Although he did not find out about the attack until after his mother confirmed that his father was still alive, he struggled with "a lot of anxiety" and

remembers "waking up in the middle of the night and . . . sleeping on the floor [of his parents' room]." *Id.* When his father returned, Dwight Burnham "distanced" himself because his father would "lose his temper" over "the smallest things." *Id.* ¶ 8. Dwight Burnham suffers from an "anxious stutter," which has "affected how [he] interact[s] with the public, with [his] friends, and . . . in job interviews," and believes that "growing up with this anxiety" may have been the "root cause for [his] speech impediment." *Id.* ¶ 6. While Dwight Burnham works as a pharmacist and lives on his own, he is unable to live "more than a day's drive from [his] parents" because of "fear of being too far away from them if something were ever to happen." *Id.* ¶ 7.

Burnham's younger son, Keelan C. Burnham, was five months old at the time of the Khobar Towers attack. Decl. of Keelan C. Burnham ("Keelan Burnham Decl.") (Sept. 13, 2018) ¶ 5, ECF No. 40 (sealed), ECF No. 163 (public). Although he was "unaware of the incident until [his] father decided to share little details of that awful day," the attack's effects were "most apparent throughout [his] father's parenting," which could be harsh. *Id.* ¶¶ 5–6. Keelan Burnham "feared [his] father" and does "not have a close relationship [with him] at all, even to this day." *Id.* ¶¶ 6–7. He blames his "distress[ful]" experiences on his father's PTSD. *Id.* ¶ 8.

### 74. *Michael D. Atkins and One Family Member*

On June 25, 1996, Michael D. Atkins was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Michael D. Atkins ("Atkins Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 52 (sealed), ECF No. 154 (public). Atkins was in his suite when the bomb denotated and was knocked unconscious "for almost half an hour" from the force of the explosion, resulting in a concussion. *Id.* ¶ 5. After he regained consciousness, he "render[ed] first aid treatment to blast victims for several hours" before he was "rushed to a hospital for medical treatment" for his own injuries. *Id.* Atkins was

treated for a severed temporal artery, glass-shard lacerations to his "arms, face, left knee, chest, back and stomach," a one-inch diameter wound in his left calf from a wood-shard, and had "a wire removed from [his] face." *Id.* ¶ 6. His recovery from these injuries "required numerous procedures." *Id.* Atkins has suffered "severe chronic medical problems as a result of the life-threatening injuries [he] sustained." *Id.* ¶ 8. He was diagnosed with a traumatic brain injury and obstructive sleep apnea, suffers from "intractable migraines," and has trouble sleeping. *Id.* He also suffers from pain in his lower neck, back, left forehead, left foot, face, calf, and left knee, "loss of sensation," vision degradation, gastro-esophageal reflux disease, temporomandibular joint, sinus pain, and respiratory issues. *Id.* ¶ 9. Additionally, Atkins suffers from tinnitus and hearing loss, chronic skin disorders, and "painful and disfiguring scars on [his] head, face, left knee, and left calf." *Id.* His physical injuries have "prevented [him] from working an average of six to eight weeks per year," which affected his advancement in his career. *Id.* ¶ 12. Atkins was also diagnosed with PTSD, which has "severely impacted [his] ability to focus on career advancement, professional relationships, as well as personal relationships." *Id.* ¶¶ 8, 12. Atkins states that "[t]he attack on Khobar Towers changed [his] life forever" and "[e]very moment of [his] life [he] experience[s] the effects of the Khobar Towers bombing, which have permanently damaged [his] opportunities and outlook." *Id.* ¶¶ 8, 11. On July 2, 1996, Atkins was awarded the Purple Heart and on April 21, 1997, he received the Airman's Medal for Heroism. *Id.* ¶¶ 13–14; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 52 at 63; *id.*, Att. (The Airman's Medal for Heroism, dated April 21, 1997), ECF No. 52 at 66. The VA rated Atkins 100% disabled. *Id.* ¶ 15; *id.*, Att. (Letter from VA, dated Dec. 5, 2018), ECF No. 52 at 67–70; *see also id.*, Att. (medical records), ECF No. 52 at 8–57.

One of Atkins' family members is a plaintiff in this lawsuit: his mother Patricia D. Atkins. Patricia Atkins learned about the Khobar Towers attack "on television when [she] saw a report of the bombing." Decl. of Patricia D. Atkins ("Patricia Atkins Decl.") (Oct. 31, 2018) ¶ 5, ECF No. 52 (sealed), ECF No. 154 (public). She "became increasingly worried as [she] observed horrific pictures of the overwhelming destruction to the building and reports of dead Air Force Members." *Id.* For twenty-four hours, she was unable to "confirm[] that he was alive" and experienced "sleeplessness and painful anxiety attacks" until she finally spoke with her son and, even then, she was unable to "recognize his voice and was deeply concerned about his physical and mental condition based on his remarks." *Id.* ¶ 6. After Atkins returned home, Patricia Atkins observed that her son "didn't seem himself and . . . was on edge with his surroundings." *Id.* ¶ 7. Patricia Atkins states that her son's experience "has been incredibly stressful and traumatic" for her. *Id.* ¶ 10. She "constantly worrie[s] about his physical and mental well-being," which has "severely impacted" her social relationships, "ability to focus on workplace advancement," and "eternally damaged [her] positive outlook." *Id.* ¶¶ 9–10. She believes that her husband's sudden death, on July 29, 1997, was caused by the "stress [their] son went through." *Id.* ¶ 8.

### 75. *Jeffrey J. Gardner*

On June 25, 1996, Jeffrey J. Gardner was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Jefferey J. Gardner ("Gardner Decl.") (Sept. 5, 2018) ¶ 3, ECF No. 53 (sealed), ECF No. 188 (public). Gardner was in the second-floor bathroom at the time of the explosion. *Id.* ¶ 4. He was "hit by a door blown off its hinges" and "sustained cuts and bruises behind [his] right ear and right hip." *Id.* Gardner was treated for cuts and "was evaluated for a concussion." *Id.* Gardner "no longer

enjoy[s] large crowds or loud cars or fireworks[,] . . . [or] buy[ing] season tickets to University of South Carolina football games, one of [his] favorite activities." *Id.* ¶ 6. He also suffers from "recurring nightmares . . . about the bombing." *Id.* Gardner has been told that he exhibits "classic symptoms of PTSD," but he has not sought treatment "because of the stigma that comes with being classified as having a mental illness." *Id.* On August 8, 1996, he received the Purple Heart. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 53 at 10; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 53 at 5–6. The VA rated Gardner 30% disabled due to tinnitus, left lower extremity lumbar radiculopathy, and a painful upper back scar. *Id.* ¶ 5; *id.*, Att. (Letter from VA, dated June 29, 2018), ECF No. 53 at 8–9.

### 76. *Shane A. Little*

On June 25, 1996, Shane A. Little was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Shane A. Little ("Little Decl.") (Oct. 22, 2018) ¶ 3, ECF No. 68 (sealed), ECF No. 208 (public). He was asleep when the bomb detonated and was "awoken by objects being propelled through [his] room." *Id.* ¶ 4. While hearing "moaning and screaming" and not knowing the whereabouts of two of his "best friends," Little assisted his suitemates with "head[ing] out and down the stairs." *Id.* ¶¶ 4–5. "When [they] got outside the panic and terror ensued." *Id.* ¶ 6. Little witnessed "so many people bleeding and injured" and assisted with "gather[ing] the severely injured and plac[ing] them in a group for medics." *Id.* He then realized that he "had fragments of glass in [his] scalp" and "blood running from a hole in [his] right lower hip." *Id.* ¶ 8. He sought medical treatment, as "[t]he hole in [his] side throbbed." *Id.* ¶ 9. While the medic "tried to remove

whatever created the hole," Little "gripp[ed] the table" in agony until he was unable "to endure this any longer." *Id.*

Little "suffer[s] from nightmares, anxiety, . . . flinching during thunderstorms and fireworks," is "uncomfortable in large groups," and "feel[s] as though [he] cannot ever let [his] guard down." *Id.* ¶ 11. He "live[s] with daily anxiety" and has "ongoing pain that has not been able to be resolved." *Id.* Little states that "[her] life changed forever after the attack" and that "[s]ubsequent terrorist attacks . . . brought all those feelings and issues back." *Id.* ¶¶ 11–12. Little received the Purple Heart on August 8, 1996 for his injuries. Id. ¶ 9; *id.*, Att. (Purple Heart Certificate, dated Aug. 8, 1996), ECF No. 68 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 68 at 6.

### 77. *Angeline Marsh and One Family Member*

On June 25, 1996, Angeline Marsh was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Angeline Marsh ("Marsh Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 69 (sealed), ECF No. 209 (public). She was in her suite when the bomb detonated and "[t]he force of the blast threw [her] across the room." *Id.* ¶ 5. Marsh sustained glass and metal shrapnel wounds to her legs and "had difficulty evacuating the room because of [her] injuries." *Id.* After she was transported to a medical facility, Marsh received treatment for her "multiple cuts and lacerations on both legs and on [her] Achilles' tendon," "cuts on [her] arm and a scratched cornea." *Id.* ¶¶ 5–6. Upon her return to the United States, Marsh began suffering the effects of PTSD, which makes her anxious about people and her surroundings and makes sleeping difficult. *Id.* ¶¶ 8–9. Although her "physical wounds have healed . . . [she] still ha[s] the scars." *Id.* On August 7, 1996, Marsh received the Purple Heart. *Id.* ¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF

No. 69 at 20; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 69 at 5–6. Marsh takes medication for her PTSD symptoms and received an aggregate disability rating from the VA of 90%. *Id.* ¶¶ 9–10; *id.*, Att. (VA Rating Decision, undated), ECF No. 69 at 24–29; *id.*, Att. (medical records), ECF No. 69 at 8–19.

One of Marsh's family members is a plaintiff in this lawsuit: her mother Minnie D. Hebert. Hebert learned that her daughter had been injured in the Khobar Towers when she received a phone call from Marsh's supervisor, who confirmed that she "had been injured . . . but he did not know the extent of her injuries." Decl. of Minnie D. Hebert ("Hebert Decl.") (Sept. 20, 2018) ¶ 5, ECF No. 69 (sealed), ECF No. 209 (public). She was "very worried not knowing where [her daughter] was, how she was feeling, or if she was safe" and "panicked trying to find out more information, but couldn't." *Id.* ¶ 5. Only when she spoke to her daughter "a couple of days later," did Hebert learn "what happened and the extent of her injuries." *Id.* Since Marsh returned, Hebert "constantly worrie[s]" about her daughter's possible redeployment, as she "fear[s] that something similar could happen again." *Id.* ¶ 6. She continues to experience "extreme grief and distress" from the "profound impact [the attack has had] on [their] relationship" and from watching Marsh "suffer[] from PTSD" and "thinking there is nothing [she] can do to help her." *Id.* ¶ 7.

### 78. *Erich J. Schneider and One Family Member*

On June 25, 1996, Erich J. Schneider was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Erich J. Schneider ("Schneider Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 95 (sealed), ECF No. 229 (public). Schneider was with his friend inside an elevator when he "heard a loud sound" and "saw a big flash of light." *Id.* ¶ 5. He "was thrown to the back of the elevator" and "was

knocked unconscious." *Id.* From the force of the impact, Schneider "sustained a concussion, a Traumatic Brain Injury (TBI), a back injury," bruise[s] "all over [his] body," and "severe pain." *Id.* When he regained consciousness, Schneider left the building while "sliding on shattered glass, and dodging debris" and spent the night sleeping in a "building [that was] completely blown out." *Id.* ¶¶ 6–7. The attack affected him to the point that he "couldn't function," and, after numerous tests, Schneider was diagnosed with PTSD. *Id.* ¶¶ 9–11. He tried to maintain his job, but his "condition never got any better" and, eventually, he "was forced to leave the Air Force," *id.* ¶ 12, and his wife left him, *id.* ¶ 13. Schneider states, "[he] sometimes wish[es that he] had died there instead of those other people because [his] life has never been the same." *Id.* ¶ 15. Although he has received numerous forms of therapy, he continues to suffer from "insomnia, nightmares, depression, anxiety, anger, loss of memory, and social problems." *Id.* ¶¶ 14, 16. He was awarded the Purple Heart for his wounds sustained in the attack. *Id.* ¶ 8; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 95 at 8. The VA has rated Schneider 70% disabled. *Id.* ¶ 17; *id.*, Att. (Letter from VA, dated Apr. 18, 2018), ECF No. 95 at 9.

One of Schneider's family members is a plaintiff in this lawsuit: his mother Dianne M. Martinson, who learned about the Khobar Towers attack "when [she] received a call . . . [that] there was a bombing, and [her son] was injured." Decl. of Dianne M. Martinson ("Dianne Martinson Decl.") (Oct. 17, 2018) ¶ 5, ECF No. 95 (sealed), ECF No. 229 (public). She was unaware of the extent of his injuries until the next day when she spoke to Schneider and he shared with her what had occurred. *Id.* After his return to the United States, she noticed that Schneider changed "from a sweet mild-mannered guy to a completely different person," to the point that she no longer "kn[ew] who he was anymore." *Id.* ¶ 8. She needs to "help him

maintain his documents because he doesn't remember where he places them or what to do with them." *Id.* ¶ 11. Martinson tries to help her son with his PTSD by "always . . . pick[ing] up the pieces and stay[ing] ahead of his destructive behavior, so he [won't] end up on the streets or in jail. *Id.* ¶ 10.

### 79. *Thomas A. Kininger*

On June 25, 1996, Thomas A. Kininger was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Thomas A. Kininger ("Kininger Decl.") (Sept. 18, 2018) ¶ 3, ECF No. 96 (sealed), ECF No. 205 (public). Kininger was asleep when "[t]he force of the bomb . . . shattered glass all over the room," causing him to get "cuts on both feet, both legs, and abdomen." *Id.* ¶¶ 4–5. Nonetheless, Kininger searched "door to door, room to room, floor by floor, telling everyone to get outside." *Id.* ¶ 5. He recalls "[i]njured personnel . . . being carried past [his] building" and "[e]mergency personnel . . . yelling for people to move out of the way." *Id.* Since the attack, Kininger has "developed an aggressive temper," and "fight[s] through bouts of depression to try to live a semi-normal life." *Id.* ¶ 7. He has nightmares about the bombing and because the "nightmares are so bad [he] suffer[s] with insomnia to avoid sleep." *Id.* ¶¶ 6–7. Kininger is "hyper-sensitive to people's actions and events around [him]," and "suffer[s] from panic attacks . . . whenever [he] see[s] people act[ing] suspiciously." *Id.* ¶ 7. He "avoid[s] crowded places, loud music, bright lights and anything that can remind [him] of the bombing." *Id.* Kininger has "problems focusing on simple tasks and [his] memory is terrible." *Id.* On August 7, 1996, Kininger was awarded the Purple Heart for his wounds from the attack. *Id.* ¶ 4; *id.*, Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 96 at 5. He has been diagnosed with PTSD, depression, and anxiety, for which he received an aggregate disability rating of 70% from the VA. *Id.* ¶ 7; *id.*, Att. (Letter

from VA, dated June 13, 2017), ECF No. 96 at 6; *id.*, Att. (medical records), ECF No. 96 at 7–20.

**80.** *Jefferson A. Craven and Two Family Members*

On June 25, 1996, Jefferson A. Craven was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Jefferson A. Craven ("Craven Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 114 (sealed), ECF No. 176 (public); *see also* Plaintiffs' Notice of Errata Regarding Jefferson Craven's Declarations and Exhibits (Jan. 11, 2019), ECF No. 122 (sealed), ECF No. 177 (public). Craven was inside his room gazing at the city when suddenly he heard what "sounded like standing behind an F-15" and then he felt "immediate pain." *Terrorism Hits Home: 'It was over before we knew what happened,' survivor says*, Florida Today, June 29, 1996, ECF No. 114 at 7. From the force of the explosion, Craven was struck in the head by a "large foreign object" and suffered a traumatic head injury, as well as multiple lacerations to his face, right shin, and right forearm, a three-inch cut to his chin, a six-inch wound to his left shin, a 3/8-inch puncture in his left knee, and a chest wound caused by a "3/8 inch by ½ inch by 2-inch glass chunk." Craven Decl. ¶ 5. Craven's left shin injury prevented him from walking so he needed to be carried during his evacuation, but this resulted in his "right shoulder and shoulder blade muscles were torn from [his] spine." *Id.* Since the attack, Craven has "been in and out of treatment for PTSD." *Id.* ¶ 8. He is "uncomfortable" around "simple [day to day things]," like camera flashes. *Id.* ¶ 10. He also suffers from back pains and nerve and leg damage. *Id.* Craven states that the bombing "robbed [him] of [his] physical abilities" and the "attack on Khobar Towers changed [his] life forever." *Id.* ¶ 10. Craven was awarded the Purple Heart for the wounds that he sustained in the attack. *Id.* ¶ 9; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 114 at 14. The VA rated Craven

100% disabled, including 30% from PTSD, 30% from congestive heart failure, and 70% from "multiple orthopedic conditions." *Id.* ¶ 8; *id.*, Att. (Letter from VA, dated Sept. 12, 2018), ECF No. 114 at 12–13.

Two of Craven's family members are plaintiffs in this lawsuit: his wife, Tirana K. Craven; and his daughter, Jessica M. Verboom. Craven's wife "experienced extreme grief and distress when [she] found out that [her husband] was injured in the attack on Khobar Towers." Decl. of Tirana K. Craven ("Tirana Craven Decl.") (filed Dec. 28, 2018) ¶ 5, ECF No. 114 (sealed), ECF No. 176 (public). At the time of the attack, she was a "mother of three, and was left worrying, and not knowing if [her] husband was dead or alive," for three days, until she finally learned that Craven was still alive. *Id.* Since the bombing, her husband has been "unable to do simple tasks," and Tirana needs to "assist him with his personal hygiene, chores, feeding, and provide emotional support." *Id.* ¶ 7. Craven "still has nightmares" and struggles with PTSD, which has had a "devastating" effect on Tirana's "daily life and family life," and she "continue[s] to experience[] extreme grief and distress" due to the "profound impact" that the attack has had on her marriage. *Id.* ¶¶ 6, 9–10.

Craven's daughter, Jessica M. Verboom, was twelve years old at the time of the Khobar Towers attack. Decl. of Jessica M. Verboom ("Jessica Verboom Decl.") (June 25, 2018) ¶ 5, ECF No. 114 (sealed), ECF No. 176 (public). Her mother informed her about the attack and they watched the television reports together. *Id.* For three days, she suffered "extreme grief and distress," as she had no idea whether her father "was among the survivors." *Id.* The attack "profound[ly] impact[ed]" Jessica Verboom's relationship with her father. *Id.* ¶ 10. After Craven returned, she needed to help him with "simple things he could not do," like "put [on] his shoes" and "bring him his meals." *Id.* ¶ 7. Her father then became "emotionally abusive," as he

would "bec[o]me frustrated and would lash out." *Id.* ¶ 8. Verboom "could not handle the abuse" and eventually "moved out of the house," and "sought therapy" to help her "work through the emotional abuse [she] endured." *Id.* ¶¶ 8–9.

### 81. *William F. Sine and One Family Member*

On June 25, 1996, William F. Sine was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia when the bomb detonated. Decl. of William F. Sine ("Sine Decl.") (Oct. 29, 2018) ¶ 4, ECF No. 123 (sealed), ECF No. 237 (public). Sine was knocked unconscious "for thirty to forty-five minutes" from the force of the explosion and "suffered severe injuries, including broken ribs, a concussion, back injuries, and lacerations from glass shrapnel." *Id.* ¶¶ 5–6. Despite these injuries, and his "grossly swollen" right arm and right calf, he assisted "six badly wounded and disoriented" service members in escaping from the building and "rendered [them] lifesaving medical treatment." Citation to Accompany the Award of the Airman's Medal for Heroism (dated Apr. 21, 1997), ECF No. 123 at 34. After the bombing, Sine was prescribed "powerful opioids for [his] chronic back pain," and these medications have "caused side effects and other serious issues," including "persistent high blood pressure." Sine Decl. ¶ 8. In addition to his "obvious" physical injuries, which "seriously limit[]" his range of motion, Sine suffers from a TBI caused by the attack that has "negatively impacted [his] health and continue[s] to adversely affect [his] life." *Id.* ¶¶ 7–8, 10. He was awarded a special citation and the Airman's Medal for Heroism for his assistance to other personnel, as well as the Purple Heart. *Id.* ¶ 9; *id.*, Att. (Citation to Accompany the Award of the Airman's Medal for Heroism, dated Apr. 21, 1997), ECF No. 123 at 34; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 123 at 33; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 123 at 7.

The VA rated Sine 80% disabled, including 30% from sinusitis, 20% from right and left knee strains, and 10% from a right shoulder strain. *Id.* ¶ 11; *id.*, Att. (Letter from VA, dated Oct. 27, 2014), ECF No. 123 at 13–17; *see also id.*, Att. (medical records), ECF No. 123 at 9–10.

One of Sine's family members is a plaintiff in this lawsuit: his son, William D. Sine, who was a "young child" at the time of the Khobar Towers attack. Decl. of William D. Sine ("William Sine Decl.") (Oct. 16, 2018) ¶ 4, ECF No. 123 (sealed), ECF No. 237 (public). He was at school when "a couple service men" arrived and told him "about the explosion, and that [his] father was injured." *Id.* Although the service men "reassured [him] that [his] father was . . . stable," William Sine "was tearful and terrified and thought the worst." *Id.*

### 82. *John M. Baldwin and Four Family Members*

On June 25, 1996, John M. Baldwin was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of John M. Baldwin ("Baldwin Decl.") (Sept. 5, 2018) ¶ 4, ECF No. 34 (sealed), ECF No. 156 (public). The blast from the attack "[sent] glass flying, cutting [his] lower right leg, the right side of [his] abdomen and right arm." *Id.* ¶ 5. The blast "blew [his] room doors off the hinges," and "[o]ne of the doors hit the back of [his] head and knocked [him] out." *Id.* When he came to, Baldwin "started crawling through the debris trying to find [his] roommate" and "filled [his] feet, knees, and hands with glass shards." *Id.* The attack "changed [his] life forever." *Id.* ¶ 6. Glass shards still work out of his skin, and the laceration in his right leg continues to cause pain. *Id.* Baldwin still suffers from headaches and tinnitus, with permanent hearing loss in both ears from the explosion. *Id.* Baldwin also was diagnosed with PTSD, with symptoms that would cause him to "wake up in sweat at night and get in the shower to wash away blood that was not there." *Id.* ¶ 7. The years following the attack were a "mental hell" for Baldwin. *Id.* ¶ 8. For twenty-two years,

Baldwin avoided large crowds of people or going out socially, and he became reclusive to his family after the bombing. *Id.* Baldwin was awarded the Purple Heart for wounds sustained in the attack and the Airman's Medal for Heroism for his actions in saving the life of a fellow airman on the day of the attack. *Id.* ¶ 10; *id.*, Att. (Purple Heart Certificate, dated May 27, 1997), ECF No. 34 at 9; *id.*, Att. (Airman's Medal for Heroism, dated Oct. 1, 1997), ECF No. 34 at 11; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 34 at 5. When Baldwin was honorably discharged from the Air Force in 1998, he was given a disability rating of 100% by the VA and was considered to be totally and permanently disabled due to his service-connected disabilities. *Id.* ¶¶ 6, 8–9; *id.*, Att. (Letter from VA Regional Office, dated Dec. 12, 2016), ECF No. 34 at 6; *id.*, Att. (Letter from VA Regional Office, dated Aug. 1, 2012), ECF No. 34 at 7–8.

Four of Baldwin's family members are plaintiffs in this lawsuit: his father, Bobby F. Baldwin Jr.; his mother, Kathy L. Beach; and his two brothers, Bobby F. Baldwin and Steven L. Baldwin. Baldwin's father first learned of the bombing the morning of June 26, 1996, but he was initially unable to get information regarding his son's status. Decl. of Bobby F. Baldwin Jr. ("Bobby Baldwin Decl.") (Sept. 3, 2018) ¶¶ 2, 5, ECF No. 34 (sealed), ECF No. 156 (public). He "was terrified from watching the news reports that John may have been killed" and only learned that his son was injured "after two long days." *Id.* ¶¶ 5–6. The attack has "seriously affected [his] daily life and [his] family's life." *Id.* ¶ 7. Bobby Baldwin "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries sustained by [his] son . . . and the profound impact they had on [their] relationship." *Id.* ¶ 10. His son was "very different" when he moved back home, with "extended periods of time when John has been distant and withdrawn from his family." *Id.* ¶ 8. After the attack, Bobby Baldwin has had to

intervene on his son's behalf to find solutions to problems created by his son's alcohol abuse, which was not an issue before the bombing. *Id.* ¶ 9. He has "regretted encouraging [John] to join the military because [he] know[s] that some aspects of [John's] life would have been much better, if [John] hadn't been exposed to the terror of the bombing at such a young age." *Id.* ¶ 7.

Baldwin's mother, Kathy L. Beach, initially saw coverage of the attack on the television, and "fell to [her] knees" and "could not stand." Decl. of Kathy L. Beach ("Beach Decl.") (Oct. 18, 2018) ¶¶ 2, 7, ECF No. 34 (sealed), ECF No. 156 (public). During the following days, Kathy Beach "prayed to God" and "begged for a sign to let [her] know that [her] son was okay." *Id.* Although she repeatedly dialed the hotline that was provided, she only learned the fate of her son four days later, when her son called her to tell her that he was one of the injured. *Id.* Beach "experienced extreme grief and distress when [she] found out that John was injured in the attack on Khobar Towers." *Id.* After he returned to the United States, Baldwin's PTSD "caused hardships on family relations," since he was "not [her] son that left" but "was distant and disconnected." *Id.* ¶ 8. Kathy Beach "mourn[s] for the relationship and the years of family memories that were taken from [them]." *Id.* ¶ 12. As a result of her son's PTSD, she fears losing her only son to suicide. *Id.* ¶ 11. She "experienced, and continue[s] to experience, extreme grief and distress as a result of [John's] injuries . . . and the profound impact on [their] relationship." *Id.* ¶ 13.

Baldwin's brother, Bobby F. Baldwin III, was "panicked" when he found out about the attack where his brother was stationed and was "left in limbo, fearing for the worst" until he found out that his brother was alive, but injured. Decl. of Bobby F. Baldwin III ("Bobby Baldwin III Decl.") (Sept. 11, 2018) ¶¶ 2, 5, ECF No. 34 (sealed), ECF No. 156 (public). Bobby Baldwin experienced "extreme grief and distress" upon learning that his brother had been

injured.  *Id.* ¶ 5.  When he saw his brother after the attack, "[h]e was not the same brother that had left," but "was more reclusive," and "detached from the family."  *Id.* ¶ 6.  Bobby Baldwin decided not to join the Air Force "after seeing the grief [his] parents went through with [his] brother's experience, and the physical and emotional toll it took on [his brother]."  *Id.* ¶ 8.  In making this choice, he "forewent [his] dreams, and possibly stifled [his] own life's potential."  *Id.*  Baldwin's brother "experienced, and continues to experience, extreme grief and distress as a result of the injuries to [his] brother . . . and the profound impact on [their] relationship."  *Id.* ¶ 9.

Baldwin's other brother, Steven L. Baldwin, was six years old at the time of the attack, and he too was "in limbo, fearing the worst" for four days when he did not know his brother's fate.  Decl. of Steven L. Baldwin ("Steven Baldwin Decl.") (Sept. 3, 2018) ¶¶ 2, 5, ECF No. 34 (sealed), ECF No. 156 (public).  Steven "experienced extreme grief and distress" when he found out that his brother was injured.  *Id.* ¶ 5.  After the bombing, their "relationship completely changed,"  and due to his brother's "reclusive personality after the attack," Steven would "go months or longer without being able to communicate with him."  *Id.* ¶ 7.  The attack "cost [him] the loss of the ability to keep a close friendship with [his] brother."  *Id.*  Steven attributes the distance in their relationship to the bombing and "the trauma and its lasting effects on [his] brother."  *Id.* ¶ 8.  He "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries to [his] brother . . . and the profound impact it has had on [their] relationship."  *Id.* ¶ 9.

### 83. *Melinda J. Caines and Three Family Members*

On June 25, 1996, Melinda J. Caines was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Melinda J. Caines ("Caines Decl.") (Nov. 12, 2018) ¶ 4, ECF No. 42 (sealed), ECF No. 166

(public).  At the time of the attack, Caines was in her dorm room and, when the lights went out, she "froze and time seemed to slow as [her] senses [tried] to figure out what just happened."  *Id.* ¶ 6.  Caine observed "people [] running, screaming, and crying" as well as "bloody footprints on the ground and blood smeared along the hand railing and walls."  *Id.*  People were "trampled" while attempting to flee, and Caines "felt like [she] was running for [her] life."  *Id.* ¶ 7.  Her remaining time there was "a living hell."  *Id.*  In addition to the "smeared blood, the rubble, [and] the destruction," Caines witnessed the "broken" spirit of her comrades.  *Id.*  After the bombing, Caines "noticed [she] was different" and found "[l]oud noises[,] thunder, alarms, movies with breaking glass, [and] gunfire . . . too much for [her] to [bear]."  *Id.* ¶ 8.  She "had flashbacks and nightmares," and her "mind and emotional well-being ha[s] not been the same since the attack."  *Id.*  Caines was diagnosed with PTSD, *id.*, which "made it very difficult for [her] to function on a normal scale on a daily basis." *Id.* ¶ 9.  She is "constantly on guard [and] nervous around crowds."  *Id.*  In addition, Caines "suffer[s] from nightmares and difficulty sleeping."  *Id.*  Caines has a VA disability rating of 80% and compensation at 100% because she is deemed unemployable due to service-connected disabilities.  *Id.* ¶¶ 6, 9; *id.*, Att. (Letter from VA Regional Office, dated July 12, 2018), ECF No. 42 at 6; *see also id.*, Att. (medical records), ECF No. 42 at 12–50.

Three of Caines' family members are plaintiffs in this lawsuit: her father, John L. Dean; her mother, Alfreda Peak; and her sister, Carmen R. Dean.  Caines' father first learned of the attack on Khobar Towers forty-eight hours after the attack from his oldest daughter.  Decl. of John L. Dean ("Dean Decl.") (Nov. 12, 2018) ¶ 2, 5, ECF No. 42 (sealed), ECF No. 166 (public).  He was "left in limbo, fearing for the worst and not knowing the fate of [his] daughter."  *Id.* ¶ 5.  His daughter's depression "affected [him] as well as [his] grandchildren."  *Id.* ¶ 6.  "[He] was in

distress every time [his] daughter deployed." *Id.* John "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries sustained by [his] daughter . . . and the profound impact they had on [their] relationship." *Id.* ¶ 7.

Caines' mother, Alfreda Peak, initially learned of the attack from Red Cross personnel, who called her forty-eight hours after the attack. Decl. of Alfreda Peak ("Peak Decl.") (Nov. 4, 2018) ¶¶ 2, 5, ECF No. 42 (sealed), ECF No. 166 (public). Alfreda was "left in limbo, fearing for the worst and not knowing the fate of [her] daughter." *Id.* ¶ 5. When she was eventually informed that her daughter was injured in the attack, she "was so distraught [she] had to take off from work for several days." *Id.* ¶ 6. Alfreda "had to take time off from work to care for her [daughter's] emotional state." *Id.* Alfreda's mental state "has never been the same because of the pain and suffering [she] went through as a mother watching [her] daughter have such pain and suffering." *Id.* ¶ 7. She "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries sustained by [her] daughter . . . and the profound impact they had on [their] relationship." *Id.* ¶ 8.

Caines' sister, Carmen R. Dean, learned of the attack through the television, and she "had to watch/listen to the news accounts not knowing if [her sister] was dead or alive." Decl. of Carmen R. Dean ("Carmen Dean Decl.") (Oct. 21, 2018) ¶¶ 2, 5, ECF No. 42 (sealed), ECF No. 166 (public). For Dean, "the mere thought of [Caines] being in a bombing, and not knowing if she [was] dead or alive was horrible." *Id.* ¶ 5. She took off work for two weeks when her sister came home to "be with her, hug her, and help her cope." *Id.* ¶ 6. The family has "suffered mental distress" because of Caines' condition. *Id.* ¶ 7. Her sister "often took time off work to make special trips" and "shared many long distance phone calls" in an effort to help Caines. *Id.* The attack "caused total devastation" to Carmen's relationship with her sister, and "[n]o one in

[their] family is the same." *Id.* The stress of the attack "has never gone away." *Id.* ¶ 8. She "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries sustained by [her] sister . . . and the profound impact they had on [their] relationship." *Id.*

### 84. *Salvatore Capaccio and One Family Member*

On June 25, 1996, Salvatore Capaccio was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Salvatore Capaccio ("Capaccio Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 43 (sealed), ECF No. 167 (public). When the attack occurred, Capaccio was "kneeling down to pray before bed." *Id.* ¶ 5. Suddenly, "it felt like a plane crashed into the building," and Capaccio was "literally knocked off [his] knees to the floor." *Id.* Following the bombing, Capaccio had no choice but to escape using "solid marble staircases [that] were detached from the wall." *Id.* He was "terrified the building was going to collapse." *Id.* ¶ 6. While waiting at the center of the compound, Capaccio "saw many injured being carried, along with two deceased people in body bags." *Id.* In the weeks following the attack, Capaccio was responsible for repairing vehicles damaged in the attack, which task involved "cleaning out blood stained glass, repairing or replacing body panels, and doing what [he] could with the parts [they] had available." *Id.* ¶ 9. During this time, Capaccio feared that the building he was sleeping in would collapse because it had "a giant crack in it." *Id.* ¶ 10. Capaccio sustained physical injuries, including cuts and bruises throughout his body and respiratory problems from inhaling cement dust from the air. *Id.* ¶ 8. He also has suffered emotionally and psychologically, including "trouble sleeping, fear of being trapped, [and] fear of vehicles parked next to buildings" and being "easily startled." *Id.* For example, while Capaccio was stationed at an air base near a tank range, live night fire caused him to "jump[] out of [his] skin, hit the floor[,] and [] shak[e]." *Id.* ¶ 11. Capaccio later was stationed

in a dorm "similar in design and construction to those at Khobar," which made him "very uneasy sleeping at night, half expecting to be bombed." *Id.* ¶ 12. Capaccio "still [has] fears of [his] home collapsing in an earthquake . . . and [has] trouble sleeping because of it." *Id.* ¶ 10. He also has other symptoms of PTSD, is "easily irritated/angered . . . [and has] a difficult time establishing and maintaining relationships, which leads to bouts of severe depression, high anxiety, and stress." *Id.* ¶ 8. Capaccio has a VA disability rating of 90%, with 30% for PTSD. *Id.* ¶ 8; *id.*, Att. (VA Rating Decision, undated), ECF No. 43 at 6; *id.*, Att. (Letter from VA Benefits Assistance Service, dated June 23, 2018), ECF No. 43 at 7–8; *see also id.*, Att. (medical records), ECF No. 43 at 8–18.

One of Capaccio's family members is a plaintiff in this lawsuit: Capaccio's mother, Diane Martucci, who found out about the attack and that her son was alive from Capaccio's stepmother. Decl. of Diane Martucci ("Martucci Decl.") (Nov. 13, 2018) ¶¶ 2, 5, ECF No. 43 (sealed), ECF No. 167 (public). She felt "anxious and crazy with fear, not knowing the fate of [her] son." *Id.* Her fears and anxiousness became "overwhelm[ing]." *Id.* ¶ 6. A doctor prescribed her medication to help calm her nerves, which she takes to this day. *Id.* She "gradually became more and more fearful for the safety and wellbeing of [her] loved ones." *Id.* ¶ 7. She "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries to [her son] and the profound impact on [their] relationship." *Id.* ¶ 8.

### 85. *Steven R. Kitis and One Family Member*

On June 25, 1996, Steven R. Kitis was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Steven R. Kitis ("Kitis Decl.") (Oct. 22, 2018) ¶ 4, ECF No. 66 (sealed), ECF No. 206 (public). Kitis and three other active duty members were sitting in the common area of the Khobar Towers dorms when

the truck bomb exploded approximately 250 yards away from their location. *Id.* ¶ 5. The explosion "caused [Kitis] to be slammed head first into the concrete wall directly behind [him]," and he "was hit with dirt, rocks, glass, and a liquid of some sort as well as other debris from the explosion." *Id.* Kitis suffered physical injuries from the explosion, including "several large lacerations to [his] head, neck, torso, arms, hands, and legs," with extensive bleeding "from all parts of [his] body." *Id.* ¶ 6. The event "changed [his] life forever," and required treatment for his mental condition. *Id.* ¶¶ 9–10. Although his wife believes that Kitis has PTSD due to his "serious mood swings, quick to anger reactions, and overall attitudes since the events," Kitis has refused to get diagnosed for "personal reasons" and admits that he would "feel weak" if ever diagnosed with PTSD. *Id.* ¶ 8. Kitis received the Purple Heart for his wounds, and the Air Force Commendation Medal. *Id.* ¶¶ 6, 10; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 66 at 9; *id.*, Att. (The Air Force Commendation Medal Certificate, dated Dec. 2, 1996), ECF No. 66 at 12; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 66 at 8. Kitis received a disability rating from the VA of 100% due to service-connected disabilities. *Id.* ¶¶ 7, 11; *id.*, Att. (Letter from VA, dated June 29, 2017), ECF No. 66 at 11; *id.*, Att. (medical records), ECF No. 66 at 13–24.

One of Kitis' family members is a plaintiff in this lawsuit: Kitis' spouse, Geraldine R. Hartman-Kitis, who was making dinner when a friend from work called and told her to "turn on the news and not hang up." Decl. of Geraldine R. Hartman-Kitis ("Hartman-Kitis Decl.") (Sept. 12, 2018) ¶¶ 2, 5, ECF No. 66 (sealed), ECF No. 206 (public). When she saw on the news that Khobar Towers had been bombed, with resulting casualties, she started crying and called her husband's co-workers and friends in an attempt to get information but learned that all communication on the base was down. *Id.* ¶ 5. After spending "hours making and receiving

phone calls" and learning nothing, she finally received a ten second phone call from her husband at 3:00 a.m. *Id.* She did not understand the extent of her husband's injuries until he returned home in July or August of 1996. *Id.* ¶ 6. The effects of the attack on her daily life and family life "were devastating." *Id.* ¶ 7. Steve "came home a different person." *Id.* The emotional consequences in the attack have strained their marriage and, at one point, caused them to separate. *Id.* ¶ 8. She "experienced, and continue[s] to experience, extreme grief and distress as a result of the injuries to [her] husband . . . and the profound impact on [their] relationship." *Id.*

### 86. *Aaron L. Lande*

On June 25, 1996, Aaron L. Lande was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Aaron L. Lande ("Lande Decl.") (Sept. 11, 2018) ¶ 3, ECF No. 67 (sealed), ECF No. 207 (public). At the time of the attack, Lande was watching television with other service members in their dorm and then "[awoke] on the floor in a pool of blood." *Id.* ¶ 4. Lande was bleeding from his legs and feet and the pain was "so intense [he] screamed" and was "at times, unbearable." *Id.* When he got outside the barracks following the blast, Lande saw "a person holding his guts from falling out as he limped by," a vision he will "never forget." *Id.* Lande "suffered severe injuries" in the attack, including "multiple lacerations, glass shrapnel wounds and trauma to [his] extremities." *Id.* ¶ 5. Glass fragments from the blast were embedded in his foot and were removed months after the attack, but he suffers from ongoing issues with his feet. *Id.* ¶ 7. His feet take a long time to adapt to water temperature when swimming and, during winter, Lande must wear extra warm boots and extra socks because his feet hurt in extreme cold temperatures. *Id.* To this day, Lande also suffers from hearing loss and tinnitus. *Id.* ¶ 6. Lande sought counseling for PTSD after he left the Air Force, *id.* ¶ 9, and "ha[s] some symptoms of PTSD

from the bombing, as sudden loud noises will send [him] into panic," *id.* ¶ 7. He also "get[s] easily angered, something which [he] never experienced before the bombing." *Id.* Lande was awarded the Purple Heart for wounds sustained in the attack. *Id.* ¶ 10; *id*., Att. (Purple Heart Certificate, dated Aug. 7, 1996), ECF No. 67 at 6. The VA has given Lande a disability rating of 40%. *Id.* ¶¶ 5, 8; *id.,* Att. (Letter from VA, dated Jan. 21, 2013), ECF No. 67 at 5.

### 87. *Billy G. Allen Jr.*

On June 25, 1996, Billy G. Allen Jr. was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Billy G. Allen Jr. ("Allen Decl.") (Dec. 29, 2018) ¶ 3, ECF No. 106 (sealed), ECF No. 152 (public). At the time of the attack, Allen was watching television in the day room of his dorm with other airmen. *Id.* ¶ 4. The blast "threw [him] across the room into a cinder block wall," *id.*, and knocked him unconscious, *id.* ¶ 5. As a result of the blast, Allen sustained multiple serious physical injuries, including "a traumatic brain injury (TBI), a dislocated left hip, a dislocated left shoulder, nerve and muscle damage to [his] back, a sprained cervical spine, head trauma, and ruptures to both ear drums." *Id.* He also "sustained multiple glass fragment lacerations," *id.*, and had "twenty-four stitches and three staples to close the lacerations," *id.* ¶ 6. Allen was placed in a cervical collar and a body cast and was in traction for three days. *Id.* ¶ 7. He has permanent scarring on his left thigh and upper lip as a result of his injuries, and even years later, glass fragments remain under his skin and "still come out of [his] scalp, chest, arms, back and face." *Id.* ¶¶ 5, 15. Allen continues to suffer from chronic pain in his hip, *id.* ¶ 11, and believes that a lack of blood circulation to his left leg from the hip injury he sustained in the explosion contributed to blood clots that ultimately resulted in the amputation of his leg, *id.* ¶ 12. Continuing migraine headaches and muscle spasms "greatly limit[] [his] ability to do anything while the pain lasts."

*Id.* ¶ 16.  Allen's health problems continue to create emotional stress for himself and his family, despite seeking help by attending support group meetings and counseling to help with nightmares and the fact that he is easily startled.  *Id.* ¶¶ 16–17.  He was awarded the Purple Heart for injuries sustained in the attack.  *Id.* ¶ 19; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 106 at 263.  Allen was given a 90 percent disability rating by the VA prior to his amputation.  *Id.* ¶ 18; *id.*, Att. (Letter from VA, dated July 17, 2018), ECF No. 106 at 261–62; *see also id.*, Att. (medical records), ECF No. 106 at 8–260.

**88.** *Douglas T. Widdis*

On June 25, 1996, Douglas T. Widdis Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Douglas T. Widdis ("Widdis Decl.") (Sept. 10, 2018) ¶ 3, ECF No. 107 (sealed), ECF No. 250 (public). When the attack occurred, Widdis was in an office approximately four hundred yards from Building 131, waiting to make his weekly "morale call" to his wife.  *Id.* ¶ 4.  He felt a "violent ground tremor reminiscent of an earthquake, followed by a negative pressure wave."  *Id.* Seconds later, the glass patio windows and a wall-mounted air conditioning unit exploded into the room and Widdis was "impaled" by "numerous shards of flying glass."  *Id.* ¶ 6.  He "sustained multiple deep lacerations from the impact of unknown objects," shrapnel wounds and head trauma when the air conditioning unit fell on him.  *Id.*; *id.*, Att. (medical records), ECF No. 107 at 6.  Despite these injuries, Widdis refused treatment until the next morning so that he could assist with performing first aid on the more seriously wounded.  *Id.* ¶ 6.  To this day, Widdis is scarred from the attack.  Compl. ¶ 136.  For his wounds and actions during the attack, Widdis received the Purple Heart medal and an Air Force Achievement Medal with Valor.  Widdis Decl.

¶ 7; *id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 107 at 5; *id.*, Att. (The Air Force Achievement Medal Certificate, dated Mar. 16, 1998), ECF No. 107 at 7.

### 89. *Michael A. Wilson*

On June 25, 1996, Michael A. Wilson was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Michael A. Wilson ("Michael Wilson Decl.") (Oct. 12, 2018) ¶ 3, ECF No. 108 (sealed), ECF No. 254 (public). When the attack occurred, Wilson was getting ready for work. *Id.* ¶ 4. He "saw a flash of light" and the "ground started to move." *Id.* The bomb blast "threw [him] against the wall," leaving him with his "ears[] ringing" and his right arm "sliced wide open at the elbow." *Id.* When he stood up, Wilson got glass in the bottom of his feet. *Id.* After assisting fellow soldiers, *id.* ¶ 5, Wilson's arm was treated by a Saudi doctor who picked glass out of the wound and stitched it up without anesthetic, *id.* ¶ 6. Wilson had to seek further treatment a few days later when his elbow began "seeping blood." *Id.* ¶ 8. Medical staff reopened the wound and removed additional embedded glass. *Id.* In addition to this physical injury, Wilson suffers from PTSD related to the attack. *Id.* ¶ 3. Even after returning to the United States, Wilson "didn't feel comfortable being in large groups or walking around town." *Id.* ¶ 9. To this day, he is fearful of stepping on manhole covers. *Id.* Due to his fear of loud noise, Wilson was unable to be around fireworks for many years. *Id.* Although Wilson was treated by a VA doctor for PTSD for years, he still has bad dreams and flashbacks relating to the attack. *Id.* ¶ 10. He was awarded the Purple Heart for injuries sustained in the attack. *Id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 108 at 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 108 at 6. Wilson has a VA combined disability rating of 40%. *Id.* ¶ 10; *id.*, Att. (Letter from VA, dated Aug. 1, 2018), ECF No. 108 at 8–9.

**90.** *Martin L. Wheeler and Two Family Members*

On June 25, 1996, Martin L. Wheeler was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Martin L. Wheeler ("Wheeler Decl.") (Nov. 9, 2018) ¶ 4, ECF No. 109 (sealed), ECF No. 249 (public). Wheeler was in Building 131, the building nearest to the attack, and was "thrown about 30 feet across the room, up against a brick wall" by the force of the explosion, leaving him covered in debris, including shattered glass, a window frame, a dresser, a door, and doorframe, with his leg pinned behind a small refrigerator. *Id.* ¶ 5. He was eventually assisted to a triage area where he received stitches in his legs, knee, and head. *Id.* Due to his physical injuries from the bombing, Wheeler was medically discharged after being placed on light duty for about a year and a half. *Id.* ¶ 7. Wheeler's physical injuries included "multiple punctures, cuts, and scrapes from shards of glass, brick, metal, and wood covering all areas of [his] body," damage to his knees, lower back and hearing ability, as well as head trauma that has "degraded [his] short-term memory and focus." *Id.* ¶ 8. To this day, Wheeler is "scarred for life and [is] still suffering from tinnitus and orthopedic injuries." *Id.* ¶ 9. He is "unable to run, kneel or lift heavy objects without experiencing extreme pain." *Id.* ¶ 10. Wheeler has gained over 75 pounds and is unable to reduce his weight due to his lack of mobility. *Id.* In addition to physical injuries, Wheeler has suffered from injuries to his mental health, including PTSD, which has "made [him] fearful and angry at everything," *id.*, and "has driven [his] friends and family away, and marriage to the brink of disaster," *id.* ¶ 11. Wheeler suffers from "severe uncontrollable mood swings," difficulty sleeping, with "severe nightmares" and "night sweats," as well as depression and "recurring thoughts of ending [his] life." *Id.* ¶ 10. Wheeler was awarded the Purple Heart for wounds received in connection with the bombing. *Id.* ¶ 12; *id.*, Att. (Purple Heart Certificate,

dated Aug. 28, 1996), ECF No. 109 at 21; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 109 at 9. The VA assigned Wheeler a combined disability rating of 40%. *Id.* ¶ 11; *id.* at 19; *id.*, Att. (Letter from VA, dated July 16, 2018), ECF No. 109 at 19; *id.*, Att. (medical records), ECF No. 109 at 15–17.

Two of Wheeler's family members are plaintiffs in this lawsuit: his wife, Tracie L. Wheeler; and his daughter, Ashlie L. Wheeler. Wheeler's wife first learned of the attack from a co-worker who called after hearing about the bombing on the news. Decl. of Tracie L. Wheeler ("Tracie Wheeler Decl.") (Sept. 20, 2018) ¶¶ 2, 5, ECF No. 109 (sealed), ECF No. 249 (public). For the next three hours, "life stopped" for Tracie as she tried to learn whether her husband was alive. *Id.* ¶ 5. With the help of several civilian operators in the United States and abroad, she learned that her husband was alive, but injured. *Id.* Since Wheeler returned home, "he has never been close to being the same man he was before he left." *Id.* ¶ 6. He was unable to drive for one and a half months or lift his two-year-old daughter, and required Tracie's assistance with bathing, driving and getting in and out of bed. *Id.* ¶ 7. Noises from thunderstorms were "very troublesome," and fireworks "were out of the question." *Id.* ¶ 6. She is "anxious and fearful" that her husband may have a flashback, and other symptoms of PTSD have "placed severe strain not only on [their] marriage but on [their] family as a whole." *Id.* ¶¶ 6, 9. Their children "have suffered from his sporadic inattentiveness and mental anguish, quick temper and anger[.]" *Id.* ¶ 10. Tracie has "struggled to keep it together" and has reached out to family and friends throughout the years for assistance, but their marriage has suffered. *Id.* ¶¶ 11–12.

Wheeler's daughter, Ashlie, was 18 months old when her father was injured in the Khobar Towers bombing. Decl. of Ashlie L. Wheeler ("Ashlie Wheeler Decl.") (Oct. 29, 2018) ¶¶ 4–5, ECF No. 109 (sealed), ECF No. 249 (public). Although she does not remember the

attack itself, *id.* ¶ 5, her father was "distant and not really outgoing" throughout her childhood, *id.* ¶ 6. Her father's anger was "frequent," and Ashlie fears that her father "is holding onto things internally." *Id.* ¶¶ 6–7.

### 91. *Brenda A. Eilers and One Family Member*

On June 25, 1996, Brenda Ann Eilers was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Brenda Ann Eilers ("Eilers Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 111 (sealed), ECF No. 184 (public). At the time of the attack, Eilers was on the couch in the living room of her dorm getting ready to watch television. *Id.* ¶ 5. She saw "an incredibly bright light and felt immense heat, and was knocked unconscious." *Id.* Eilers was evacuated from the building and transported to a hospital where a doctor put her fully-dislocated left shoulder back in place and put her arm into a sling. *Id.* ¶ 6. Over several days, Eilers removed broken glass from her body, and her wounds were treated with butterfly tape and glue. *Id.* Her physical and emotional injuries from the bombing, including bilateral shoulder injuries, lacerations, a traumatic brain injury (TBI), puncture wounds, and PTSD. *Id.* ¶¶ 5, 14. Eilers suffers from chronic pain and has undergone multiple surgeries for her left shoulder and right knee. *Id.* ¶ 7. She uses a combination of medication, a transcutaneous electrical nerve stimulation ("TENS") unit, and physical therapy to address her pain. *Id.* As result of her shoulder injuries, Eilers has a reduced range of motion in her arms and is limited in her ability to complete "repetitive or heavy tasks." *Id.* ¶ 8. Eilers "often require[s] help with getting dressed, personal grooming, getting into the bath, and tying [her] shoes." *Id.* She is unable to walk or stand for extended periods due to knee injuries. *Id.* ¶ 9. Her TBI "hampers [her] ability to learn, memorize, and follow direction." *Id.* ¶ 13. Eilers also suffers from "post traumatic migraine headaches that make concentration difficult

and can cause near blindness . . . forcing [her] to lie in bed for hours." *Id.* ¶ 10. Although Eilers takes medication for migraines and to help with problems concentrating due to TBI, *id.* ¶ 7, she dropped out of college due to "migraines, memory and concentration problems from [her] TBI, and other health problems," *id.* ¶ 17. Eilers also suffers from, and takes medication for, PTSD. *Id.* ¶ 14. She "can't bear loud noises, crowds, or confrontation" and has "developed a fear of closed spaces and trucks." *Id.* In addition to PTSD, Eilers has suffered from severe depression and suicidal thoughts. *Id.* Eilers' PTSD and TBI contributed to the breakup of her first marriage, and she had to move in with her mother because she was unable to live on her own. *Id.* Eilers' injuries prevent her from functioning in the workplace, *id.*, and she was recommended for discharge in 1999, *id.* ¶ 16. Eilers received the Purple Heart for her wounds sustained in the bombing. *Id.* ¶ 4*; id.,* Att. (Purple Heart Certificate, dated Aug. 6, 1996), ECF No. 111 at 8. Eilers has a VA disability rating of 90%, including 50% for PTSD, 50% for migraines, and 40% for left shoulder impingement, and she is compensated at 100% because she is permanently and totally disabled. *Id.* ¶ 19; *id.*, Att. (VA Rating Decision, undated), ECF No. 111 at 32–39; *id.*, Att. (medical records), ECF No. 111 at 10–31.

Eilers' mother, Rosemary Ann Ritt, heard about the bombing over the car radio while she was driving home from work and "felt immediately consumed by anguish and uncertainty." Decl. of Rosemary A. Ritt ("Ritt Decl.") (Sept. 5, 2018) ¶¶ 2, 6, ECF No. 111 (sealed), ECF No. 184 (public). She "became frozen with fear every time people came to the door," fearing that they would be Air Force personnel bringing news of her daughter's death. *Id.* ¶ 6. She only learned that her daughter was alive two days later. *Id.* ¶ 7. In the weeks following the explosion, Ritt was unable to have an in-depth discussion with her daughter about the injuries, but learned about her daughter's condition "piece by piece," increasing Ritt's anxiety about her daughter's

well-being and health. *Id.* Until her daughter returned home, Ritt was "unable to sleep, eat, or work because [she] had trouble concentrating." *Id.* Since the attack, Ritt, like her daughter, has not been the same. *Id.* ¶ 9. Her daughter, who is no longer employable, has moved in with her, *id.* ¶ 13, and as a result, Ritt has "suffered substantial economic loss," *id.* ¶ 15. Ritt took time off work to help her daughter move back home and has purchased a motorhome to compensate for her daughter's physical and medical needs when they travel to visit family or take vacations. *Id.* ¶ 8. Ritt has driven "hundreds of miles, many times, to take her [daughter] to doctor appointments" and has taken care of her following her surgeries. *Id.* ¶ 9. Ritt provided assistance when her daughter suffered from "frequent bouts of migraine headaches that left her bedridden for weeks at a time." *Id.* Her daughter "is no longer the same person she once was," *id.* ¶ 13, and learning to deal with her daughter's change in temperament "is still enormously challenging" for Ritt, *id.* ¶ 14. The process has left Ritt "with profound grief, hopelessness and a huge negative sense of emotion." *Id.* Caregiving for her daughter has taken a toll on her health. *Id.* ¶ 15. Ritt "face[s] difficulty sleeping and endure[s] anxiety if [her daughter] is away from [her] any length of time." *Id.* ¶ 9. Witnessing her daughter's ailments and health issues "have yielded extreme mental pain, suffering, grief, and anguish" for her, and "[t]he emotional injury and loss" are "insurmountably overwhelming." *Id.* ¶ 15.

## 92. *William E. Giles IV and Three Family Members*

On June 25, 1996, William Emory Giles IV was a service member in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers in Dhahran. Decl. of William E. Giles IV ("Giles IV Decl.") (Dec. 27, 2018) ¶ 4, ECF No. 54 (sealed), ECF No. 189 (public). At the time of the attack, Giles was walking on the patio of his apartment directly behind the site of the explosion. *Id.* ¶ 5. Upon impact, Giles was blown across the room into a kitchen countertop and

hit his lower back. *Id.* After the impact, he remembers spinning around on the floor in the kitchen, where he could not see through the dust and was severely disoriented from the concussion of the blast. *Id.* Although he soon realized he had severely injured his back, he did not seek treatment while in Saudi Arabia because he did not want to take attention away from those who were more severely injured. *Id.* When his back was medically evaluated upon his return to the United States, Giles was prescribed anti-inflammatories, muscle relaxers, a TENS unit, and a back brace, *id.* ¶ 6, for two fractures in his lower back that have not healed, *id.* ¶ 8. He has undergone physical therapy sessions, cortisone shots, and a spinal fusion for back pain, but the pain persists. *Id.* Since the attack, he has also had constant mental health care and suffers from hypervigilance, insomnia, depression, flashbacks, nightmares, and anxiety. *Id.* ¶ 6. He was officially diagnosed with PTSD in 2007, *id.* ¶ 8, with symptoms that make him uncomfortable in social situations, fear thunderstorms, flashes of light, and people screaming, *id.* ¶ 7. Giles received the Purple Heart for wounds received in action. *Id.* ¶ 4; *id.*, Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 54 at 5. The VA rates Giles 50% disabled from PTSD and 10% disabled for his back, for a total of 60%. *Id.* ¶ 8; *id.*, Att. (medical records), ECF No. 54 at 6–8.

Three of Giles' family members are plaintiffs in this lawsuit: his father, William Giles III; his mother, Connie S. Love; and his sister, Tammy G. Adams. Giles' father, William Giles III, learned of the attack on Khobar towers on the day of the attack. Decl. of William E. Giles III ("William E. Giles III Decl.") (filed Dec. 28, 2018) ¶¶ 2, 5, ECF No. 54 (sealed), ECF No. 189 (public). He tried to reach his son by telephone without success, while terrified by the news reports that his son may have been killed or seriously injured. *Id.* He was notified that his son was alive but then a day or more passed before he received further information of his son's

condition. *Id.* ¶ 6. His son's injuries have had a profound impact on their relationship. *Id.* ¶ 9. He is thankful that his son survived and returned home, but notices that his son is very different. *Id.* ¶ 7. His son's PTSD has been a constant strain for him and affects his son's relationships with other people, including himself. *Id.* This hurts him personally, because his son was always so outgoing and seeing his son suffer causes him to suffer, *id.*, because he lost a part of his son that day that he can never get back, *id.* ¶ 8.

Giles' mother, Connie S. Love, learned of the attack on the radio in her beauty salon. Decl. of Connie S. Love ("Connie Love Decl.") (filed Dec. 28, 2018) ¶¶ 4–5, ECF No. 54 (sealed), ECF No. 189 (public). She immediately closed the salon and went home to watch the news, but did not find out that he was alive until 2:00 a.m. that night. *Id.* She describes the wait to hear about her son as "excruciating" and that she was "going crazy not knowing if he was alive or dead." *Id.* Later, when she finally reunited with her son, she could "see how much pain he was in when [she] first laid eyes on him." *Id.* Since her son returned home, Connie has tended to his emotional needs, and, as a result, lost a significant amount of work. *Id.* ¶ 7. She suffers from anxiety because of her constant worrying over her son. *Id.* ¶ 8. Connie still blames herself for letting him join the service, feeling that it is her fault her son is "tortured" and that he "will never be the loving caring son [she] once had." *Id.*

Giles' sister, Tammy G. Adams, was at work with her mother, Connie Love, on the day of the attack. Decl. of Tammy G. Adams ("Tammy Adams Decl.") (filed Dec. 28, 2018) ¶¶ 2, 5, ECF No. 54 (sealed), ECF No. 189 (public). They learned of the attack on the radio and immediately closed the salon. *Id.* ¶ 5. Tammy Adams was "worried to death about [her] brother." *Id.* She did not find out that her brother was alive until the next day, when her mother received a call that he was coming home. *Id.* Once her brother returned home, Tammy Adams

took a month off work to be with him, trying to help him in any way she could.  *Id.* ¶ 6.  She "wanted to be right there with him because he was suffering so much."  *Id*.  She recalls going to the store the Fourth of July after her brother came home.  *Id.* ¶ 7.  When people started setting off fireworks, her brother was severely startled, broke down, and started to cry.  *Id.*  Her empathy for her brother's pain caused her to cry with him.  *Id.*  Her family no longer celebrates the Fourth of July because it brings back those memories.  *Id.*  To this day, she worries about her brother because she knows he is hurting and his pain makes her hurt too.  *Id.*

### 93. *Phillip E. Miller*

On June 25, 1996, Phillip E. Miller was an Airman First Class in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers.  Decl. of Phillip E. Miller ("Phillip Miller Decl.") (filed Dec. 28, 2018) ¶ 3, ECF No. 124 (sealed), ECF No. 212 (public).  At the time of the attack, Miller was standing in front of his wall locker getting dressed.  *Id.* ¶ 4.  The force of the blast threw him back against the wall and he sustained glass and shrapnel wounds to his head, face, and hands.  *Id.*  Once he was able to collect himself, he noticed a ringing in his ears and he could not hear anything.  *Id.* ¶ 5.  He and his roommate left the room and found Sergeant Anderson standing behind a couch in a state of shock.  *Id.*  They exited the building together, "dodging debris and slipping on shattered glass" along the way.  *Id.*  Miller helped Sergeant Anderson get medical attention, before going back into the building to look for other airmen.  *Id.* ¶ 6.  By that time, his hearing had cleared up and he "could hear all the screams at one time."  *Id.*  Eventually, their First Sergeant directed everyone to the mess hall.  *Id.* ¶ 7. Miller remembers seeing "a huge ocean crowd of people moving in with their flash lights," a sight he will never forget.  *Id.*  Miller's "life changed forever after the attack on the Khobar Towers Complex."  *Id.* ¶ 9.  He cannot do many things because he suffers from PTSD, panic

attacks, debilitating headaches, constant nightmares, and flashbacks and avoids large crowds. *Id.* ¶¶ 9–10. He was awarded the Purple Heart for the injuries he received that day. *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated Oct. 10, 1996), ECF No. 124 at 6. The VA has rated him 100% disabled. *Id.* ¶ 10; *id.*, Att. (Letter from VA, dated April 5, 2018), ECF No. 124 at 7–8.

### 94. *Roland L. Tiner Jr. and Three Family Members*

On June 25, 1996, Roland L. Tiner Jr. was a Senior Airman in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers. Decl. of Roland L. Tiner ("Tiner Decl.") (Nov. 9, 2018) ¶ 3, ECF No. 125 (sealed), ECF No. 243 (public). At the time of the bombing, Tiner was in Building 131, where the explosion occurred. *Id.* ¶ 5. He was blown completely across the room and his back slammed into the window air conditioner. *Id.* "Building material and glass embedded itself into [his] body," and he "thought [he] was dead." *Id.* When he regained consciousness, he found his roommate near him with his arm almost completely severed off. *Id.* Tiner tried to stop the bleeding by wrapping a tee shit and sheet around his roommate's arm and then went to get more help. *Id.* "The screaming throughout the building was horrific" and "coming from different parts of the building," with some screams, he could identify as coming from friends. *Id.* While another airman helped his roommate, Tiner followed the screams, "only to find when [he] reached the injured they were dead." *Id.* Someone ordered him to evacuate. *Id.* By the time he made it out of the building, "most of the screaming inside the building had stopped" and he "knew they had all died." *Id.* He has "been living in pain ever since." *Id.* ¶ 6. At the time, he was only wearing boxers and a tee shirt so his "feet were cut to pieces" and he sustained shrapnel wounds to his legs, arms, torso and head. *Id.* Tiner developed PTSD, and has nightmares, constantly feels unsafe, and is often sleepless. *Id.* ¶ 7. He feels "like someone is out to harm [him] and [his] family." He cannot be in crowded

places and lashes out at people and is moody. *Id.* After the attack, he "wouldn't call what [he] ha[s] much of a life." *Id.* Most of his friends have taken their own lives from not being able to live with the horror. *Id.* He received the Purple Heart for the wounds he received that day. *Id.* ¶ 8; *id.*, Att. (Photograph of Purple Heart Medal), ECF No. 125 at 15; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 125 at 14. The VA rates him 100% disabled. *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated Feb. 22, 2018), ECF No. 125 at 11; *id.*, Att. (Letter from VA Regional Office, dated Nov. 11, 2013), ECF No. 125 at 10; *id.*, Att. (VA Decision Review Officer Decision, dated Aug. 21, 2013), ECF No. 125 at 5–7.

Three of Tiner's family members are plaintiffs in this lawsuit: his mother, Annie L. Tiner; his sister, Stacee L. Tiner Marcum; and his brother, Thomas S. Tiner. Tiner's mother heard about the Khobar Towers bombing on the news but was unaware her son was stationed there until a few days later when she received a call at work. Decl. of Annie L. Tiner ("Annie Tiner Decl.") (Sept. 10, 2018) ¶¶ 2, 5, ECF No. 125 (sealed), ECF No. 243 (public). She was informed that he had survived the attack, but was given no information about his condition. *Id.* ¶ 5. She describes that day as "the worst day [she] can remember." *Id.* She received no further information about his condition for many days. *Id.* When he returned home she was unable to see him for almost two weeks. *Id.* ¶ 6. When she finally saw her son again, "[h]e looked like a different person." *Id.* He soon moved in with her and had difficulties finding and holding a job, which led to depression and paranoia. *Id.* Annie is sixty-eight years old, works full time, and still finds time to tend to her forty-nine-year-old son. *Id.* ¶¶ 7–8. In the morning before work, she checks on him to make sure he is still breathing and calls him several times a day, just to make sure he is okay. *Id.* ¶ 7. Sometimes, when he is having a difficult time, she must take time off to be with him. *Id.* She feels "life has cheated [them] both." *Id.* ¶ 8.

Tiner's sister, Stacee, heard about the attack on Khobar Towers from other service members who had served with her brother but had not deployed to Saudi Arabia. Decl. of Stacee L. Tiner Marcum ("Stacee Marcum Decl.") (Sept. 20, 2018) ¶¶ 2, 5, ECF No. 125 (sealed), ECF No. 243 (public). Although they did not have a lot of information about her brother "their demeanor said it all." *Id.* ¶ 5. "Their voices were shaky, everyone was scared." *Id.* She felt "shock and fear" and questioned if her brother was alive, but no one could answer her. *Id.* The days that followed were "chaotic" with her brother's fellow servicemen comforting her while waiting for further information. *Id.* Finally, after several days she was notified that her brother was alive. *Id.* Since her brother returned home, she has "had to watch his life decline, mentally and physically." *Id.* ¶ 7. She sees that her brother's "state of mind has kept him from maintaining relationships or work." *Id.* ¶ 8. Although Tiner receives some disability benefits from the government, his sister and the rest of her family must help him financially. *Id.* She has "spent countless night stressed and crying, staying up worried that [her] brother won't wake up the next day." *Id.* ¶ 9. She knows that he "still suffers from PTSD and survivor's guilt," *id.*, and since the day of the Khobar Towers attack, she in turn has suffered much emotional distress. *Id.* ¶ 11.

Tiner's brother, Thomas, learned that his brother had been in the Khobar Towers attack on the news. Decl. of Thomas S. Tiner ("Thomas Tiner Decl.") (Dec. 31, 2018) ¶¶ 2, 5, ECF No. 125 (sealed), ECF No. 243 (public). A week and a half passed before he was able to know the details of his brother's condition, and he was not made aware of the extent of his brother's injuries until reuniting with him on July 3, 1996. *Id.* ¶ 5. Thomas fears for his brother's life because he believes that his brother has not received the help he needs from the VA hospital. *Id.* ¶ 6. Thomas helps provide his brother with financial and emotional support due to his brother's

PTSD.  *Id.* ¶¶ 6–7.  The injuries his brother sustained in the Khobar Towers attack have impacted their relationship and caused Thomas extreme grief.  *Id.* ¶ 8.

### 95. *David G. Westrup and Three Family Members*

On June 25, 1996, David G. Westrup was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers.  Decl. of David G. Westrup ("Westrup Decl.") (Oct. 24, 2018) ¶ 4, ECF No. 126 (sealed), ECF No. 248 (public).  On the night of the Khobar Towers attack, Westrup was parked outside of Building 129 waiting for a coworker to join him, with a view of the blast site, at Building 131, in the distance.  *Id.* ¶ 5.  When the bomb detonated, the explosion was "so violent" that Westrup was thrown to the ground "like a rag doll[.]"  *Id.* ¶ 6.  When he got back to his feet, he saw a plume of smoke cascading hundreds of feet above the eight-story blast site.  *Id.*  Concrete, glass, and window air conditioners rained down on the parking lot, and the power went off.  *Id.*  Westrup's coworkers came out of Building 129 "bloody[,] seeking help and shelter."  *Id.*  He was "[n]umb and in shock[.]"  *Id.* ¶ 7.  He knew three of his friends had been inside the blast site and was sure they were dead along with the others.  *Id.*  He still "can't put into words how [he] felt that night," *id.,* and he did not sleep for three days, *id.* ¶ 8.  He "struggled with the emptiness, and [the] strong sense of betrayal [he] had because [he] didn't die with [his] roommates."  *Id.*  He sustained a traumatic brain injury and trauma to his ears and head, causing him hearing loss, sharp pain in his ear, numbness and tinnitus.  *Id.* ¶¶ 11–12.  For several months after the attack, he had violent nightmares, would sweat and fight with his wife in his sleep.  *Id.* ¶ 8.  He still has nightmares, albeit less violent ones, and has developed PTSD.  *Id.* ¶¶ 8, 12.  He now panics and finds it hard to breathe around large crowds, with Fourth of July fireworks making him jumpy.  *Id.* ¶ 9.  When Las Vegas was attacked by a sniper, the images of people running for cover caused him to

relapse and seek VA counseling. *Id.* He is "obsessed" with ensuring that his family never forgets his friends that died that night. *Id.* ¶ 10. He was awarded the Purple Heart for wounds received in action. *Id.* ¶ 14; *id.,* Att. (Purple Heart Certificate, dated Aug. 26, 1996), ECF No. 126 at 12; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medals), ECF No. 126 at 6. The VA rated him 30% disabled. *Id.* ¶ 13; *id.*, Att. (Letter from VA, undated), ECF No. 126 at 10–11; *see also id.*, Att. (medical records), ECF No. 126 at 7–9.

Three of Westrup's family members are plaintiffs in this lawsuit: his wife, Rebecca L. Westrup; his son, Michael D. Westrup; and his daughter, Angelena D. Westrup. Westrup's wife received a call from Westrup shortly after the attack. Decl. of Rebecca L. Westrup ("Rebecca Westrup Decl.") (Feb. 16, 2019) ¶¶ 2, 5, ECF No. 126 (sealed), ECF No. 248 (public). He quickly told her that he was alive, that he loved her, and to get everyone she knew on their hands and knees and pray for them, before hanging up abruptly. *Id.* ¶ 5. She then heard on the news that about the attack on Khobar Towers, and rushed home to be with the children to assure them that their father was alive and coming home. *Id.* ¶¶ 5, 6. When he came home, she "remained numb" so that she could "cope with the day-to-day assistance [her husband] needed." *Id.* ¶ 8. He had nightmares for years, and often she would get black eyes and bloody noses from him flailing his arms in his sleep. *Id.* He "is no longer the man [she] married twenty-six years ago," *id.* ¶ 10, and he does not go out unless she is with him, *id.* They no longer attend large functions together. *Id.* Westrup used to love hockey, but now attending a hockey game causes them both severe distress. *Id.* Three to four times a year, they take their children to Elgin Air Force Base to visit those who died during the Khobar Towers attack. *Id.* ¶ 9. The night of the attack was the first night her husband had left early for work in four months. *Id.* He knows that if he had not done so he would be dead too, and his survivor's guilt has strained their marriage and daily life.

*Id.* She does not enjoy life because she is constantly worrying about her husband. *Id.* ¶ 11. "Living with David will always be a challenge." *Id.* ¶ 14.

Westrup's son, Michael, learned about the attack on the Khobar Towers from his stepmother, Rebecca Westrup. Decl. of Michael D. Westrup ("Michael Westrup Decl.") (Sept. 30, 2018) ¶¶ 2, 5, ECF No. 126 (sealed), ECF No. 248 (public). He was eleven at the time and does not remember how long it took to find out if his father was alive, but "it felt like an eternity." *Id.* ¶ 5. After the attack, his separation issues became even worse. *Id.* While he and his father were separated, he constantly worried and waited for another attack. *Id.* It "seemed like forever until [they] were reunited." *Id.* Now, his father is "not the man [he] learned to love as a child before the Khobar Towers" attack. *Id.* ¶ 9. The family is constantly worried about taking his dad anywhere with loud noises and this makes planning frustrating. *Id.* ¶¶ 5, 9. His father's visits with his grandchildren are often cut short and this has been "devastating" for Michael Westrup to see his dad not be a part of his children's lives. *Id.* ¶ 7. The attack not only changed his father's life forever, but it changed Michael's life forever too. *Id.* ¶ 10

Westrup's daughter, Angelena, was at home with her younger brother when they heard the news of the attack on television. Decl. of Angelena D. Mangnall ("Angelena Mangnall Decl.") (Sept. 24, 2018) ¶¶ 2, 5, ECF No. 126 (sealed), ECF No. 248 (public). She was "panicked, scared and confused" not knowing if her father was alive and "fear[ing] that [she] would never see him again." *Id.* ¶ 5. When she finally learned that he had survived she was filled with "life changing emotions[.]" *Id.* Nonetheless, the attack had detrimental effects on her life and her family's life. *Id.* ¶ 6. Seeing her father's survivor's guilt and watching him have nightmares is "heartbreaking." *Id.* Additionally, her father's PTSD affects their family dynamic. *Id.* Family gatherings are often too much for him to bear and he must retreat to a quiet space to

collect himself. *Id.* To recall the details of the attack and how it affected each member of her family's life makes her extremely emotional. *Id.* ¶ 7.

### 96. *Richard E. Rollins*

On June 25, 1996, Richard E. Rollins was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers. Decl. of Richard E. Rollins ("Rollins Decl.") (Nov. 28, 2018) ¶ 3, ECF No. 128 (sealed), ECF No. 225 (public). When the bomb went off Rollins was writing a letter to his now wife, Kendra, in the barracks behind the attack site. *Id.* ¶ 4. The force of the blast gave him a concussion and he was unable to breathe so he "thought [he] was going to die by asphyxiation" and was in "severe pain." *Id.* ¶ 5. He suffered "shrapnel to [the] back of the head and [his] back, asphyxiation, concussion and three open wounds." *Id.* After the attack, he was tended to by Saudi doctors and given counseling by the Army but the attack "changed [his] life forever." *Id.* ¶¶ 4, 8. Rollins now suffers from PTSD. *Id.* ¶ 6. He had been "outgoing, had friends and was always positive" and now he considers himself "anti-social." *Id.* ¶ 8. He has "sleeping issues, mood issues, irritability issues, trust issues and motivational issues" and is "obsessed with the news on terror attacks" and because of them feels "helpless and powerless." *Id.* Rollins received the Purple Heart for wounds received in action. *Id.* ¶ 7; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming medal), ECF No. 128 at 5. The VA has rated him 70% disabled, with 50% due to his PTSD. *Id.* ¶ 6; *id.*, Att. (Letter from VA, dated Dec. 12, 2016), ECF No. 128 at 7–8; *id.*, Att. (VA Rating Decision, dated Oct. 25, 2013), ECF No. 128 at 6; *id.*, Att. (medical records), ECF No. 128 at 9–33.

### 97. *Deborah L. Danielsgale and One Family Member*

On June 25, 1996, Deborah L. Danielsgale was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia and stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Deborah L. Danielsgale ("Danielsgale Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 129 (sealed), ECF No. 178 (public). When the attack occurred, she was taking a shower in her dorm room. *Id.* ¶ 5. The force of the blast slammed her head against the shower wall, as shrapnel cut her feet and legs. *Id.* She was in "severe pain" and "enormously scared." *Id.* In the aftermath of the blast, despite her injuries, she assisted in the setup of the flight line memorial service for the nineteen soldiers killed in the attack. *Id.* She was then appointed to assist the FBI with loading evidence and coordinating transportation to crime labs in the U.S. *Id.* Due to the attack, Danielsgale suffers from PTSD and depression, which has affected her social life and activities and caused her to obtain medical treatment. *Id.* ¶¶ 6–7. She has become forgetful about where she put things, has recurring nightmares, and cannot bear being in a crowd. *Id.* The attack on Khobar Towers "changed [her] life forever" and left her "permanently devastated." *Id.* ¶¶ 6, 8. Danielsgale received the Purple Heart and an Air Force Commendation Medal for her wounds from, and response to, the Khobar Towers attack. *Id.* ¶ 4; *id.*, Att. (Purple Heart Certificate, dated Aug. 5, 1996), ECF No. 129 at 5; *id.*, Att. (Citation to Accompany the Award of the Air Force Commendation Medal), ECF No. 129 at 6.

One of Danielsgale's family members is a plaintiff in this lawsuit: Danielsgale's daughter, Msichanna L. Alexander, who learned of the attack on Khobar Towers from a childhood friend who called and told her there had been a bombing in Dhahran. Decl. of Msichanna L. Alexander ("Msichanna Alexander Decl.") (filed Dec. 28, 2018) ¶¶ 2, 5, ECF No. 129 (sealed), ECF No. 178 (public). She "turned on the TV [and] it was all over the news" and her "entire world started falling apart." *Id.* ¶ 5. She "fell to [her] knees and became hysterical."

*Id.* Approximately twelve hours later, she got a call from her mother. *Id.* ¶ 6. "It was so good to hear her [mother's] voice[] all [she] could do was cry." *Id.* Since the bombing, she has started worrying more about her mother. *Id.* ¶ 8. Her mother often calls "confused, sad[,] or angry because she [can] not remember where she []put her keys or if she put her laundry away." *Id.* ¶¶ 8–9. Msichanna often goes to her mother's house to help her. *Id.* ¶ 8. Her mother gets especially bad each year during the time of the bombing. *Id.* ¶ 9. Msichanna worries about her mother every day and sees how her PTSD affects her life. *Id.* ¶ 10. "Before the attack [her] mother was an outgoing [and] loving parent, grandparent, daughter, sister, aunt, and friend. *Id.* After the attack she has become "reserved and withdrawn," "fearful of loud noises, uncomfortable in crowds, and easily confused, sad[,] and angry." *Id.*

### 98. *Rodney C. Smith and Four Family Members*

On June 25, 1996, Rodney C. Smith was a Technical Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Rodney C. Smith ("Smith Decl.") (filed Dec. 28, 2018) ¶ 4, ECF No. 130 (sealed), ECF No. 238 (public). At the time of the attack, Smith was in his dormitory and his commander had just informed him he was getting a promotion. *Id.* ¶ 5. Soon after his commander left, Smith saw a flash, heard a large sound, and felt a shockwave. *Id.* He was "hit hard and seemingly out of nowhere," and "pelted with glass shrapnel and other debris from [his] face to [his] ankles." *Id.* As he tried to get to safety, he began to walk more and more slowly. *Id.* He "looked down and realized [he] had been hit in multiple locations on [his] body, but [his] legs took the most damage." *Id.* He followed the trail of his blood with his eyes. *Id.* Everywhere he walked he drew a path of blood. *Id.* Then he "realized [he] was paralyzed and bleeding out." *Id.* The youngest member of his team came back to look for him. *Id.* ¶ 6. He "can still hear the sound of

his voice as he saw me and yelled out to the others that I was hurt." *Id.*  Special Forces were nearby and gave him field stitching "to slow down [his] bleeding until [he] could further medical attention." *Id.*  He sustained "neck and back injuries, a dislocated right knee, a hole in [his] left knee, and was paralyzed in both legs." *Id.* ¶ 5.  Shortly after the attack, his First Sergeant and doctor recommended his release for further medical care, but due to a lack of personnel in his field, Rodney stayed in Saudi Arabia. *Id.* ¶ 9.  He was eventually ordered to leave the Area of Responsibility for further medical treatment because the bleeding, pain, and loss of feeling from his injuries were increasing. *Id.* ¶ 10.  When he finally returned to the United States, Rodney was unable to move his legs or wiggle his toes and many of his wounds were infected. *Id.* ¶ 11.  It took him "six months of electric shock therapy, five days a week for fifty minutes a day before [he] could get any feeling back," and another "eighteen months of physical therapy to learn to fully walk again." *Id.* ¶ 7.  His headaches were diagnosed as a symptom of traumatic brain injury. *Id.* ¶ 11.  He has had knee surgery and his knees still give out on him often. *Id.* ¶ 13.  He "relive[s] that attack every step [he] take[s.]" *Id.*  His neck gets so bad sometimes he has trouble holding his head upright. *Id.*  He also suffers from PTSD and other emotional injuries that have impacted his marriage, since he returned stateside "a different person." *Id.* ¶¶ 11–12.  He suffered "severe memory loss." *Id.*  At one point he carried a PDA with him so that he could answer questions for himself and others when he was lost in a memory fog. *Id.*  Smith received the Purple Heart for wounds received in action and the Military Outstanding Volunteer Service Medal in part for his actions during the Khobar Towers attack. *Id.* ¶ 14; *id.*, Att. (Citation to Accompany the Award of Military Outstanding Volunteer Service Medal), ECF No. 130 at 18; *id.*, Att. (Certification of Release or Discharge, confirming medals), ECF No. 130 at 6.  The VA

has rated Smith 90% disabled.  *Id.* ¶ 11; *id.*, Att. (VA Rating Decision, dated Feb. 6, 2015), ECF No. 130 at 8–11.

Four of Smith's family members are plaintiffs in this lawsuit: his wife, Jennie L. Smith; his two daughters, A'Doria T. Smith and Alexandra C. Smith; and his son, Romarus C. Smith. Smith's wife, Jennie, was planning a day of fun with her kids when suddenly her oldest daughter came running into the room and told her to watch the news about a bombing where daddy was. Decl. of Jennie L. Smith ("Jennie Smith Decl.") (Oct. 24, 2018) ¶¶ 2, 5, ECF No. 130 (sealed), ECF No. 238 (public).  As they watched the news together and realized that Smith was at the blast site, her "whole body went numb." *Id.* ¶ 6.  She "had no idea what to do with three young children by [her] side." *Id.*  She "felt helpless[,]" but tried "to stay strong for [her] children." *Id.* Her son went to his room, "just shut down[,]" and began to play with the fighter jet toy his dad had given him, while her daughters cried uncontrollably. *Id.*  It took three days before she learned if her husband was alive. *Id.* ¶ 8.  "The worst thing you want to see is to have two military officers come to your door in uniform." *Id.*  Thankfully, "it was the news [she] wanted to hear.  Rodney was one of the survivors." *Id.*  At the end of the month, when Smith finally called she "felt like someone lifted a house off of [her]," *id.*, but when he came home, "[i]t was like he came home in pieces." *Id.* ¶ 9.  She "did what needed to be done, worked, attended school, and took care of the kids." *Id.*  Her husband "was paralyzed, so everything he needed [she] had to do for him." *Id.*  Sometimes, Smith "would yell and scream at [her] because he felt [she] shouldn't be taking care of him." *Id.* ¶ 10.  She "hung in there, and did what [she] needed to do so he could get better[,]" although she "knew [their] lives would change forever." *Id.*  She continues to struggle to this day because the effects of the attack on her family and daily life have been "devastating." *Id.* ¶ 9.

Smith's daughter, A'Doria, "will always remember the day [her] dad was injured in the Khobar Towers." Decl. of A'Doria T. Smith ("A'Doria Smith Decl.") (Oct. 26, 2018) ¶¶ 2, 5, ECF No. 130 (sealed), ECF No. 238 (public). She was playing with her siblings and watching TV when "a breaking news banner scrawled across the screen, and later the special report broadcast broke in." *Id.* She watched for a few minutes and then called her mom. *Id.* Her mom reassured A'Doria that that was not where her father was stationed so A'Doria went back to playing, until the phone rang. *Id.* After the first phone call, things became a little blurry. *Id.* ¶ 6. She "remembers people calling and visiting" and "overhearing that [her] dad was listed as M.I.A until June 27th." *Id.* Finally, her dad returned home on July 4th, but "things were different." *Id.* ¶¶ 6–7. Her mom "tried to explain what happened[,]" "told her not to slam things," and to "inform [her] dad when [she was] going to vacuum." *Id.* As the oldest, A'Doria took it upon herself to make sure her siblings followed the new rules. *Id.* Since the attack, she has become very protective of her family and was later diagnosed with obsessive compulsive disorder and anxiety. *Id.* ¶ 9. Now, sometimes if she cannot get a hold of her parents by phone, she has a panic attack. *Id.* She is very "thankful for [her] dad returning home, but [she] feel[s] like part of him still remains in Saudi Arabia." *Id.*

Smith's daughter, Alexandra, learned of the Khobar Towers attack on the news. Decl. of Alexandra C. Smith ("Alexandra Smith Decl.") (Oct. 25, 2018) ¶¶ 2, 5, ECF No. 130 (sealed), ECF No. 238 (public). As she watched with her family, her mother reassured her that her dad was not there, but when they started to get a lot of phone calls, she found out her dad had indeed been stationed in the Khobar Towers. *Id.* After that "all [she] remember[s] are the thoughts of dread, anxiety, and what [they] would do without [her] dad." *Id.* When her dad did come home, "it was a big adjustment for the entire family." *Id.* ¶ 6. They had to be careful about speaking

loudly and slamming doors because loud noises would upset him.  *Id.*  The effects of the bombing have had a lasting effect on the whole family.  *Id.* ¶ 7.  Her dad's temperament changed and she often "wonder[s] if he hadn't been hurt how much better [their] family dynamic would be."  *Id.*

Smith's son, Romarus, learned about the Khobar Towers attack from the "breaking news" bulletin that interrupted regular programming as he was watching television that day.  Decl. of Romarus C. Smith ("Romarus Smith Decl.") (Oct. 18, 2018) ¶¶ 2, 5, ECF No. 130 (sealed), ECF No. 238 (public).  He was so young at the time, he did not really understand what was happening, but he kept his eyes on the television.  *Id.* ¶ 6.  He remembers "[w]atching the numbers and pictures of those who were injured, missing and killed from the attack, [and they] led [him] to think [his] dad may not be coming back home[.]"  *Id.*  Watching his family hurt so much was "a horrible feeling" and he felt "an indescribable feeling of void."  *Id.*  When he was finally able to see his father, he knew "right when he came through the door [that] he was different."  *Id.* ¶ 7.  "[I]t still puts [him] in shock to think of what [his] dad went through that day."  *Id.* ¶ 8.  Romarus is thankful that his dad came home but he "will always know [he] lost a lot of him in Saudi Arabia."  *Id.*

### 99. *Elliott Williams and Four Family Members*

On June 25, 1996, Elliott Williams was a Staff Sergeant in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Elliott Williams ("Elliott Williams Decl.") (Jan. 18, 2019) ¶ 4, ECF No. 131 (sealed), ECF No. 251 (public). When the attack hit, Williams was watching TV on the fifth floor of the building next to Building 131.  *Id.* ¶ 5.  He saw a bright flash out of his left eye, and everything went black.  *Id.* "It sounded like a freight train coming [into his] apartment."  *Id.*  The patio door that Williams

was sitting beside fell on him and the shards of glass and door frame hit him causing his eye to swell shut and cuts across his face, arms, and legs and bruises to his body. *Id.* ¶¶ 5–6. He lost a lot of blood but his roommate was able to tend to his injuries. *Id.* ¶ 5. Williams still has pain in both knees, and his entire left hand suffers from nerve damage. *Id.* ¶ 6. He also suffers from PTSD, which causes him constant nightmares and "to wake up screaming," to be "constantly on guard" and "deeply startled by loud noises." *Id.* ¶ 8. His PTSD "scarred [him] for life." *Id.* He received the Purple Heart for his wounds. *Id.* ¶ 10; *id.*, Att. (Purple Heart Certificate, dated July 2, 1996), ECF No. 131 at 20. The VA has rated Williams as 40% disabled. *Id.* ¶ 7; *id.*, Att. (Letter from VA, dated July 26, 2005), ECF No. 131 at 5–10; *see also id.*, Att. (medical records), ECF No. 131 at 11–19.

Four of Williams' family members are plaintiffs in this lawsuit: his wife, Dana L. Williams; his stepson, Erik B. Lee; his son, Chad T. Williams; and his daughter, Kelsie A. Williams. Williams's wife heard the day after the attack that her husband had been injured and she was "deeply concerned for [her husband] and very scared." Decl. of Dana L. Williams ("Dana Williams Decl.") (Jan. 17, 2019) ¶¶ 2, 6, ECF No. 131 (sealed), ECF No. 251 (public). When Williams returned to the U.S. several days later, she was "very relieved that he was home alive but [she] was so distressed at what he had experienced in the bombing." *Id.* ¶ 7. The days and months following the bombing were "very trying on their marriage." *Id.* ¶ 8. Williams "would wake up in the middle of the night screaming for no apparent reason" and was very frightened of any loud noises. *Id.* He "still has anger episodes" and the attack has had a "profound impact on [their] relationship." *Id.* ¶¶ 9–10.

Williams' stepson, Erik, heard from his mother the day after the attack that his step-father had been injured. Decl. of Erik B. Lee ("Lee Decl.") (Jan. 17, 2019) ¶¶ 2, 5, ECF No. 131

(sealed), ECF No. 251 (public). Erik lived with his mother and Williams "as a family full-time while [he] was growing up," and Williams "was completely financially responsible for [him] and [] raised [him] as if [he] were his own child." *Id.* ¶ 2. He has always thought of Williams as his father. *Id.* When Williams returned to the U.S., "[h]e was all bandaged up and he had a black eye." *Id.* ¶ 6. Erik was happy to see him, but "knew he was still hurting." *Id.* He recognizes that his step-father "still has issues with loud noises," and gets "very angry and then he tries to explain why he gets so upset." *Id.* ¶ 7. His stepson "can still see the pain in his eyes from the aftermath of the bombing[,]" and "continue[s] to experience[] extreme grief" because of his stepfather's injuries from the Khobar Towers attack. *Id.* ¶ 8.

Williams' son, Chad, was, on the day of the attack, on the baseball field practicing with the other Shaw Air Force Base All-Stars getting ready for a regional tournament, when his mother pulled him out of practice early. Decl. of Chad T. Williams ("Chad Williams Decl.") (Jan. 18, 2019) ¶¶ 2, 6, ECF No. 131 (sealed), ECF No. 251 (public). She told him that something happened in Saudi Arabia and that his dad was hurt. *Id.* He will never forget the day his dad came back home, noting that that "was one of the only days [he] remember[s] crying in front of [his] parents[.]" *Id.* ¶ 7. When his dad got off the plane from Saudi Arabia, Chad "could see [his dad] was hurting." *Id.* ¶ 8. To this day, he experiences "extreme grief and distress" because of his father's injuries from the Khobar Towers attack. *Id.* ¶ 11.

Williams' daughter, Kelsie, was three years old at the time of the attack and "[does not] remember much," except sitting on her aunt's shoulders and waving a small American flag as her dad got off the plane. Decl. of Kelsie A. Williams ("Kelsie Williams Decl.") (Jan 7, 2019) ¶¶ 2, 6, ECF No. 131 (sealed), ECF No. 251 (public). No one had told her what happened while her dad was gone and when she saw him covered in cuts and bruises, she became frightened. *Id.* As

she got older, she found it difficult to grow up with a father with PTSD.  *Id.* ¶ 8.  He would have nightmares and wake up shouting, which was frightening for her because she did not understand PTSD, or exactly what happened in the Air Force.  *Id.*  She "felt grief and sadness that he experienced such a serious attack and lost his friends."  *Id.*

### 100.   *Joseph D. Wilson and Eight Family Members*

On June 25, 1996, Joseph D. Wilson was a service member in the U.S. Air Force deployed to Saudi Arabia, stationed at Khobar Towers in Dhahran, Saudi Arabia.  Decl. of Joseph D. Wilson ("Joseph Wilson Decl.") (Jan. 17, 2019) ¶ 7, ECF No. 132 (sealed), ECF No. 253 (public).  At the time of attack, Wilson was at home on the sixth floor of Building 131, the building closest to the explosion.  *Id.* ¶ 8.  A security officer knocked on his door and demanded he exit.  *Id.*  The bomb exploded as he proceeded down the stairwell.  *Id.*  The blast threw Wilson on the floor and knocked him unconscious.  *Id.*  When he regained consciousness, he was surrounded by dust, smoke, and broken glass, and he thought they had been hit by a rocket and braced himself for another impact.  *Id.* ¶¶ 8–9.  When none came, he helped treat the other injured airmen.  *Id.* ¶ 9.  He was devastated to learn that his best friend for over fifteen years and an airman under his command, Staff Sergeant Ronald L. King, was killed in the blast.  *Id.* ¶ 11.  Wilson sustained a concussion, a dislocated knee, a lower back injury, multiple lacerations, and shrapnel wounds from the broken glass.  *Id.* ¶ 10.  His knee and back still cause him pain to this day.  *Id.*  When he returned to his permanent duty station, he began having migraines and trouble falling asleep.  *Id.* ¶ 13.  If he managed to fall asleep, he had nightmares about the bombing and would scream in his sleep, as well as having flashbacks of the attack.  *Id.* ¶¶ 13, 15.  Since the bombing, his personality has changed.  *Id.* ¶ 16.  Once easy going and sociable, he now often feels angry and aggressive, with trouble controlling his emotions, and has coped by drinking.  *Id.*

To this day, he gets startled by loud noises or when someone comes up behind him without him noticing. *Id.* ¶ 18. Wilson has sought treatment for PTSD at the VA's Trauma Treatment Program in Mental Health and participated in PTSD coping programs. *Id.* ¶ 20. Wilson received the Purple Heart for wounds received in action, the Air Force Expeditionary Service Ribbon, the Outstanding Unit Award, and the Air Force Sgt. Ronald L. King Outstanding Contingency Contracting Award, named in honor of his friend who died that day. *Id.* ¶¶ 11, 22–23; *id.*, Att. (Special Order from Department of the Air Force, dated Aug. 8, 1996, confirming Purple Heart), ECF No. 132 at 33; *id.*, Att. (Certificate of Release or Discharge from Active Duty, confirming Purple Heart), ECF No. 132 at 8. The VA rates Wilson 30% disabled from PTSD and alcohol abuse. *Id.* ¶ 21; *id.*, Att. (VA Rating Decision, dated Sept. 13, 2010), ECF No. 132 at 29–32.

Eight of Wilson's family members are plaintiffs in this lawsuit: his wife, Toni Olsen-Wilson; his stepson, Brandon C. Olsen; his son, Brenton M. Wilson; his four living brothers, Richard T. Wilson, Daryl B. Wilson, Eric L. Wilson, and Joe Wilson Jr.; and his deceased brother Rodney S. Wilson, whose estate is represented by Daryl B. Wilson.[5] Wilson's wife "immediately feared the worst" when she learned of the bombing of the Khobar Towers, and the two-day wait to learn that Wilson was still alive was "unbearable." Decl. of Toni Olsen-Wilson ("Toni Olsen-Wilson Decl.") (Jan. 17, 2019) ¶¶ 2, 6, ECF No. 132 (sealed), ECF No. 253 (public). She was finally reunited with him two weeks later. *Id.* Wilson is "the love of [her] life" and was "the best role model" to their kids. *Id.* ¶ 5. "The Khobar Towers bombing shattered [their] lives forever." *Id.* ¶ 6. Once Wilson returned home, she noticed the manifestation of his physical and emotional injuries immediately—his cuts, trouble sleeping, migraines, consistent nightmares, and that he had begun drinking heavily. *Id.* ¶ 7. She had

---

[5]     *See* Minute Order, dated Jan. 30, 2019 (granting motion for substitution of plaintiff-decedent Rodney S. Wilson with Daryl B. Wilson, in his capacity as personal representative for the Estate of Rodney S. Wilson).

tremendous sympathy for him, but still, was fearful that her husband would become angry or violent. *Id.* ¶¶ 7–8. Since the attack, her husband avoids crowds, his children's sporting events, family outings, and vacations. *Id.* ¶ 9. She often feels helpless because she does not know how to fix the problem or his excessive drinking. *Id.* ¶¶ 9, 11. She finds it difficult to live with someone who is so withdrawn, nervous, and fearful, and as his wife, she feels his trauma. *Id.* ¶¶ 10–11. She became depressed and feels "as though [she] were a direct victim of the trauma." *Id.* ¶ 10. She also is angry at the way the bombing affected not only her husband's life, but her life, and the life of her children since her husband had always been out-going, fun-loving, and great to be around. *Id.* ¶ 14. The Khobar Towers attack "changed the way [she] feel[s] about the world." *Id.* ¶ 10.

Wilson's son, Brenton, was twenty-five months old at the time of the Khobar Towers bombing. Decl. of Brenton M. Wilson ("Brenton Wilson Decl.") (Jan. 17, 2019) ¶¶ 2, 8, ECF No. 132 (sealed), ECF No. 253 (public). Although he does not remember that time of his life well, he does remember people coming to his house and consoling his mother. *Id.* He later learned that the bombing caused his father to develop PTSD, which "explains a lot of what happened in our home while I was growing up." *Id.* ¶ 9. His father was "difficult[,]" had "a bad temper[,]" and nightmares, with yelling in his sleep that frightened Brenton. *Id.* ¶¶ 9–10. The bombing had an emotional effect on his father that affected Brenton's personal relationship with him. *Id.* ¶ 12. His father would not attend Brenton's sporting events, disappointing Brenton "because [his] friends' fathers would be there." *Id.* ¶ 14. To this day, he tries "to be careful around him and [tries] not to irritate him." *Id.* During his childhood, his father drank heavily and as he got older he realized that his father was an alcoholic as a result of the Khobar Towers bombing. *Id.* ¶ 15. He "felt an obligation to [his father] and to [his family] to help him stop

drinking," but try as he may, he could not stop his dad from drinking.  *Id.*  Now that he understands PTSD, he feels sorry that his father still has symptoms.  *Id.* ¶ 18.  He tries hard to let him know that he loves him and sympathizes with him.  *Id.*  His dad's experience in the Khobar Towers bombing had a detrimental effect on Brenton's own emotional heath and he feels that his father "transmitted some of that trauma to [him], along with all the love and caring of a father." *Id.* ¶¶ 19–20.

Wilson's stepson, Brandon, was seven-years old at the time of the Khobar Towers bombing.  Decl. of Brandon C. Olsen ("Brandon Olsen Decl.") (Jan. 17, 2019) ¶¶ 2, 10, ECF No. 132 (sealed), ECF No. 253 (public).  He remembers people coming and going, consoling his mother.  *Id.* ¶ 10.  Wilson, Toni Olsen-Wilson, Brenton Wilson, and Brandon Olsen were a "so-called 'blended family' but it didn't feel that way[,]" since Brandon knew that his stepfather "loved [him] as if [he] was his own son.  He always treated [him] and [his] brother Brenton equally."  *Id.* ¶ 5. Wilson was "a great role model" and Brandon was "proud that he served in the Air Force."  *Id.* ¶ 6.  When his stepdad came home, Brandon saw that he had changed, citing that his stepdad started drinking heavily, no longer threw the football around after work and would come home and go straight to his room.  *Id.* ¶¶ 12, 14.  As Brandon got older, he recognized the signs of his stepfather's PTSD but felt helpless and angry because he did not know how to fix the problem, how best to be there for his mom, or how to stop his father's excessive drinking.  *Id.* ¶¶ 18–19.  He was often disappointed when his dad missed his sporting events and family outings.  *Id.* ¶ 18.  He feels sorry that his father must deal with PTSD.  *Id.* ¶ 20.  One of his "fondest memories" is the day his father was awarded the Purple Heart for his injuries at the Khobar Towers bombing.  *Id.* ¶ 16.  As the military band played, Brandon and his

family were escorted to their seats so that they could have a good view of the pinning ceremony. *Id.* Brandon had not seen his dad smile like that in a long time. *Id.*

Wilson's brother, Richard, was at work when he heard about the Khobar Towers attack on the news and "could only imagine the worst." Decl. of Richard T. Wilson ("Richard Wilson Decl.") (Oct. 26, 2018) ¶¶ 2, 7, ECF No. 132 (sealed), ECF No. 253 (public). One or two days passed before he was able to reach the Red Cross and learn that his brother was alive. *Id.* ¶ 8. Still, he "wouldn't rest" until he saw his brother in the fall of 1997, noting that they were particularly close growing up. *Id.* ¶ 6, 8. Ever since the bombing, he has noticed that his brother has changed dramatically. *Id.* ¶ 9. Now, his brother "keeps to himself" and has become "a different person, a stranger," *id.*, who is "very hard to get along with" and "withdrawn from the rest of the family." *Id.* ¶ 10. After the attack on the Khobar Towers, "the family stopped getting together" and Richard does not "know that things will ever be the same for [them] as a family[.]" *Id.* ¶ 12. "Joseph's PTSD has certainly taken its toll" on the family and on each family member individually. *Id.* ¶ 13.

Wilson's brother, Daryl, learned of the bombing and "became extremely anxious and fearful for his [brother's] safety," but he did not learn that Wilson was still alive until "at least two days" had passed. Decl. of Daryl B. Wilson ("Daryl Wilson Decl.") (Jan. 21, 2019) ¶¶ 2, 6, 7, ECF No. 132 (sealed), ECF No. 253 (public). The effects the attack had on his brother's daily life and family life were "devastating," and Daryl's personal relationship with Wilson "completely changed." *Id.* ¶ 8. As kids, they "went everywhere together, wore each other's clothes, and played with each other's toys." *Id.* ¶ 5. After the bombing, Wilson was "very different" and "very hard to get along with." *Id.* ¶ 9. "His PTSD caused him to become withdrawn" and "aggressive[.]" *Id.* After the bombing they "stopped most of [their] family

events such as annual barbecues, vacations together and holiday gatherings." *Id.* ¶ 11. Just "knowing that something terrible can happen, [like the Khobar Towers attack], out of the blue, [has] made [Daryl Wilson] very fearful." *Id.* ¶ 12.

Wilson's brother, Rodney, drafted a declaration to submit in this case, but passed away on October 9, 2018, before he could sign and submit the declaration to counsel. Decl. of Daryl B. Wilson as Personal Representative on Behalf of the Estate of Rodney S. Wilson ("Estate of Rodney Wilson Decl.") (Jan. 1, 2019) ¶¶ 3–4, 21, ECF No. 132 (sealed), ECF No. 253 (public). Daryl B. Wilson is a court-appointed Personal Representative of Rodney S. Wilson's estate. *Id.* ¶¶ 5, 8. He makes a declaration on Rodney's behalf for the purposes of this lawsuit. *Id.* ¶ 9. His knowledge of the impact that the Khobar Towers attack had on Rodney comes from his close relationship with his brother Rodney, and their conversations and interactions in the years since Wilson was injured. *Id.* After the Khobar Towers attack, their mother called Rodney and told him that Wilson was at the site of the bombing. *Id.* ¶ 13. Rodney felt "an incredible shock[,]" "extreme grief and distress while waiting to find out what happened to [his brother Wilson]." *Id.* ¶¶ 13–14. "The waiting was excruciating for Rodney and for the whole family." *Id.* ¶ 14. About two days later, their mother called him to let him know that Wilson had survived the bombing. *Id.* ¶ 15. When Wilson returned home, however, he "kept to himself, even when the family was together, and didn't really want to take part in [their] conversations like he used to." *Id.* ¶ 17. "Rodney was very distressed about how [Wilson] had been changed by the bombing[,]" and even began to feel fearful himself. *Id.* ¶¶ 17, 19. Before his death, Rodney told his brother Daryl that knowing something as terrible as the Khobar Towers attack can happen with such suddenness, "made him very anxious[,]" and he often worried about the possibility of another "attack or other terrible incident." *Id.*

Wilson's brother, Eric, was watching CNN when the attack was reported. Decl. of Eric L. Wilson ("Eric Wilson Decl.") (Oct. 24, 2018) ¶¶ 3, 5, ECF No. 132 (sealed), ECF No. 253 (public). Their mother called Eric to share that Wilson was on the base that had been attacked, and that she could not get any information about whether he was alive. *Id*. ¶ 6. He was "terrified not knowing anything." *Id.* "After what seemed to be forever, [he] received another call from [his] mother stating that Joseph was still alive." *Id.* Since he has been back home, his brother "is nothing like the brother [he] grew up with." *Id.* ¶ 7. Now, he has to "watch everything that [he] say[s] around him because [he does not] know what will set him off." *Id.* Wilson is "reserved and always gives short answers to everything." *Id.* The family "hardly do[es] anything together now," and Eric Wilson "feel[s] that [he] lost [his] brother forever even though he is alive." *Id.*

Wilson's brother, Joe, heard about the attack on the Khobar Towers from his mother, who called him immediately after she found out. Decl. of Joe T. Wilson ("Joe Wilson Decl.") (Oct. 28, 2018) ¶¶ 2, 6, ECF No. 132 (sealed), ECF No. 253 (public). Waiting for information about his brother was a "very anxious" and "stressful couple of days." *Id.* ¶ 6. When his brother came home, Joe "saw that he was a changed person." *Id.* ¶ 8. "His temperament was different. He was always on alert. He seemed like a different person." *Id.* ¶ 8. Joe feels that the attack "took [his] very close brother away from [him]," *id.,* since his "personal relationship with [Wilson] changed." *Id.* ¶ 9. "The companionship and closeness [a]re no longer there." *Id.* When they do get together, if his "brother doesn't take his psychiatric medications, he is extremely moody and very quiet." *Id.* ¶ 11. After twenty-two years, it still affects Joe to watch his brother "act so differently from the brother [he] knew when [he] was a teenager." *Id.* ¶ 10.

### 101. *Kevin Williams and Two Family Members*

On June 25, 1996, plaintiff Kevin S. Williams was a First Lieutenant with the U.S. Air Force on a tour of duty to Dhahran Air Force Base and housed in Khobar Towers. Decl. of Kevin S. Williams ("Kevin Williams Decl.") (Nov. 11, 2018) ¶ 5, ECF No. 134 (sealed), ECF No. 252 (public). At the time of the attack, Williams was in his room sitting near the window. *Id.* ¶ 6. The blast of the truck bomb shattered all the windows, causing Williams to sustain "[c]uts . . . in the back and side of [his] head, shoulder, arms, hands, back, and legs." *Id.* He administered self-aid and was given buddy care by his fellow airmen, before being taken to the Desert Rose Triage Clinic where he was given additional bandaging and treated for shock and dehydration. *Id.* ¶ 7. Since the attack he has suffered from "PTSD, with bouts of depression, intense reflection, nightmares, and fear and anxiety, especially during travel and large events that could be subject to attack." *Id.* ¶ 9. He now "constantly look[s] for terrorist situations at large gatherings and sporting events, and when traveling both in the U.S. and overseas." *Id.* When he first returned home, he had frequent nightmares. *Id.* ¶ 10. At one point, he even "roll[ed] his wife out of bed onto the floor to protect her during a bad thunderstorm[.]" *Id.* He has lashed out at his family members in anger and has had "wild mood swings." *Id.* The anniversary of the attack "always brings back horrible memories and great sadness. The year 2016 was very difficult [for him] and [he] experienced bouts of depression and many nightmares upon [his] retirement from the military in April 2016, and as [he] reflected on the twenty-year anniversary of the attack." *Id.* ¶ 11. He teaches a course on Homeland Security at Air University and is "constantly reminded of this terrible event as [he] share[s] [his] experience with the students and staff." *Id.* He suffered permanent hearing loss in his right ear from the blast. *Id.* ¶ 12. Williams received the Purple Heart and the Airforce Achievement Medal. *Id.* ¶ 8; *id.*, Att. (Purple Heart Certificate, dated Feb. 3, 2016), ECF No. 134 at 9; *id.*, Att. (Certificate of Release or Discharge

from Active Duty, confirming medals), ECF No. 134 at 4–5; *id.*, Att. (Air Force Achievement Medal Certificate, dated Jan. 27, 1997), ECF No. 134 at 11.  The VA rates him as 80% disabled. *Id.* ¶ 12; *id.*, Att. (Letter from VA, dated June 28, 2018), ECF No. 134 at 19–20; *see also id.*, Att. (medical records), ECF No. 134 at 8.

Two of Kevin Williams' family members are plaintiffs in this lawsuit: his mother, Lorna M. McDermott; and his brother, Eric R. Williams.  Kevin Williams' mother first heard about the attack on Khobar Towers as she was getting ready to go to the airport to celebrate her mother's birthday.  Decl. of Lorna M. McDermott ("McDermott Decl.") (Nov. 15, 2018) ¶¶ 2, 5, ECF No. 134 (sealed), ECF No. 252 (public).  When she arrived at the airport, her former sister-in-law met her at the airport and told her that her son had been able to call before Dhahran's phone lines had been shut off to let them know that he had been injured, but was okay.  *Id.* ¶ 6.  He did not tell them the extent of his injuries, and his mother was unable to get in touch with him.  *Id.*  She spent the next two days "frantically worried and watching television for any news."  *Id.* Williams had been scheduled to come home from a three-month tour of duty but stayed for an extra three months to help with the aftermath of the attack.  *Id.* ¶ 7.  When her son came home, she realized that he had developed PTSD, with symptoms that have adversely affected their relationship.  *Id.* ¶¶ 8–9.  The effects of the attack on Lorna's daily life and family life were "devastating" and cause her "much anxiety."  *Id.* ¶ 9.

Kevin Williams' brother, Eric, was in college in Lincoln, Nebraska when his father called to tell him his brother had been at the attack at Khobar Towers.  Decl. of Eric R. Williams ("Eric Williams Decl.") (Jan. 24, 2019) ¶¶ 2, 5, ECF No. 134 (sealed), ECF No. 252 (public).  He was "in shock and disbelief for a period of three days, until [his] family finally heard from [his] brother]."  *Id.*  When he was finally able to speak with his brother, Eric had "incredible relief just

knowing that [he] was alive." *Id.* When his brother returned to the United States, however, Eric immediately noticed that he was different and "much quieter than he had been before the attack." *Id.* ¶ 6. "The gregarious [brother] who was deployed came back a very different man." *Id.* Eric subsequently had a "constant fear that [he] could lose [his brother] at any time. *Id.* ¶ 8. He "desire[d] to be closer to [his] brother," but "[his brother] remained distant and grew short on his temper." *Id.* The feelings of loss since the bombing at Khobar Towers have left Eric Williams "with a lifetime of anguish and sorrow." *Id.*

### D. Procedural History

The plaintiffs filed this lawsuit against the defendants on July 13, 2017. *See* Compl. As discussed, *infra* in Part III.B, the defendants were properly served summons in accordance with the FSIA, which provides the procedure for completing service upon a foreign state or political subdivision of a foreign state. *See* Return of Service, ECF No. 13. The Clerk entered default against the defendants on April 23, 2018. Entry of Default, ECF No. 15. The plaintiffs then filed a motion for judicial notice of prior related cases and for default judgment as to liability and damages. *See* Pls.' Mem.[6]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). "[S]trong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an

---

[6] The plaintiffs originally sought entry of default judgment after an evidentiary hearing, *see* Pls.' Mot. for Default Judgment as to Liability and Damages Upon Evidentiary Hearing Against Defendants and Pls.' Mem. Supp. Mot. Default J., ECF No. 16, but subsequently withdrew that request in favor of submitting documentary evidence as to damages, *see* Pls.' Resp. to Order of the Court, ECF No. 18, and thereafter filed the pending renewed motion for default judgment, *see* Pls.' Mot. for Judicial Notice of Prior Related Cases and Default J. and Mem. Supp. Pls.' Mot. for Judicial Notice, ECF No. 146.

essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). Thus, the procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. "In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing.'" *Id.* at 7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* at 7. A court may not, however, "act *sua sponte* to raise affirmative defenses on behalf of defendants who do not appear to defend actions against them." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1113 (D.C. Cir. 2019).

Finally, when default judgment is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d). *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments

against the U.S. Government under rule 55(e), F.R. Civ. P.").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf*, 923 F.3d at 1114.

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'"  *Id.* at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  Courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence."  *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  "In a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'"  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)) (alteration in original).  Uncontroverted factual allegations that are supported by admissible evidence are taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007));

*accord* Fed. R. Civ. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

Finally, the D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion," and its "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient,'" *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, *et al.*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens*, 864 F.3d at 785), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785).

## III. DISCUSSION

A default judgment may be entered when (1) the Court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. Each of these requirements is addressed *seriatim* below.

### A. Subject-Matter Jurisdiction under the FSIA

This Court may exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" in "nonjury civil action[s]" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). As the plaintiffs seek *in personam* relief, the remaining question is whether the defendants are entitled to immunity under the FSIA or another international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies. *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic*

*Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  The plaintiffs invoke jurisdiction under §

1605A of the FSIA, which provides that "[a] foreign state shall not be immune from the

jurisdiction of courts of the United States or of the States in any case . . . in which money

damages are sought against a foreign state for personal injury or death that was caused by an act

of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material

support or resources for such an act . . . ."  28 U.S.C. § 1605A(a)(1).  The plaintiffs must prove

four elements to establish subject-matter jurisdiction under this exception: (1) "the foreign

country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782

F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)); (2) "the 'claimant or the victim was' a

'national of the United States' at that time," *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or

was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II); (3) "in a case in which

the act occurred in the foreign state against which the claim has been brought, the claimant has

afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. §

1605A(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death

caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

material support or resources for such an act,' if 'engaged in by an official, employee, or agent'

of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)).  The

plaintiffs have satisfactorily proven the applicable elements here.[7]

   With respect to the first element, Iran has been designated a state sponsor of terrorism by

the U.S. Department of State since 1984, and, consequently, retained this designation at the time

---

[7]        Although this suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's
terrorism exception established at 28 U.S.C. § 1605A(b), the "limitation period in § 1605A(b) is not jurisdictional,"
and the defendants have "forfeited [their] affirmative defense . . . by failing to raise it in" this Court.  *Owens*, 864
F.3d at 804; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019) (holding that a
district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

of the Khobar Towers bombing. *See* Compl. ¶ 17; *see also Blais*, 459 F. Supp. 2d at 47 ("Iran . . . has been designated a state sponsor of terrorism . . . since January 19, 1984." (internal quotation marks omitted)). The IRGC, as "a powerful military instrument for defending and furthering Iran's Islamic fundamentalist revolution," Compl. ¶ 10, is included within the FSIA's definition of a "foreign state" as encompassing "a political subdivision of a foreign state or an agency or instrumentality" thereof, 28 U.S.C. § 1603(a); *see Rimkus*, 750 F. Supp. 2d at 180 (finding that the IRGC "constitute[s] [an] integral part[] of Iran's political structure, and thus constitute[s] a foreign state for [FSIA] purposes"). Finally, the third and last defendant, MOIS, is a political subdivision within the meaning of the FSIA. *See Blais*, 459 F. Supp. 2d at 53 (stating that "MOIS and the IRGC are considered to be a division of state of Iran."). Consequently, the plaintiffs have satisfied the first element as to all three defendants.

As to the second element, the plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack, supported by confirming documentation, such as copies of their passports, birth certificates, or similar documents.[8] Thus, the second element is firmly established.

---

[8] *See* Schooley Decl. ¶ 1 (attesting to the declarant's United States citizenship); Adams Decl. ¶ 1 (same); Carol Adams Decl. ¶ 1 (same); Albritton Decl. ¶ 1 (same); Sandra Albritton Decl. ¶ 1 (same); Weinfurter Decl. ¶ 1; Alston Decl. ¶ 1 (same); Brittany Alston Decl. ¶ 1 (same); Marcus Alston Decl. ¶ 1 (same); Ayala Decl. ¶ 1 (same); Fernando Ayala Decl. ¶ 1 (same); Zandra Ayala Decl. ¶ 1 (same); John Ayala Decl. ¶ 1 (same); Baldwin Decl. ¶ 1 (same); Bobby Baldwin Decl. ¶ 1 (same); Beach Decl. ¶ 1 (same); Bobby Baldwin III Decl. ¶ 1 (same); Steven Baldwin Decl. ¶ 1 (same); Benfield Decl. ¶ 1 (same); Gloria Brown Decl. ¶ 2 (same); Jimmy Brown Decl. ¶ 1 (same); Collin Decl. ¶ 1 (same); Brock Decl. ¶ 1 (same); Locke Decl. ¶ 1 (same); Broda Decl. ¶ 1 (same); Pamela Broda Decl. ¶ 1 (same); Alycia Broda Decl. ¶ 1 (same); Brown Decl. ¶ 1 (same); Amanda Brown Decl. ¶ 1 (same); Bump Decl. ¶ 1 (same); Valerie Bump Decl. ¶ 1 (same); Burnham Decl. ¶ 1 (same); Ralph Burnham Decl. ¶ 1 (same); Margaret Burnham Decl. ¶ 1 (same); Debra Burnham Decl. ¶ 1 (same); Dwight Burnham Decl. ¶ 1 (same); Keelan Burnham Decl. ¶ 1 (same); Rondal Burns Decl. ¶ 1 (same); Rebekah Burns Decl. ¶ 1 (same); Ledgerwood Decl. ¶ 1 (same); Nickolaus Burns Decl. ¶ 1 (same); Caines Decl. ¶ 1 (same); Peak Decl. ¶ 1 (same); John Dean Decl. ¶ 1(same); Carmen Dean Decl. ¶ 1 (same); Capaccio Decl. ¶ 1 (same); Martucci Decl. ¶ 1 (same); Clevenger Decl. ¶ 1 (same); Collins Decl. ¶ 1 (same); Cotterman Decl. ¶ 1 (same); Davis Decl. ¶ 1 (same); DePyssler Decl. ¶ 1 (same); Robert W. DePyssler Decl. ¶ 1 (same); Dupree Decl. ¶ 1 (same); Edman Decl. ¶ 1 (same); Elizabeth Edman Decl. ¶ 1 (same); Freeman Decl. ¶ 1 (same); Atkins Decl. ¶ 1 (same); Patricia Atkins Decl. ¶ 1 (same); Gardner Decl. ¶ 1 (same); Giles IV Decl. ¶ 1 (same); Giles III Decl. ¶ 1; Love Decl. ¶ 1 (same); Tammy Adams Decl. ¶ 1 (same); Goff Decl. ¶ 1 (same); Grimm Decl. ¶ 1 (same); Hale Decl. ¶ 1 (same); Hardy Decl. ¶ 1 (same); Harner Decl. ¶ 1 (same); Julia Harner Decl. ¶ 1 (same); Nancy Harner Decl. ¶ 1 (same); James Harner Decl. ¶ 1 (same);

The plaintiffs in this case need not satisfy the third element because the attack took place in Saudi Arabia, not Iran, and thus the statutory requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action does not apply. 28 U.S.C. § 1605A(a)(2)(A)(iii).

Finally, the evidence presented in *Blais* and *Heiser*, of which the Court has taken judicial notice, is sufficient to establish the plaintiffs' claimed damages "for personal injury . . . that was

Caldwell Decl. ¶ 1 (same); Hedglin Decl. ¶ 1 (same); Jordan Decl. ¶ 1 (same); Ruth Jordan Decl. ¶ 1 (same); Kick Decl. ¶ 1 (same); Brewster Decl. ¶ 1 (same); Hooker Decl. ¶ 1 (same); Johnson Decl. ¶ 1 (same); Jessica Johnson Decl. ¶ 1 (same); Stephen Johnson II Decl. ¶ 1 (same); Ryan Johnson Decl. ¶ 1 (same); Kitis Decl. ¶ 1 (same); Hartman-Kitis Decl. ¶ 1 (same); Lande Decl. ¶ 1 (same); Little Decl. ¶ 1 (same); Marsh Decl. ¶ 1 (same); Minnie Hebert Decl. ¶ 1 (same); Mohammed Decl. ¶ 1 (same); McDonald Decl. ¶ 1 (same); Murphy Decl. ¶ 1 (same); Rusnak Decl. ¶ 1 (same); McEndree Decl. ¶ 1 (same); Scott Miller Decl. ¶ 1 (same); Neldon Decl. ¶ 1 (same); Parker Decl. ¶ 1 (same); Oritz Decl. ¶ 1 (same); Rhode Decl. ¶ 1 (same); Laurie Rhode Decl. ¶ 1 (same); Rozelle Decl. ¶ 1 (same); Stroud Decl. ¶ 1 (same); Sturdivant Decl. ¶ 1 (same); Scott Decl. ¶ 1 (same); Sturgill Decl. ¶ 1 (same); Michael G. Scott Decl. ¶ 1 (same); Michael Scott II Decl. ¶ 1 (same); Jonathan Scott Decl. ¶ 1 (same); Volk Decl. ¶ 1 (same); Sutton Decl. ¶ 1 (same); Thomas Decl. ¶ 1 (same); Margaret Thomas Decl. ¶ 1 (same); Camillia Thomas-Harris Decl. ¶ 1 (same); Cedrick Thomas Decl. ¶ 1 (same); Adrian Thomas Decl. ¶ 1 (same); Siler Decl. ¶ 1 (same); Reid Decl. ¶ 1 (same); Sean Reid Decl. ¶ 1 (same); Shaffer Decl. ¶ 1 (same); Coleman Decl. ¶ 1 (same); Betty Coleman Decl. ¶ 1 (same); Artis Coleman Decl. ¶ 1 (same); Oliver Decl. ¶ 1 (same); Tucker Jr. Decl. ¶ 1 (same); Tucker Sr. Decl. ¶ 1 (same); Schamber Decl. ¶ 1 (same); Schneider Decl. ¶ 1 (same); Martinson Decl. ¶ 1 (same); Kininger Decl. ¶ 1 (same); Castor Decl. ¶ 1 (same); Kenneth Castor Decl. ¶ 1 (same); Nancy Castor Decl. ¶ 1 (same); Washer Decl. ¶ 1 (same); Richards Decl. ¶ 1 (same); Pflaum Decl. ¶ 1 (same); Donna Pflaum Decl. ¶ 1 (same); Huntley Decl. ¶ 1 (same); Roberta Huntley Decl. ¶ 1 (same); Kevin Huntley Decl. ¶ 1 (same); Kyle Huntley Decl. ¶ 1 (same); Vanhorn Decl. ¶ 1 (same); Wyatt Decl. ¶ 1 (same); Zuhoski Decl. ¶ 1 (same); Robinson Decl. ¶ 1 (same); Jay Decl. ¶ 1 (same); Donna Jay Decl. ¶ 1 (same); Robert Jay Decl. ¶ 1 (same); Allen Decl. ¶ 1 (same); Widdis Decl. ¶ 1 (same); Michael Wilson Decl. ¶ 1 (same); Wheeler Decl. ¶ 1 (same); Tracie Wheeler Decl. ¶ 1 (same); Ashlie Wheeler Decl. ¶ 1 (same); Schuchard Decl. ¶ 1 (same); Munoz Decl. ¶ 1 (same); Eilers Decl. ¶ 1 (same); Ritt Decl. ¶ 1 (same); Wright Decl. ¶ 1 (same); Patricia Wright Decl. ¶ 1 (same); Brown Decl. ¶ 1 (same); Erik Wright Decl. ¶ 1 (same); Estate of Hector Manuel Gonzalez-Pastrana Decl. ¶ 1 (same); Diana Gonzalez-Pastrana Decl. ¶ 1 (same); Hector Gonzalez Jr. Decl. ¶ 1 (same); Jose Gonzalez Decl. ¶ 1 (same); Natasha Gonzalez Decl. ¶ 1 (same); Craven Decl. ¶ 1 (same); Tirana Craven Decl. ¶ 1 (same); Verboom Decl. ¶ 1 (same); Wolff Decl. ¶ 1 (same); Yeichner Decl. ¶ 1 (same); Nicholaou Decl. ¶ 1 (same); Noreen Nicholaou Decl. ¶ 1 (same); Frank Decl. ¶ 1 (same); Sonia Frank Decl. ¶ 1 (same); Nathan Frank Decl. ¶ 1 (same); Dana Frank Decl. ¶ 1 (same); Weimer Decl. ¶ 1 (same); Carrizales Decl. ¶ 1 (same); Juanita Carrizales Decl. ¶ 1 (same); Olivia Carrizales Decl. ¶ 1 (same); Sarah Carrizaels Decl. ¶ 1 (same); Sine Decl. ¶ 1 (same); William Sine Decl. ¶ 1 (same); Phillip Miller Decl. ¶ 1 (same); Tiner Decl. ¶ 1 (same); Annie Tiner Decl. ¶ 1 (same); Stacee Tiner Marcum Decl. ¶ 1 (same); Thomas Tiner Decl. ¶ 1 (same); Westrup Decl. ¶ 1 (same); Rebecca Westrup Decl. ¶ 1 (same); Michael Westrup Decl. ¶ 1 (same); Mangnall Decl. ¶ 1 (same); Rollins Decl. ¶ 1 (same); Danielsgale Decl. ¶ 1 (same); Alexander Decl. ¶ 1 (same); Smith Decl. ¶ 1 (same); Jennie Smith Decl. ¶ 1 (same); A'Doria Smith Decl. ¶ 1 (same); Alexandra Smith Decl. ¶ 1 (same); Romarus Smith Decl. ¶ 1 (same); Elliott Williams Decl. ¶ 1 (same); Dana Williams Decl. ¶ 1 (same); Lee Decl. ¶ 1 (same); Chad Williams Decl. ¶ 1 (same); Kelsie Williams Decl. ¶ 1 (same); Joseph Wilson Decl. ¶ 1 (same); Toni Olsen-Wilson Decl. ¶ 1 (same); Brenton Wilson Decl. ¶ 1 (same); Brandon Olsen Decl. ¶ 1 (same); Richard Wilson Decl. ¶ 1 (same); Daryl Wilson Decl. ¶ 1 (same); Estate of Rodney Wilson Decl. ¶ 1 (same); Eric Wilson Decl. ¶ 1 (same); Joe Wilson Decl. ¶ 1 (same); Kevin Williams Decl. ¶ 2 (same); McDermott Decl. ¶ 1 (same); Eric Williams Decl. ¶ 1 (same); DeArman Decl. ¶ 1 (same).

caused by an . . . extrajudicial killing" at the Khobar Towers for which the defendants provided "material support or resources." 28 U.S.C. § 1605A(a)(1). The plaintiffs explain the history of Iran and IRGC and MOIS' support of Hezbollah, Compl. ¶¶ 9–37, and the expert testimony in the *Blais* and *Heiser* litigation, described above, based on the FBI's extensive investigation of the bombing, proves that the defendants "organized and sponsored" the Khobar Towers attack, *Heiser*, 466 F. Supp. 2d at 262. In other words, the evidence shows that the defendants' actions were a "substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant[s'] conduct." *Owens*, 864 F.3d at 794 (internal quotation marks omitted) (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013).

In addition, the Khobar Towers bombing carried out by Saudi Hezbollah, which killed 19 American service members and caused the "personal injur[ies]" suffered by the plaintiffs, was manifestly an extrajudicial killing for which the defendants provided material support, and for which the defendants can be subject to the jurisdiction of this Court. *See Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors."). "[E]xtrajudicial killing" has the "meaning given . . . in section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which, in turn, defines this term to mean "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)). No "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples" could have authorized the truck bomb that

"sheared off the face of Building 131 . . . and reduced most of it to rubble." *Blais*, 459 F. Supp. 2d at 48. Thus, the evidence presented in *Blais* and *Heiser* demonstrates that the plaintiffs' claims arise from an extrajudicial killing for which the defendants provided material support.

Accordingly, the defendants do not enjoy foreign sovereign immunity from the instant suit, pursuant to 28 U.S.C. § 1605A, and subject-matter jurisdiction may be properly exercised pursuant to 28 U.S.C. § 1330(a).

### B. Personal Jurisdiction under the FSIA

The Court next examines whether effective service has been made, as required by 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states. *See* 28 U.S.C. § 1330(b) (providing that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title"). Service may be effected under 28 U.S.C. § 1608 in one of four ways: (1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in accordance with an applicable international convention on service of judicial documents," or, if the first two options are not applicable, (3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or, if service cannot be made under the third option, (4) by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of

the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a).

"The defendants have neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017); Pls.' Mot. For Order Permitting Pls. to Proceed With Service Through Diplomatic Channels ¶¶ 8–9, ECF No. 11, leaving only the latter two forms of service available here. The plaintiffs have used both. The necessary papers were sent via certified mail to the defendants, Certificate of Mailing (Sept. 8, 2017), ECF No. 10, consistent with 28 U.S.C. § 1608(a)(3). The necessary papers were also transmitted via diplomatic channels, Return Serv./Aff., ECF No. 13, consistent with 28 U.S.C. § 1608(a)(4).

Accordingly, the plaintiffs have established that service was properly effected against the defendants and, thus, personal jurisdiction is properly exercised.

## C.     The Defendants' Liability

All the plaintiffs bring a claim under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress. Compl. ¶¶ 153–66 (Counts III–IV). In addition, the 101 service member plaintiffs, each of whom was present at the bombing site, bring a claim for assault and battery, *id.* ¶¶ 146–52 (Counts I–II), seeking compensatory damages for "extreme mental anguish, physical injury, pain and suffering and economic losses," *id.* ¶¶ 149–52. The 118 family member plaintiffs bring a claim for loss of solatium, *id.* ¶¶ 160–66, and the Estate of Hector Manuel Gonzalez-Pastrana, who was a service member, brings a claim of wrongful death, *id.* ¶¶ 167–73, or in the alternative a survival claim, *id.* ¶¶ 174–78. Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United States" or her "legal representative,"

for "personal injury or death caused by . . . that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages." 28 U.S.C. § 1605A(c). Successful plaintiffs may recover damages that "include economic damages, solatium, pain and suffering, and punitive damages." *Id.* [9]

Though Section 1605A(c) provides a private right of action, this statutory provision does not set out any guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014). The availability of these claims for each plaintiff is discussed in detail below.

1.    *Service Member Victims*

The 101 plaintiffs who were members of the U.S. Armed Forces injured in the Khobar Towers bombing—Jimmy Adams, Timothy Albritton, Josephine Alston, Angel Ayala, John Baldwin, Stacey Benfield, Bryan Brock, Mark Broda, Kyle Brown, Shannon Bump, Dwayne Burnham, Rondal Burns, Melinda Caines, Salvatore Capaccio, Shawn Clevenger, Paul Collins, Robbie Cotterman, Rose Davis, Robert DePyssler, Richard Dupree, Thomas Edman, Christopher

---

[9]    The plaintiffs originally sought punitive damages in addition to their compensatory damages, *see* Compl. at 67, but subsequently withdrew this demand for punitive damages, without prejudice, because "'the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A'" in 2008, Pls.' Notice of Voluntary Withdrawal of Punitive Damages Demand Without Prejudice at 1, ECF No. 29 (quoting *Owens v. Rep. of Sudan*, 864 F.3d 751, 812 (D.C. Cir. 2017), *petition for cert. filed*, 2018 WL 1182929 (U.S. Mar. 2, 2018) (No. 17-1236)).

Freeman, Michael Atkins, Jeffrey Gardner, William Giles IV, Michael Goff, Rudolph Grimm, Shawn Hale, Torrey Hardy, Michael Harner, Gregory Hedglin, David Jordan, Patrick Kick, Willard Brewster, Randy Hooker, Stephen Johnson, Steven Kitis, Aaron Lande, Shane Little, Angeline Marsh, Shawn Mohammed, Joe McDonald, Erin Murphy, Michael Rusnak, Matthew McEndree, Scott Miller, Ronald Neldon, Jennifer Parker, Mary Ortiz, Dustin Rhode, Dana Rozelle, Joseph Stroud, Kenneth Sturdivant, Bryan Scott, Brian Volk, Zachary Sutton, Clifford Thomas, Robert Siler, Leighton Reid, Brandie Shaffer, Artis Coleman, Laurence Oliver, Grady Tucker Jr., Jon Schamber, Erich Schneider, Thomas Kininger, Eric Castor, Andrea Richards, Kevin Pflaum, Dusty Huntley, Brian Vanhorn, Travis Wyatt, William Schooley, Selena Zuhoski, Michael Jay, Billy Allen Jr, Douglas Widdis, Michael Wilson, Martin Wheeler, Jereme Schuchard, Brenda Eilers, Mitchell Wright, Hector Gonzalez-Pastrana, Jefferson Craven, Scott Wolff, John Yeichner, George Nicholaou, Larry Frank, Aaron Weimer, Hilario Carrizales, William F. Sine, Phillip Miller, Roland Tiner Jr., David Westrup, Richard Rollins, Deborah Danielsgale, Rodney Smith, Elliott Williams, Joseph Wilson, Kevin Williams, Gregory DeArman—are expressly covered by, and entitled to bring claims under, Section 1605A(c), both as United States citizens and members of the armed services at the time of the attack.[10] *See* 28 U.S.C. §1605A(c) ("A foreign state that is or was a state sponsor of terrorism . . . shall be liable to—(1) a national of the United States, (2) a member of the armed forces, . . . or (4) the legal representative of a person described in paragraph (1), (2), or (3)[.]").

> a. Assault and Battery

---

[10] The Estate of Hector Manuel Gonzalez-Pastrana seeks damages on behalf of service member Hector Gonzalez-Pastrana, who died on March 4, 2017. Decl. of Diana Gonzalez-Pastrana, Personal Representative of the Estate of Hector Manuel Gonzalez-Pastrana ("Estate of Hector Manuel Gonzalez-Pastrana Decl.") ¶ 3, ECF No. 113 (sealed), ECF No. 191 (public).

The defendants are liable for assault as to each of the 101 service members present at Khobar Towers on June 25, 1996, if, when the defendants provided material support to and resources for the attack, they acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" to those attacked, and those attacked were "thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1) (AM. LAW INST. 1977). *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (since "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," where plaintiffs asserted "that they did, in fact, fear such harm because of the attack," Iran may be held liable for assault); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (same). Indeed, "terrorism" is defined to mean "the systematic use of terror especially as a means of coercion." Terrorism, Merriam-Webster Dictionary online, https://www.merriam-webster.com/dictionary/terrorism (last visited Apr. 5, 2019). The defendants are liable for battery if, when they provided material support and resources for the attack, they acted "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact" with those attacked, and "a harmful contact with [those attacked] directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13. "Harmful contact" has occurred where "any physical impairment of the condition of another's body, or physical pain or illness" results. *Id.* § 15.[11]

_____

[11] PTSD, as an "illness," would therefore appear to constitute a "harmful contact" for purposes of establishing battery. This Court, applying District of Columbia law, has reserved the tort of battery for injuries associated with physical contact, and has instead treated trauma without physical contact as an intentional infliction of emotional damages claim. *See Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 275 (D.D.C. 2005) ("To the extent that a battery plaintiff suffered emotional distress that might be seen as caused by something other than the battery itself—for example, the more general trauma associated with being the target of a terrorist bombing—and assuming that such events are dissociable, D.C. law provides plaintiffs with an additional route to recovery for psychological injuries: intentional infliction of emotional distress ('IIED').").

Of the 101 service member plaintiffs, 97 alleged specific physical injury from the attack.[12] Each of the hundred and one plaintiffs injured in the Khobar Towers bombing has, through their sworn declarations, demonstrated either the physical impact, the psychological impact, or a combination of both that the bombing had on them.[13] All service member plaintiffs have submitted corroborating evidence, such as VA letters, medical records, certificates of release from active duty, Purple Heart Awards, and/or declarations from family members, which confirm the service member's service-related injuries.[14] Accordingly, the defendants are liable for assault and battery to these ninety-seven plaintiffs who were physically harmed, and the defendants are additionally liable for assault to the remaining four plaintiffs who did not allege physical harm from the bombing.

### b. Intentional Infliction of Emotional Distress

---

[12] The following four service member plaintiffs claimed mental, but not physical, injury as a result of the terrorist attack: Paul Collins, Brandie Shaffer, Dusty Huntley, and Aaron Weimer. *See generally* Collins Decl.; Shaffer Decl.; Huntley Decl.; Weimer Decl.

[13] *See* Schooley Decl. ¶¶ 4–25; Benfield Decl. ¶¶ 5–15; Brock Decl. ¶¶ 5–8; Broda Decl. ¶¶ 5–15; Bump Decl. ¶¶ 5–12; Burns Decl. ¶¶ 5–17; Dupree Decl. ¶¶ 4–11; Edman Decl. ¶¶ 5–14; Freeman Decl. ¶¶ 4–5; Goff Decl. ¶¶ 4–13; Grimm Decl. ¶¶ 4–11; Hale Decl. ¶¶ 4–12; Hardy Decl. ¶¶ 5–15; Harner Decl. ¶¶ 5–12; Hedglin Decl. ¶¶ 4–9; Jordan Decl. ¶¶ 5–7; Kick Decl. ¶¶ 4–10; Brewster Decl. ¶¶ 4–9; Hooker Decl. ¶¶ 4–14; Johnson Decl. ¶¶ 5–10; Rozelle Decl. ¶¶ 4–13; Stroud Decl. ¶¶ 4–8; Sturdivant Decl. ¶¶ 4–9; Scott Decl. ¶¶ 5–11; Volk Decl. ¶¶ 4–10; Sutton Decl. ¶¶ 4–7; Thomas Decl. ¶¶ 4–7; Siler Decl. ¶¶ 4–11; Reid Decl. ¶¶ 5–9; Shaffer Decl. ¶¶ 4–10; Coleman Decl. ¶¶ 5–20; Oliver Decl. ¶¶ 4–10; Tucker Jr. Decl. ¶¶ 5–9; Schamber Decl. ¶¶ 4–10; Vanhorn Decl. ¶¶ 4–9; Wyatt Decl. ¶¶ 4–9; Schuchard Decl. ¶¶ 5–12; Wright Decl. ¶¶ 5–10; Wolff Decl. ¶¶ 4–15; Yeichner Decl. ¶¶ 4–8; Weimer Decl. ¶¶ 4–6; DeArman Decl. ¶¶ 4–7; Adams Decl. ¶¶ 10–13; Albritton Decl. ¶¶ 4–20; Alston Decl. ¶¶ 4–7; Ayala Decl. ¶¶ 4–19; Clevenger Decl. ¶¶ 4–13; Collins Decl. ¶¶ 4–12; Cotterman Decl. ¶¶ 4–6; Davis Decl. ¶¶ 4–10; DePyssler Decl. ¶¶ 5–10; Mohammed Decl. ¶¶ 4–7; McDonald Decl. ¶¶ 4–9; Murphy Decl. ¶¶ 4–14; Rusnak Decl. ¶¶ 4–13; McEndree Decl. ¶¶ 4–7; Scott Miller Decl. ¶¶ 5–13; Neldon Decl. ¶¶ 4–14; Parker Decl. ¶¶ 4–8; Ortiz Decl. ¶¶ 4–5; Rhode Decl. ¶¶ 5–8; Castor Decl. ¶¶ 5–10; Richards Decl. ¶¶ 5–10; Pflaum Decl. ¶¶ 5–8; Huntley Decl. ¶¶ 5–10; Zuhoski Decl. ¶¶ 5–18; Jay Decl. ¶¶ 5–8; Nicholaou Decl. ¶¶ 4–10; Frank Decl. ¶¶ 5–8; Carrizales Decl. ¶¶ 5–11; Brown Decl. ¶¶ 5–11; Burnham Decl. ¶¶ 5–11; Atkins Decl. ¶¶ 5–14; Gardner Decl. ¶¶ 4–7; Little Decl. ¶¶ 4–12; Marsh Decl. ¶¶ 5–10; Schneider Decl. ¶¶ 5–17; Kininger Decl. ¶¶ 4–7; Craven Decl. ¶¶ 4–10; Sine Decl. ¶¶ 5–12; Lande Decl. ¶¶ 4–8; Allen Decl. ¶¶ 4–18; Eilers Decl. ¶¶ 5–19; Widdis Decl. ¶¶ 4–6; Baldwin Decl. ¶¶ 5–10; Wheeler Decl. ¶¶ 5–11; Caines Decl. ¶¶ 6–9; Michael Wilson Decl. ¶¶ 4–10; Capaccio Decl. ¶¶ 5–12; Kitis Decl. ¶¶ 5–11; Giles IV Decl. ¶¶ 5–8; Phillip Miller Decl. ¶¶ 4–10; Tiner Decl. ¶¶ 5–7; Westrup Decl. ¶¶ 6–13; Rollins Decl. ¶¶ 4–8; Danielsgale Decl. ¶¶ 5–8; Smith Decl. ¶¶ 5–13; Elliott Williams Decl. ¶¶ 5–9; Joseph Wilson Decl. ¶¶ 8–20; Kevin Williams Decl. ¶¶ 6–11; Estate of Hector Manuel Gonzalez-Pastrana Decl. ¶¶ 11–31.

[14] Two service members, Richard Dupree and Christopher Freeman, submitted only their declarations and their Purple Heart Awards, confirming that wounds were incurred on June 25, 1996, the date of the attack. *See* Dupree Decl., Att. (Purple Heart Certificate for Richard Dupree, dated Aug. 26, 1996), ECF No. 49 at 6; Freeman Decl., Att. (Special Order GB-458 awarding the Purple Heart to Christopher Freeman, dated Aug. 5, 1996), ECF No. 51 at 4.

The defendants are liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Heiser II*, 659 F. Supp. 2d at 26). Where the claimants were not the direct target of the "extreme and outrageous conduct," the Restatement permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (leaving "open the possibility of situations in which presence at the time may not be required").

The defendants engaged in conduct that is extreme and outrageous by providing material support and resources to a known terrorist organization. *See*, *e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009))). The 101 service member plaintiffs present at Khobar Towers suffered the severe and serious repercussions of the extreme and outrageous conduct. The service members' declarations demonstrate that the Khobar Towers attack caused extreme emotional distress, and sixty-two of these plaintiffs have been formally diagnosed with PTSD.[15]

---

[15] *See* Schooley Decl. ¶ 20 (noting PTSD diagnosis); Benfield Decl. ¶ 12 (noting PTSD diagnosis); Brock Decl. ¶ 7 (same); Broda Decl. ¶ 13 (same); Bump Decl. ¶ 12 (noting emotional distress caused by the attack); Burns Decl. ¶ 17 (noting PTSD diagnosis); Dupree Decl. ¶¶ 8–11 (noting PTSD-like symptoms); Edman Decl. ¶¶ 12–14 (stating he has never sought treatment for PTSD but suffers from symptoms of the disorder); Goff Decl. ¶¶ 13 (noting PTSD diagnosis); Grimm Decl. ¶ 10 (same); Hale Decl. ¶ 10 (same); Hardy Decl. ¶ 4 (same); Harner Decl. ¶¶ 7 (describing his emotional trauma); Hedglin Decl. ¶ 7 (noting PTSD diagnosis); Jordan Decl. ¶ 7 (same); Kick Decl. ¶ 5 (same); Brewster Decl. ¶¶ 9 (same); Hooker Decl. ¶ 10 (same); Johnson Decl. ¶ 8 (noting General Anxiety Disorder); Rozelle Decl. ¶ 11 (noting PTSD diagnosis); Stroud Decl. ¶¶ 10 (describing his severe depression); Sturdivant Decl. ¶ 8 (noting PTSD diagnosis); Scott Decl. ¶ 10 (same); Volk Decl. ¶ 7 (same); Sutton Decl. ¶ 6 (same); Thomas Decl. ¶ 7 (noting PTSD diagnosis) Siler Decl. ¶ 11 (noting PTSD diagnosis); Reid Decl. ¶ 8 (same); Shaffer Decl. ¶ 10 (describing her Chronic Adjustment Disorder); Coleman Decl. ¶ 17 (noting PTSD diagnosis);

Accordingly, the defendants are liable to the 101 plaintiffs injured at the Khobar Towers bombing for intentional infliction of emotional distress.

### 2. *Victims' Family Members*

The 118 plaintiffs who are immediate family members of service members injured at the Khobar Towers bombing—Carol Adams, Sandra Albritton, Erika Weinfurter, Brittany Alston, Marcus Alston, Fernando Ayala, Zandra Ayala, John Ayala, Bobby Baldwin, Kathy Beach, Bobby Baldwin III, Steven Baldwin, Gloria Brown, Jimmy Brown, Melena Collins, Joan Locke, Pamela Broda, Alycia Broda, Amanda Brown, Valerie Bump, Ralph Burnham, Margaret Burnham, Debra Burnham, Dwight Burnham, Keelan Burnham, Rebekah Burns, Emileigh Ledgerwood, Nickolaus Burns, Alfreda Peak, John Dean, Carmen Dean, Diane Martucci, Robert W. DePyssler, Elizabeth Edman, Patricia Atkins, William Giles III, Connie Love, Tammy Adams, Julia Harner, Nancy Harner, James Harner, Michelle Caldwell, Ruth Jordan, Jessica Johnson, Stephen Johnson II, Ryan Johnson, Geraldine Hartman-Kitis, Minnie Hebert, Laurie

---

Oliver Decl. ¶ 7 (same); Tucker Jr. Decl. ¶ 6 (same); Schamber Decl. ¶ 7 (same); Vanhorn Decl. ¶ 9 (same); Wyatt Decl. ¶ 9 (same); Schuchard Decl. ¶ 12 (same); Wright Decl. ¶ 10 (same); Wolff Decl. ¶ 15 (describing PTSD symptoms); Yeichner Decl. ¶ 6 (noting PTSD diagnosis); Weimer Decl. ¶ 5 (same); DeArman Decl. ¶ 7 (describing his psychological issues); Adams Decl. ¶ 12 (noting his psychological issues); Albritton Decl. ¶ 18 (noting PTSD diagnosis); Alston Decl. ¶¶ 6–7 (describing emotional effects); Ayala Decl. ¶ 17 (noting PTSD diagnosis); Clevenger Decl. ¶¶ 11–14 (describing his emotional injuries); Collins Decl. ¶¶ 9 (noting PTSD diagnosis); Cotterman Decl. ¶ 5 (same); Davis Decl. ¶ 9–10 (same); DePyssler Decl. ¶ 8 (same); Mohammed Decl. ¶ 5 (describing emotional injuries); McDonald Decl. ¶ 9 (noting PTSD diagnosis); Murphy Decl. ¶ 14 (same); Rusnak Decl. ¶ 12 (same); McEndree Decl. ¶ 7 (same); Scott Miller Decl. ¶ 9 (same); Neldon Decl. ¶ 8 (same); Parker Decl. ¶ 8 (same); Ortiz Decl. ¶ 5 (same); Rhode Decl. ¶¶ 8 (describing emotional injuries); Castor Decl. ¶ 10 (noting PTSD diagnosis); Richards Decl. ¶ 15 (same); Pflaum Decl. ¶¶ 7–8 (describing his difficulty sleeping, nightmares, and other emotional trauma); Huntley Decl. ¶ 10 (noting PTSD diagnosis); Zuhoski Decl. ¶ 20 (same); Jay Decl. ¶ 8 (same); Nicholaou Decl. ¶ 8 (same); Frank Decl. ¶ 8 (same); Carrizales Decl. ¶¶ 8–9 (describing his Traumatic Brain Injury and loss of cognitive ability); Brown Decl. ¶ 11 (noting PTSD diagnosis); Burnham Decl. ¶ 11 (same); Atkins Decl. ¶ 15 (same); Gardner Decl. ¶ 6 (describing emotional injuries); Little Decl. ¶¶ 11–12 (noting PTSD diagnosis); Marsh Decl. ¶ 10 (noting PTSD diagnosis); Schneider Decl. ¶ 11 (same); Kininger Decl. ¶ 6 (same); Craven Decl. ¶ 8 (same); Sine Decl. ¶ 10 (describing Traumatic Brain Injury); Lande Decl. ¶ 7 (describing PTSD symptoms); Allen Decl. ¶ 16 (describing emotional stress); Eilers Decl. ¶ 19 (noting PTSD diagnosis); Baldwin Decl. ¶ 7 (same); Wheeler Decl. ¶ 10 (same); Caines Decl. ¶ 8 (same); Michael Wilson Decl. ¶ 3 (same); Capaccio Decl. ¶ 8 (same); Kitis Decl. ¶ 8 (same); Giles IV Decl. ¶ 6 (same); Phillip Miller Decl. ¶ 9 (describing emotional injuries); Tiner Decl. ¶ 7 (noting PTSD diagnosis); Westrup Decl. ¶ 12 (same); Rollins Decl. ¶ 6 (same); Danielsgale Decl. ¶ 6 (same); Smith Decl. ¶ 11 (same); Joseph Wilson Decl. ¶ 21 (same); Kevin Williams Decl. ¶ 9 (same); Elliott Williams Decl. ¶ 8 (noting PTSD diagnosis)

Rhode, Connie Sturgill, Michael G. Scott, Michael Scott II, Jonathan Scott, Margaret Thomas, Camillia Thomas-Harris, Cedrick Thomas, Adrian Thomas, Sean Reid, Betty Coleman, Artis Coleman Jr., Grady Tucker Sr., Diane Martinson, Kenneth Castor, Nancy Castor, Laura Washer, Donna Pflaum, Roberta Huntley, Kevin Huntley, Kyle Huntley, Linda Robinson, Donna Jay, Robert Jay, Tracie Wheeler, Ashlie Wheeler, Brenda Munoz, Rosemary Ritt, Patricia Wright, Elin Brown, Erik Wright, Diana Gonzalez-Pastrana, Hector Gonzalez Jr., Jose Gonzalez, Natasha Gonzalez, Tirana Craven, Jessica Verboom, Noreen Nicholaou, Sonia Frank, Nathan Frank, Dana Frank, Juanita Carrizales, Olivia Carrizales, Sarah Carrizales, William D. Sine, Annie Tiner, Stacee Tiner Marcum, Thomas Tiner, Rebecca Westrup, Michael Westrup, Angelena Mangnall, Msichanna Alexander, Jennie Smith, A'Doria Smith, Alexandra Smith, Romarus Smith, Dana Williams, Erik Lee, Chad Williams, Kelsie Williams, Toni Olsen-Wilson, Brenton Wilson, Brandon Olsen, Richard Wilson, Daryl Wilson, Rodney Wilson, Eric Wilson, Joe Wilson Jr., Lorna McDermott, Eric Williams—were each United States citizens at the time of the attack and therefore are expressly covered by, and entitled to bring claims. *See* 28 U.S.C. § 1605A(c)(1)–(4) (providing a private right of action for United States citizens, members of the armed forces, federal government employees and contractors, and their legal representatives).

Each of these 118 plaintiffs is an immediate family member of a service member injured in the Khobar Towers bombing, but none was present at the time of the attack. In this case, however, the defendants' conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," such that a victim's family members need not have been present to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834); *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt v. Syrian*

*Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012).  Consequently, the defendants are liable

to these 118 family member plaintiffs for intentional infliction of emotional distress caused by

their extreme and outrageous conduct in materially supporting the Khobar Towers attack.

Accordingly, the plaintiffs have established the defendants' liability to the plaintiffs

under the federal private right of action against state sponsors of terrorism, 28 U.S.C. §

1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.  The

damages allowable to the plaintiffs are discussed next.

### D.      Damages

The plaintiffs in this case seek to recover economic, pain and suffering, and solatium

damages to compensate for their own losses.  Damages recoverable on claims of intentional

infliction of emotional distress resulting from harms suffered by family member plaintiffs will be

discussed as claims for solatium damages.  *See, e.g.*, *Fraenkel*, 892 F.3d at 357 (citing *Flanagan

v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015), for the proposition that "a

claim for solatium [i]s nearly indistinguishable from a claim for intentional infliction of

emotional distress" (internal quotation marks omitted)); *Valore*, 700 F. Supp. 2d at 85 ("Under

the FSIA, a solatium claim is indistinguishable from an [intentional infliction of emotional

distress] claim.").  The damage award to which each plaintiff is entitled is described below.

### 1.      *Legal Standard for Damages under Section 1605A(c)*

Congress, in creating a private right of action in Section 1605A(c) for victims of state-

sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for

money damages, including "economic damages, solatium, pain and suffering and punitive

damages."  28 U.S.C. § 1605A(c).  "Upon obtaining a default judgment, successful plaintiffs

may recover damages by proving 'that the projected consequences are reasonably certain (i.e.,

more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)); *see also Roth*, 78 F. Supp. 3d at 402 ("To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotation marks omitted and alteration in original))); *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015) (quoting *Hill*, 328 F.3d at 681). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed *supra* in Part I.B, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were actually the intended consequences of the defendants' material support of Saudi Hezbollah. Consequently, the defendants' conduct in supporting Saudi Hezbollah was likely, and intended, to result in injury and death and to devastate the service members residing in the Khobar Towers and their families. Having concluded that the plaintiffs have proven that "the consequences of the foreign state's conduct were 'reasonably certain' . . . to occur," *Roth*, 78 F. Supp. 3d at 402, the reasonable awards as to each plaintiff for economic loss, pain and suffering, and solatium will be determined next.

### 2.    *Economic Losses and Medical Expenses*

The 101 service member plaintiffs to whom the defendants are liable for assault and battery initially sought to recover for "economic losses."  Compl. at 67.  "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015).  Consequently, where plaintiffs have "failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages," no economic damages may be awarded.  *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016); *see also Akins*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence).  Despite initially requesting economic losses, the plaintiffs subsequently acknowledged that they "have not presented evidence for lost wages or other economic losses and therefore no economic damages may be awarded."  Pls.' Proposed Findings of Fact and Conclusions of Law at 43, ECF No. 145.  Plaintiffs' claim for economic losses and medical expenses is therefore denied.

### 3.    *Pain and Suffering*

As discussed above, the defendants are liable to the 101 service member plaintiffs injured in the Khobar Towers bombing for battery, assault, and the intentional infliction of emotional distress, but in view of the bar on multiple recoveries, the plaintiffs may only recover damages reflecting the single harm underlying these three torts.  *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'" (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980))); *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) ("[A] party 'cannot recover the same damages twice, even though the recovery is based on two different theories.'"

(quoting *Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 34 (5th Cir. 1992))); *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").

The plaintiffs contend in their "uncontroverted . . . affidavits," *Roth*, 78 F. Supp. 3d at 386, that they experienced significant physical and psychological injuries as a result of the attack. "[W]hen assessing damages for surviving victims of terrorist hostilities[,]" the "baseline assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline may be adjusted either upward or downward. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, including partially lost vision and hearing, or were mistaken for dead,' or downward in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84) (citation omitted and alteration adopted). The amount of downward departure from the $5,000,000 baseline is by "an amount of $2–3 million," *Harrison*, 882 F. Supp. 2d at 49.

Awarding damages for pain and suffering is inherently difficult in any context. In the instant case, an objective metric is available for determining the relative degree of injury suffered by each service member plaintiff by using the VA disability rating. The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members "in connection with military service." *See, e.g.*, Benfield Decl., Att. (Letter from VA, dated Feb. 22, 2018), ECF No. 35 at 21 (confirming a "service-connected disability"); Broda Decl., Att. (Letter from VA, dated Dec. 6, 2012), ECF No. 37 at 38 (same).

*Cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007)). Moreover, this approach treats mental and physical injuries as equally capable of causing disability, and therefore equally deserving of compensatory damages, and is preferable to discounting a damage award merely because a service member suffered 'only' mental, but not physical, injuries. *Cf., e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 85 (reducing a service member's damages because he lacked severe physical injuries, even though he "suffered severe emotional injuries"); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d at 49 (same). The VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides a relatively objective measure of comparative injuries among the 101 service member plaintiffs.

Accordingly, the following rubric is adopted for awarding damages in this case: those service member plaintiffs rated by the VA up to 30% disabled, whether due to mental or physical injuries, or a combination of both, will receive a baseline award of $5,000,000 each; those plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000 each; and those service member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000 each.[16] The fourteen injured service

---

[16]     In adopting this approach, the Court need not decide how damages should be awarded to service member plaintiffs who were denied a VA disability rating, but nonetheless claim significant injuries, because none of the plaintiffs in the instant case appear to be so situated.

member plaintiffs who have not been rated as disabled by the VA will be awarded damages based on the severity of their injuries as discernable from their filings.[17]

Forty-seven of the 101 service member plaintiffs have a VA disability rating of 70% or higher: Jimmy Adams, John Baldwin, Stacey Benfield, Rondal Burns, Melinda Caines, Salvatore Capaccio, Paul Collins, Robert DePyssler, Michael Atkin, Rudolph Grimm, Michael Harner, Willard Brewster, Steven Kitis, Angeline Marsh, Joe McDonald, Michael Rusnak, Jennifer Parker, Dana Rozelle, Brian Volk, Clifford Thomas, Brandie Shaffer, Artis Coleman, Laurence Oliver, Grady Tucker, Jon Schamber, Erich Schneider, Thomas Kininger, Andrea Richards, Dusty Huntly, Travis Wyatt, William Schooley, Selena Zuhoski, Michael Jay, Billy Allen Jr., Brenda Eilers, Mitchell Wright, the Estate of Hector Manuel Gonzalez-Pastrana, represented by Diana Gonzalez-Pastrana, Jefferson Craven, George Nicholaou, Larry Frank, Aaron Weimer, William Sine, Phillip Miller, Roland Tiner Jr., Richard Rollins, Rodney Smith, and Kevin Williams. Accordingly, these 47 plaintiffs are each entitled to an upward departure from the baseline award, for a total award to each of $7,000,000 for their pain and suffering as survivors of the bombing.

Twenty-eight of the 101 service member plaintiffs have a VA disability rating of 40–60%: Angel Ayala, Kyle Brown, Dwayne Burnham, Shawn Clevenger, Thomas Edman, William Giles IV, Michael Goff, Shawn Hale, Torrey Hardy, Randy Hooker, Stephen Johnson, Aaron Lande, Erin Murphy, Matthew McEndree, Mary Ortiz, Bryan Scott, Zachary Sutton, Robert Siler, Leighton Reid, Eric Castor, Martin Wheeler, Michael Wilson, Jereme Schuchard, Scott

---

[17] A service member's lack of a VA disability rating does not give rise to an inference that the service member has not been severely injured by the attack, as many service members decline to seek VA disability ratings for other reasons, such as the stigma of receiving a mental health diagnosis. *See, e.g.*, Gardner Decl. ¶ 6, ECF No. 53 (averring that he has not sought treatment for PTSD "because of the stigma that comes with being classified as having a mental illness").

Wolff, John Yeichner, Hilario Carrizales, Elliott Williams, and Gregory Dearman. Accordingly, these 28 plaintiffs are each entitled to an upward departure from the baseline award for a total award to each of $6,000,000 for their pain and suffering as survivors of the bombing.

Twelve of the 101 service member plaintiffs have a VA disability rating of up to 30%: Mark Broda, Rose Davis, Jeffrey Gardner, Gregory Hedglin, Patrick Kick, Shawn Mohammed, Ronald Neldon, Kenneth Sturdivant, Kevin Pflaum, Brian Vanhorn, David Westrup, and Joseph Wilson. Accordingly, these twelve plaintiffs are each entitled to the baseline award of $5,000,000 each for their pain and suffering as survivors of the bombing.

Lastly, fourteen of the 101 injured service member plaintiffs have not received VA disability ratings: Timothy Albritton, Josephine Alston, Bryan Brock, Shannon Bump, Robbie Cotterman, Richard Dupree, Christopher Freeman, David Jordan, Shane Little, Scott Miller, Dustin Rhode, Joseph Stroud, Douglas Widdis, and Deborah Danielsgale. Review of these plaintiffs' "uncontroverted factual allegations" in their affidavits, *Roth*, 78 F. Supp. 3d at 386, and, where available, exhibits, demonstrates that 9 of these 14 service members—Timothy Albritton, Bryan Brock, Robbie Cotterman, Richard Dupree, David Jordan, Shane Little, Scott Miller, Joseph Stroud, and Deborah Danielsgale—each suffered the types of "severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain," *Khaliq*, 33 F. Supp. 3d at 33, *aff'd sub nom. Owens*, 864 F.3d 751, warranting a baseline award of $5,000,000.[18] By contrast, five of these fourteen

---

[18] Albritton Decl. ¶¶ 16, 18 (suffering lacerations from broken glass and PTSD); Brock Decl. ¶¶ 5, 7-8 (suffering lacerations from broken glass, PTSD, and depression); Cotterman Decl. ¶ 5 (suffering lacerations and PTSD); Dupree Decl. ¶¶ 3, 6 (suffering shrapnel wounds, hearing problems, and PTSD); Jordan Decl. ¶¶ 5, 7 (suffering lacerations from broken glass, head trauma, and PTSD); Little Decl. ¶¶ 9, 11 (suffering shrapnel wounds and PTSD); Scott Miller Decl. ¶ 4 (suffering lacerations from broken glass and PTSD); Stroud Decl. ¶¶ 4, 8, 10 (suffering lacerations, shrapnel wounds, severe back pain, and depression); Danielsgale Decl. ¶¶ 5-6 (suffering lacerations from shrapnel and PTSD).

injured service members, Josephine Alston, Shannon Bump, Christopher Freeman, Dustin Rhode, and Douglas Widdis, suffered comparatively minor injuries and will therefore receive a downward departure.[19]  Accordingly, Timothy Albritton, Bryan Brock, Robbie Cotterman, Richard Dupree, David Jordan, Shane Little, Scott Miller, Joseph Stroud, and Deborah Danielsgale are awarded $5,000,000 each, whereas Josephine Alston, Shannon Bump, Christopher Freeman, Dustin Rhode, and Douglas Widdis are awarded $3,000,000 each.

### 4.  *Solatium*

The 118 family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of service member victims.[20]  Compl. at 67.  "District Court judges have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning."  *Fraenkel*, 892 F.3d at 351.  Citing Judge Lamberth's "seminal opinion explaining the origins and particulars of solatium damages"

---

[19]  Alston Decl. ¶¶ 5–7 (suffering lacerations from stepping on glass and mild difficulty sleeping); Bump Decl. ¶¶ 10, 12 (suffering lacerations from flying debris and emotional distress); Freeman Decl. ¶ 5 (suffering lacerations from broken glass, and a concussion); Rhode Decl. ¶¶ 7–8 (suffering lacerations from broken glass and bad dreams); Widdis Decl. ¶ 6 (suffering from shrapnel wounds and head trauma).

[20]  The family members of service members are: Carol Adams, Sandra Albritton, Erika Weinfurter, Brittany Alston, Marcus Alston, Fernando Ayala, Zandra Ayala, John Ayala, Bobby Baldwin, Kathy Beach, Bobby Baldwin III, Steven Baldwin, Gloria Brown, Jimmy Brown, Melena Collins, Joan Locke, Pamela Broda, Alycia Broda, Amanda Brown, Valerie Bump, Ralph Burnham, Margaret Burnham, Debra Burnham, Dwight Burnham, Keelan Burnham, Rebekah Burns, Emileigh Ledgerwood, Nickolaus Burns, Alfreda Peak, John Dean, Carmen Dean, Diane Martucci, Robert DePyssler, Elizabeth Edman, Patricia Atkins, William Giles III, Connie Short, Tammy Adams, Julia Harner, Nancy Harner, James Harner, Michelle Caldwell, Ruth Jordan, Jessica Johnson, Stephen Johnson II, Ryan Johnson, Geraldine Hartman-Kitis, Minnie Herbert, Laurie Rhode, Connie Sturgill, Michael Scott, Michael Scott II, Jonathan Scott, Margaret Thomas, Camillia Thomas-Harris, Cedrick Thomas, Adrian Thomas, Sean Reid, Betty Coleman, Artis Coleman Jr., Grady Tucker, Diane Martinson, Kenneth Castor, Nancy Castor, Laura Washer, Donna Pflaum, Roberta Huntley, Kevin Huntley, Kyle Huntley, Linda Robinson, Donna Jay, Robert Jay, Tracie Wheeler, Ashlie Wheeler, Brenda Munoz, Rosemary Ritt, Patricia Wright, Elin Brown, Erik Wright, Diana Gonzalez-Pastrana, Hector Gonzalez Jr., Jose Gonzalez, Natasha Gonzalez, Tirana Craven, Jessica Verboom, Noreen Nicholaou, Sonia Frank, Nathan Frank, Dana Frank, Juanita Carrizales, Olivia Carrizales, Sarah Carrizales, William Sine, Annie Tiner, Stacee Tiner Marcum, Thomas Tiner, Rebecca Westrup, Angelena Mangnall, Msichanna Alexander, Jennie Smith, A'Doria Smith, Alexandra Smith, Romarus Smith, Dana Williams, Erik Lee, Chad Williams, Kelsie Williams, Toni Olsen-Wilson, Brenton Wilson, Brandon Olsen, Richard Wilson, Daryl Wilson, Rodney Wilson, Eric Wilson, Joe Wilson Jr., Lorna McDermott, Eric Williams

in *Flatow v. Islamic Republic of Iran*, the D.C. Circuit explained that "'[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society,'" and was an award that "'began as a remedy for the loss of a spouse or a parent,'" but is now understood to include the loss of a child or a sibling as well.  *Id.* at 356 (quoting *Flatow*, 999 F. Supp. 1, 29 (D.D.C. 1998)).

Solatium is not, however, reserved for those who have suffered the death of a loved one: "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are valued at half of the awards to family members of the deceased.'"  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (Lamberth, J.) (internal quotation marks omitted) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011) (Lamberth, J.)); *see also Valore*, 700 F. Supp. 2d at 85 (Lamberth, J.) ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."); *Heiser I*, 466 F. Supp. 2d at 269 (Lamberth, J.) ("[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive." (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006) (Lamberth, J.))); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001) (Lamberth, J.), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (awarding a lower sum where the victim "returned alive").

 "Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium."  *Fraenkel*, 892 F.3d at 356–57 (quoting *Flatow*, 999 F. Supp. at 30) (alteration adopted); *see also Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) ("A claim of solatium seeks compensation for the 'mental anguish, bereavement and grief that those with a

close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort.'" (quoting *Belkin*, 667 F. Supp. 2d at 22)). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29. Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and, therefore, this Court has developed a commonly accepted standardized framework, known as the *Heiser* damages framework, for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Though the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("District Court judges invariably must exercise discretion in determining damages awards under the FSIA. There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here in the interest of consistency, especially given that *Heiser* also stemmed from the Khobar Towers bombing. *See also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages).

As a baseline, the *Heiser* framework awards "spouses of deceased victims . . . approximately $8 million, while parents and children received $5 million and siblings received $2.5 million." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). As noted, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim*, 425 F. Supp. 2d at 75). Accordingly, "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are valued at half of the awards to

family members of the deceased,'" *i.e.*, $4,000,000 to spouses of surviving victims, $2,500,000 to parents of surviving victims, *Wultz*, 864 F. Supp. 2d at 39 (internal quotation marks omitted) (citing authorities), and "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014).

These numbers serve only as a baseline from which the Court may deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Oveissi*, 879 F. Supp. 2d at 26.

The 118 family member plaintiffs have each suffered from seeing the effects of the Khobar Towers bombing on their loved ones. In light of the *Heiser* framework, the damages awards for plaintiff spouses are addressed first, followed by parents and children, and then siblings.

*a. Spouses*

Twenty-six of the 118 family member plaintiffs were spouses or fiancés of service member plaintiffs at the time of the attack and have continued in the marriage dealing with the concomitant adverse effects of the 1996 bombing: Carol Adams, Sandra Albritton, Amanda Brown, Valerie Bump, Debra Burnham, Rebekah Burns, Elizabeth Edman, Julia Harner, Ruth Jordan, Jessica Johnson, Geraldine Hartman-Kitis, Margaret Thomas, Betty Coleman, Donna Pflaum, Roberta Huntley, Tracie Wheeler, Patricia Wright, Diana Gonzalez-Pastrana, Tirana Craven, Noreen Nicholaou, Sonia Frank, Juanita Carrizales, Rebecca Westrup, Jennie Smith,

Dana Williams, and Toni Olsen-Wilson.[21]  As described above, each has averred to their fear for their spouses' physical well-being in the immediate aftermath of the attack as they waited for information on the status of their spouses, and the emotional toll of the physical and psychological after-effects of the attack once their spouses returned home.[22]  Accordingly, the spouses are entitled to a baseline award of $4,000,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $4,000,000 as a baseline for the spouses of injured service members).

### b. Parents

Thirty-four of the 118 family member plaintiffs are parents of service members who were stationed at the Khobar Towers at the time of the bombing: Fernando Ayala, Zandra Ayala, Bobby F. Baldwin Jr., Kathy Beach, Gloria Brown, Jimmy Brown, Joan Locke, Pamela Broda, Ralph Burnham, Margaret Burnham, Alfreda Peak, John Dean, Diane Martucci, Robert W. DePyssler, Patricia Atkins, William Giles III, Connie Love, Nancy Harner, James Harner, Minnie Hebert, Laurie Rhode, Connie Sturgill, Michael G. Scott, Grady Tucker Sr., Diane Martinson, Kenneth Castor, Nancy Castor, Linda Robinson, Donna Jay, Robert Jay, Brenda Munoz, Rosemary Ritt, Annie Tiner, Lorna McDermott.  Each has described their fear for their respective children upon learning about the attack, and the ongoing struggle of witnessing, and helping their children cope with, the physical and psychological after-effects of the attack.[23]  The

---

[21]     One of these plaintiffs, Carol Adams, was engaged to a service member plaintiff at the time of the bombing and then married that service member upon his return to the United States.  Carol Adams Decl. ¶¶ 2–3, 5–6.  Carol Adams is treated the same as the other spouses of the service member plaintiffs.

[22]     *See* Carol Adams Decl. ¶¶ 9–13; Sandra Albritton Decl. ¶¶ 5–11; Amanda Brown Decl. ¶¶ 5–10; Valerie Bump Decl. ¶¶ 5–10; Debra Burnham Decl. ¶¶ 5–9; Rebekah Burns Decl. ¶¶ 5–18; Elizabeth Edman Decl. ¶¶ 5–11; Julia Harner Decl. ¶¶ 5–9; Ruth Jordan Decl. ¶¶ 5–7; Jessica Johnson Decl. ¶¶ 5–11; Geraldine Hartman-Kitis Decl. ¶¶ 5–8; Margaret Thomas Decl. ¶¶ 5–8; Betty Coleman Decl. ¶¶ 5–14; Donna Pflaum Decl. ¶¶ 5–7; Roberta Huntley Decl. ¶¶ 5–10; Tracie Wheeler Decl. ¶¶ 5–13; Patricia Wright Decl. ¶¶ 5–18; Diana Gonzalez-Pastrana Decl. ¶¶ 9–37; Tirana Craven Decl. ¶¶ 5–10; Noreen Nicholaou Decl. ¶¶ 5–12; Sonia Frank Decl. ¶¶ 5–14; Juanita Carrizales Decl. ¶¶ 5–10; Rebecca Westrup Decl. ¶¶ 5–15; Jennie Smith Decl. ¶¶ 5–11; Dana Williams Decl. ¶¶ 6–10; Toni Olsen-Wilson Decl. ¶¶ 6–15.

[23]     *See* Fernando Ayala Decl. ¶¶ 5–9; Zandra Ayala Decl. ¶¶ 5–7; Bobby F. Baldwin Jr. Decl. ¶¶ 5–10; Kathy Beach Decl. ¶¶ 5–13; Gloria Brown Decl. ¶¶ 6–14; Jimmy Brown Decl. ¶¶ 5–11; Joan Locke Decl. ¶¶ 5–10; Pamela Broda Decl. ¶¶ 5–8; Ralph Burnham Decl. ¶¶ 5–7; Margaret Burnham Decl. ¶¶ 5–9; Alfreda Peak Decl. ¶¶ 5–8;

harm suffered by each of these plaintiffs is consistent with that suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16. The parents of the injured service members are each entitled to a baseline award of $2,500,000. *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members).

Three of the 34 parents of injured service members, Brenda Munoz, Rosemary Ritt, and Annie Tiner will receive upward departures based on the extraordinary circumstances they endure, living with, and caring for, their injured service member children. Brenda Munoz's injured son, Jereme Schuchard, lives with her "98% of the year," Munoz Decl. ¶ 11, and she cannot "have anyone in [her] house because he frightens them," *id.* ¶ 9. Rosemary Ritt's injured daughter, Brenda Eilers, has moved in with her, Ritt Decl. ¶ 13, and "caregiving for [her] daughter has taken a toll on [her] health," *id.* ¶ 15. Annie Tiner cares for her injured son, Roland Tiner, who lives with her and "is pretty much a recluse," Annie Tiner Decl. ¶ 8, "can only travel short distances, and can only stand for very short periods of time," *id.* Applying an upward departure based on these circumstances, Brenda Munoz, Rosemary Ritt, and Annie Tiner will each receive an additional $1,500,000, for a total of $4,000,000 each.

### c. Children

Thirty-nine of the 118 family member plaintiffs are each children of service member plaintiffs who were injured in the Khobar Towers Attack: Erika Weinfurter, Brittany Alston, Marcus Alston, Dwight Burnham, Keelan Burnham, Emileigh Ledgerwood, Nickolaus Burns, Stephen Johnson II, Ryan Johnson, Camillia Thomas-Harris, Cedrick Thomas, Adrian Thomas,

---

John Dean Decl. ¶¶ 5–7; Diane Martucci Decl. ¶¶ 5–8; Robert W. DePyssler Decl. ¶¶ 5–11; Patricia Atkins Decl. ¶¶ 5–12; William Giles III Decl. ¶¶ 5–9; Love Decl. ¶¶ 5–10; Nancy Harner Decl. ¶¶ 5–9; James Harner Decl. ¶¶ 5–9; Minnie Hebert Decl. ¶¶ 5–7; Laurie Rhode Decl. ¶¶ 4–5; Connie Sturgill Decl. ¶¶ 5–11; Michael G. Scott Decl. ¶¶ 5–7; Tucker Sr. Decl. ¶¶ 5–8; Martinson Decl. ¶¶ 5–11; Kenneth Castor Decl. ¶¶ 5–9; Nancy Castor Decl. ¶¶ 5–10; Robinson Decl. ¶¶ 5–8; Donna Jay Decl. ¶¶ 5–8; Robert Jay Decl. ¶¶ 5–7; Munoz Decl. ¶¶ 5–13; Ritt Decl. ¶¶ 5–15; Annie Tiner Decl. ¶¶ 5–9; McDermott Decl. ¶¶ 5–10.

Sean Reid, Artis Coleman Jr., Kevin Huntley, Kyle Huntley, Ashlie Wheeler, Elin Brown, Erik Wright, Hector Gonzalez Jr., Jose Gonzalez, Natasha Gonzalez, Jessica Verboom, Nathan Frank, Dana Frank, Olivia Carrizales, Sarah Carrizales, William D. Sine, Michael Westrup, Angelena Mangnall, Msichanna Alexander, A'Doria Smith, Alexandra Smith, Romarus Smith, Erik Lee, Chad Williams, Kelsie Williams, Brenton Wilson, Brandon Olsen.  Each has expressed suffering emotional distress and other adverse effects of the impact of the bombing on their family as they were growing up.[24]  The harm suffered by each of these plaintiffs is consistent with that suffered by many children of victims of terrorism, *Valencia*, 774 F. Supp. 2d at 16.  Some of the children were too young at the time of the attack to fully comprehend that their parents had been injured, *see, e.g.*, Marcus Alston Decl. ¶ 5; Keelan Burnham Decl. ¶ 5; Ashlie Wheeler Decl. ¶ 5; Jose Gonzalez Decl. ¶ 5; Sarah Carrizales Decl. ¶ 5; Kelsie Williams Decl. ¶ 6, whereas other children were old enough to understand and experience the horror of the attack.  Differences in children's relative levels of awareness at the time do not alter the losses they experience from growing up with injured parents, and the strain that those injuries put on their families.  In fact, the children who were too young to experience their parent's injury at the time necessarily also had fewer, if any, years with their parents before their parents were injured.  Thus, consistent with the *Heiser* framework, the children of the injured service members are each entitled to an

---

[24]  *See* Erika Weinfurter Decl. ¶¶ 5–9; Brittany Alston Decl. ¶¶ 5–9; Marcus Alston Decl. ¶¶ 5–7, Dwight Burnham Decl. ¶¶ 5–10; Keelan Burnham Decl. ¶¶ 5–8; Emileigh Ledgerwood Decl. ¶¶ 6–10; Nickolaus Burns Decl. ¶¶ 5–26; Stephen Johnson II Decl. ¶¶ 5–7; Ryan Johnson Decl. ¶¶ 5–6; Camillia Thomas-Harris Decl. ¶¶ 5–8; Cedrick Thomas Decl. ¶¶ 5–9; Adrian Thomas Decl. ¶¶ 5–10; Sean Reid Decl. ¶¶ 5–9; Artis Coleman Decl. ¶¶ 5–10; Kevin Huntley Decl. ¶¶ 5–9; Kyle Huntley Decl. ¶¶ 5–9; Ashlie Wheeler Decl. ¶¶ 5–8; Brown Decl. ¶¶ 5–11; Erik Wright Decl. ¶¶ 5–12; Hector Gonzalez Jr. Decl. ¶¶ 5–9; Jose Gonzalez Decl. ¶¶ 5–12; Natasha Gonzalez Decl. ¶¶ 5–11; Verboom Decl. ¶¶ 5–10; Nathan Frank Decl. ¶¶ 5–7; Dana Frank Decl. ¶¶ 5–8; Olivia Carrizales Decl. ¶¶ 5–6; Sarah Carrizales Decl. ¶¶ 5–10; William Sine Decl. ¶¶ 4–6; Michael Westrup Decl. ¶¶ 5–10; Angelena Mangnall Decl. ¶¶ 5–7; Alexander Decl. ¶¶ 5–10; A'Doria Smith Decl. ¶¶ 5–9; Alexandra Smith Decl. ¶¶ 5–7; Romarus Smith Decl. ¶¶ 5–8; Lee Decl. ¶¶ 5–8; Chad Williams Decl. ¶¶ 5–11; Kelsie Williams Decl. ¶¶ 6–8; Brenton Wilson Decl. ¶¶ 8–22; Brandon Olsen Decl. ¶¶ 10–22.

award of $1,500,000.  *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014) (awarding a baseline amount of $1,500,000 to the children of injured service members).

### d.  Siblings

Nineteen of the 118 family member plaintiffs are each siblings of service member plaintiffs who were injured by the Khobar Towers bombing: John Ayala, Bobby Baldwin III, Steven Baldwin, Melena Collins, Alycia Broda, Carmen Dean, Tammy Adams, Michelle Caldwell, Michael Scott II, Jonathan Scott, Laura Washer, Stacee Tiner Marcum, Thomas Tiner, Richard Wilson, Daryl Wilson, Rodney Wilson, Eric Wilson, Joe Wilson Jr., and Eric Williams. Each has described the emotional distress they experienced when they first learned of the bombing and then the struggle of witnessing the psychological after-effects of the attack on their respective siblings. [25]  The harm suffered by each of these plaintiffs is consistent with that suffered by many siblings of victims of terrorism.  *Valencia*, 774 F. Supp. 2d at 16.  Consistent with the *Heiser* framework, the siblings of the injured service members are each entitled to an award of $1,250,000.  *See Akins*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to the siblings of injured service members).

### E.    Interest, Attorneys' Fees, and Costs

The plaintiffs also seek post-judgment interest, attorneys' fees, and costs.  *See* Compl. at 67.  Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152,

---

[25]        *See* John Ayala Decl. ¶¶ 5–8; Bobby Baldwin III Decl. ¶¶ 5–9; Steven Baldwin Decl. ¶¶ 5–9; Melena Collins Decl. ¶¶ 5–11; Alycia Broda Decl. ¶¶ 5–8; Carmen Dean Decl. ¶¶ 5–8; Tammy Adams Decl. ¶¶ 5–8; Caldwell Decl. ¶¶ 5–10; Michael Scott II Decl. ¶¶ 5–9; Jonathan Scott Decl. ¶¶ 5–10; Washer Decl. ¶¶ 5–10; Stacee Tiner Marcum Decl. ¶¶ 5–11; Thomas Tiner Decl. ¶¶ 5–8; Richard Wilson Decl. ¶¶ 7–14; Daryl Wilson Decl. ¶¶ 6–15; Estate of Rodney Wilson Decl. ¶¶ 13–20; Rodney Wilson Decl. ¶ 6-13; Eric Wilson Decl. ¶¶ 5–8; Joe Wilson Decl. ¶¶ 6–12; Eric Williams Decl. ¶¶ 5–9.

165 (D.D.C. 2013). By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment . . . ." 28 U.S.C. § 1961(a). Application of section 1961(a) is mandatory, not discretionary. *See Cont'l Transfert Technique Ltd. V. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165. The Court will therefore award post-judgment interest at the statutory rate.

The plaintiffs also seek attorneys' fees and costs, but because the plaintiffs have not provided any information regarding the fees and costs sought, the request is denied without prejudice. The plaintiffs may file a post-judgment motion for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B), and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1).

## IV.     CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment is granted. Due to their support for Saudi Hezbollah's bombing of the Khobar Towers on June 25, 1996, the defendants are jointly and severally liable for the pain and suffering inflicted on the 101 service member plaintiffs present at Khobar Towers at the time of the bombing, and the emotional distress inflicted on the 118 family member plaintiffs.

The plaintiffs are awarded monetary damages in the following amounts:

- Service member plaintiffs Jimmy Adams, John Baldwin, Stacey Benfield, Rondal Burns, Melinda Caines, Salvatore Capaccio, Paul Collins, Robert DePyssler, Michael Atkins, Rudolph Grimm, Michael Harner, Willard Brewster, Steven Kitis, Angeline Marsh, Joe McDonald, Michael Rusnak, Jennifer Parker, Dana Rozelle, Brian Volk, Clifford Thomas, Brandie Shaffer, Artis Coleman, Laurence Oliver, Grady Tucker Jr., Jon Schamber, Erich

Schneider, Thomas Kininger, Andrea Richards, Dusty Huntley, Travis Wyatt, William Schooley, Selena Zuhoski, Michael Jay, Billy Allen Jr., Brenda Eilers, Mitchell Wright, the Estate of Hector Manuel Gonzalez-Pastrana, represented by Diana Gonzalez-Pastrana, Jefferson Craven, George Nicholaou, Larry Frank, Aaron Weimer, William Sine, Phillip Miller, Roland Tiner Jr., Richard Rollins, Rodney Smith, and Kevin Williams, who each suffered injuries resulting in 70% or higher disability rating, are each entitled to $7,000,000 in pain and suffering damages;

- Service member plaintiffs Angel Ayala, Kyle Brown, Dwayne Burnham, Shawn Clevenger, Thomas Edman, William Giles IV, Michael Goff, Shawn Hale, Torrey Hardy, Randy Hooker, Stephen Johnson, Aaron Lande, Erin Murphy, Matthew McEndree, Mary Ortiz, Bryan Scott, Zachary Sutton, Robert Siler, Leighton Reid, Eric Castor, Martin Wheeler, Michael Wilson, Jereme Schuchard, Scott Wolff, John Yeichner, Hilario Carrizales, Elliott Williams, and Gregory DeArman, who each suffered injuries resulting in 40–60% disability rating, are each entitled to $6,000,000 in pain and suffering damages;

- Service member plaintiffs Mark Broda, Rose Davis, Jeffrey Gardner, Gregory Hedglin, Patrick Kick, Shawn Mohammed, Ronald Neldon, Kenneth Sturdivant, Kevin Pflaum, Brian Vanhorn, David Westrup, and Joseph Wilson, who each suffered injuries resulting in 30% or lower disability rating, are each entitled to $5,000,000 in pain and suffering damages;

- Service member plaintiffs Timothy Albritton, Bryan Brock, Robbie Cotterman, Richard Dupree, David Jordan, Shane Little, Scott Miller, Joseph Stroud, and Deborah Danielsgale, who have no VA disability rating but all suffered severe physical or mental injuries, are each entitled to $5,000,000 in pain and suffering damages;

- Service member plaintiffs Josephine Alston, Christopher Freeman, Shannon Bump, Dustin Rhode, and Douglas Widdis, who have no VA disability rating and sustained comparatively less severe injuries, are each entitled to $3,000,000 in pain and suffering damages;

- Plaintiff spouses Carol Adams, Sandra Albritton, Amanda Brown, Valerie Bump, Debra Burnham, Rebekah Burns, Elizabeth Edman, Julia Harner, Ruth Jordan, Jessica Johnson, Geraldine Hartman-Kitis, Margaret Thomas, Betty Coleman, Donna Pflaum, Rebecca Westrup, Toni Olsen-Wilson, Roberta Huntley, Tracie Wheeler, Patricia Wright, Diana Gonzalez-Pastrana, Tirana Craven, Noreen Nicholaou, Sonia Frank, Juanita Carrizales, Jennie Smith, and Dana Williams, are each entitled to $4,000,000 in solatium damages;

- Plaintiff parents Fernando Ayala, Zandra Ayala, Bobby F. Baldwin Jr., Kathy Beach, Gloria Brown, Jimmy Brown, Joan Locke, Pamela Broda, Ralph Burnham, Margaret Burnham, Alfreda Peak, John Dean, Diane Martucci, Robert W. DePyssler, Patricia Atkins, William Giles III, Connie Love, Nancy Harner, James Harner, Minnie Hebert, Laurie Rhode, Connie Sturgill, Michael G. Scott, Grady Tucker Sr., Diane Martinson, Kenneth Castor, Nancy Castor, Linda Robinson, Donna Jay, Robert Jay, and Lorna McDermott, are each entitled to $2,500,000 in solatium damages;

- Plaintiff parents Brenda Munoz, Rosemary Ritt, and Annie Tiner, are each entitled to $4,000,000 in solatium damages;

- Plaintiff children Erika Weinfurter, Brittany Alston, Marcus Alston, Dwight Burnham, Keelan Burnham, Emileigh Ledgerwood, Nickolaus Burns, Stephen Johnson II, Ryan Johnson, Camillia Thomas-Harris, Cedrick Thomas, Adrian Thomas, Sean Reid, Artis Coleman Jr., Kevin Huntley, Kyle Huntley, Ashlie Wheeler, Elin Brown, Erik Wright, Hector Gonzalez Jr., Jose Gonzalez, Natasha Gonzalez, Jessica Verboom, Nathan Frank,

Dana Frank, Olivia Carrizales, Sarah Carrizales, William D. Sine, Michael Westrup, Angelena Mangnall, Msichanna Alexander, A'Doria Smith, Alexandra Smith, Romarus Smith, Erik Lee, Chad Williams, Kelsie Williams, Brenton Wilson, and Brandon Olsen, are each entitled to $1,500,000 in solatium damages;

- Plaintiff siblings John Ayala, Bobby Baldwin III, Steven Baldwin, Melena Collins, Alycia Broda, Carmen Dean, Tammy Adams, Michelle Caldwell, Michael Scott II, Jonathan Scott, Laura Washer, Stacee Tiner Marcum, Thomas Tiner, Richard Wilson, Daryl Wilson, Estate of Rodney Wilson, represented by Daryl Wilson, Eric Wilson, Joe Wilson Jr., and Eric Williams are each entitled to $1,250,000 in solatium damages.

Thus, the total damages award is $892,750,000.

An appropriate Order accompanies this Memorandum Opinion.


Date: June 27, 2019


_____
BERYL A. HOWELL
Chief Judge